**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MAISON KITSUNE, INC.,

                    Plaintiff,

    -against-

VINOD KASTURI,

                    Defendant.

VINOD KASTURI,

                Counterclaimant and
                Third-Party Plaintiff,

    -against-

MAISON KITSUNE, INC., and KITSUNE
CREATIVE SAS,

                Counterclaim and Third-
                Party Defendants.

Case No. 1:24-cv-04431-ALC

**ANSWER WITH**
**AFFIRMATIVE DEFENSES,**
**COUNTERCLAIMS, AND**
**THIRD-PARTY COMPLAINT**

Defendant/Counterclaimant and Third-Party Plaintiff Vinod Kasturi ("Defendant" or "Counterclaim and Third-Party Plaintiff" or "Kasturi") by and through his counsel Cole Schotz P.C., hereby answers the Complaint of Plaintiff and Counterclaim Defendant Maison Kitsune, Inc. ("Plaintiff" or "Kitsune America"), and states as follows:

## AS TO THE NATURE OF THE CASE[1]

1.    Other than to admit he was employed as an officer of Kitsune America between September 5, 2016 and March 28, 2024, Kasturi denies the allegations contained in Paragraph 1 of the Complaint.

---

[1] Defendant has incorporated the same headings contained in the Complaint for ease of reference. Defendant denies any allegations contained in the headings.

68201/0001-48381283

<u>**AS TO THE PARTIES**</u>

2.      Kasturi admits the allegations contained in Paragraph 2 of the Complaint.

3.      Kasturi admits that he is an individual who, at substantially all of the relevant times, was a resident of the State of New York, County of New York. Kasturi further admits that from September 1, 2016 through March 28, 2024 he was variously employed by Plaintiff, on either a full-time or part-time basis, as its Chief Executive Officer, President, and/or Treasurer. Kasturi further admits that he is currently a resident of the State of California, County of Los Angeles, City of Los Angeles.  Kasturi denies the remainder of the allegations.

<u>**AS TO JURISDICTION, VENUE, AND STANDING**</u>

4.      Paragraph 4 of the Complaint states a legal conclusion as to which no response is required. To the extent there are any factual allegations requiring a response, same are denied.

5.      Paragraph 5 of the Complaint states a legal conclusion as to which no response is required. To the extent there are any factual allegations requiring a response, same are denied.

6.      Paragraph 6 of the Complaint states a legal conclusion as to which no response is required. To the extent there are any factual allegations requiring a response, same are denied.

<u>**AS TO THE PURPORTED FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS**</u>

**Defendant's Alleged Work History with Plaintiff and Related Entities**

7.      Kasturi denies the allegations contained in Paragraph 7 of the Complaint

8.      Kasturi lacks sufficient knowledge or information to form a belief about the truth of the allegations in Paragraph 8 of the Complaint and leaves Kitsune America to its proofs.

9.      Kasturi lacks sufficient knowledge or information to form a belief about the truth of the allegations in Paragraph 9 of the Complaint and leaves Kitsune America to its proofs.

68201/0001-48381283

10. Kasturi lacks sufficient knowledge or information to form a belief about the truth of the allegations in Paragraph 10 of the Complaint and leaves Kitsune America to its proofs.

11. Kasturi lacks sufficient knowledge or information to form a belief about the truth of the allegations in Paragraph 11 of the Complaint and leaves Kitsune America to its proofs.

**Defendant's Alleged Overpayment**

12. Kasturi denies the allegations contained in Paragraph 12 of the Complaint.

13. Kasturi denies the allegations contained in Paragraph 13 of the Complaint.

14. Kasturi denies the allegations contained in Paragraph 14 of the Complaint.

15. Kasturi denies the allegations contained in Paragraph 15 of the Complaint.

16. Kasturi denies the allegations contained in Paragraph 16 of the Complaint.

17. Kasturi denies the allegations contained in Paragraph 17 of the Complaint.

18. Kasturi denies the allegations contained in Paragraph 18 of the Complaint.

19. Kasturi denies the allegations contained in Paragraph 19 of the Complaint.

**Defendant's Alleged Use of Plaintiff's Corporate Assets for Personal Use**

20. Kasturi respectfully refers the Court to the invoices cited in Paragraph 20 of the Complaint for a true and accurate recitation of their contents. To the extent the contents of the invoices differ from the description set forth in Paragraph 20 of the Complaint, the allegations are denied.

21. Kasturi denies the allegations contained in Paragraph 21 of the Complaint.

22. Kasturi denies the allegations contained in Paragraph 22 of the Complaint.

23. Kasturi denies the allegations contained in Paragraph 23 of the Complaint.

24. Kasturi denies the allegations contained in Paragraph 24 of the Complaint.

25. Kasturi denies the allegations contained in Paragraph 25 of the Complaint.

26.     Kasturi denies the allegations contained in Paragraph 26 of the Complaint.

### AS TO THE FIRST CAUSE OF ACTION
### (BREACH OF FIDUCAIRY DUTY)

27.     Kasturi repeats and realleges his answers to the allegations in the preceding paragraphs of the Complaint as if fully stated herein.

28.     Kasturi admits that he was, at various times, Chief Executive Officer and President of Plaintiff. Kasturi admits that he served as Treasurer for a transitional period (during Kitsune America's change in CFO and retaining a new accounting firm to provide that same function). The remainder of the allegations set forth in Paragraph 28 call for a legal conclusion to which no response is required.  To the extent a response is required, Kasturi denies the remainder of the allegations.

29.     Paragraph 29 of the Complaint states a legal conclusion as to which no response is required. To the extent a response is required, Kasturi denies the allegations.

30.     Paragraph 30 of the Complaint states a legal conclusion as to which no response is required. To the extent a response is required, Kasturi denies the allegations.

31.     Kasturi denies the allegations contained in Paragraph 31 of the Complaint.

### AS TO THE SECOND CAUSE OF ACTION
### (CONVERSION)

32.     Kasturi repeats and realleges his answers to the allegations in the preceding paragraphs of the Complaint as if fully stated herein.

33.     Kasturi lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 33 of the Complaint and leaves Plaintiff to its proofs thereon.

34.     Paragraph 34 of the Complaint states a legal conclusion as to which no response is required. To the extent a response is required, Kasturi denies the allegations.

35.     Kasturi denies the allegations contained in Paragraph 35 of the Complaint.

4

68201/0001-48381283

36.     Kasturi denies the allegations contained in Paragraph 36 of the Complaint.

37.     Paragraph 37 of the Complaint states a legal conclusion as to which no response is required. To the extent a response is required, Kasturi denies the allegations.

38.     Kasturi denies the allegations contained in Paragraph 38 of the Complaint.

39.     Kasturi denies the allegations contained in Paragraph 39 of the Complaint.

40.     Kasturi denies the allegations contained in Paragraph 40 of the Complaint.

**AS TO THE THIRD CAUSE OF ACTION**
**(BREACH OF CONTRACT)**

41.     Kasturi repeats and realleges his answers to the allegations in the preceding paragraphs of the Complaint as if fully stated herein.

42.     Kasturi respectfully refers the Court to the emails comprising the Agreement cited in Paragraph 42 of the Complaint for a true and accurate recitation of their contents.  To the extent the contents of the emails differ from the description set forth in Paragraph 42 of the Complaint, the allegations are denied.  Further, to the extent the allegations set forth in Paragraph 42 call for a legal conclusion, no response is required.  To the extent a response is required Kasturi denies the allegations.

43.     Kasturi respectfully refers the Court to the emails comprising the Agreement cited in Paragraph 43 of the Complaint for a true and accurate recitation of their contents.  To the extent the contents of the emails differ from the description set forth in Paragraph 43 of the Complaint, the allegations are denied.  Further, to the extent the allegations set forth in Paragraph 43 call for a legal conclusion, no response is required.  To the extent a response is required Kasturi denies the allegations..

44.     Kasturi denies the allegations contained in Paragraph 44 of the Complaint.

45.     Kasturi denies the allegations contained in Paragraph 45 of the Complaint.

68201/0001-48381283

46.    Kasturi denies the allegations contained in Paragraph 46 of the Complaint.

## AS TO THE FOURTH CAUSE OF ACTION
## (UNJUST ENRICHMENT)

47.    Kasturi repeats and realleges his answers to the allegations in the preceding paragraphs of the Complaint as if fully stated herein.

48.    Kasturi denies the allegations contained in Paragraph 48 of the Complaint.

49.    Kasturi denies the allegations contained in Paragraph 49 of the Complaint.

50.    Kasturi denies the allegations contained in Paragraph 50 of the Complaint.

51.    Kasturi denies the allegations contained in Paragraph 51 of the Complaint.

52.    Kasturi denies the allegations contained in Paragraph 52 of the Complaint.

## PRAYER FOR RELIEF

Kasturi denies the allegations set forth in the WHEREFORE clause and its subparts and denies that Plaintiff is entitled to any of the relief sought therein.  Instead, Kasturi respectfully submits he is entitled to judgment in his favor dismissing each count of Plaintiff's complaint in its entirety.

## AFFIRMATIVE DEFENSES

1.    As and for a first affirmative defense, Plaintiff fails to state any claim upon which relief can be granted.

2.    As and for a second affirmative defense, Plaintiff's claims are barred, in whole or in part, by res judicata, collateral estoppel, and/or the law of the case doctrine.

3.    As and for a third affirmative defense, Plaintiff's claims are barred because Plaintiff suffered no damages as a result of any claims asserted.

4.    As and for a fourth affirmative defense, Plaintiff's claims are barred, in whole or in part, by Plaintiff's unclean hands and bad faith.

68201/0001-48381283

5. As and for a fifth affirmative defense, Plaintiff's claims are barred, in whole or in part, because Plaintiff failed to make reasonable efforts to mitigate its alleged injury or damages that would have prevented all or part of any such alleged injury or damages.

6. As and for a sixth affirmative defense, Plaintiff's claims against Defendant are barred, in whole or in part, because any relief or recovery would unjustly enrich or constitute a windfall to Plaintiff.

7. As and for a seventh affirmative defense, Plaintiff's claims are time-barred, in whole or in part, including by applicable statutes of limitation or the doctrine of laches.

8. As and for an eighth affirmative defense, Plaintiff's claims are barred, in whole or in part, because Plaintiff seeks a remedy (or remedies) that is (are) not available to it.

9. As and for a ninth affirmative defense, Plaintiff's claims are barred, in whole or in part, by virtue of the express terms of the relevant agreements between the parties.

10. As and for a tenth affirmative defense, Plaintiff's claims are barred, in whole or in part, because Defendant took all actions in good faith.

11. As and for an eleventh affirmative defense, Plaintiff's claims are barred, in whole or in part, by an accord and satisfaction.

12. As and for a twelfth affirmative defense, Plaintiff's claims are barred, in whole or in part, by the doctrines of setoff and/or recoupment.

13. As and for a thirteenth affirmative defense, Plaintiff's claims are barred, in whole or in part, by the doctrines of waiver and/or estoppel.

14. As and for a fourteenth affirmative defense, Plaintiff's claims are barred, in whole or in part, by virtue of its equitable fraud against Kasturi.

7

68201/0001-48381283

15.     Kasturi reserves the right to raise additional and other affirmative defenses as may be or as may become applicable to the claims as his investigation and discovery continue.

## COUNTERCLAIMS/THIRD-PARTY COMPLAINT

## INTRODUCTION

1.     Through this action Kasturi seeks compensation that remains due and owing to him as a result of his over seven years of diligent employment.  That compensation includes an approximately 1.75% equity interest in Third-Party Defendant Kitsune Creative SAS ("Kitsune Parent"), as well as past due salary and bonus compensation.

2.     In 2016 Kasturi left a lucrative finance and media career to become the Chief Executive Officer and Head of Kitsune America, a position which offered reduced salary and bonus compensation.  He did so based on the explicit, written agreement with Counterclaim Defendant Kitsune America and Third-Party Defendant Kitsune Parent (collectively, "Kitsune Defendants"), which promised that Kasturi would receive a specific grant of 1.5% equity in the Kitsune Parent (vesting 0.5% per year over the first three years of his employment) and annual bonus compensation.

3.     The situation here is straightforward— Kitsune America was looking for an American-based employee to run its American operations. In exchange for these services in America, Kitsune America offered Kasturi equity in the Kitsune Parent, which happens to be located in France. Kasturi had and has no other business or employment connection to France.

4.     Kasturi served as Chief Executive Officer and Head of Kitsune America for over seven years, growing Kitsune Defendants' American business, and in turn their global business, across multiple new business lines and contributing substantially to Kitsune Parent's increased level of brand awareness, revenues and profitability in this period.

68201/0001-48381283

5.      While Kasturi was hard at work building Kitsune America and growing Kitsune Defendants' global brand, Kitsune Defendants repeatedly acknowledged, validated, and expressed their intention to fulfill their contractual obligation and issue the equity stake Kasturi bargained for prior to commencing his employment in 2016. In fact, at one point Kitsune Defendants even agreed to increase the equity grant to 3% in the Kitsune Parent – after the 1.5% originally agreed to was fully vested, together with an additional 1.5% (vesting 0.5% per year over the second three years of his employment). But, with the benefit of hindsight, Kitsune Defendants would never fulfill their promises or honor their obligations.

6.      Management frequently delayed communication, authorization and payment of portions of Kasturi's compensation. In some cases, Kitsune Defendants paid Kasturi's compensation weeks, months or even years after it was earned. Kasturi attributed this conduct to the laissez-faire management style of the Kitsune Defendants generally, and the Managing Director of Kitsune Parent's well-known lack of responsiveness specifically, coupled with the typical cash flow fluctuations often experienced in start-up, growth-oriented companies.

7.      Kasturi believed the delay of the Kitsune Defendants to execute on the administrative step of documenting the agreed-upon equity grant was yet another example of their typical behavior and trusted that the Kitsune Defendants would honor the parties' contract, and all of their representations confirmed this expectation. As a result, Kasturi exercised patience in the face of Kitsune Defendants' delays, while continuing to perform his duties as head of Kitsune America and remaining committed to building Kitsune Defendants' business lines.

8.      After more than six years of dedicated service, in March 2023, Kasturi informed Kitsune Defendants that he had received an offer to lead a new fashion brand, which he was inclined to accept. However, rather than simply resigning, Kasturi agreed to diligently manage the

9

transition period, providing the Kitsune Defendants with ample time – a full year – to organize the changeover.  The parties agreed that Kasturi would formally cease being an employee of Kitsune on March 31, 2024, a Sunday, making his last day of work March 29, 2024.

9.    Throughout his lengthy transition period, Kasturi was characteristically diligent, thorough, and effective in completing his transitionary duties for Kitsune America. Kasturi was thus surprised when, in January 2024, Kitsune Defendants revealed for the first time their intention to deprive Kasturi of the equity they were contractually obligated to provide, and which was fundamental to Kasturi's decision to accept employment with Kitsune America so many years before.

10.    When Kasturi insisted the Kitsune Defendants honor the parties' agreement regarding the equity grants and fulfill all unpaid compensation, the Kitsune Defendants, without any discussion or warning, abruptly terminated Kasturi after the close of business on March 28, 2024, just hours before his scheduled, voluntary, and negotiated departure.  The allegations set forth in the Complaint in this action are nothing more than a blatantly false pretext for this termination.  The Kitsune Defendants, desperate to avoid their obligations to justly compensate Kasturi for his work, and after receiving demand, and a draft complaint from Kasturi, rushed to commence a campaign of pretextual litigation to evade their responsibilities.

## THE PARTIES

11.    Counterclaim and Third-Party Plaintiff Vinod Kasturi is an individual and citizen of the State of California with residence at 1720 South Los Robles Avenue, Los Angeles, California.  Kasturi served as Chief Executive Officer of Counterclaim Defendant Kitsune America from September 2016 through March 2024.

10

68201/0001-48381283

12. Counterclaim Defendant Kitsune America is a company incorporated under the laws of New York with its principal place of business located at 248 Lafayette Street, New York, New York.

13. Third-Party Defendant Kitsune Parent is a limited liability company organized by shares under the laws of France. Kitsune Parent is a global lifestyle brand comprised of a clothing, footwear, personal care & accessories line (Maison Kitsuné), specialty coffee & hospitality division (Café Kitsuné), and a music label business (Kitsuné Musique).

## JURISDICTION

14. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332(a) and 28 U.S.C. §1367 because: (i) Counterclaim and Third-Party Plaintiff is a citizen of California; (ii) Counterclaim Defendant Kitsune America is a citizen of New York; (iii) Third-Party Defendant Kitsune Parent is a foreign party with no U.S. domicile; and (iv) the amount in controversy exceeds $75,000.

15. This Court has personal jurisdiction over Counterclaim Defendant Kitsune America because it is incorporated and headquartered in New York State.

16. This Court has personal jurisdiction over Third-Party Defendant Kitsune Parent under N.Y. C.P.L.R. § 302(a)(1) because it "transacts business within the state or contracts anywhere to supply goods or services in the state." Third-Party Defendant Kitsune Parent willingly hired and contracted with Counterclaim and Third-Party Plaintiff in New York State and employed Counterclaim and Third-Party Plaintiff within the state. The exercise of personal jurisdiction over Kitsune Defendants is consistent with the Due Process clauses of the Fifth and Fourteenth Amendments to the U.S. Constitution.

68201/0001-48381283

17.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because Kitsune America is headquartered in this district and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## FACTS COMMON TO ALL COUNTS

### Kasturi Meets Kitsune Defendants' Co-Founder and Provides Complimentary Consulting Services

18.     In or around February 2015, Kasturi met Gildas Loaec, Kitsune Parent's co-founder and Chief Executive Officer ("Loaec").  At the time, Kasturi had a burgeoning career in finance with a media-focused private equity fund with over $500 million under management.

19.     Before 2015, Kitsune Defendants had limited indirect operations in North America, with Kitsune Parent working through a United States based third-party distributor, but they were seeking opportunities to raise additional capital and expand business independently in the United States.

20.     Between 2015 and 2016, Kasturi, who was passionate about the multi-faceted Maison Kitsune brand (which spans music, fashion, art and hospitality endeavors), and Kitsune Defendants developed a working relationship. Specifically, Kasturi began consulting with Loaec regarding Kitsune Defendants' anticipated capital infusion, restructuring, and expansion in the North American market.

21.     Kasturi's consulting work for the Kitsune Defendants was performed *gratis*, driven by his strong belief in the incredible potential of the Maison Kitsune brand and his desire to contribute to its success.

22.     In fact, Kasturi was so committed to the Maison Kitsune brand that a major factor in his decision to leave his private equity firm for a role as a business development executive at the music video company, Vevo, was the opportunity it provided to devote more time to continue

his 'passion project' with the Kitsune Defendants. Kasturi also enjoyed a competitive compensation package, including an equity package, with his then-new employer.

23.    Kasturi continued to provide Loaec with business feedback, insights, and substantial consulting work, without compensation, for nearly a year between February 2015 and February 2016. For example, Kasturi provided valuation analyses, advised Kitsune Parent on potential international investors, assisted it in negotiations with its U.S.-based distributor, and provided consultation on North American-focused brand and marketing strategies.

24.    On or about February 25, 2016, Loaec contacted Kasturi and expressed Kitsune Defendants' interest in hiring Kasturi as "the head" of Kitsune America. Loaec asked Kasturi, "What would be the ideal time you would need to terminate your job at Vevo" and wrote, "I feel [it] would be great to have a chance for Maison [K]itsune to collaborate with [you] in the States."

25.    Kasturi replied positively to Loaec's interest, writing: "I am still very interested in joining the Kitsune team as Head of [Kitsune America]. As we have discussed, I am constantly thinking about ways to grow the company's presence in the US & Canada, and think I bring unique passion and skill to the table." Kasturi continued, "I know things have been moving faster than anticipated, and as I mentioned last year in NY, my initial plan was to finish at least one year at Vevo (ending in June), so I need to spend some time thinking through my own priorities and responsibilities."

26.    Kasturi then asked Loaec to provide an "ideal timeline" for terminating his employment at Vevo and commencing full-time employment with Kitsune Defendants. Kasturi also asked for additional details on the "job responsibilities" and "compensation/benefits." Kasturi noted that he was "[v]ery excited to continue the conversation" regarding the opportunity to join Kitsune Defendants as the head of Kitsune America.

13

**The Parties Negotiate and Enter into an**
**Agreement Regarding Kasturi's Employment**

27.     On or about March 7, 2016, Audrey Castel Oster, Managing Director of Kitsune Parent ("Oster"), contacted Kasturi by email regarding his potential employment with Kitsune America. Oster asked Kasturi to provide information, including: (1) the salary level he had in mind; (2) an explanation of the salary system in the U.S.; and (3) additional expected costs associated with Kasturi's employment.

28.     In the same email, Oster provided a detailed description of the role and responsibilities for the position as "Head of Maison Kitsuné USA/CANADA," which included reopening and operating Kitsune's American operations at Maison Kitsune Inc. and Kitsune Music Inc. (together, the "American Operations"). This would require Kasturi to serve as the focal point for all American Operations, including through modeling expected profits and losses, developing performance objectives, recruiting and building the management team, and overseeing administrative matters.

29.     From the outset of the parties' negotiations, Kasturi made clear that an equity interest in the Kitsune Parent was of paramount importance to his decision of whether to leave his current employer, and an express condition for him to commence full-time employment with Kitsune America.  Kasturi was not willing to leave a position of employment that included equity as part of his compensation package unless he could similarly secure an ownership stake in the Maison Kitsune brand, which he was deeply passionate about developing.  Having already provided over a year of unpaid consulting services, Kasturi wanted to feel truly invested in the Maison Kitsune brand and to have the opportunity to directly benefit from the value his 'sweat' investment would create.

30.     Kasturi responded to Oster's inquiries regarding his expectations on compensation, proposing: "$200K salary plus 3% equity (based on market comps); reimbursement for travel and other business-related expenses."

31.     On or about March 15, 2016, Loaec responded to Kasturi's email regarding his proposal on salary and compensation with a series of questions, including whether the 3% equity Kasturi outlined would be in Kitsune America or Kitsune Parent.

32.     On or about March 16, 2016, Kasturi replied to Loaec's inquiries. On the question of whether the 3% equity included in Kasturi's compensation proposal referred to equity in Kitsune America, Kasturi responded: "My proposal is for the equity at the corporate-level; Growth in the US & Canada business will benefit Kitsune globally, and the other way around too . . . In my mind, we are one team, and carving out America would be counterproductive." Kasturi continued, "As I will be working in a capacity that directly affects the revenue of the company, equity is a powerful motivating force, and provides incentive to be even more invested in the future success of the company." Kasturi also noted, "[a]s reference, my current job at Vevo includes salary, annual bonus and equity compensation."

33.     On or about March 18, 2016, Oster responded by email, thanking Kasturi for the additional information and stating, "We can't answer right now on your offer." Oster further noted that Kasturi's proposed salary-level was high in comparison to the company's current salary ranges and wrote, "[w]e are now exploring ideas of other possible compensations, and will come back to you shortly with a more precise feedback." Oster then thanked Kasturi for offering to help Kitsune Defendants build the "P&L for US/Canada" during his free time and indicated Kitsune Parent's interest in moving forward with this pre-employment P&L collaboration.

15

34.    On or about March 19, 2016, Kasturi emailed Oster noting, "I am open to discussing, and look forward to reviewing your more specific feedback and ideas about alternative compensation structures." Kasturi also offered that they could "make progress on this in parallel to working on the P&L."

35.    Between mid-March and early July 2016, Kasturi continued to provide complimentary consulting work to Kitsune Defendants, including, for example, working on a forecasted P&L structure for the American Operations, and reviewing historical financials and key performance indicators regarding Kitsune Defendants' U.S. distribution.

36.    On or about July 5, 2016, Oster reached out to Kasturi with a detailed offer of employment, including compensation terms. Oster wrote, "We've considered your offer and come back with a counter-offer. . . ." The Kitsune Defendants' July 5 offer included "$100K salary" and "$25K extra bonus paid yearly, upon achievement of agreed performance objectives." Kitsune Defendants' written offer of compensation further provided:

> **[W]e can offer a system of equity warrants in Kitsuné Creative…**
>
> **We had in mind:**
> **\* 0,5 [0.5%] after 1 year of activity with [Kitsune America]**
> **\*0,5 [0.5%] after 2 years of activity with [Kitsune America]**
> **\*0,5 [0.5%] after 3 years of activity with [Kitsune America]**
>
> This offer will be detailed and formalized by our lawyer M. Fouter in cc, and will be set up at the occasion of fundraising which may happen soon (I will update you about this in a separate email).

(emphases added). Oster continued, stating that Kitsune Defendants' July 5 offer also included "reimbursement for travel and other business-related expenses, in the limit of a yearly agreed budget" and "health insurance," and provided an expected start date of September 1, 2016.

16

37.     On or about July 8, 2016, Kasturi responded to Kitsune Defendants' offer of July 5. Kasturi wrote:

> **Before I can accept**, I would like to discuss the compensation terms. The current salary offer of $100k is a meaningful reduction from my initial proposal of $200K – which I based on my experience, research on comparable [General Manager] salaries and the extensive responsibilities for the role. I completely understand the need to maintain general alignment with Kitsuné France salaries, but I would like to see if we can come to a compromise at $150K. . . . If you can see to making this **improvement to your offer**, I know my performance will show a strong return.

(emphases added).

38.     On or about the same day, Oster responded to Kasturi confirming that Kitsune Defendants agreed to a salary of $150,000 for Kasturi's offer of employment at Kitsune America. Oster wrote, "After discussing with Gildas [Loaec], we'd be OK to upgrade our offer to $150K. **The whole other conditions stay as below** [referring to Oster's July 5 email]." The conditions "below" included the equity grant specifically detailed in Oster's July 5 email. Eliminating any question whether the 1.5% equity grant was included, Oster further provided in her July 8 email, "We are offering you having the equity warrants set up at the occasion of fundraising, ***but this offer is binding and not subjected to fundraising***." (emphases added).

39.     Accordingly, on or about July 8, 2016, Kitsune Defendants had made Kasturi a written offer for full-time employment as head of Kitsune America (the "July 2016 Offer") on the following specific terms: (1) a base salary of $150,000; (2) annual bonuses of $25,000; (3) a grant of equity warrants totaling a 1.5% interest in Kitsune Parent, which would vest over the course of three years, with 0.5% vesting at the end of each of Kasturi's first three years of employment at Kitsune America (the "Initial Equity Grant"); (4) reimbursement for travel and other business-

related expenses within an agreed-upon annual budget; (5) health insurance coverage; and (6) a start date of September 1, 2016.

40.     On or about July 8, 2016, Kasturi formally accepted Kitsune Defendants' July 2016 Offer, creating a binding contract between and among the parties (the "July 2016 Agreement"). Kasturi wrote, "Thank you for meeting my salary request, **I'm very pleased to accept the offer**. I look forward to working with you and the Kitsuné team to achieve the goals outlined with the position." (emphasis added).

41.     Loaec and Oster reacted to Kasturi's acceptance of Kitsune Defendants' offer with enthusiasm. Loaec wrote, "Great stuff" and Oster wrote, "Absolument, bon week-end!" ("Absolutely, have a good week-end" in French).

42.     The July 2016 Agreement included all material terms concerning Kasturi's employment with Kitsune Defendants, including the description of the role, the start date, and the specific terms of Kasturi's compensation, which included: (i) a base salary, (ii) an annual bonus, and (iii) the Initial Equity Grant, the size, form, and vesting structure of which was specifically outlined in the July 2016 Agreement. Other than vesting over three years of employment, there were no additional conditions or limitations imposed on the Initial Equity Grant.

43.     Through the July 2016 Agreement, Kitsune Defendants made a clear and unambiguous promise to provide Kasturi with the Initial Equity Grant on the terms set forth in the Agreement.

44.     Kitsune Defendants further promised that the agreed-upon terms of Kasturi's employment with Kitsune America would be "formalize[d]" in an "employment contract."

45.     In or around July 2016, Oster sent Kasturi a draft of the employment agreement. In addition to the above-described provisions, the draft employment agreement contained a provision

that issued an equity grant in Kitsune Parent to Kasturi, as well as a governing law and jurisdiction provision that stated that "Any controversy or claim arising out of or relating to this Agreement shall be brought solely in the federal or state courts having jurisdiction over New York County, New York, to whose exclusive jurisdiction the parties hereby irrevocably submit." Kasturi believed that the parties would formalize the employment agreement shortly.

46.     Based on and consistent with the July 2016 Agreement, Kasturi left his employment at Vevo and commenced employment on or about September 1, 2016 as Chief Executive Officer of Kitsune America.

47.     Kasturi relied on Kitsune Defendants' promise in the July 2016 Agreement, and subsequent promise to formalize the Agreement[2], when he left his employment and commenced employment with Kitsune America with the reasonable expectation that Kitsune Defendants would provide the compensation set forth in writing in the July 2016 Agreement.

**<u>Kasturi Performed Pursuant to the July 2016 Agreement</u>**

48.     Kasturi remained employed as Chief Executive Officer of Kitsune America from September 1, 2016 through March 28, 2024.

49.     In his over seven years leading Kitsune America, Kasturi opened the brand's first independent fashion flagship, café, restaurant, bar and art gallery in the territory, expanded the company's presence to Hawaii and Los Angeles, and set up its first operations in Canada, growing the North America retail network to a total of nine stores (five Maison Kitsune fashion boutiques and four Cafe Kitsune coffeeshop locations). Kasturi localized the management and logistics of the company's U.S. e-commerce (and launched a new investment arm, Kitsune Ventures). For its

---

[2] While the July 2016 Agreement was never 'formalized', i.e., formatted into a more standard employment contract form, the July 2016 Agreement was and remains a valid, binding contract between Kasturi and the Kitsune Defendants.

music label, Kasturi managed a myriad of brand partnerships and the production of hundreds of events during the course of his employment. Kasturi also spearheaded significant wholesale growth.

50.    All-in-all, Kasturi grew consolidated North America sales exponentially between 2017 and 2023. In his work as the head of Kitsune America, Kasturi introduced and helped negotiate collaborations with global partners, generating millions of dollars in creative fees and product sales for Kitsune Parent.

51.    Throughout his tenure as head of Kitsune America, Kasturi played an integral role in advising and executing global strategies with Loaec, Oster, and other members of the headquarters and international executive teams, spanning collection merchandising, product expansion, PR, collaborations, web development, digital marketing, international partnerships, capital raising, new business lines and overall brand direction. These expansion efforts and associated brand awareness substantially contributed to global growth including the signing of lucrative international licenses.

### Kitsune Defendants Engage in a Prolonged Pattern of Delay and Avoidance in Formally Documenting the Initial Equity Grant

52.    After Kasturi accepted the position, Kitsune Defendants began engaging in a prolonged pattern of delaying and avoiding formally documenting their obligations under the July 2016 Agreement.

53.    Based on the vesting schedule set forth in the July 2016 Agreement, 0.5% of the agreed-upon Initial Equity Grant vested in September 1, 2017; another 0.5% vested in September 1, 2018; and the remaining 0.5% equity vested in September 1, 2019, at which point the entire Initial Equity Grant of 1.5% had fully vested.

54.    For seven years, Kitsune Defendants repeatedly acknowledged and validated the Initial Equity Grant contained in July 2016 Agreement, and represented to Kasturi that they were working to formally document the Initial Equity Grant, including:

a.  In or around July 2021, in connection with discussions among the parties concerning a potential modification to the Initial Equity Grant[3] and an additional grant of equity, Kitsune Defendants acknowledged that the parties had initially agreed on a 1.5% grant in the Kitsune Parent; and

b.  On or about October 11, 2021, in communications concerning Kasturi's compensation for the time period from 2020 through 2022, Kitsune Defendants again acknowledged that the parties had agreed to a 1.5% equity grant in the Kitsune Parent.  In fact, on or about October 11, 2021, Oster wrote **"Regarding equity:** As said, we'll stick to 1,5% of Kitsuné Creative [*i.e.,* Kitsune Parent], taht [sic] we find already really rewarding."

55.    At no point during this time period did Kitsune Defendants ever claim that they did not agree to the Initial Equity Grant, nor did they communicate to Kasturi a refusal to honor the Initial Equity Grant.

56.    Instead, Kitsune Defendants continually promised to make good on their obligations under the July 2016 Agreement, and indicated to Kasturi that they were directing company counsel to prepare formal documentation of the issuance of the Initial Equity Grant.

57.    Notwithstanding Kitsune Defendants' delay in preparing the administrative documentation representing the issuance of the Initial Equity Grant, it is clear that during the

---

[3] Kasturi never agreed to Kitsune Defendants' proposed modifications to the Initial Equity Grant contained in the July 2016 Agreement.

68201/0001-48381283

course of Kasturi's employment with Kitsune America all parties understood that the essential terms of the Initial Equity Grant—including the size of the grant, the form of the grant, and the vesting schedule attending the grant—were determined and agreed upon by all parties, that the grant was binding, and that the company was working to provide the promised formal documentation.

58.     Kasturi repeatedly raised the issue of documenting his Initial Equity Grant and Kitsune Defendants repeatedly assured Kasturi of their intentions to do so. Despite Kitsune Defendants' assurances, they continued to delay formal documentation of the Initial Equity Grant.

**<u>Kitsune Defendants Agree to Provide Additional Equity Compensation to Kasturi</u>**

59.     Kasturi's tenure at Kitsune America was highly successful (*see supra*). In recognition of his achievements, and with a view toward continued long-term employment, Kasturi approached the Kitsune Defendants to request an additional grant of 1.5% equity, supplementing the Initial Equity Grant of 1.5% which had fully vested, for a total equity grant of 3%.

60.     Between November 2016 and January 2021, Kasturi had discussions about the additional grant of 1.5% equity with Oster. In these conversations, it was initially agreed that Kasturi would receive the total equity grant of 3%, with the additional equity vesting on a similar schedule to the first tranche – 0.5% per year between September 2019 and September 2022.

61.     At Oster's request, Kasturi retained counsel to update the draft agreement memorializing his equity grant (both the original 1.5% and the additional 1.5%). Oster had asked Kasturi to find a more cost-effective law firm as compared to the firm that the Kitsune Defendants retained to draft the original agreement, given that Kitsune America was covering the costs.

62.     On or about June 5, 2020, Kasturi, through his counsel, sent a revised draft employment agreement to Oster.

63.      In or around January 4, 2021, Oster sent Kasturi back a red-lined version of the

draft employment agreement which contained the following provisions:

> 1.7      Equity Distribution. Company shall issue shares to Executive equaling **3%** equity in the Company ("Shares"). On the effective date of this Agreement, Company shall gift to Executive shares equaling 1.5% equity in the Company. The Company shall gift the remaining 1.5% equity to Executive on a monthly basis beginning on the effective date of the Agreement and continuing in equal monthly installments over the course of three (3) years following the effective date of this Agreement.
>
> 4.5      Governing Law; Jurisdiction; Waiver of Jury Trial. This Agreement shall be governed by and construed in accordance with the laws of the State of New York (without regard to its choice of law principles**). Any controversy or claim arising out of or relating to this Agreement shall be brought solely in the federal or state courts having jurisdiction over New York County, New York, to whose exclusive jurisdiction the parties hereby irrevocably submit.** Both parties hereby expressly waive the right to a trial by jury.
>
> (emphasis added)

64.      Oster's redline further commented on the equity distribution provision, stating

that:

> All clauses are fine by us except clause 1.7 "Equity", which :
>
> -      We think should be object of a separate agreement that we'd like to have our corporate lawyer draft or review
>
> -      **For this equity clause application, this separated agreement will not be drastically different in its principle (which we agree with).** The deal will just be more precise and will include vesting period + bad liver [sic] clauses

(emphasis added).

65.      Oster once again delayed signing the draft employment agreement, citing the need

for the Kitsune Defendants' lawyer to prepare a separate equity agreement, However, there is no

doubt that Oster acknowledged Kasturi's entitlement to the Initial Equity Grant of 1.5%, as well as an additional 1.5% equity grant.

66.     While the Kitsune Defendants initially agreed to an additional 1.5% of equity, on top of the Initial Equity Grant of 1.5%, for a total of 3% equity in January 2021, by September 2021, the Kitsune Defendants had reneged on this agreement. On or about September 14, 2021, Oster contacted Kasturi and explained that, as a Kitsune employee and executive of 15 years of service with 3% equity herself, it was decided that Kasturi, a Kitsune employee and executive of then 5 years of service, should receive a lesser amount.

67.     Despite this blatant display of bad faith, Kasturi continued to negotiate with the Kitsune Defendants in an effort to secure at least some amount of additional equity in the business he had devoted himself to for over five years. In or around January 2022, Kasturi responded to an earlier email from Oster, dated October 11, 2021, regarding his compensation package. Kasturi wrote, "As you know, I was particularly concerned after the misunderstanding over my equity, which is being substantially lowered from the 3% previously documented, **back to 1.5%, the original amount issued 5 years ago**, before we embarked on our partnership." Kasturi continued, "the most motivating driver for me to extend my deep commitment to the brand over the long-term, would be **to grant an additional 0.5% vesting over the next 5 years**. This would allow me to reach 2% after 10 years of service to the company, which I believe to be fair and equitable, especially after seeing my track record and dedication."

68.     In or around February 2022, Kitsune Defendants agreed to provide Kasturi with the additional 0.5% (the "Secondary Equity Grant"), beyond the 1.5% represented by the Initial Equity Grant. During the first quarter of 2022, the parties agreed that the Secondary Equity Grant would vest over five years in 60 substantially equal monthly installments through September 2026.

69. On or around April 7, 2022, and April 12, 2022, Oster authorized Kasturi to engage Foley Hoag LLP, an American law firm previously used by Kitsune America, to memorialize the employment terms. Oster also requested that Kasturi provide her with a rough estimate of the associated legal costs, with the understanding that Kitsune America would cover the fees, as had been the case with Kasturi's previous employment contract drafts and negotiations. Oster recognized that the Kitsune Defendants' French lawyer would take too long to prepare the agreement, and given that this was an American employment matter, it was logical for Kasturi to lead the process with American counsel.

**Kitsune America Fails to Pay Kasturi's Promised Annual Bonus for Three Years**

70. In addition to the base salary and Initial Equity Grant outlined in the July 2016 Agreement, Kitsune America also promised to pay Kasturi an annual bonus of $25,000.

71. Kitsune America paid Kasturi the $25,000 annual bonus for fiscal years ending in 2018 and 2021.

72. However, Kitsune America failed to pay Kasturi's annual bonus for the fiscal years ending in 2017, 2019, 2020, 2022, and 2023. As discussed *infra*, the bonuses for 2022 and 2023 were: (i) increased to $75,000 per year; and (ii) intended to be 'rolled forward' by Kitsune America, as part of the separation agreement compensation.

73. While Kasturi did not receive his annual bonus in these years, he understood and reasonably expected that the bonuses would be paid at a later date because, during the course of Kasturi's employment, Kitsune America had a common practice of deferring earned compensation and paying it at a later date as "back pay."

74. For example, for the fiscal year ending March 2021, Kitsune America delayed payment to Kasturi of $25,000 in salary and $25,000 in bonus, which it ultimately paid as "back

pay" in or around April 2023. For the fiscal year ending March 2022, Kitsune America delayed payment to Kasturi of $60,000 in salary, which it paid as "back pay" in or around April 2023. For the fiscal year ending March 2023, Kitsune America delayed payment to Kasturi of $45,000 in salary, which it paid as "back pay" in or around April 2023.

75.    Throughout this time, the Kitsune Defendants treated Kasturi as an equity owner, disclosing intimate financial details of their growth, capital transactions, key shareholder terms, valuation parameters and offers, seeking his input related to debt financing, management buyouts and shareholder replacements.

76.    As an equity owner, and given that the Kitsune Defendants were in a growth phase, Kasturi accepted the delays in his compensation based on his good-faith belief that the Kitsune Defendants would ultimately satisfy their compensation obligations pursuant to the July 2016 Agreement.

77.    Kasturi's financial subsidies, cooperation and hard work benefitted the Kitsune Defendants. By way of example, from the fiscal year ending April 2017 to the fiscal year ending April 2023, the company's sales increased by 407% (growing from 22.3M EUR to 113.0M EUR). During Kasturi's employment, Kitsune Parent's earnings (or EBITDA) increased from 1.8M EUR to 11.1M EUR (+514%)[4].

78.    The pattern of delaying compensation to Kasturi and later paying it as back pay created uncertainty as to when Kasturi could expect to receive his earned compensation. However, it also established a reasonable expectation that the Kitsune Defendants would ultimately fulfill their obligation to pay Kasturi his due compensation at a later date.

---

[4] In fact, Kitsune Defendants alleged that they had €200,000,000 in sales volume during their fiscal year ending in March 2024. (*See* https://www.lesechos.fr/industrie-services/conso-distribution/bali-paris-japon-la-griffe-de-mode-kitsune-demultiplie-ses-cafes-2102639)

68201/0001-48381283

79.     However, after years of delay, Kasturi still has not been paid his outstanding bonuses of $25,000 per year for fiscal years 2017, 2019 and 2020, totaling $75,000, as well as the rolled-forward bonuses for 2022 and 2023, totaling an additional $150,000.

**Kasturi Moves to a Reduced Employment Schedule and Ultimately Relocates to California**

80.     In the summer of 2023, Kasturi informed Kitsune Defendants of his desire to move to a reduced work schedule, and to relocate from New York to Los Angeles, as he transitioned to a new employer which was headquartered there. Kitsune Defendants, desiring to have Kasturi remain employed to continue to guide the business and aid in the transition to his eventual replacement, affirmed that remote work and reduced schedule was not an issue.  The Kitsune Defendants also acknowledged that Kasturi would need to spend considerable time in Los Angeles regardless, as Kitsune America was launching a new store and café in the city, which project Kasturi was charged with overseeing.

81.     Specifically, starting in or around June 2023, Kasturi began spending extended periods of time week-to-week in California.

82.     At the same time, the parties agreed that subject to the execution of the formal documentation regarding Kasturi's equity grants in the business, Kasturi would move to a reduced schedule, receiving a reduced annual salary of $100,000, with an additional: (i) $75,000 to be paid on a pro-rata basis over the 10-month period from June 2023 to March 2024 (reflecting the rolled-over 2022 bonus); (ii) $75,000 retention bonus (the "Retention Bonus", reflecting the rolled-over 2023 bonus) to be paid in exchange for Kasturi remaining committed to Kitsune America until March 31, 2024 (the "Retention Period"); and (iii) a $30,000 performance bonus to be paid upon achieving a specified EBITDA target for the American Operations.

83.     Kasturi moved to California on a full-time basis in October 2023 and became a California resident at that time.

84.     Kitsune Defendants were aware that Kasturi became a full-time resident of California in late 2023 and met with Kasturi in California on at least one occasion in or around November 2023.

**The Parties Begin Negotiating Kasturi's Separation and the Kitsune Defendants**
**<u>Refuse to Provide the Initial Equity Grant and Unpaid Bonuses</u>**

85.     Through and including December 2023, the Kitsune Defendants had consistently provided assurances that they would provide Kasturi documentation formally issuing him the Initial Equity Grant, and Secondary Equity Grant, but had not yet done so.

86.     Kitsune America had also not paid Kasturi's overdue bonuses for the fiscal years ending in 2017, 2019, and 2020.

87.     Around this time, Kasturi and Kitsune Defendants expressed their mutual interest in fully separating after the completion of the 10-month period ending on March 31, 2024, as agreed by the parties in June of 2023.

88.     In anticipation of Kasturi's separation, the parties recognized the need to formalize their employment agreement and equity grants.

89.     In or around December 2023, Kasturi provided Kitsune Defendants with a draft separation agreement, which incorporated a proposed phantom-stock structure as a simplified and alternative mechanism to satisfy the Initial Equity Grant and Secondary Equity Grant. The draft separation agreement was substantially based on the draft employment agreement previously provided, which the Kitsune Defendants had already had substantial time to review, and which they had not substantially objected to or commented on.

90.    Kitsune Defendants refused to engage with Kasturi or otherwise respond to the draft separation agreement and phantom-stock structure, and also did not provide any documentation of the Initial Equity Grant and Secondary Equity Grant.

91.    On or about January 4, 2024, Kasturi and Kitsune Defendants, along with their respective counsel, had a telephone conference to discuss Kasturi's separation from the company. Kitsune Defendants, suddenly and for the first time, communicated their refusal to provide the Kasturi the agreed upon equity and to satisfy their obligations under the July 2016 Agreement.

92.    In particular, the Kitsune Defendants expressed their reluctance to issue the equity and instead offered Kasturi a lowball payment of $150,000 to effectively 'buyout' his equity. This offer, which serves as an admission Kasturi is entitled to equity, was based on a 'buyout' of only the Initial Equity Grant (1.5%) at a value lower than Kitsune Parent's valuation five years earlier, despite its substantial growth since.  In an attempt to justify this lowball offer, Kitsune Parent utilized an inapplicable valuation from a mezzanine (debt) financing transaction in the summer of 2023[5], to which it then arbitrarily applied an 80% discount on the flawed premise that Kasturi was obtaining an economic benefit receiving the lump sum payment in lieu of the equity he was supposed to receive years earlier.

93.    Kitsune Defendants' buyout offer did not remotely reflect the economic value or benefits of the Initial Equity Grant and the Secondary Equity Grant – benefits that Kasturi had well-earned through his substantial efforts to grow the Maison Kitsune brand and enhance the business' overall market penetration and income.

---

[5] (*See* https://ww.fashionnetwork.com/news/Kitsune-partners-with-siparex-to-finance-digital-e-tail-expansion,1540868.html)

94.     Under the terms of the July 2016 Agreement, the Initial Equity Grant's 1.5% stake in Kitsune Parent represented 66 shares. The Secondary Equity Grant represented 27 shares, of which 14 would have vested in the ordinary course before Kasturi's termination, under the terms of the Secondary Equity Grant's vesting schedule.

95.     On information and belief, the economic value of the Initial Equity Grant of 1.5% and the Secondary Equity Grant of 0.5% in Kitsune Parent, as of February 2024, was approximately €5.87 million ($6.34 million USD). Moreover, the losses incurred by Kasturi from the tax implications of failing to receive such grants in their promised forms and at their promised times constitute a further approximately €2.47 million ($2.66 million USD). Accordingly, Kasturi has suffered damages from Kitsune Defendants' failure to convey the grants of approximately €8.4 million ($9.1 million USD), and Kitsune Defendants' buyout offer represented less than two percent (2%) of the overall value attributable to the Initial Equity Grant and the Secondary Equity Grant, based on the evaluation of past capital raise valuation metrics for Kitsune Parent shared with Kasturi, and relevant industry precedent transactions applied to Kitsune Parties' financial statements.  In short, Kitsune Parent made a demonstrably unreasonable and unsupportable lowball offer.

**Kitsune America Terminates Kasturi Hours Prior to His Retention Bonus Coming Due**

96.     Between January and March 2024, Kasturi continued his employment with Kitsune America in honor of his commitment to remain with the company until March 31, 2024.

97.     During this time, Kasturi continued to fulfill the responsibilities of his role and made his best efforts to effectively transition his responsibilities in anticipation of his departure on March 31, 2024.

68201/0001-48381283

98.     Kasturi also continued efforts to engage with Kitsune Defendants on documenting the Initial Equity Grant as agreed at the outset of his employment, and securing his past due bonuses and Secondary Equity Grant.

99.     When it became apparent that Kasturi would not accept the Kitsune Defendants' unreasonably low equity buyout offer, and adopting the strategy that the best defense is a good offense, the Kitsune Defendants began implementing tactics intended to prevent Kasturi from receiving the benefits of the parties' agreement.

100.    Without prior notice, Kitsune America abruptly terminated Kasturi's employment late in the evening of March 28, 2024, mere hours before Kasturi's scheduled departure from the company.   The termination was strategically timed to occur just before Kasturi's $75,000 Retention Bonus came due.

101.    Kitsune America failed to provide Kasturi with his final paycheck on the date of his termination.

102.    Tellingly, Kasturi's replacement as the new head of Kitsune America began work just four days later, on April 1, 2024. This timing strongly suggests a premeditated decision by Kitsune America to exploit Kasturi's time without compensating him as agreed, knowing all along that his successor was already poised to take over.

103.    Kitsune America's termination of Kasturi's employment was done in bad faith, abruptly, and without notice purely as pretext to avoid paying the $75,000 Retention Bonus.

104.    On information and belief, Kitsune America's bad faith termination was designed to allow Kitsune America to reap the benefits of Kasturi's continued employment for 289 of the 290 days of the Retention Period while avoiding having to fully pay for same, *i.e.,* the Retention Bonus. It was also retaliation for insisting on Kitsune Parent's fulfillment of its obligation to

31

provide the Initial Equity Grant that was provided in the July 2016 Agreement and the Secondary Equity Grant agreed to in February 2022.

## FIRST COUNTERCLAIM
### (Breach of Contract)

105.    Counterclaim and Third-Party Plaintiff re-alleges and incorporates by reference the allegations contained in the foregoing paragraphs as if set forth fully herein.

106.    Through the July 2016 Agreement, in consideration of Kasturi's leaving his prior employment and commencing work as Chief Executive Officer and Head of Kitsune America, Kitsune Defendants offered to provide Kasturi with a base salary of $150,000 (which was later increased to $225,000), $25,000 annual performance bonuses (which were later increased to $75,000 bonuses), and the Initial Equity Grant, on the terms set forth in the Agreement.

107.    Kasturi accepted the offer, forming a binding contract.

108.    Kasturi performed the contract in full.

109.    In or about the first quarter of 2022, Kasturi offered to continue his employment with Kitsune America for consideration of an additional 0.5% equity in Kitsune Parent, beyond the Initial Equity Grant, as well as his existing salary and bonus compensation. Kitsune Defendants accepted the offer and agreed to additionally provide Kasturi the Secondary Equity Grant. Kasturi fully performed his obligations through his continued work for Kitsune America until his termination.

110.    In or around January 2024, Kitsune America materially breached these agreements by refusing to pay promised annual bonuses in 2017, 2019, and 2020, and Kitsune Defendants materially breached these agreements by refusing to honor the promised Initial Equity Grant and the Secondary Equity Grant.

68201/0001-48381283

111. As a result of Kitsune Defendants' failure to perform pursuant to the contract, Counterclaim and Third-Party Plaintiff has been injured in an amount to be determined at trial but no but in no event less than $9.1 million USD, and Counterclaim, and Third-Party Plaintiff's attorney's fees and costs.

## SECOND COUNTERCLAIM
### (Promissory Estoppel)

112. Counterclaim and Third-Party Plaintiff re-alleges and incorporates by reference the allegations contained in the foregoing paragraphs as if set forth fully herein.

113. Through the July 2016 Agreement, Kitsune Defendants made a clear and unambiguous promise to provide Kasturi with a base salary of $150,000, $25,000 annual performance bonuses, and the Initial Equity Grant, on the terms set forth therein. During the course of Kasturi's employment, Kitsune Defendants continually promised to convey the agreed-upon Initial Equity Grant and the annual bonuses. In or about the first quarter of 2022, Kitsune Defendants further promised to compensate Kasturi by providing the Secondary Equity Grant.

114. Kasturi reasonably and foreseeably relied on Kitsune Defendants' promises, which Kitsune Defendants made after negotiation between the parties as to the terms of Kasturi's employment, and which induced Kasturi to leave his employment in 2016, and which induced Kasturi to continue working for Kitsune Defendants for over seven years.

115. As a result of Kitsune Defendants' failure to honor their promise, including their withholding of the Initial Equity Grant, annual bonuses for fiscal years 2017, 2019, and 2020, and the Secondary Equity Grant, Counterclaim and Third-Party Plaintiff has been injured in an amount to be determined at trial but no but in no event less than $9.1 million USD, and Counterclaim, and Third-Party Plaintiff's attorney's fees and costs.

68201/0001-48381283

## THIRD COUNTERCLAIM
### (Unjust Enrichment)

116.    Counterclaim and Third-Party Plaintiff re-alleges and incorporates by reference the allegations contained in the foregoing paragraphs as if set forth fully herein.

117.    Kitsune Defendants were enriched through the value they received from Kasturi's uncompensated labor as Chief Executive Officer and Head of Kitsune America.  Specifically, that value of Kasturi's performance is reflected by the compensation terms set forth in the July 2016 Agreement, including the 1.5% interest in Kitsune Parent, *i.e.,* the Initial Equity Grant, that Kitsune Defendants have wrongfully withheld. Kitsune Defendants have been further enriched through the wrongfully withheld Secondary Equity Grant, and Kitsune America has been further enriched by the wrongfully withheld bonuses promised to Kasturi, for fiscal years 2017, 2019, and 2020.

118.    Kitsune Defendants' enrichment came directly at Kasturi's expense, as it reflects the amount Kasturi otherwise would have obtained had Kitsune Defendants fulfilled their promises. Kasturi performed valuable labor for over seven years without receiving agreed-upon compensation.

119.    It is against equity and good conscience to permit Kitsune Defendants to retain the excess value they have extracted from Counterclaim and Third-Party Plaintiff's work by refusing to pay his promised compensation.

120.    As a result of Kitsune Defendants' unjust enrichment at Counterclaim and Third-Party Plaintiff's expense, Counterclaim and Third Paty Plaintiff has been injured in an amount to be determined at trial but no but in no event less than $9.1 million USD, and Counterclaim, and Third-Party Plaintiff's attorney's fees and costs.

## FOURTH COUNTERCLAIM
### (Quantum Meruit)

121.    Counterclaim and Third-Party Plaintiff re-alleges and incorporates by reference the allegations contained in the foregoing paragraphs as if set forth fully herein.

122.    From September 1, 2016 through March 28, 2024, Kasturi provided services to Kitsune America in good faith, as Chief Executive Officer and Head of Kitsune America.

123.    Kitsune America accepted those services.

124.    Kasturi reasonably expected to be compensated for those services, in the amount and manner that he had negotiated for with Kitsune Defendants in July 2016, including compensation in the form of the Initial Equity Grant, all annual non-discretionary bonuses, and, in February 2022, the Secondary Equity Grant.

125.    The value of those services that was negotiated-for at arms' length and the reasonable value of those services is reflected in the compensation terms set forth in the July 2016 Agreement and the terms of the Secondary Equity Grant.

126.    By virtue of the foregoing, Counterclaim and Third Paty Plaintiff has been injured in an amount to be determined at trial but no but in no event less than $9.1 million USD, and Counterclaim, and Third-Party Plaintiff's attorney's fees and costs.

## FIFTH COUNTERCLAIM
### (New York Labor Law, Article 6)

127.    Counterclaim and Third-Party Plaintiff re-alleges and incorporates by reference the allegations contained in the foregoing paragraphs as if set forth fully herein.

128.    New York Labor Law § 198(3) provides, in relevant part: "All employees shall have the right to recover full wages, benefits and wage supplements and liquidated damages accrued during the six years previous to the commencing of such action…"

68201/0001-48381283

129. New York Labor Law § 193 provides, in relevant part, that "No employer shall make any deduction from the wages of an employee, except deductions which…are expressly authorized in writing by the employee and are for the benefit of the employee, provided that such authorization is voluntary and only given following receipt by the employee of written notice of all terms and conditions of the payment and/or its benefits and the details of the manner in which deductions will be made."

130. Kasturi's annual bonus of $25,000 for fiscal years 2017, 2019 and 2020 are non-discretionary compensation which Kasturi earned as of the conclusion of each fiscal year.

131. Kitsune America's failure to pay Kasturi's annual bonuses for 2017, 2019 and 2020 was a failure to pay all wages due and/or an unlawful deduction of wages.

132. Kasturi's equity grant of 0.5% that vested on September 1, 2017, 0.5% that vested on September 1, 2018, 0.5% that vested on September 1, 2019, and 0.5% equity grant that began vesting in February 2022 are non-discretionary compensation which Kasturi earned as of the conclusion of each fiscal year.

133. Kitsune Defendants' failure to issue Kasturi's equity grant of 0.5% that vested on September 1, 2017, 0.5% that vested on September 1, 2018, 0.5% that vested on September 1, 2019, and 0.5% equity grant that began vesting in February 2022 was a failure to pay all wages due and/or an unlawful deduction of wages.

134. By virtue of the foregoing, Counterclaim and Third-Party Plaintiff has been damaged in an amount to be determined at trial, but in no event less than the value of his unpaid 2017, 2019 and 2020 bonuses, unpaid 2% equity, liquidated damages equal to 100% of the foregoing amounts, and Counterclaim and Third-Party Plaintiff's attorney's fees and costs.

## SIXTH COUNTERCLAIM
### (California Failure to Pay Wages Claim)

135.    Counterclaim and Third-Party Plaintiff re-alleges and incorporates by reference the allegations contained in the foregoing paragraphs as if set forth fully herein.

136.    As of October 2023 Kasturi was a resident of California. All subsequent work performed by Kasturi for Kitsune America was performed in California, of which Kitsune Defendants were aware of.

137.    On March 28, 2024, Kitsune America terminated Kasturi's employment without notice and without providing Kasturi with his final paycheck.

138.    Kasturi was entitled to the Retention Bonus so long as he was committed to Kitsune America up and until March 31, 2024. While Kitsune America terminated Kasturi on March 28, 2024, Kasturi had remained committed throughout his ten-month transition/handover period, and he did not choose to leave or terminate his agreement with Kitsune America before the agreed-upon date of March 31, 2024. Therefore, it is clear that as of March 28, 2024, Kasturi had substantially earned, but had not been paid, the agreed upon Retention Bonus in the amount of $75,000.

139.    California Code, Labor Code § 200(a) provides, in relevant part, that "'Wages' includes all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation."

140.    California Code, Labor Code § 201 provides, in relevant that, "If an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately."

37

141.    This Retention Bonus, as well as Kasturi's outstanding salary payments, constitute "wages" under California law. Cal. Lab. Code § 200(a).

142.    Under California law, Kasturi's wages earned and unpaid, *i.e.,* the Retention Bonus and unpaid salary payments, were due and payable "at the time of discharge." Cal. Lab. Code § 201.

143.    Kitsune America has not paid Kasturi's Retention Bonus and outstanding salary payments since his discharge, and they remain liable for these wages.

144.    Further, pursuant to a statutory penalty, Kitsune America is additionally liable for Kasturi's wages, "at the same rate" as under his employment, for an additional 30 days following the discharge date. Cal. Lab. Code § 203.

145.    Additionally, Kitsune America is liable for Kasturi's attorney's fees and costs, Cal. Lab. Code § 218.5(a), and prejudgment interest, *id.* § 218.6.

146.    By virtue of the foregoing, Counterclaim and Third-Party Plaintiff has been damaged in an amount to be determined at trial, but in no event less than the value of his unpaid Retention Bonus, outstanding salary payments, and Counterclaim and Third-Party Plaintiff's attorney's fees and costs.

## SEVENTH COUNTERCLAIM
### (California Tortious Discharge)

147.    Counterclaim and Third-Party Plaintiff re-alleges and incorporates by reference the allegations contained in the foregoing paragraphs as if set forth fully herein.

148.    Kasturi's wrongful termination violated fundamental public policy of the state of California and therefore gives rise to a claim in tort. *See Tameny v. Atl. Richfield Co.*, 27 Cal. 3d 167 (1980).

38

149. Kasturi was employed by Kitsune America from September 1, 2016 until his termination on March 28, 2024.

150. Had Kasturi not been terminated, his employment was scheduled to conclude on March 31, 2024, and Kitsune America was obligated to pay the $75,000 Retention Bonus.

151. In exchange for Kasturi's agreement to remain employed with Kitsune America in a reduced-time capacity for the Retention Period, Kitsune America promised Kasturi the Retention Bonus of $75,000, conditioned only on his remaining employed with Kitsune America through March 31, 2024.

152. Kitsune America's decision to terminate Kasturi mere hours before his employment was due to conclude and his Retention Bonus would vest was motivated by the intent to avoid paying the Retention Bonus.

153. The decision to terminate an employee in order to avoid promptly paying amounts owed to that employee, including bonuses, violates fundamental public policy of the State of California, as established in California Labor Code § 201 and *Gould v. Maryland Sound Indus., Inc.* 31 Cal. App. 4th 1137, 1147 (1995).

154. Kitsune America's wrongful termination harmed Counterclaim and Third-Party Plaintiff in a myriad of ways, including by denying him the $75,000 Retention Bonus to which he is entitled.

155. By virtue of the foregoing, Counterclaim and Third-Party Plaintiff has been damaged in an amount to be determined at trial, but in no event less than the value of his unpaid Retention Bonus, and Counterclaim, and Third-Party Plaintiff's attorney's fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Counterclaim and Third-Party Plaintiff Vinod Kasturi respectfully requests that this Court:

68201/0001-48381283

a.      Dismiss the Complaint against Counterclaim and Third-Party Plaintiff in its entirety and with prejudice, together with costs and expenses, including attorney's fees;

b.      On the First Counterclaim, enter judgment against Counterclaim Defendant Maison Kitsune, Inc. and Third-Party Defendant Kitsune Creative SAS in an amount to be determined at trial but no but in no event less than $9.1 million USD, and Counterclaim, and Third-Party Plaintiff's attorney's fees and costs;

c.      On the Second Counterclaim, enter judgment against Counterclaim Defendant Maison Kitsune, Inc. and Third-Party Defendant Kitsune Creative SAS in an amount to be determined at trial but no but in no event less than $9.1 million USD, and Counterclaim, and Third-Party Plaintiff's attorney's fees and costs;

d.      On the Third Counterclaim, enter judgment against Counterclaim Defendant Maison Kitsune, Inc. and Third-Party Defendant Kitsune Creative SAS in an amount to be determined at trial but no but in no event less than $9.1 million USD, and Counterclaim, and Third-Party Plaintiff's attorney's fees and costs;

156.    On the Fourth Counterclaim, enter judgment against Counterclaim Defendant Maison Kitsune, Inc. and Third-Party Defendant Kitsune Creative SAS in an amount to be determined at trial but no but in no event less than $9.1 million USD, and Counterclaim, and Third-Party Plaintiff's attorney's fees and costs;

157.    On the Fifth Counterclaim, judgment against Counterclaim Defendant Maison Kitsune, Inc. and Third-Party Defendant Kitsune Creative SAS in an amount to be determined at trial, but in no event less than the value of his unpaid 2017, 2019 and 2020 bonuses, unpaid 1.75% equity, liquidated damages equal to 100% of the foregoing amounts, and Counterclaim and Third-Party Plaintiff's attorney's fees and costs.

e.      On the Sixth Counterclaim, judgment against Counterclaim Defendant Maison Kitsune, Inc. in an amount to be determined at trial, but in no event less than the value of Counterclaim and Third-Party Plaintiff's unpaid Retention Bonus, outstanding salary payments, and Counterclaim and Third-Party Plaintiff's attorney's fees and costs;

f.      On the Seventh Counterclaim, judgment against Counterclaim Defendant Maison Kitsune, Inc. in in an amount to be determined at trial, but in no event less than the value of his unpaid Retention Bonus, and Counterclaim and Third-Party Plaintiff's attorney's fees and costs;

g.      Award Counterclaim and Third-Party Plaintiff its costs and attorney's fees incurred in prosecuting this action; and

h.      For such other relief as may be just and proper.

## <u>JURY TRIAL REQUESTED</u>

Kasturi respectfully requests a trial by jury on all claims so triable.

Respectfully submitted,

Dated: September 3, 2024
       New York, NY

/s/ *Cameron A. Welch*
Randi Kochman, Esq.
Cameron A. Welch, Esq.
Arielle H. Wasserman, Esq.
COLE SCHOTZ P.C.
1325 Avenue of the Americas
Suite 1900
New York, NY 10019
(212) 752-8000

*Counsel for Counterclaim and Third-Party Plaintiff Vinod Kasturi*

68201/0001-48381283