# EXHIBIT A

**SARL**
**LEGRAIN CESCA**
et associés
Commissaires de Justice

**66, avenue des Champs Elysées**
**75008 PARIS**

Tél : 01 55 74 69 60
Fax : 01 84 25 48 23

etude@legrain-cesca.fr
www.legrain-cesca.fr

AISSE DES DEPOTS
IAN :
R024003100750000472513A46
IC :
JCGFRPPXXX



www.legrain-cesca.fr

ACTE DE
COMMISSAIRE
DE
JUSTICE

*EXPEDITION*

REFERENCES A RAPPELER
Cor : 29277, MD
:66376 - PF

Dossier suivi par :
PF

| | |
|---|---|
| Emol. | 72,36 |
| SCT | 7,67 |
| H.T. | 80,03 |
| Tva 20,0 % | 16,01 |
| LR | 14,20 |
| T.T.C | 110,24 |

# ACTE D'ACCOMPLISSEMENT DES FORMALITES POUR TRANSMISSION D'ACTE HORS U.E.

L'AN **DEUX-MILLE-VINGT-QUATRE** ET LE **TROIS JUIN**

Nous, SARL LEGRAIN CESCA et associés, Commissaires de Justice, 66 avenue des Champs Elysées - Immeuble D1 - 7ème Etage 75008 PARIS, par l'un d'eux soussigné

Atteste avoir accompli ce jour les formalités prévues par la Convention de la Haye du 15 Novembre 1965, relatives à la signification et à la notification des actes judiciaires et extrajudiciaires dans les Etats membres.

A cet effet, j'ai adressé à l'entité requise :

**ABC LEGAL SERVICES**
1099 Stewart St. Suite 700
WA 98101 SEATTLE
ETATS-UNIS D'AMERIQUE

- le formulaire F2
- Un projet d'acte de Assignation, accompagnée de sa traduction en Anglais en double exemplaire.

## LE PROJET D'ACTE EST DESTINE A ETRE SIGNIFIE OU NOTIFIE À :

**Monsieur Vinod KASTURI**
1423 Elevado Street
90026 LOS ANGELES - CALIFORNIE
ETATS-UNIS D'AMERIQUE

## À LA DEMANDE DE :

**La Société KITSUNÉ CREATIVE, Société par Actions Simplifiée,** dont le siege est 9 rue du Helder 75009 PARIS Agissant poursuites et diligences de son président domicilié en cette qualité audit siège

Une copie du formulaire ainsi que le projet de l'acte transmis et les pièces qui lui sont éventuellement jointes, sont annexées au présent acte.

En application de l'article 686 du Code de Procédure Civile et les dispositions de la Convention de la Haye du 15 Novembre 1965, une copie certifiée conforme de « l'acte à notifier » a été adressée en lettre recommandée avec demande d'avis de réception au destinataire de l'acte :

**Monsieur Vinod KASTURI**
1423 Elevado Street
90026 LOS ANGELES - CALIFORNIE
ETATS-UNIS D'AMERIQUE

Le présent acte comporte 4 feuilles sur l'original et 43 feuilles sur la copie transmise à l'entité requise.



Anthony CESCA

1020

# REQUEST
# FOR SERVICE ABROAD OF JUDICIAL OR
# EXTRAJUDICIAL DOCUMENTS

DEMANDE AUX FINS DE SIGNIFICATION OU DE NOTIFICATION À L'ÉTRANGER
D'UN ACTE JUDICIAIRE OU EXTRAJUDICIAIRE

**Convention on the Service Abroad of Judicial and Extrajudicial Documents in
Civil or Commercial Matters, signed at The Hague, the 15th of November 1965.**
Convention relative à la signification et à la notification à l'étranger des actes judiciaires ou extrajudiciaires en
matière civile ou commerciale, signée à La Haye le 15 novembre 1965.

| **Identity and address of the applicant** | **Address of receiving authority** |
|---|---|
| Identité et adresse du requérant | Adresse de l'autorité destinataire |
| SARL LEGRAIN CESCA ET ASSOCIES | ABC LEGAL SERVICES |
| 66 avenue des Champs Elysées | 1099 Stewart St. Suite 700 |
| 75008 Paris | WA 98101 SEATTLE |
| Mail : etude@legrain-cesca.fr | ETATS-UNIS D'AMERIQUE |

**The undersigned applicant has the honour to transmit – in duplicate – the documents listed
below and, in conformity with Article 5 of the above-mentioned Convention, requests prompt
service of one copy thereof on the addressee, i.e.:**
Le requérant soussigné a l'honneur de faire parvenir – en double exemplaire – à l'autorité destinataire les
documents ci-dessous énumérés, en la priant, conformément à l'article 5 de la Convention précitée, d'en faire
remettre sans retard un exemplaire au destinataire, à savoir :

| **(identity and address)** |
|---|
| (identité et adresse) |
| Monsieur Vinod KASTURI |
| 1423 Elevado Street |
| 90026 LOS ANGELES - CALIFORNIE |
| ETATS-UNIS D'AMERIQUE |

| ☒ | a) | **in accordance with the provisions of sub-paragraph a) of the first paragraph of Article 5 of the Convention\*** |
|---|---|---|
| | | selon les formes légales (article 5, alinéa premier, lettre a))\* |
| ☐ | b) | **in accordance with the following particular method (sub-paragraph b) of the first paragraph of Article 5)\*:** |
| | | selon la forme particulière suivante (article 5, alinéa premier, lettre b)\* : |
| ☐ | c) | **by delivery to the addressee, if he accepts it voluntarily (second paragraph of Article 5)\*** |
| | | le cas échéant, par remise simple (article 5, alinéa 2)\* |

**The authority is requested to return or to have returned to the applicant a copy of the documents -
and of the annexes\* - with the attached certificate.**
Cette autorité est priée de renvoyer ou de faire renvoyer au requérant un exemplaire de l'acte - et de ses annexes\* -
avec l'attestation ci-jointe.

*List of documents* / Énumération des pièces

| |
|---|
| • Assignation |
| • Summons Translate |

\* if appropriate / s'il y a lieu

| **Done at** / Fait à Paris, | **Signature and/or stamp** |
|---|---|
| | Signature et / ou cachet |
| **The** / le  03/06/2024 | SARL LEGRAIN CESCA et Associés |
| | Huissiers de Justice |
| | 66, avenue des Champs-Elysées |
| | 75008 Paris |

# CERTIFICATE
## ATTESTATION

**The undersigned authority has the honour to certify, in conformity with Article 6 of the Convention,**
L'autorité soussignée a l'honneur d'attester conformément à l'article 6 de ladite Convention,

☐  **1. that the document has been served\***
que la demande a été exécutée\*

| — **the (date)** / le (date): | 1. Insert the date when the document was served |
|---|---|
| — **at (place, street, number):** à (localité, rue, numéro) : | 2. Insert the place, street and number where the document was served |

| — **in one of the following methods authorised by Article 5:** dans une des formes suivantes prévues à l'article 5 : | |
|---|---|
| ☐ *a)* | **in accordance with the provisions of sub-paragraph** *a)* **of the first paragraph of Article 5 of the Convention\*** selon les formes légales (article 5, alinéa premier, lettre *a*))\* |
| ☐ *b)* | **in accordance with the following particular method\*:** selon la forme particulière suivante\* : ————— |
| ☐ *c)* | **by delivery to the addressee, if he accepts it voluntarily\*** par remise simple\* |

**The documents referred to in the request have been delivered to:**
Les documents mentionnés dans la demande ont été remis à :

| **Identity and description of person:** Identité et qualité de la personne : | 3. Insert the identity and description of the person who received the documents |
|---|---|
| **Relationship to the addressee (family, business or other):** Liens de parenté, de subordination ou autres, avec le destinataire de l'acte : | 4. Insert the relationship to the addressee of the person who received the documents |

☐  **2. that the document has not been served, by reason of the following facts\*:**
que la demande n'a pas été exécutée, en raison des faits suivants\*:

| 5. Insert facts/reasons why the document has not been served |
|---|

☐  **In conformity with the second paragraph of Article 12 of the Convention, the applicant is requested to pay or reimburse the expenses detailed in the attached statement\*.**
Conformément à l'article 12, alinéa 2, de ladite Convention, le requérant est prié de payer ou de rembourser les frais dont le détail figure au mémoire ci-joint\*.

***Annexes*** / *Annexes*

| **Documents returned:** Pièces renvoyées : | Insert a list of the documents that are being returned |
|---|---|
| **In appropriate cases, documents establishing the service:** Le cas échéant, les documents justificatifs de l'exécution : | Insert a list of the documents that establish that service has been effected |

\* if appropriate / s'il y a lieu

| **Done at** / Fait à  Insert the location where you signed the Certificate  **The** / le  Insert the date on which you signed the Request (spelt out in full) | **Signature and/or stamp** Signature et / ou cachet |
|---|---|

Permanent Bureau July 2017

# WARNING
## AVERTISSEMENT

**Identity and address of the addressee**
Identité et adresse du destinataire
Monsieur Vinod KASTURI
1423 Elevado Street
90026 LOS ANGELES - CALIFORNIE
ETATS-UNIS D'AMERIQUE

### IMPORTANT

**THE ENCLOSED DOCUMENT IS OF A LEGAL NATURE AND MAY AFFECT YOUR RIGHTS AND OBLIGATIONS. THE 'SUMMARY OF THE DOCUMENT TO BE SERVED' WILL GIVE YOU SOME INFORMATION ABOUT ITS NATURE AND PURPOSE. YOU SHOULD HOWEVER READ THE DOCUMENT ITSELF CAREFULLY. IT MAY BE NECESSARY TO SEEK LEGAL ADVICE.**

**IF YOUR FINANCIAL RESOURCES ARE INSUFFICIENT YOU SHOULD SEEK INFORMATION ON THE POSSIBILITY OF OBTAINING LEGAL AID OR ADVICE EITHER IN THE COUNTRY WHERE YOU LIVE OR IN THE COUNTRY WHERE THE DOCUMENT WAS ISSUED.**

**ENQUIRIES ABOUT THE AVAILABILITY OF LEGAL AID OR ADVICE IN THE COUNTRY WHERE THE DOCUMENT WAS ISSUED MAY BE DIRECTED TO:**

### TRÈS IMPORTANT

LE DOCUMENT CI-JOINT EST DE NATURE JURIDIQUE ET PEUT AFFECTER VOS DROITS ET OBLIGATIONS. LES « ÉLÉMENTS ESSENTIELS DE L'ACTE » VOUS DONNENT QUELQUES INFORMATIONS SUR SA NATURE ET SON OBJET. IL EST TOUTEFOIS INDISPENSABLE DE LIRE ATTENTIVEMENT LE TEXTE MÊME DU DOCUMENT. IL PEUT ÊTRE NÉCESSAIRE DE DEMANDER UN AVIS JURIDIQUE.

SI VOS RESSOURCES SONT INSUFFISANTES, RENSEIGNEZ-VOUS SUR LA POSSIBILITÉ D'OBTENIR L'ASSISTANCE JUDICIAIRE ET LA CONSULTATION JURIDIQUE, SOIT DANS VOTRE PAYS, SOIT DANS LE PAYS D'ORIGINE DU DOCUMENT.

LES DEMANDES DE RENSEIGNEMENTS SUR LES POSSIBILITÉS D'OBTENIR L'ASSISTANCE JUDICIAIRE OU LA CONSULTATION JURIDIQUE DANS LE PAYS D'ORIGINE DU DOCUMENT PEUVENT ÊTRE ADRESSÉES À :

SARL LEGRAIN CESCA ET ASSOCIES
66 avenue des Champs Elysées
75008 Paris
Mail : etude@legrain-cesca.fr

**It is recommended that the standard terms in the notice be written in English and French and where appropriate also in the official language, or in one of the official languages of the State in which the document originated. The blanks could be completed either in the language of the State to which the document is to be sent, or in English or French.**

Il est recommandé que les mentions imprimées dans cette note soient rédigées en langue française et en langue anglaise et le cas échéant, en outre, dans la langue ou l'une des langues officielles de l'État d'origine de l'acte. Les blancs pourraient être remplis, soit dans la langue de l'État où le document doit être adressé, soit en langue française, soit en langue anglaise.

# SUMMARY OF THE DOCUMENT TO BE SERVED
## ÉLÉMENTS ESSENTIELS DE L'ACTE

**Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, signed at The Hague, the 15th of November 1965 (Article 5, fourth paragraph).**

Convention relative à la signification et à la notification à l'étranger des actes judiciaires ou extrajudiciaires en matière civile ou commerciale, signée à La Haye le 15 novembre 1965 (article 5, alinéa 4).

| | |
|---|---|
| **Name and address of the requesting authority:**<br>Nom et adresse de l'autorité requérante : | SARL LEGRAIN CESCA ET ASSOCIES<br>66 avenue des Champs Elysées<br>75008 Paris<br>Mail : etude@legrain-cesca.fr |
| **Particulars of the parties\*:**<br>Identité des parties\* : | Société KITSUNÉ CREATIVE, Société par Actions Simplifiée, dont le siege est 9 rue du Helder<br>75009 PARIS **c/ Monsieur Vinod KASTURI**<br>**1423 Elevado Street**<br>**90026 LOS ANGELES - CALIFORNIE**<br>**ETATS-UNIS D'AMERIQUE** |

\* If appropriate, identity and address of the person interested in the transmission of the document
S'il y a lieu, identité et adresse de la personne intéressée à la transmission de l'acte

☒ **JUDICIAL DOCUMENT\*\***
   ACTE JUDICIAIRE\*\*

| | |
|---|---|
| **Nature and purpose of the document:**<br>Nature et objet de l'acte : | Assignation |
| **Nature and purpose of the proceedings and, when appropriate, the amount in dispute:**<br>Nature et objet de l'instance, le cas échéant, le montant du litige : | |
| **Date and Place for entering appearance\*\*:**<br>Date et lieu de la comparution\*\* : | 24 Octobre 2024 à 11 Heures devant le Tribunal de Commerce de Paris |
| **Court which has given judgment\*\*:**<br>Juridiction qui a rendu la décision\*\* : | |
| **Date of judgment\*\*:**<br>Date de la décision\*\* : | |
| **Time limits stated in the document\*\*:**<br>Indication des délais figurant dans l'acte\*\* : | DEUX MOIS |

\*\* if appropriate / s'il y a lieu

☐ **EXTRAJUDICIAL DOCUMENT\*\***
   ACTE EXTRAJUDICIAIRE\*\*

| | |
|---|---|
| **Nature and purpose of the document:**<br>Nature et objet de l'acte : | |
| **Time-limits stated in the document\*\*:**<br>Indication des délais figurant dans l'acte\*\* : | 12. Specify limits |

\*\* if appropriate / s'il y a lieu

## COMPLAINT BEFORE THE COMMERCIAL COURT OF PARIS

THE YEAR TWO THOUSAND AND TWENTY-FOUR AND

**AT THE REQUEST OF :**

**Kitsune Creative**, a French société par actions simplifiée (simplified joint stock company) with a capital stock of 5,276 euros, whose registered office is located at 9 rue du Helder, 75009 Paris, registered in the Paris Trade and Companies Register under number 538 017 187, in the person of its legal representative in office, duly authorized for the purposes hereof,

**Having for lawyer**:           **Maître Nicole Delay-Peuch**
                                 Lawyer at the Paris Bar
                                 15 rue Monsigny, 75002 Paris
                                 Tel.: +33 (0)1 45 31 78 01
                                 Toque: A377

**Having for instructing lawyers**:  **Maître Marie-Laure Cartier**
                                 **Maître Alexandre Meyniel**
                                 Lawyers at the Paris Bar
                                 CARTIER MEYNIEL
                                 5, avenue Alphand, 75116 Paris
                                 Tel.: +33 (0)6 95 86 21 32
                                 Toque: E1874

*Plaintiff*

**I, THE UNDERSIGNED BAILIFF,**

**SERVE A SUMMONS ON:**

**Mr. Vinod Kasturi,** born on December 7, 1987, American citizen, company director, whose personal address is 1423 Elevado Street, Los Angeles, California 90026, United States of America.

*Defendant*

TO APPEAR ON THURSDAY October 24, 2024 at 11 a.m. before the 18th Chamber of the Commercial Court of Paris, 1 Quai de la Corse, 75004 Paris, France.

## VERY IMPORTANT

A lawsuit has been brought against you for the reasons set out below. In accordance with article 853 of the French Code of Civil Procedure, you are required to appoint a lawyer to represent you at this hearing before this Court. This formality is mandatory. If you fail to do so, you run the risk of having a judgment rendered against you based solely on the information provided by your adversary.

You are reminded that article 861-2 of the French Code of Civil Procedure stipulates that:

> "Without prejudice to the provisions of article 68, an incidental claim for the granting of a payment extension under article 1343-5 of the Civil Code may be lodged by request made, delivered or addressed to the clerk's office, where it is registered. Before the hearing, the author of the request must provide proof that the opposing party has been informed by letter with acknowledgement of receipt. The documents that the party invokes in support of its request for a payment extension are attached to the request. The author of this incidental request may not appear at the hearing, in accordance with the second paragraph of article 446-1. In this case, the judge will only grant the claims made against this party if he considers them to be regular, admissible and well-founded."

In addition, Articles 641, 642, 643 and 644 of the Code of Civil Procedure provide as follows:

> "Where a time-limit is expressed in days, the day of the process, of the event, of the decision or that of service that causes it to run will not be counted Where the time-limit is expressed in months or years, it will expire on the day of the last month or year bearing the same date as the day of the process, of the event, of the decision or of the notification that causes the time-limit to run. In the absence of an identical date, the time-limit will expire on the last day of the month. Where a time-limit is expressed in months and in days, the months will be counted first, then the days."

> "All time-limits will expire on the last day at midnight. The time-limit that would normally expire on a Saturday, Sunday or a public or non-working day will be extended till the first following working day."

> "The provisions of Articles 640 and 642 apply likewise to time-limits within which registration and other formalities of publication must be made."

> "Where the action is brought before a court sitting in the mainland of France, the time-limits for appearances, lodging an appeal, a motion to set aside as provided at article 586 al. 3, a motion for revision and an appeal in cassation will be extended by: 1. One month for persons living in Guadeloupe,

*Guyane, Martinique, Reunion, Mayotte, Saint-Barthelemy, Saint-Martin, Saint-Pierre-et-Miquelon, French Polynesia, Wallis and Futuna Islands, New Caledonia and Austral Islands and French Antartics; 2. Two months for persons living in a foreign country."*

*"Where the action is brought before a court sitting in Guadeloupe, Guyane, à la Martinique, Reunion, Mayotte, Saint-Barthelemy, Saint-Martin, Saint-Pierre-et-Miquelon and Wallis and Futuna Islands, the time-limits for appearances, lodging an appeal, a motion to set aside as provided at article 586 al. 3, a motion for revision ill be extended by one month for persons not living in that administrative department as well as for those who live in the districts of such administrative department as specified by the order of the first president and two months for persons living aboard."*

The documents on which the claim is based are listed at the end of the complaint.

# TABLE DES MATIERES

1. Facts and procedure ..................................................................................................... 1

   1.1   The Parties ......................................................................................................... 1

         (a)    Kitsuné Creative ................................................................................. 1

         (b)    Vinod Kasturi ..................................................................................... 1

   1.2   The employment contract between MK Inc. and Mr Kasturi ........................... 1

         (a)    Negotiating the employment contract between February and September 2016 ..... 1

         (b)    Mr. Kasturi's appointment as Kitsuné Group's Head of America on September 5, 2016. ...................................................................................... 2

   1.3   Unsuccessful negotiations to set up an incentive plan for Mr. Kasturi at Kitsuné Creative .................................................................................................................. 3

         (a)    July-September 2016: unsuccessful negotiations on the clause relating to Kitsuné Creative's commitment to offer a BSPCE plan ...................................................... 4

                (i)    Initial discussions on setting up an incentive plan in March 2016 ...... 4

                (ii)   July 5, 2016: the Kitsuné Group's proposal to set up an incentive scheme based on BSPCE warrants (bons de souscription de parts de créateur d'entreprise). ...................................................................... 5

                (iii)  September 2016: Mr. Kasturi's refusal to be granted BSPCEs ........... 7

         (b)    June 2020-January 2021: Kitsuné Group's rejection of Mr. Kasturi's request for free shares ......................................................................................... 9

         (c)    July-October 2021: negotiations resume ............................................ 11

         (d)    January 2022: new start of the negotiations and further changes desired by Mr. Kasturi ........................................................................................ 12

         (e)    October 27, 2022: Mr. Kasturi's new offer of a structured incentive plan in the form of phantom shares. ................................................................ 14

         (f)    April 2023: final talks .......................................................................... 17

   1.4   The emergence of the dispute ........................................................................... 19

         (a)    The discovery of Mr. Kasturi's mismanagement .............................. 19

         (b)    Termination of employment contract on March 28, 2024 .................. 19

         (c)    The threat of a jury trial in New York against Kitsuné Creative and MK Inc. ..... 19

2. Discussion ....................................................................................................................... 22

   2.1   On the application of French law ...................................................................... 22

   2.2   On the absence of consent to set up an incentive plan ..................................... 22

         (a)    In law ................................................................................................... 23

         (b)    In fact: no meeting of the minds ever took place between Mr. Kasturi and Kitsuné Creative. ............................................................................ 26

(i)     The draft employment contract sent by Kitsuné on September 9, 2016 contained neither an offer to subscribe to a BSPCE plan nor a unilateral promise on the part of Kitsuné...........................................27

(ii)    Mr. Katsuri has fully rejected the proposal to negotiate a BSPCE plan set out in clause 1.7 of the draft employment contract. ....................28

(iii)   In any event, the offer contained in article 1.7 has become null and void. ...............................................................................................28

(iv)    No subsequent meeting of the minds.................................................29

2.3   In the alternative, on the statute of limitations applicable to mr. Kasturi's claims ...........30

For these reasons..............................................................................................................31

*Translation for information purposes only*

Kitsuné Creative *vs.* Vinod Kasturi
Commercial Court of Paris
Complaint

## PURPOSE OF THE REQUEST

1. **FACTS AND PROCEDURE**

   1.1 **The Parties**

   (a) **Kitsuné Creative**

1. Kitsune Creative[1] is the holding company of the Kitsune group (the **"Company"** or **"Kitsune Creative"**).

2. Founded in 2002 by Gildas Loëc and Masaya Kuroki, Kitsune operates a music label (Kitsune Musique), a fashion house (Maison Kitsune) and a café franchise (Kitsune Café).

3. The company is led by the company named GIMA.

   (b) **Vinod Kasturi**

4. Vinod Kasturi is an American resident of California[2].

5. From 2016 to 2024, he was Head of America for the Kitsuné group, leading the group's American and Canadian subsidiaries.

   1.2 **The employment contract between MK Inc. and Mr Kasturi**

   (a) **Negotiating the employment contract between February and September 2016**

6. The Parties came together in February 2016 on the occasion of a meeting between the founder of the Kitsuné Group, Mr. Gildas Loëc, and Mr. Kasturi. At the time, Mr. Kasturi was working at Vevo, a digital music video sharing platform.

7. On February 25, 2016, Mr. Loëc wrote to Mr. Kasturi to thank him for the advice he gave with respect to the joint venture with their U.S. distributor Want and to propose that he join Kitsuné in taking over the management of the U.S. business and subsidiaries[3]. Kitsuné's aim was to revive the business of its American subsidiaries

---

[1]  **Kitsuné Creative Exhibit 1**, Registration certificate Kitsuné Creative dated May 12, 2024

[2]  **Kitsuné Creative Exhibit 2,** Passport of Vinod Kasturi

[3]  **Kitsuné Creative Exhibit 3**, Email from G. Loëc to V. Kasturi, February 25, 2016 (« *Perhaps we need to state properly the position beforehand. To me it will be head of KITSUNÉ inc America* »)

1

Kitsuné Creative *vs.* Vinod Kasturi
Commercial Court of Paris
Complaint

independently, in order to no longer be dependent on an exclusive distributor as it had been the case with Want.

8.  On the same day, Mr. Kasturi stated that he was highly motivated by the idea of joining Kitsuné and its team, stressing however that before he could move forward with setting a departure date from Vevo, it would be important for him to meet with the founders and management team, in particular with a view to determining the scope of his mission and the terms of his compensation[4].

9.  On March 7, 2016, Ms. Audrey Castel Oster, current head of Kitsuné Creative[5], provided him with a detailed response on his role and the objectives that would be his if he were to join the Kitsuné group.

10. As evidenced by the exchanges between the Parties between February 25 and July 11, 2016, the issue of the annual compensation to be paid to Mr. Kasturi was at the heart of the discussion. After an initial request from Mr. Kasturi for a USD 200,000 compensation, followed by a USD 100,000 proposal from Kitsuné, an agreement was finally reached at USD 150,000, which represented a significant increase in the international compensation scale for employees of the Kitsuné group.

11. On September 9, 2016, Ms. Castel Oster wrote to Mr. Kasturi to provide him with the draft employment contract that had been prepared by Kitsuné Group's U.S. counsel, Me. Dudley Kimball[6].

### (b)    Mr. Kasturi's appointment as Kitsuné Group's Head of America on September 5, 2016.

12. Mr. Kasturi began his managerial duties on September 5, 2016.

13. During his period of employment, Mr. Kasturi was initially compensated at USD 150,000. His compensation was increased over the years until it reached USD 225,000.

14. In May 2023, he wrote to the management of the Kitsuné Group to inform them that he wished to leave the management of the US subsidiaries in order to embark on a new project. Mr Kasturi then worked full time without interruption until 2 June 2023, when

---

[4]  **Kitsuné Creative Exhibit 4**, Exchange of emails between V. Kasturi, G. Loëc and A. Castel Oster between February 25, 2016 and July 11, 2016

[5]  In 2016, Ms. Castel Oster was employed as Managing Director of Kitsune France. However, she was not a company representative.

[6]  **Kitsuné Creative Exhibit 5**, Email from A. Castel Oster to V. Kasturi (copy D. Kimball) dated September 9, 2016

2

*Translation for information purposes only*

Kitsuné Creative *vs.* Vinod Kasturi
Commercial Court of Paris
Complaint

he began working part time, two days a week until 31 March 2024, with the agreement of the Kitsuné Group.

15.    On March 28, 2024, following the discovery of Mr. Kasturi's abnormal acts of management, his contract was terminated with immediate effect and he was dismissed[7].

### 1.3    Unsuccessful negotiations to set up an incentive plan for Mr. Kasturi at Kitsuné Creative

16.    Between February 2016 and November 2023, Mr. Kasturi and the Kitsuné group had intermittent discussions on the implementation of a possible incentive plan for the latter.

17.    As described below, while the idea of an incentive plan was discussed between the parties, they were never able to agree either (i) on the actual nature of the incentive instrument (BSPCE, ordinary shares, securities, phantom shares) (ii) and on the key terms and conditions that would have governed the contract for the issue of the incentive instruments in question (issue date, issue term, issue price, exercise price, holding period, liquidation condition, etc.).

18.    In summary, the discussions took place over the following periods:

- Firstly, between July and September 2016, the parties discussed the possibility of granting shares to Mr. Kasturi by allowing him to subscribe to a plan to issue BSPCEs. Mr. Kasturi refused this proposal, requesting the allocation of warrants or any other equivalent instrument giving him title to ordinary shares.

- Secondly, between June 2020 and January 2021, Mr. Kasturi counter-proposed in June 2020 that he be granted free ordinary shares corresponding to 3% of Kitsuné Creative's capital stock, while indicating that share warrants could also be granted to him. Kitsuné Creative did not accept this proposal.

- Finally, between October 27, 2022 and November 14, 2023, Mr. Kasturi proposed an entirely new incentive formula involving the contractualization of phantom stocks in Kitsuné Creative's American subsidiary, Maison Kitsuné Inc. ("MK Inc."). Such a mechanism, unknown under French law, differed significantly from the incentive tools that had previously been envisaged. Kitsuné Creative did not accept the documentation presented to it.

19.    It follows that Mr. Kasturi has never subscribed to any instrument issued by Kitsuné Creative.

---

[7]    **Kitsuné Creative Exhibit 6**, Notice of termination of employment dated March 28, 2024

3

*Translation for information purposes only*

Kitsuné Creative *vs.* Vinod Kasturi
Commercial Court of Paris
Complaint

> **(a)    July-September 2016: unsuccessful negotiations on the clause relating to Kitsuné Creative's commitment to offer a BSPCE plan**
>
> > **(i)    Initial discussions on setting up an incentive plan in March 2016**

20.    At the time of the initial discussions on his compensation, Mr. Kasturi and representatives of the Kitsuné group also discussed the possibility of Mr. Kasturi benefiting from an incentive plan within Kitsuné Creative's capital.

21.    The very first mention of this incentive scheme came in March 2016 when Mr. Kasturi formulated his salary claims in response to a request from Kitsuné's CEO, Audrey Castel Oster[8]. He then indicated that he wished to receive

> *"$200K salary plus 3% equity (based on market comps); reimbursement for travel and other business-related expenses" 22.*

22.    On March 15, 2016, Gildas Loaec, co-founder of the Kitsuné group, immediately replied *"equity in Kitsuné America?"* in order to understand upon which entity - and therefore which performance perimeter - the incentive plan would be indexed.

23.    On March 16, 2016, Mr. Kasturi replied that his proposal was with respect to an incentive plan at holding company level, since growth in the United States and Canada would benefit the Kitsuné group on a more global scale[9].

24.    On March 18, 2016, Ms. Castel Oster replied that she was unable to get back to him immediately in view of the major commitments this would represent for the Group and its shareholders.

25.    While Mr. Kasturi returned on March 19, 2016 with some additional information on the subject of salary and the estimated employer contributions relating to gross salaries, he did not address the issue of the incentive plan.

26.    At the time, no agreement had been reached on either compensation or incentive arrangements, or even on the very idea of an incentive.

---

[8]    **Kitsuné Creative Exhibit 7**, E-mail from V. Kasturi to A. Castel Oster dated March 14, 2024

[9]    **Kitsuné Creative Exhibit 8**, Email from Mr. Kasturi to Kitsuné, March 16, 2016

*Translation for information purposes only*

Kitsuné Creative *vs.* Vinod Kasturi
Commercial Court of Paris
Complaint

> **(ii)    July 5, 2016: the Kitsuné Group's proposal to set up an incentive scheme based on BSPCE warrants (bons de souscription de parts de créateur d'entreprise).**

27.    On July 5, 2016, Ms. Castel Oster wrote to Mr. Kasturi to provide him with the initial terms that the Group would be able to offer him with regard to the incentive plan that had been discussed in March:

> *"We can offer a system of equity warrants in Kitsuné Creative (BSPCE, in French - this system has to be under French law as Kitsuné Creative holding is based in France, but you'll have to do your own research about capital gain taxation in US as this will be different from ours in France)*
>
> *We had in mind:*
>
> *\*0.5 after 1 year of activity with MK*
>
> *\*0.5 after 2 years of activity with MK*
>
> *\*0,5 after 3 year of activity with MK*
>
> *This offer will be detailed and formalized by our lawyer M. Fouter in cc, and will be set up at the occasion of the fundraising which may happen soon (I will update you about this in a separate email)."*

28.    In the same e-mail, she concluded as follows:

> *"If this 1st elements of our proposal meet your expectations, we can quickly move forward in:*
>
> *• Going much deeper details of 2016/2017 objectives for US/Canada*
>
> *• Issuing a contract of employment, via our US lawyer*
>
> *• Discussing equity warrants system with M. Fouter."*

29.    Thus, the Kitsuné group indicated to Mr. Kasturi that, if the first elements contained in their proposal caught his attention, then they could move forward together towards (i) more in-depth discussions regarding the objectives for the year 2016/2017 for the United States and Canada, (ii) having the employment contract prepared by their US counsel,

Kitsuné Creative *vs.* Vinod Kasturi
Commercial Court of Paris
Complaint

and, finally, (iii) "discussing" the BSPCE plan with Mr. Fouter, the Kitsuné group's tax lawyer[10].

30.    On July 8, 2024, Mr. Kasturi wrote back to the Kitsuné group, his email not containing any comments on the initial elements transmitted concerning the form his incentive plan might take but focusing all of his comments on his salary. In this respect, he emphasized that "*before I can accept, I would like to discuss the compensation*". He added that $100,000 was a significant reduction on his initial proposal of $200,000, and wanted to know whether the Kitsuné group would be able to improve its offer to $150,000[11].

31.    On the same day, Ms. Castel Oster wrote to Mr. Kasturi to indicate that the Kitsuné Group was prepared to accept his proposal for compensation at $150,000, stressing that all other conditions remained as set out in her email of July 5, 2016.

32.    The latter also indicated that the Group had received two letters of intent from Stripe International and Neo Investment to acquire stakes. She explained that the Kitsuné group was proposing that its BSPCE plan be put in place on this occasion, but that the principle of the incentive offer remained in any case and would not be subject to a financial event such as a fund-raising[12]. She concluded by asking him to get back to them so that Kitsuné's lawyer could start preparing the appropriate documentation.

33.    Also on July 8, 2016, Mr. Kasturi replied to share his acceptance of the $150,000 compensation. With regard to fundraising, he expressed his enthusiasm at the idea that several investors from the consumer sector wished to invest in Kitsuné, and that he was at their disposal for the due diligence phase, if required, but also to discuss 2016/2017 objectives.

34.    On July 11, 2016, Ms. Castel Oster told Mr. Kasturi that she was in contact with the Group's US counsel with a view to formalizing the employment contract, and that the same counsel would contact their French counsel, Maître Fouter, with regard to the BSPCEs. She also told him that it would be a good idea for him to meet the other key members of the French team.

35.    On the same day, Mr. Kasturi replied that he would review the contract with his counsel upon receipt, and that he was available to meet with key members of the Paris team[13].

---

[10]    *Ibid.*

[11]    **Kitsuné Creative Exhibit 9**, E-mail from V. Kasturi to Kitsuné Creative, July 8, 2024

[12]    **Kitsuné Creative Exhibit 10,** Email from A. Castel Oster to V. Kasturi dated July 11, 2016

[13]    **Kitsuné Creative Exhibit 11,** Email from V. Kasturi to A. Castel Oster, July 11, 2016

*Translation for information purposes only*

Kitsuné Creative *vs.* Vinod Kasturi
Commercial Court of Paris
Complaint

He then addressed three other operational issues concerning P&L and orders for the 2017 season.

### (iii)    September 2016: Mr. Kasturi's refusal to be granted BSPCEs

36.    While the parties were soon able to reach agreement on Mr. Kasturi's salary conditions at MK Inc, they were never able to agree on the nature of the incentive instrument to be granted by Kitsuné Creative to Mr. Kasturi, as he refused to allow it to take the form of a BSPCE allocation.

37.    On September 9, 2016, in line with its commitment, the Kitsuné group sent a first draft of the employment contract to Mr. Kasturi. With regard to the incentive plan, the draft contract provided for the following commitment:

> *" 1.7 Equity Warrants. Upon implementation by Kitsuné Créative of an equity warrant plan (commonly referred to in France as "BSPCE"), the timing of which is uncertain since it depends upon the closing of a fundraising transaction by Kitsuné Créative, equity warrants shall be awarded to Executive. The number of warrants to be awarded to Executive, as well as the terms and conditions thereof (including, without limitation, award date, exercise price, vesting requirements and all other material features) shall be set forth in a written document provided to Executive as soon as practicable, but in no event later than the date that similar information is provided to employees of affiliates of Company to whom equity warrants are awarded."*

38.    The clause envisaged in article 1.7 thus formalized Kitsuné's intention to offer Mr. Kasturi the option of subscribing to a BSPCE plan, the terms of which would be defined at a later date.

39.    As regards the basic elements of the future BSPCE plan, clause 1.7 stipulated that both (i) the number of BSPCEs to be allocated and (ii) the applicable terms and conditions (notably the award date, the BSPCE strike price and the vesting conditions) would be set out in a future written document.

40.    On September 29, 2016, Mr. Kasturi responded to the Kitsuné Group with an amended version of the draft employment contract.

41.    With regard to the BSPCE plan, the draft submitted by Mr. Kasturi deleted the [Kitsuné] proposed clause in its entirety and replaced it with the following terms:

*Translation for information purposes only*

Kitsuné Creative *vs.* Vinod Kasturi
Commercial Court of Paris
Complaint

> « *1.7 Equity Award. As soon as practicable, but in no event later than November 21, 2016, Company or Parent shall issue Executive in a reasonably lawful, tax- and economically efficient manner, an equity award in the form of a warrant or similar instrument (the "Award"). The Award shall entitle Executive to purchase or obtain a number of Ordinary Shares in the Parent equal to one and one half percent (1.5%) of the equity of the Parent on a fully diluted, post-financing basis, treating all equity issued or reserved for issuance under the Parent's equity incentive plans as issued and outstanding. The Award shall vest, contingent on Executive's continued service to the Company, Parent or any of their affiliates, in thirty six (36) substantially equal monthly increments, with the first such increment vesting on the on fifteenth (15th) day of the month immediately following the month in which Executive began providing services to the Company; provided, however, the 50% of the Award shall automatically vest in the event Executive is terminated without Cause (as defined below) or resigns for Good Reason (as defined below); provided, further, that 100% of the Award shall automatically vest upon the Parent's acquisition, merger, change in control or similar transaction.* »[14]

42. Mr. Kasturi's new proposal differed in every respect from Kitsuné's, especially with respect to all its material elements:

- On the nature of the offer: while Kitsuné Creative's proposal consisted in a commitment to offer Mr. Kasturi, in the near future and subject to the occurrence of a financial event, the possibility of subscribing to a BSPCE plan which would be open to certain members of the management team, Mr. Kasturi's proposal provided for a firm commitment to grant him securities equivalent to 1.5% of the Company's ordinary shares.

- On the object of the offer: while Kitsuné Creative's proposal was for BSPCEs, the amount of which remained to be defined, Mr. Kasturi's proposal provided, instead of BSPCEs, for the granting of warrants giving access to 1.5% of the paid-up share capital on a fully diluted basis.

- On the terms and conditions of the allocation: while Kitsuné Creative's proposal deferred the determination of the terms and conditions of the issue, which would be those applicable to all BSPCE holders, Mr. Kasturi's counter-offer already set out a *vesting* schedule.

---

[14]    **Kitsuné Creative Exhibit 12,** Projet de contrat de travail du 29 septembre 2016, Clause 1.7

8

*Translation for information purposes only*

Kitsuné Creative *vs.* Vinod Kasturi
Commercial Court of Paris
Complaint

43.  Moreover, Mr. Kasturi's counter-proposal did not mention the strike price of the option that would enable him to acquire ordinary shares.

44.  Mr. Kasturi's changes, particularly to article 1.7, came as a surprise to Kitsuné's management, who failed to understand why he was going against the very nature of the proposed incentive instrument.

45.  The distance between the parties' positions on both the nature of the incentive instrument and the terms and conditions for allocating it led to an outright halt to negotiations.

### (b)  June 2020-January 2021: Kitsuné Group's rejection of Mr. Kasturi's request for free shares

46.  On June 5, 2020, Mr. Kasturi's counsel wrote to Ms. Castel Oster to inform her that he was representing Mr. Kasturi's interests in the negotiation and conclusion of his Executive Agreement[15].

47.  He took the opportunity to communicate a new draft which included several substantial modifications to the drafts exchanged on September 6 and 29, 2016:

 -  With regard to the salary component, the draft suggested a broadening of Mr. Kasturi's missions, with him also acting as manager of Café Kitsuné Inc. and an increase in his annual compensation to $190,000;

 -  With regard to the incentive plan, the recital stated that Kitsuné Creative wished to allocate free shares to him, a proposal which was then reflected in clause 1.7, once again completely redrafted, pursuant to which Mr. Kasturi now proposed that:

> *"1.7 Equity Distribution. Company shall issue shares to Executives equaling 3% equity in the Company ("Shares"). On the effective date of this Agreement, Company shall gift to Executives shares equaling 1.5% equity in the Company. The Company shall gift the remaining 1.5% equity to Executive on a monthly basis beginning on the effective date of this Agreement and continuing in equal monthly installments over the course of three (3) years following the effective date of this Agreement. All Shares received by Executive shall vest immediately. The complete terms and conditions of the Executive's equity warrant (including, without limitation, terms relating to permissible times and manner of exercise) shall be set forth in a written document provided to Executive at the time that the equity warranted is awarded to him. The Company and executive will*

---

15    **Kitsuné Creative Exhibit 13**, E-mail from M. Yankovich to A. Castel Oster, June 5, 2020

*Translation for information purposes only*

Kitsuné Creative *vs.* Vinod Kasturi
Commercial Court of Paris
Complaint

> *mutually determine the structure of the equity warrants to*
> *minimize tax impact to the Executive.* »[16]

48. This new proposal also recognized that the full terms of the incentive would be set out in a future written document drawn up at the time when the shares would be granted.

49. More fundamentally, this new proposal issued by Mr. Kasturi on June 5, 2020 represented a major paradigm shift since it was now mentioned, in addition to an incentive plan in a future form yet to be determined (cf. the last two sentences of the clause), a 3% grant with Kitsuné Creative free shares.

50. In other words, Mr. Kasturi not only wished to subscribe to an incentive plan, the major elements of which had yet to be determined, but also wished to be granted, free of charge, a number of ordinary shares equivalent to 3% of the company's capital.

51. Once again, Kitsuné was extremely surprised by the content of this new proposal, and by the aggressiveness of the financial claims it contained. Mr. Kasturi now wanted to be granted free shares, a mechanism that had never been part of the Kitsuné group's shareholding until then.

52. Mr. Kasturi did not contact the Kitsuné group again on this topic.

53. On January 4, 2021, Ms Castel Oster wrote to Mr Kasturi to wish him a Happy New Year. She also informed him that, after validation with Raphaël Grand (Administrative and Financial Director of the Kitsuné Group) and Axelle Hicter (Director of Human Resources), the Kitsuné Group accepted the new terms of the employment contract, all relating to the compensation increase, as proposed by Mr. Kasturi in June 2020.

54. In particular, it stated that, with the exception of clause 1.7 concerning incentive, it was satisfied with all the modifications. In this respect, it pointed out that incentive should be the subject of a separate agreement (which had always been the parties' position until then, both in the offer of July 5, 2016 and in those of September 9 and September 29, 2016), which should be reviewed by their corporate counsel.

55. More fundamentally, if she were to announce that the forthcoming agreement would not be radically different in principle, the incentive mechanism would have to include vesting and bad leaver clauses.

56. Mr. Kasturi never replied to this e-mail.

---

[16] **Kitsuné Creative Exhibit 14**, Draft contract of June 5, 2020

10

*Translation for information purposes only*

Kitsuné Creative *vs.* Vinod Kasturi
Commercial Court of Paris
Complaint

### (c)    July-October 2021: negotiations resume

57.    On July 8, 2021, in view of the parties' inability to reach an agreement and Mr. Kasturi's renewed silence, Ms. Castel Oster wrote to Mr. Kasturi to inform him of a new proposal from the Kitsuné group concerning his incentive.

58.    This time, the offer was for a stake in MK Inc, the American subsidiary headed by Mr. Kasturi.

59.    While it included further details on some of the key clauses of the future incentive contract, it was still unclear as to the very purpose of the future contract, i.e. the legal nature that the incentive should take. Indeed, as indicated, it was still necessary to determine whether these would be employee *stock options* or phantom stocks, provided that they followed the same mechanics as traditional stock options[17].

60.    Finally, she invited him to send her his questions and comments, which she would then pass on to Mr. Grand, the Kitsuné group's Chief Financial Officer.

61.    On July 26, 2021, Mr. Kasturi wrote to Ms. Castel Oster to express his concern, as the Kitsuné group's new offer was, in his view, contrary to some of the points, previously agreed upon, namely:

–    an allowance of 3% (not 1.5%);

–    vesting, which would have begun on September 19, 2016 and would therefore already have vested;

–    finally, if the incentive were to be in Kitsuné Creative (or its economic equivalent), there should be no difference in the calculation of market value.

62.    Finally, he pointed out that this agreement had been under discussion for 5 years and that he really wanted to see it formalized as soon as possible. He therefore asked the Kitsuné group to confirm that the above conditions (i.e. those he referred to in his own e-mail) would not change, thus enabling him to prepare the contractual documentation.

63.    It is easy to understand why Mr. Kasturi wanted to benefit from an incentive scheme at the level of the Kitsuné group's holding company: the figures for the American subsidiary he had been managing for the past 5 years were poor, with the latter accumulating losses and only maintaining its activity with the financial support of its parent company. In this, the American business differed markedly from the other geographical subsidiaries, notably in Europe and Asia, where results were very good.

---

[17]    **Kitsuné Creative Exhibit 15**, E-mail from A. Castel Oster to V. Kasturi of July 8, 2021

11

*Translation for information purposes only*

Kitsuné Creative *vs.* Vinod Kasturi
Commercial Court of Paris
Complaint

64. Mr. Kasturi's approach may have come as a surprise, given that he wanted to benefit from an incentive scheme based on a perimeter of earnings that was not his own, and from the profitability generated by the work of European and Asian teams that were not his own.

65. On Monday September 20, 2021, Ms. Castel Oster wrote to Mr. Kasturi to inform him that his incentive would be discussed on Thursday and that she wished to know what his salary expectations were on the basis of an incentive plan equivalent to 1.5% of Kitsuné Creative[18].

66. On September 23, 2021, Mr. Kasturi wrote to Ms. Castel Oster to provide her with a document showing the bonuses he considered himself entitled to receive[19].

67. On October 11, 2021, Ms Castel Oster wrote to Mr Kasturi to inform him of the Group's new salary proposal, namely a fixed salary of $225,000 and a variable salary of $75,000 subject to certain targets. With regard to the incentive plan, she confirmed that incentive should be calculated on the equivalent of 1.5% of Kitsuné Creative, but asked for his feedback on the equivalence of calculation with MK Inc. on the basis of the excel document prepared by Mr. Grand[20].

68. Mr. Kasturi never replied to this e-mail.

### (d)   January 2022: new start of the negotiations and further changes desired by Mr. Kasturi

69. On January 5, 2022, Mrs. Castel Oster again wrote to Mr. Kasturi to wish him a Happy New Year. She indicated that she hoped they would finally be able to reach agreement on the package, stressing that it was not healthy for these discussions to go on forever. She added that once an agreement would have been reached on the incentive plan, they would then be able to deal with the points relating to targets for 2022-2023[21]. Finally, it was proposed that a telephone meeting be held shortly to solve these points.

---

[18]   **Kitsune Creative Exhibit 16**, Email from A. Castel Oster to V. Kasturi dated September 20, 2021

[19]   **Kitsune Creative Exhibit 17**, E-mail from V. Kasturi to A. Castel Oster, September 23, 2021

[20]   **Kitsune Creative Exhibit 18**, E-mail from A. Castel Oster to V. Kasturi dated October 11, 2021

[21]   **Kitsune Creative Exhibit 19,** E-mail from A. Castel Oster to V. Kasturi dated January 5, 2022

*Translation for information purposes only*

Kitsuné Creative *vs.* Vinod Kasturi
Commercial Court of Paris
Complaint

70. On the same day, Mr. Kasturi thanked Ms. Castel Oster and indicated that he had finally been able to consider the last offer made to him (i.e. the one made in the e-mail of October 11, 2021)[22].

71. On January 10, 2022, Mr. Kasturi wrote an e-mail to Gildas Loaëc and Ms. Castel Oster in the following terms:

> « *I have always put my sweat and tears into the brand and have succeeded in growing the US company considerably, while sacrificing my own personal benefits.*
>
> *While I highly value my position and will continue to negotiate in good faith, I am not willing to further compromise my worth to the company, which is well established.*
>
> *As you know, I was particularly concerned after the misunderstanding over my equity, which is being substantially lowered from the 3% previously documented, back to 1.5%, the original amount issued 5 years ago, before we embarked on our partnership.*
>
> *While I agree this is still rewarding, the most motivating driver for me to extend my deep commitment to the brand over the long-term, would be to grant an additional 0.5% vesting over the next 5 years. This would allow me to reach 2% after 10 years of service to the company, which I believe to be fair and equitable, especially after seeing my track record and dedication.*
>
> *If this is achievable, I would be greatly appreciative and accept the major terms you last presented, with some clarification on targets and the equivalence calculation (as I previously wrote, there should not be a separate valuation if there is a change of control in the holding company - since I was originally promised warrants in Kitsuné Creative).*
>
> *Please let me know your thoughts, so we can finally wrap this up and focus our time and efforts on continuing to move the company forward. I look forward to discussing tomorrow.* »

72. On January 24, 2022, Ms. Castel Oster wrote to Mr. Kasturi and Mr. Grand to arrange a work meeting on Teams. She explained that she had already been able to obtain agreement in principle from the Kitsuné group with respect to an additionnal 0.5%

---

[22]    **Kitsune Creative Exhibit 20**, E-mail from V. Kasturi to A. Castel Oster, January 5, 2022

*Translation for information purposes only*

Kitsuné Creative *vs.* Vinod Kasturi
Commercial Court of Paris
Complaint

incentive acquired over a 5-year vesting schedule, stressing that the incentive plan should instead be based on an equivalence mechanism between MK Inc. and Kitsuné Creative[23].

### (e) October 27, 2022: Mr. Kasturi's new offer of a structured incentive plan in the form of phantom shares.

73. On October 27, 2022, Mr. Kasturi wrote to Ms. Castel Oster to provide her with an updated draft employment contract including the latest amendments. With regard to the incentive plan, he indicated that Foley Hoag had included new proposed stipulations concerning the incentive allowance and the calculation of the equivalence between MK Inc. and Kitsuné Creative. He explained that several footnotes had been included in response to requests for information on points still under discussion (notably the formula for calculating market value). Foley Hoag was also in the process of finalizing the terms and conditions of the Phantom Stock Plan and the notice of awards. Finally, Mr. Kasturi thanked the Kitsuné group's executives for their patience, explaining that the construction of the new incentive proposal had taken longer than expected given the difficulty of identifying a mechanism to reduce tax impact for both the Kitsuné group and himself[24].

74. It should be pointed out that Mr. Kasturi had the fees of his counsel, Foley Hoag, paid by MK Inc. without Kitsune Creative's knowledge and without ever having sought the authorization of Kitsune Creative's management.

75. In particular, Mr. Kasturi had attached a draft employment contract including (once again) a new version of clause 1.7, which had again been redrafted in full, but also a new clause 1.8 providing for the future issuance of BSPCEs.

> « *1.7 Equity Grant. As soon as practicable, and in any event within thirty (30) days of the execution date of this Agreement, Company or its designee shall issue ordinary shares of Parent to Executive in an amount equal to the sum of (i) the Initial Shares and (ii) the Secondary Shares, as set forth below. If for any reason, the Company or Parent fail to issue the Initial Shares and/or the Secondary Shares in a timely fashion, the Company and Parent shall be obligated to provide Executive with contractual payment rights commensurate with the value of the Initial Shares and/or Secondary Shares (including the*

---

[23] **Kitsune Creative Exhibit 21**, E-mail from A. Castel Oster to V. Kasturi and R. Grand dated January 24, 2022

[24] **Kitsune Creative Exhibit 22**, E-mail from V. Kasturi to A. Castel Oster (copy Foley Hoag), October 27, 2022

14

*Translation for information purposes only*

Kitsuné Creative *vs.* Vinod Kasturi
Commercial Court of Paris
Complaint

*Valuation True-up, as defined below), pursuant to a mutually acceptable written instrument (the "Economic Rights Contract").*

(i)      *[66] ordinary shares of Parent (the "Initial Shares"), which shall be fully vested at the time of grant. Company represents and warrants that such Initial Shares would have represented no less than 1.5% of the total amount of issued and outstanding share capital, calculated on a fully diluted basis, assuming the exercise of all convertible securities or securities reserved under any equity warrant plan (commonly referred to in France as "BSPCE"), or any similar plan, as of September 26, 2016 (the "2016 Target Date"). Executive shall be entitled to acquire the Initial Shares free and clear, upon exercise at a price per share denominated in euros equal to the price per share at which warrants were issued or would have been issued to employees of Parent in France in September 2016, which shall not exceed a valuation of EU€[30,000,000]. If and to the extent the Initial Shares cannot be issued in such a manner to avoid adverse tax consequences in respect of the Initial Shares, to a greater extent than Executive would have been subject to had the Initial Shares been issued on the 2016 Target Date, the Company shall provide a cash bonus to Executive in an amount adequate to make Executive whole in respect of such shortfall (a "Valuation True-Up").*

(ii)      *An additional 27 ordinary shares of Parent (the "Secondary Shares", and together with the Initial Shares, the "Equity Grant"), subject to upward or downward adjustment in accordance with the Equivalence Calculation set forth on Schedule B. Provided, notwithstanding the foregoing, such downward adjustment with respect to the Equivalence Calculation shall not be in excess of 0.25% of the total amount of issued and outstanding share capital, calculated on a fully diluted basis. The Secondary Shares shall vest in 60 substantially equal monthly*

Kitsuné Creative *vs.* Vinod Kasturi
Commercial Court of Paris
Complaint

*increments, with the first increment vesting on September 1, 2021 (the "2021 Target Date") and the remaining 59 increments vesting on the first of each month thereafter, until the last increment vests on August 1, 2026; provided, however, upon a change in control of Parent all such Secondary Shares shall immediately vest and become exercisable. Company represents and warrants that such initial 27 Secondary Shares represents no less than 0.5% of the total amount of issued and outstanding share capital, calculated on a fully diluted basis, assuming no adjustment is made pursuant to the Equivalence Calculation and the exercise of all convertible securities or securities reserved under any BSPCE, or any similar plan, as of the 2021 Target Date. Executive shall be entitled to acquire the Secondary Shares free and clear, upon exercise at a price per share denominated in euros equal to the price per share at which warrants were issued or would have been issued to employees of Parent in France as of the 2021 Target Date. If and to the extent the Secondary Shares cannot be issued in such a manner to avoid adverse tax consequences in respect of the Secondary Shares, to a greater extent than Executive would have been subject to had the Secondary Shares been issued on the 2021 Target Date, the Company shall provide a Valuation True-Up.*

*1.8    Equity. As soon as practicable after implementation by Parent of a BSPCE and in no event later than the time that Parent first awards equity warrants under such plan to its employees in France, Parent shall award one or more equity warrants to Executive, which shall represent or be exercisable for the Initial Shares and the Secondary Shares. The equity interests issued in respect of the Equity Grant shall not be subject to restrictions on transfer except for restrictions reasonably required under applicable securities law. The Company and Executive will mutually determine the structure of the Equity Grant to minimize adverse tax consequences to the Executive. After the Secondary Shares have fully vested, Company and Executive will accept the terms of the Company's future*

*Translation for information purposes only*

Kitsuné Creative *vs.* Vinod Kasturi
Commercial Court of Paris
Complaint

> *incentive plan. Notwithstanding anything herein to the contrary, the Company's failure to provide or execute definitive documentation with respect to the Equity Grant shall not alleviate or otherwise affect the duties and obligations of the Company or its affiliates or the entitlement of Executive to such Equity Grant. Irrespective of the form of Equity Grant, Executive and his assigns, as the holder of the Equity Grant, shall be entitled to all the rights, privileges and preferences (including, without limitation, as it relates to dividends or distributions to holders of capital stock) as a holder of ordinary shares of Parent would be entitled to receive, had such holder received such ordinary shares at the 2016 Target Date or 2021 Target Date, as applicable* (citation omise)

76. Once again, as in 2016 and 2020, Kitsuné's management was taken aback by these new clauses 1.7 and 1.8, which had never featured in previous exchanges and which, moreover, envisaged the implementation of a phantom stock plan whose terms and conditions were unknown and yet to be defined.

### (f)    April 2023: final talks

77. On April 4, 2023, Mr. Kasturi reminded the Kitsuné group of the new offer made in October 2022, specifying that documentation concerning the phantom stocks would follow in a separate e-mail[25]. He also referred to certain amounts he felt he was owed in respect of his salary compensation.

78. On the same day, Ms. Castel Oster replied to Mr. Kasturi, stating that the Group had approved the payment of $155,000 in salary arrears. With regard to the final bonus for the 2021/2022 financial year, she pointed out that a point relating to the achievement of objectives still needed to be validated with Mr. Grand.

79. However, no response was made on the new incentive plan, as the company was still awaiting a written proposal of the terms and conditions of the phantom stock plan that had been (once again) newly suggested in October 2022 by Mr. Kasturi[26].

80. On the same day, Mr. Kasturi announced that he had asked Foley Hoag to make further amendments to the draft employment contract to take into account the points validated by Kitsuné.

---

[25]    **Kitsuné Creative Exhibit 23**, E-mail from V. Kasturi to A. Castel Oster (copy Foley Hoag), April 4, 2023

[26]    **Kitsuné Creative Exhibit 24**, E-mail from A. Castel Oster to V. Kasturi (copy Foley Hoag and R. Grand) dated April 4, 2023

17

Kitsuné Creative *vs.* Vinod Kasturi
Commercial Court of Paris
Complaint

81. On April 19, 2023, Mr. Kasturi was finally able to share for the first time a written outline of his draft phantom stock plan[27].

82. On May 5, 2023, Mrs. Castel Oster wrote to Mr. Kasturi to update him on the progress of negotiations and the ongoing review of contractual documentation that had been provided by Mr. Kasturi and his advisors.

83. Acknowledging that Kitsuné did not have the in-house expertise to review such complex documentation, she indicated that it would be necessary for them to contact their U.S. legal counsel so that they could carry out an analysis of the proposed terms and conditions.

84. On the main points, however, she suggested as a prerequisite for making any progress (i) distinguishing the issues of negotiating and concluding the employment contract from those of the incentive contract (which had already been suggested on numerous occasions) and (ii) summarizing the mechanics of the phantom-stock incentive plan (a mechanism unknown under French laws). She insisted that it would be useful for them to understand the "spirit" of the proposed documentation before embarking on an analytical review of the stipulated conditions.

85. It follows that in May 2023, the parties were still far from being bound by any incentive contract, with both the philosophy and the stipulations still open to discussion.

86. On May 19, 2023, Mr. Kasturi finally got back to the Kitsuné Group after a briefing with his advisors. His comments, shown in green directly in the text of Ms. Castel Oster's e-mail of May 5, explained that a structured incentive plan in the form of phantom stocks would be a simpler formula than in the form of options or ordinary shares. He added that he and his counsel were available to discuss any points that might be misunderstood.

87. On May 29, 2023, Ms Castel Oster replied in the same e-mail chain, indicating that further discussions about incentive would be handled by Mr. Grand.

88. On May 30, 2023, she wrote again to inform him that her employment lawyer was ready to move forward with the conclusion of the employment contract. On the other hand, discussions remained open regarding the documentation for the incentive plan.

89. At the same time, Mr. Kasturi had announced that he intended to leave the Kitsuné group by 2024 at the latest but had offered to remain at the head of MK Inc. for two days a week to ensure a transition before a new executive get recruited.

---

[27] **Kitsuné Creative Exhibit 23,** E-mail from V. Kasturi to A. Castel Oster (copy Foley Hoag and R. Grand), April 19, 2023

18

*Translation for information purposes only*

Kitsuné Creative *vs.* Vinod Kasturi
Commercial Court of Paris
Complaint

90. On June 6, 2023, Mr. Kasturi wrote to Ms. Castel Oster to request an annual lump-sum compensation of at least $90,000 for a commitment of two days a week[28].

91. The question of phantom stocks was never raised again.

### 1.4    The emergence of the dispute

#### (a)    The discovery of Mr. Kasturi's mismanagement

92. An audit carried out in February 2024 revealed that Mr. Kasturi had committed several abnormal acts of management, constituting not only mismanagement but also potential criminal offences.

93. Firstly, although it had been agreed that his annual salary would be reduced to $90,000 since he was now devoting only 2 days a week to MK Inc. and the rest of his time to his new activity at Market, it emerged that he had continued to pay himself his full compensation, i.e. an excess of $75.000.

94. Secondly, Mr. Kasturi paid the fees invoiced by the international law firm Foley Hoag with MK Inc. funds in the amount of $59,523.75 for a period running from July 1, 2023 to January 31, 2024.

95. This practice is all the more shocking given that these funds have been used to finance the litigation against the Kitsuné companies, for which Foley Hoag has also been appointed.

96. Thus, Mr. Kasturi has not only committed a misuse of company assets, but this abuse is moreover directed against the company he managed and its parent company, in order to threaten them with a lawsuit and extort exorbitant funds from them.

#### (b)    Termination of employment contract on March 28, 2024

97. On March 28, 2024, in view of Mr. Kasturi's actions, the management of the Kitsuné group decided to terminate his employment contract with immediate effect.

#### (c)    The threat of a jury trial in New York against Kitsuné Creative and MK Inc.

98. On May 10, 2024, in the absence of agreement between the Parties, Foley Hoag wrote to MK Inc.'s counsel sharing a draft complaint against MK Inc. and Kitsuné Creative. In their accompanying e-mail, Mr. Kasturi's counsel indicated that they would be available to "*jump on a [telephone] call and discuss next steps*". Foley Hoag added that

---

[28]    **Kitsune Creative Exhibit 26**, E-mail from V. Kasturi to A. Castel Oster, June 6, 2023

*Translation for information purposes only*

Kitsuné Creative *vs.* Vinod Kasturi
Commercial Court of Paris
Complaint

they had also spoken with Mr. Kasturi and that they had hope in finding an amicable solution to the dispute, without undue delay or costs[29].

99. In his draft complaint, Mr. Kasturi makes seven distinct claims against MK Inc. and Kitsuné Creative, taken jointly and severally:

   – Firstly, a claim for a joint and several liability against the Kitsuné companies in the amount of USD 9.1 million for the alleged breach of two contracts.

   – Secondly, a claim for a joint and several liability against the Kitsuné companies in the amount of USD 9.1 million on the grounds of promissory estoppel.

   – Thirdly, an unquantified claim for joint and several liability against the Kitsuné companies for unjust enrichment.

   – Fourthly, a claim for a joint and several liability against the Kitsuné companies for a *quantum meruit*.

   – Fifthly, a claim for an unquantified joint and several liability against the Kitsuné companies in respect of the variable compensation that should have been paid to him under his employment contract.

   – Sixthly, a claim for a joint and several liability of USD 75,000 under California law in respect of the allegedly abrupt termination of his employment contract on March 28, 2024, a few days before the end of the contract, which would have prevented him from receiving his end-of-assignment bonus.

   – Seventhly, a claim for a joint and several liability of USD 75,000 under California law, on the grounds that the allegedly abrupt termination of his employment contract on March 28 constituted a violation of California public policy.

100. On the other hand, the draft complaint is strangely silent on several circumstances that are nonetheless fundamental to the characterization of the parties' respective rights. For example,

*On the wilful misconduct justifying the termination of his employment contract with immediate effect:*

   – Mr. Kasturi does not mention that he uses MK Inc. funds to pay the fees of the law firm Foley Hoag which was appointed by Mr. Kasturi to conduct the present [US] litigation for more than $59,000.

---

[29]    **Kitsuné Creative Exhibit 29**, E-mail from Foley Hoag to Dupont Law Group, March 10, 2024

*Translation for information purposes only*

Kitsuné Creative *vs.* Vinod Kasturi
Commercial Court of Paris
Complaint

– Mr. Kasturi is equally silent on the fact that, although a reduced compensation had been agreed for the period during which he would only work two days a week, he was paid his full compensation, i.e. an excess of over $68,000.

*On the distinction between his employment contract and the alleged incentive plan*

– Mr. Kasturi has never been an employee of Kitsuné Creative. He has always been an MK Inc. employee, exercising his management functions within MK Inc. and his compensation having been fully and systematically paid by MK Inc. of which he cannot be unaware, since he himself supervised the payment of his own compensation.

Therefore, apart from creating a general confusion in this [US] litigation and bringing the shareholder into the case, the claims against Kitsuné Creative on the basis of his status as an employee have no merit.

*On the compensation due in respect of its alleged shareholding*

– Mr. Kasturi is unable to produce the contracts that would have been concluded and that would have ratified (i) not only a validation of a capital holding in the form of ordinary shares in Kitsuné Creative, but (ii) even more so, the liquidity conditions that would allow him to benefit today from a market valuation of EUR 8,591,036. –

– Mr. Kasturi is also unable to show any e-mail in which Kitsuné Creative's consent to his multiple counter-offers could be inferred, as Kitsuné Creative has always reiterated that the incentive plan should be set out in writing in a separate deed, which should include all the key elements to the implementation of said plan.

– Even more fundamentally, a cursory reading of the correspondence shows that in fact the parties did not even agree on the nature of the securities to be issued under the negotiated incentive plan.

101. Lastly, the draft complaint mentions that the trial should be held in the presence of civil jurors.

102. The draft complaint issued by the company contains a jumble of claims relating to Mr. Kasturi's status as an employee of MK Inc. as well as claims for compensation for the alleged breach of an incentive plan to which he believes he is entitled.

103. The massive confusion created by Mr. Kasturi in this draft complaint is intended to give the impression that all his claims are intertwined and can only be dealt with together. This intentionally confusing factual characterization pursues a single objective: to justify the alleged jurisdiction of the American courts over Kitsuné Creative, in order to force the latter to settle in order to avoid necessarily very costly litigation before the American courts.

21

Kitsuné Creative *vs.* Vinod Kasturi
Commercial Court of Paris
Complaint

104. The draft complaint is nothing more than a measure of intimidation with the aim of forcing Kitsuné Creative to pay, at a high price, an amount that Vinod Kasturi would never have been able to secure in France for the reasons set out below.

* * * *
* * *
*

## 2.  DISCUSSION

105. A dispute has arisen between the parties over the existence of an agreement to set up an incentive plan.

106. Contrary to what Mr. Kasturi maintains, and as the facts of the case [above mentioned] have amply demonstrated, there is no agreement on the material elements of an enforceable incentive contract. Nor is there any unilateral undertaking on the part of the company to propose an incentive plan.

### 2.1  ON THE APPLICATION OF FRENCH LAW

107. In his draft complaint, Mr. Kasturi appears to be relying on the application of New York and Californian laws as the basis for his compensation claims.

108. However, for such claims to be valid, it is already incumbent on the latter to demonstrate the existence of the agreements of which he claims to be the beneficiary and the obligations stipulated therein.

109. Since the situation presents foreign elements, it is first necessary to determine the law applicable to the assessment of the existence of consent.

110. From a legal perspective, the law applicable to the transfer of shares or securities in a company is the law of the place where the debtor of the characteristic obligation is domiciled, i.e. the place where the transferor is domiciled in the case of a transfer of securities.

111. In this case, we are talking about the shares of Kitsuné Creative, a French company registered at the Paris Trade and Companies Register.

### 2.2  ON THE ABSENCE OF CONSENT TO SET UP AN INCENTIVE PLAN

112. Mr. Kasturi is threatening to request that MK Inc. and Kitsuné Creative be jointly and severally ordered to pay him the sum of USD 9.1 million corresponding to the annual bonuses for 2017, 2019 and 2020 allegedly unpaid, as well as the market value of 2% of Kitsuné Creative's share capital to which he would, according to him, be entitled

*Translation for information purposes only*

Kitsuné Creative *vs.* Vinod Kasturi
Commercial Court of Paris
Complaint

under the two share allocation agreements allegedly entered into with Kitsuné Creative in 2016 (1.5%) and 2022 (0.5%).

113. More specifically, Mr. Kasturi states in his draft Complaint

- on the one hand, that, with regard to the financial terms of his position as salaried Head of MK Inc., a contract had been fully formed in July 2016, containing in particular the promise of an allocation to him of 1.5% of shares at a vesting rate of 0.5% per year and spread over three years;

he considers,

- secondly, to be the beneficiary of a second promise made by the plaintiffs in early 2022 to allocate an additional 0.5% of shares.

114. For these reasons, he intends to raise before the American courts, firstly, the contractual liability of the Kitsuné companies (*breach of contract*) and secondly, Kitsuné's failure to respect its unilateral promises (*promissory estoppel*) in particular.

115. However, in view of the application of French law to the present dispute (*supra* 2.1), it is in the light of the French contract law principles that it is appropriate to examine whether Mr. Kasturi could validly rely on contractual breach and/or disrespect by the Kitsuné companies of promises they may have made to him.

116. As will be shown, such claims cannot succeed before the French courts in the absence of a meeting of the minds and consent of the parties, whether to the contract or even to the promises invoked.

117. First of all, it is worth recalling the principles governing the formation of contracts and of promises in French law.

### (a)   In law

118. According to Mr. Kasturi, a first contract was signed in July 2016.

119. It is therefore in the light of the principles governing the formation of contracts prior to the reform of Contract law of February 10, 2016 (which came into force in part on October 1 2016 and is applicable to contracts concluded after its entry into force) that it is necessary to determine whether a contract has been concluded in the present case.

120. While the former Civil Code was not very explicit on the question of contract formation, which the February 10, 2016 reform of Contract law remedied by introducing an entire

23

*Translation for information purposes only*

Kitsuné Creative *vs.* Vinod Kasturi
Commercial Court of Paris
Complaint

chapter in the Code devoted to the subject[30], in practice, however, the main rules had already been laid down by case law:

> *"Curiously, the 1804 Code did not contain any provisions relating to the agreement of wills. This gap has now been filled. Essentially enshrining the solutions that had emerged from case law, the authors of the reform deal with the issue in some detail in articles 1113 to 1121 of the Civil Code."[31]*

121. In particular, for the contract to be validly formed, the consent of each of the parties had to have been obtained[32], which implied an agreement by each of them, manifested by an offer, on the one hand, and an acceptance, on the other.

122. In the absence of a meeting of the minds or acceptance by the parties of the conditions laid down by the other party, in particular those elements considered material to the contract[33], the contract is not validly formed.

123. As regards the offer to enter into a contract, case law prior to the reform already required it to be firm and precise[34] so that acceptance could cover all the major elements of the future contract.

---

[30]   See articles 1112 to 1121, sub-section I, Negotiation, and sub-section II, Offer and acceptance, Chapter II, Contract formation, Sub-Title I, The contract, Title III, Sources of obligations.

[31]   Droit civil, les Obligations, F. Terré, P. Simler, Y. Lequette, F. Chénedé, Dalloz, 12ème edition, para 162

[32]   Article 1108 (former) of the French Civil Code

[33]   Cass. civ. 3, May 2, 1978

*"But whereas, by virtue of its sovereign power of assessment, it considered, on the one hand, that certain terms and conditions which are usually accessory, such as the date of payment of the balance of the price or the date of taking possession of the premises, had in this case been considered by the vendor as constituting elements of her consent, and that, on the other hand, it did not result from all the elements of the case that an agreement had been reached either on the date of payment of the balance of the price or on the date of taking possession of the premises, and that, on the other hand, there was no evidence from all the elements of the case that an agreement had been reached either on the date of payment of the balance, or on the date of taking possession of the premises, the appeal court was able to deduce that the sales contract had not been formed; that having thus noted the absence of an agreement, which necessarily excludes any ratification, the Court of Appeal, on this ground alone, justified its decision; that the plea cannot be accepted;".*

[34]   Cass. com., June 29, 1993, no. 91-20.380

*"whereas, on the one hand, in a sovereign appraisal, the judgment decided that the letter from the Chanel company accompanied by the contractual document sent on May 18, 1988 to the Parfumerie Plus company constituted a "precise, complete and firm offer" whose acceptance by the latter was established by the signature it had affixed to this contract on May 25, 1988 without*

24

*Translation for information purposes only*

Kitsuné Creative *vs.* Vinod Kasturi
Commercial Court of Paris
Complaint

124. All these principles are now enshrined in the French Civil Code.

125. Firstly, under article 1113 of the French Civil Code,

> *"The contract is formed by the meeting of an offer and an acceptance by which the parties express their will to commit themselves. This willingness may result from a declaration or unequivocal conduct on the part of its author".*

126. It follows from the above provision that the will of all parties must be manifest (regardless of the form of its expression, whether express or tacit) in order to conclude that there has been a "meeting of the minds" and therefore that a contract has been validly formed.

127. Article 1114 of the Civil Code then defines the notion of offer and its effects:

> *"The offer, made to a specified or unspecified person, includes the material elements of the contract envisaged and expresses the will of its author to be bound in the event of acceptance. Failing this, there is only an invitation to enter into negotiations.*

128. In accordance with the aforementioned text, the offer must be firm and precise in its content, i.e. it must contain the most important elements of the proposed contract. Failing this, as the Civil Code reminds us, it is merely an "invitation to enter into negotiations".

129. As the scholars remind us,

> *"In other words, an offer, also known as a pollicitation, is a proposal to enter into a contract, on specific terms, such that its acceptance is sufficient to form the contract.[35]".*

130. With regard to the duration of an offer, even before the reform of the law of obligations, the *Cour de cassation* had considered "*that a reasonable time limit (is) necessarily contained in any offer to sell not accompanied by a specific time limit.*"[36].

---

*any reservation and before any retraction of the offer; that the Court of Appeal therefore did not have to carry out any further research;"*.

[35]    Droit civil, les Obligations, F. Terré, P. Simler, Y. Lequette, F. Chénedé, Dalloz, 12ème edition, para 165

[36]    Cass. civ. 3, May 30, 2009

*Translation for information purposes only*

Kitsuné Creative *vs.* Vinod Kasturi
Commercial Court of Paris
Complaint

131. Article 1117, paragraph 1, reproduced below, enshrines the case law solution of the lapse of an offer after a certain period of time, thereby avoiding acceptance being formulated too late, sometimes several years after the offer was issued:

> *"The offer lapses on expiry of the deadline set by the offeror or, failing that, at the end of a reasonable time period. [...]*
> *"*

132. Finally, in the classic way, the Civil Code reminds us in article 1118 that acceptance is a unilateral legal act and that it must be final and simple; otherwise, it is not an acceptance but a counter-proposal, in other words, a new offer:

> *"Acceptance is the manifestation of the author's willingness to be bound by the terms of the offer.*
>
> *[...]*
>
> *Acceptance that does not conform to the offer is without effect, unless it constitutes a new offer."*

133. Mr. Kasturi is also claiming that an unilateral promise made to him at the beginning of 2022 to increase his incentive to 0.5% of Kitsuné Creative's capital has not been respected.

134. On this issue, the new provisions of the Civil Code are applicable and provide under article 1124:

> *"A unilateral promise is a contract by which one party, the promisor, grants the other, the beneficiary, the right to opt for the conclusion of a contract, the basic elements of which are determined, and for the formation of which only the beneficiary's consent is required. Revocation of the promise during the time given to the beneficiary to opt in does not prevent the formation of the promised contract. A contract concluded in violation of the unilateral promise with a third party who knew of its existence is null and void.*

135. As will now be shown, the application of the above principles leads to the exclusion of the existence of a contract validly formed in 2016; the same applies to the alleged unilateral promise of 2022.

### (b)   In fact: no meeting of the minds ever took place between Mr. Kasturi and Kitsuné Creative.

136. As has been amply explained in the summary of the facts, it is not possible to maintain that a contract was concluded between Mr. Kasturi and Kitsuné Creative either in 2016 or thereafter, for the reasons set out below.

26

*Translation for information purposes only*

Kitsuné Creative *vs.* Vinod Kasturi
Commercial Court of Paris
Complaint

> **(i)    The draft employment contract sent by Kitsuné on September 9, 2016 contained neither an offer to subscribe to a BSPCE plan nor a unilateral promise on the part of Kitsuné.**

137.  The proposal made to Mr. Kasturi to subscribe to a BSPCE plan as set out to Kitsuné in its draft contract transmitted on September 9, 2016 did not contain any of the key elements necessary for the legal qualification of an offer or a promise.

138.  Indeed, article 1.7 of the draft employment contract was silent on most of the key conditions of the planned incentive plan; better still, article 1.7 expressly stated that:

   – The timetable was uncertain;

   – The number of BSPCE granted was undetermined; *and*

   – The terms and conditions of exercise of the BSPCEs, including in particular their grant date, strike price, vesting conditions and all other elements essential to this type of plan.

   to be determined at a later date in future written documentation[37].

139.  As mentioned above, a contract can only be formed if there is a basis for acceptance, i.e. an offer, which, to be valid, must be clear and precise, i.e. contain the essential elements of the future contract.

140.  In this case, however, as it did not contain any of the elements of the envisaged profit sharing plan, it could not be considered as an offer within the meaning of Contract law. At best, Kitsuné made a proposal to negotiate a BSPCE plan at a later date.

141.  In the absence of an offer within the meaning of French law, it is therefore not possible to consider that a contract could have been formed on this basis alone.

142.  For the same reasons, in the absence of the key elements of the future contract, it is not possible to consider that article 1.7 contained a unilateral promise by Kitsuné to grant a BSPCE plan. At best, it was a proposal to enter into negotiations on a BSPCE plan at a later date.

143.  In any case, even if article 1.7 of the draft contract had contained an offer, Mr. Kasturi rejected it in its entirety.

---

[37]    **Kitsune Creative Exhibit 30**, Draft employment contract dated September 9, 2016

27

*Translation for information purposes only*

Kitsuné Creative *vs.* Vinod Kasturi
Commercial Court of Paris
Complaint

> **(ii)    Mr. Katsuri has fully rejected the proposal to negotiate a BSPCE plan set out in clause 1.7 of the draft employment contract.**

144. On September 29, 2016, Mr. Kasturi sent Kitsuné the draft employment contract reviewed by him and containing his amendments.

145. However, article 1.7 of the draft has not only been completely crossed out but has also been rewritten by Mr. Kasturi in very different terms.

146. As explained above, Mr. Kasturi's counter-proposal differed in all respects from that received from Kitsuné Creative:

   –  The nature of the incentive: firm grant of securities rather than BSCPE;

   –  The quantity and conditions relating to the allocation of securities.

147. As Mr. Kasturi's counter-proposal was radically different from the one sent to him, it could only be analyzed as a rejection of the initial offer, which therefore lost its effect.

148. In addition, Mr. Kasturi's counter-proposal was also ineffective, as the French Civil Code states in article 1118 that an acceptance in different terms is "ineffective".

149. In any event, even supposing it had been accepted by Kitsuné Creative, the draft of clause 1.7 as proposed by Mr. Kasturi was still incomplete in terms of the key elements to be included in a stock option plan (BSPCE or options), since the strike price was absent.

150. As a result, there was no meeting of the minds.

> **(iii)    In any event, the offer contained in article 1.7 has become null and void.**

151. In addition to being expressly rejected, the offer contained in the draft employment contract sent on September 9, 2016 became null and void, as Mr. Kasturi had not shown any interest in the subject for almost 4 years.

152. After the summer 2016 exchanges, Mr. Kasturi did not come forward again until June 2020, almost four years later.

153. It goes without saying that the "reasonable" time period during which an offer must be maintained cannot be so long.

154. For all the foregoing reasons, it will therefore be held that no contract was ever concluded between Mr. Kasturi and Kitsuné in 2016 concerning the granting of a BSPCE plan, in the absence of any exchange of wills materializing such an agreement.

28

*Translation for information purposes only*

Kitsuné Creative *vs.* Vinod Kasturi
Commercial Court of Paris
Complaint

### (iv)    No subsequent meeting of the minds

155. As mentioned above, after the initial negotiations in 2016, the parties never discussed the subject again until June 2020, when Mr. Kasturi's counsel sent a draft employment contract that was again very different from the 2016 contract (and contained a new version of clause 1.7).

156. This was followed by a new period of complete "radio silence" between the parties until the beginning of 2022, when new exchanges took place, once again confirming the distance between their positions and, above all, the fact that none of the basic elements of the conditions for Mr. Kasturi's entry into the capital had yet been agreed between them.

157. Mr. Kasturi's own conduct confirms the inexistence of a meeting of the minds in July 2016 and January 2022.

158. First of all, if Mr. Kasturi really believed that he had entered into a contract in July 2016 making him the holder of an incentive instrument in Kitsune Creative's capital, it is questionable why he nevertheless continued to solicit the Group's executives on this issue. Similarly, if Mr. Kasturi was indeed the beneficiary of an incentive contract, it is not clear why he continued to propose new incentive formulas that were incompatible and insusceptible of being cumulated with his first [alleged] contract.

159. It was because Mr. Kasturi knew that there was no agreement either the form or on the substance of the incentive that he persisted in negotiating it.

160. Furthermore, if Mr. Kasturi really believed that it was not necessary to gather all the key elements of the incentive plan in question in precise written documentation, then why did he send one prepared by Foley Hoag in November 2023 with respect to the implementation of phantom shares?

161. This is precisely because contractual mechanisms as complex as the issuance of BSPCEs, stock options or phantom stocks require the preparation of a comprehensive documentation governing all aspects of their implementation, which until now had never even been proposed by Mr. Kasturi or Kitsuné Creative.

162. It was on the basis of this comprehensive documentation that the parties were then to discuss and negotiate the content of the rights granted to one or other of them in the drafted stipulations.

163. This documentation, presented for the first time on November 15, 2023 and relating to a phantom stock incentive plan, was not accepted by Kitsuné Creative, which did not understand this sudden change in the choice of incentive instrument. Nor did Kitsuné Creative accept Mr. Kasturi's decision to go back on the gains of the negotiations held

Kitsuné Creative *vs.* Vinod Kasturi
Commercial Court of Paris
Complaint

in 2020-2021 concerning the implementation of an adjustment mechanism so that Mr. Kasturi's incentive would be indexed predominantly to the value generated by his perimeter, i.e. the American and Canadian subsidiaries.

164. For all these reasons, in the absence of an agreement, there can be no contract, whether in July 2016 or later.

### 2.3    IN THE ALTERNATIVE, ON THE STATUTE OF LIMITATIONS APPLICABLE TO MR. KASTURI'S CLAIMS

165. In the alternative, even if the parties had entered into a contract in July 2016 (*quod non*), an action seeking to sanction any contractual liability of the Kitsuné companies before the French courts would inevitably be declared inadmissible for the simple reason that it is time-barred.

166. Indeed, the limitation period for personal actions, applicable here, is five years in accordance with article 2224 of the Civil Code, which provides:

> *"Personal or personal property actions are barred after five years from the date on which the holder of a right knew or should have known the facts enabling him to exercise it."*

167. The contractual liability action that Mr. Kasturi plans to launch today would take place more than eight years after the alleged contract was concluded and would therefore be largely time-barred.

168. Although Mr. Kasturi considered that Kitsuné had made a contractual commitment to him, he never complained about its non-fulfillment, and at no time did he attempt to enforce it. And for good reason, he continued to request new incentive formulas from the group.

169. In particular, he never served formal notice on the Kitsuné companies to perform; nor did he initiate any action against them, with the result that the five-year period ran untolled.

170. Such an action should therefore be declared inadmissible as late and time-barred.

\* \* \* \*
\* \* \*
\*

171. For all the foregoing reasons, the Court is asked to order Mr. Kasturi to pay the sum of 20,000 euros under Article 700, as well as the full costs.

30

*Translation for information purposes only*

Kitsuné Creative *vs.* Vinod Kasturi
Commercial Court of Paris
Complaint

## FOR THESE REASONS

*Having regard to article 1108 (former) of the French Civil Code*
*Having regard to articles 1113 et seq. of the French Civil Code,*
*Having regard to the foregoing pleas in law,*
*Having regard to the exhibits submitted to the hearing,*

The Commercial Court of Paris is asked to:

*Primarily,*

- **JUDGE** that there is no contract between Mr. Vinod Kasturi and Kitsuné Creative relating to an incentive plan in Kitsuné Creative's capital for the benefit of Mr. Kasturi;

- **JUDGE** there is no promise between Mr. Vinod Kasturi and Kitsuné Creative relating to an incentive plan in Kitsuné Creative's capital for the benefit of M. Kasturi;

*In the alternative,*

- **JUDGE** Mr Vinod Kasturi's claim for compensation under the contract concluded in July 2016 is time-barred;

*In any event,*

- **ORDER** Mr Vinod KASTURI to pay the company KITSUNÉ CREATIVE the sum of 20,000 euros for irreducible costs in accordance with the provisions of article 700 of the French Code of Civil Procedure; and

- **ORDER** Mr Vinod KASTURI to pay all the costs.

**WITHOUT PREJUDICE**

31

Kitsuné Creative *vs.* Vinod Kasturi
Commercial Court of Paris
Complaint

*Translation for information purposes only*

## LIST OF EXHIBITS

| | |
|---|---|
| **Kitsuné Creative Exhibit 1** | Registration certificate Kitsuné Creative dated May 12, 2024 |
| **Kitsuné Creative Exhibit 2** | Passport of Vinod Kasturi |
| **Kitsuné Creative Exhibit 3** | Email from G. Loëc to V. Kasturi, February 25, 2016 |
| **Kitsuné Creative Exhibit 4** | Exchange of emails between V. Kasturi, G. Loëc and A. Castel Oster between February 25, 2016 and July 11, 2016 |
| **Kitsuné Creative Exhibit 5** | Email from A. Castel Oster to V. Kasturi (copy D. Kimball) dated September 9, 2016 |
| **Kitsuné Creative Exhibit 6** | Notice of termination of employment dated March 28, 2024 |
| **Kitsuné Creative Exhibit 7** | E-mail from V. Kasturi to A. Castel Oster dated March 14, 2024 |
| **Kitsuné Creative Exhibit 8** | Email from Mr. Kasturi to Kitsuné, March 16, 2016 |
| **Kitsuné Creative Exhibit 9** | E-mail from V. Kasturi to Kitsuné Creative, July 8, 2024 |
| **Kitsuné Creative Exhibit 10** | Email from A. Castel Oster to V. Kasturi dated July 11, 2016 |
| **Kitsuné Creative Exhibit 11** | Email from V. Kasturi to A. Castel Oster, July 11, 2016 |
| **Kitsuné Creative Exhibit 12** | Draft employment contract dated September 29, 2016, Clause 1.7 |
| **Kitsuné Creative Exhibit 13** | E-mail from M. Yankovich to A. Castel Oster, June 5, 2020 |
| **Kitsuné Creative Exhibit 14** | Draft contract of June 5, 2020 |
| **Kitsuné Creative Exhibit 15** | E-mail from A. Castel Oster to V. Kasturi of July 8, 2021 |
| **Kitsuné Creative Exhibit 16** | Email from A. Castel Oster to V. Kasturi dated September 20, 2021 |
| **Kitsuné Creative Exhibit 17** | E-mail from V. Kasturi to A. Castel Oster, September 23, 2021 |
| **Kitsuné Creative Exhibit 18** | E-mail from A. Castel Oster to V. Kasturi dated October 11, 2021 |
| **Kitsuné Creative Exhibit 19** | E-mail from A. Castel Oster to V. Kasturi dated January 5, 2022 |
| **Kitsuné Creative Exhibit 20** | E-mail from V. Kasturi to A. Castel Oster, January 5, 2022 |
| **Kitsuné Creative Exhibit 21** | E-mail from A. Castel Oster to V. Kasturi and R. Grand dated January 24, 2022 |

32

*Translation for information purposes only*

Kitsuné Creative *vs.* Vinod Kasturi
Commercial Court of Paris
Complaint

| | |
|---|---|
| **Kitsuné Creative Exhibit 22** | E-mail from V. Kasturi to A. Castel Oster (copy Foley Hoag), October 27, 2022 |
| **Kitsuné Creative Exhibit 23** | E-mail from V. Kasturi to A. Castel Oster (copy Foley Hoag), April 4, 2023 |
| **Kitsuné Creative Exhibit 24** | E-mail from A. Castel Oster to V. Kasturi (copy Foley Hoag and R. Grand) dated April 4, 2023 |
| **Kitsuné Creative Exhibit 25** | E-mail from V. Kasturi to A. Castel Oster (copy Foley Hoag and R. Grand), April 19, 2023 |
| **Kitsuné Creative Exhibit 26** | E-mail from V. Kasturi to A. Castel Oster, June 6, 2023 |
| **Kitsuné Creative Exhibit 27** | Reserved |
| **Kitsuné Creative Exhibit 28** | Appendix A (Calculation table) |
| **Kitsuné Creative Exhibit 29** | E-mail from Foley Hoag to Dupont Law Group, March 10, 2024 |
| **Kitsuné Creative Exhibit 30** | Draft employment contract dated September 9, 2016 |

33

## ASSIGNATION DEVANT LE TRIBUNAL DE COMMERCE DE PARIS

L'AN DEUX MILLE VINGT QUATRE ET LE

**A LA DEMANDE DE** :

**La société Kitsuné Creative**, société par actions simplifiée au capital social de 5.276 euros ayant son siège social sis 9 rue du Helder, 75009 Paris, immatriculée au Registre du commerce et des sociétés de Paris sous le numéro 538 017 187, prise en la personne de son représentant légal dûment habilité aux fins des présentes,

**Ayant pour avocat postulant** :

**Maître Nicole Delay-Peuch**
Avocat au Barreau de Paris
15 rue Monsigny, 75002 Paris
Tél. : +33 (0)1 45 31 78 01
Toque : A377

**Ayant pour avocats plaidant** :

**Maître Marie-Laure Cartier**
**Maître Alexandre Meyniel**
Avocats au Barreau de Paris
CARTIER MEYNIEL
5, avenue Alphand, 75116 Paris
Tél. : +33 (0) 6 95 86 21 32
Toque : E1874

*Demanderesse*

**J'AI, HUISSIER DE JUSTICE SOUSSIGNE,**

**DONNE ASSIGNATION A :**

**Monsieur Vinod Kasturi**, né le 7 décembre 1987, de nationalité américaine, dirigeant d'entreprise ayant son domicile au 1423 Elevado Street, Los Angeles, Californie 90026, Etats-Unis d'Amérique

*Défendeur*

D'AVOIR A COMPARAITRE LE JEUDI 24 octobre 2024 à 11 heures devant la 18$^{ème}$ chambre du Tribunal de commerce de Paris, 1 Quai de la Corse, 75004 Paris, France.

**TRES IMPORTANT**

Un procès vous est intenté pour les raisons ci-après exposées. Conformément à l'article 853 du code de procédure civile, vous êtes tenu de constituer avocat avant l'audience ci-dessus indiquée pour être représenté devant ce tribunal. Cette formalité est obligatoire. À défaut, vous vous exposez à ce qu'un jugement soit rendu à votre encontre sur les seuls éléments fournis par votre adversaire.

Il vous est rappelé que l'article 861-2 du code de procédure civile dispose :

> *« Sans préjudice des dispositions de l'article 68, la demande incidente tendant à l'octroi d'un délai de paiement en application de l'article 1343-5 du code civil peut être formée par déclaration faite, remise ou adressée au greffe, où elle est enregistrée. L'auteur de cette demande doit justifier avant l'audience que l'adversaire en a eu connaissance par lettre recommandée avec demande d'avis de réception. Les pièces que la partie invoque à l'appui de sa demande de délai de paiement sont jointes à la déclaration. L'auteur de cette demande incidente peut ne pas se présenter à l'audience, conformément au second alinéa de l'article 446-1. Dans ce cas, le juge ne fait droit aux demandes présentées contre cette partie que s'il les estime régulières, recevables et bien fondées. »*

Par ailleurs, les Article 641, 642, 643 et 644 du code de procédure civile disposent :

> *« Lorsqu'un délai est exprimé en jours, celui de l'acte, de l'événement, de la décision ou de la notification qui le fait courir ne compte pas. Lorsqu'un délai est exprimé en mois ou en années, ce délai expire le jour du dernier mois ou de la dernière année qui porte le même quantième que le jour de l'acte, de l'événement, de la décision ou de la notification qui fait courir le délai. A défaut d'un quantième identique, le délai expire le dernier jour du mois. Lorsqu'un délai est exprimé en mois et en jours, les mois sont d'abord décomptés, puis les jours. »*

> *« Tout délai expire le dernier jour à vingt-quatre heures. Le délai qui expirerait normalement un samedi, un dimanche ou un jour férié ou chômé est prorogé jusqu'au premier jour ouvrable suivant. »*

> *« Les dispositions des articles 640 à 642 sont également applicables aux délais dans lesquels les inscriptions et autres formalités de publicité doivent être opérées. »*

> *« Lorsque la demande est portée devant une juridiction qui a son siège en France métropolitaine, les délais de comparution, d'appel, d'opposition, de tierce opposition dans*

*l'hypothèse prévue à l'article 586 alinéa 3, de recours en révision et de pourvoi en cassation sont augmentés de : 1. Un mois pour les personnes qui demeurent en Guadeloupe, en Guyane, à la Martinique, à La Réunion, à Mayotte, à Saint-Barthélemy, à Saint-Martin, à Saint-Pierre-et-Miquelon, en Polynésie française, dans les îles Wallis et Futuna, en Nouvelle-Calédonie et dans les Terres australes et antarctiques françaises ; 2. Deux mois pour celles qui demeurent à l'étranger. »*

*« Lorsque la demande est portée devant une juridiction qui a son siège en Guadeloupe, en Guyane, à la Martinique, à La Réunion, à Mayotte, à Saint-Barthélemy, à Saint-Martin, à Saint-Pierre-et-Miquelon et dans les îles Wallis et Futuna, les délais de comparution, d'appel, d'opposition de tierce opposition dans l'hypothèse prévue à l'article 586 alinéa 3, et de recours en révision sont augmentés d'un mois pour les personnes qui ne demeurent pas dans la collectivité territoriale dans le ressort de laquelle la juridiction a son siège et de deux mois pour les personnes qui demeurent à l'étranger. »*

*Les pièces sur lesquelles la demande est fondée sont indiquées en fin d'acte selon bordereau annexé*

**TABLE DES MATIERES**

1.  Faits et Procédure.................................................................................................................1

    1.1  Les Parties ...........................................................................................................1

         (a)    Kitsuné Creative ......................................................................................1

         (b)    Vinod Kasturi............................................................................................1

    1.2  Le contrat de travail entre MK Inc. et M. Kasturi .............................................1

         (a)    La négociation du contrat de travail entre février et septembre 2016...................1

         (b)    La prise de fonction de M. Kasturi en tant que *Head of America* du groupe Kitsune le 5 septembre 2016..........................................................2

    1.3  L'échec des négociations quant à la mise en place d'un plan d'intéressement de M. Kasturi au sein de Kitsuné Creative ...............................................................3

         (a)    Juillet-Septembre 2016 : l'échec des négociations quant à la clause relative à l'engagement de Kitsuné Creative de proposer un plan de BSPCE ......................4

                (i)     Les premiers échanges relatifs à la mise en place d'un plan d'intéressement en mars 2016.................................................................4

                (ii)    5 juillet 2016 : la proposition du groupe Kitsuné de mise en place d'un intéressement par voie de bons de souscription de parts de créateur d'entreprise (BSPCE)..........................................................5

                (iii)   Septembre 2016 : le refus de M. Kasturi de se voir attribuer des BSPCE ...............................................................................................7

         (b)    Juin 2020-janvier 2021 : le rejet par le groupe Kitsuné de la demande de M. Kasturi d'allocation d'actions gratuites .......................................................9

         (c)    Juillet-octobre 2021 : la reprise des négociations...................................11

         (d)    Janvier 2022 : nouvelle reprise des négociations et nouveau changement souhaité par M. Kasturi................................................................................13

         (e)    27 octobre 2022 : la nouvelle offre formulée par M. Kasturi d'un plan d'intéressement structuré sous la forme d'actions fantômes ...............................14

         (f)    Avril 2023 : les derniers pourparlers .....................................................18

    1.4  La naissance du différend....................................................................................20

         (a)    La découverte des fautes de gestion commises par M. Kasturi .............................20

         (b)    La résiliation du contrat de travail le 28 mars 2024..............................20

         (c)    Les menaces d'un procès avec jury devant les juridictions de New York contre Kitsuné Creative et MK Inc. .....................................................................20

2.  Discussion.............................................................................................................................23

    2.1  Sur l'application du droit français .......................................................................23

    2.2  Sur l'absence de consentement à la mise en place d'un plan d'intéressement ..................23

         (a)    En droit ...................................................................................................24

(b)    En fait : aucune rencontre des volontés n'est jamais intervenue entre M. Kasturi et Kitsuné Creative ........................................................................27

    (i)    Le projet de contrat de travail transmis le 9 septembre 2016 par Kitsuné ne contenait ni une offre de souscrire un plan de BSPCE, ni une promesse unilatérale de la part de Kitsuné.................................27

    (ii)    M. Katsuri a intégralement rejeté la proposition de négocier un plan de BSPCE formulée à la clause 1.7 du projet de contrat de travail ...28

    (iii)    Surabondamment, l'offre contenue à l'article 1.7 est en tout état de cause devenue caduque...................................................................29

    (iv)    Aucune rencontre des volontés n'est intervenue par la suite.............29

2.3    A titre subsidiaire, sur la prescription des demandes de M. Kasturi ...............31

Par ces Motifs ............................................................................................................32

Kitsuné Creative *c.* Vinod Kasturi
Tribunal de commerce de Paris
Assignation

**OBJET DU LITIGE**

**1.    FAITS ET PROCEDURE**

**1.1    Les Parties**

**(a)    Kitsuné Creative**

1.    Kitsuné Creative[1] est la société holding du groupe Kitsuné (la « **Société** » ou « **Kitsuné Creative** »).

2.    Fondé en 2002 par Messieurs Gildas Loëc et Masaya Kuroki, Kitsuné est un groupe qui exploite un label de musique (Kitsuné Musique), une maison de mode (Maison Kitsuné) et une franchise de cafés (Kitsuné Café).

3.    La direction de la Société est assurée par la société holding GIMA.

**(b)    Vinod Kasturi**

4.    Vinod Kasturi est un résident américain domicilié en Californie[2].

5.    De 2016 à 2024, il a exercé les fonctions de *Head of America* du groupe Kitsuné en prenant la tête des filiales américaine et canadienne du groupe.

**1.2    Le contrat de travail entre MK Inc. et M. Kasturi**

**(a)    La négociation du contrat de travail entre février et septembre 2016**

6.    Les Parties se sont rapprochées en février 2016 à l'occasion d'une rencontre entre le fondateur du groupe Kitsuné, M. Gildas Loëc, et M. Kasturi. A l'époque, M. Kasturi travaillait chez Vevo, une plateforme numérique de partage de vidéo de musique.

7.    Le 25 février 2016, M. Loëc a écrit M. Kasturi afin de le remercier pour ses conseils sur la joint-venture avec leur distributeur américain Want et lui proposer de rejoindre Kitsuné en prenant la tête de l'activité et des filiales américaines[3]. L'objectif pour Kitsuné était de relancer l'activité de ses filiales américaines de manière indépendante

---

[1]    **Pièce Kitsuné Creative 1**, Extrait d'immatriculation Kitsuné Creative du 12 mai 2024

[2]    **Pièce Kitsuné Creative 2**, Passeport de Vinod Kasturi.

[3]    **Pièce Kitsuné Creative 3**, Courriel de G. Loëc à V. Kasturi du 25 février (« *Perhaps we need to state properly the position beforehand. To me it will be head of KITSUNÉ inc America* »)

Kitsuné Creative *c.* Vinod Kasturi
Tribunal de commerce de Paris
Assignation

et ne plus être tributaire d'un distributeur exclusif comme cela avait été le cas avec la société Want.

8. Le même jour, M. Kasturi faisait valoir qu'il était extrêmement motivé à l'idée de rejoindre Kitsuné et son équipe, soulignant toutefois qu'avant de pouvoir avancer sur la fixation d'une date de départ de Vevo, il serait important qu'il puisse rencontre les fondateurs et l'équipe dirigeante, notamment en vue de déterminer le périmètre de sa mission ainsi que les modalités de sa rémunération[4].

9. Le 7 mars 2016, Mme. Audrey Castel Oster, actuelle dirigeante de Kitsuné Creative[5], lui fournissait une réponse détaillée sur son rôle et les objectifs qui seraient les siens s'il devait rejoindre le groupe Kitsuné.

10. Comme en attestent les échanges qui se sont tenus entre les Parties entre le 25 février et le 11 juillet 2016, la question de la rémunération annuelle qui serait versée à M. Kasturi constituait le cœur de la discussion. Après une demande initiale de ce dernier d'une rémunération à USD 200.000, puis une proposition à USD 100.000 de la part de Kitsuné, un accord a finalement été arrêté à USD 150.000, ce qui constituait une augmentation significative de la grille de rémunération internationale des employés du groupe Kitsuné.

11. Le 9 septembre 2016, Mme Castel Oster a écrit à M. Kasturi afin de lui communiquer le projet de contrat de travail qui avait été préparé par le conseil américain du groupe Kitsuné, Me. Dudley Kimball[6].

### (b) La prise de fonction de M. Kasturi en tant que *Head of America* du groupe Kitsune le 5 septembre 2016

12. M. Kasturi a débuté ses fonctions le 5 septembre 2016.

13. Pendant sa période d'exercice, M. Kasturi a dans un premier temps été rémunéré à hauteur de USD 150.000. Sa rémunération a été revalorisée au fil des années jusqu'à atteindre la somme de USD 225.000.

14. En mai 2023, il a écrit à la direction du groupe Kitsuné afin de l'informer qu'il souhaitait quitter la direction des filiales américaines afin de se lancer dans un nouveau projet.

---

[4] **Pièce Kitsuné Creative 4**, Echange de courriels entre V. Kasturi, G. Loëc et A. Castel Oster entre le 25 février 2016 et 11 juillet 2016.

[5] En 2016, Mme Castel Oster était directrice générale salariée de Kitsune France. Elle n'était toutefois pas mandataire sociale.

[6] **Pièce Kitsuné Creative 5**, Courriel de A. Castel Oster à V. Kasturi (copie D. Kimball) du 9 septembre 2016

2

Kitsuné Creative *c.* Vinod Kasturi
Tribunal de commerce de Paris
Assignation

M. Kasturi a alors exercé ses fonctions à temps plein sans interruption jusqu'au 2 juin 2023, date à laquelle il a commencé à travailler à temps partiel, à savoir  deux jours par semaine jusqu'au 31 mars 2024, avec l'accord du groupe.

15.    Le 28 mars 2024, suite à la découverte d'actes anormaux de gestion, son contrat a été résilié avec effet immédiat et il a été démis de ses fonctions[7].

### 1.3    L'échec des négociations quant à la mise en place d'un plan d'intéressement de M. Kasturi au sein de Kitsuné Creative

16.    Entre février 2016 et novembre 2023, M. Kasturi et le groupe Kitsuné ont échangé de manière intermittente quant à la mise en place d'un éventuel plan d'intéressement au bénéfice de ce dernier.

17.    Comme il sera ci-après décrit, si l'idée d'un plan d'intéressement a fait l'objet de discussions entre les parties, celles-ci ne sont en revanche jamais parvenues à s'accorder tant (*i*) sur la nature même de l'instrument d'intéressement (BSPCE, actions ordinaires, valeurs mobilières, actions fantômes) (*ii*) que sur les conditions essentielles qui auraient eu vocation à régir le contrat d'émission des instruments d'intéressement en question (date d'émission, durée de l'émission, prix d'émission, prix d'exercice, durée de détention, condition de liquidation, etc.).

18.    Synthétiquement, les discussions se sont étalées sur les périodes suivantes :

  –    Premièrement, entre juillet et septembre 2016, les parties ont discuté de la possibilité d'intéresser M. Kasturi par la souscription de ce dernier à un plan d'émission de BSPCE. Celui-ci a refusé cette proposition, demandant l'attribution de « *warrant* » ou tout autre produit équivalent lui donnant la titularité d'actions ordinaires (« *ordinary shares* »).

  –    Deuxièmement, entre juin 2020 et janvier 2021, M. Kasturi a contre-proposé en juin 2020 à ce qu'il lui soit attribué des actions ordinaires gratuites correspondant à 3% du capital social de Kitsuné Creative, tout en indiquant que des bons de souscriptions d'action pourraient également lui être attribués. Une telle proposition n'a pas été acceptée par Kitsuné Creative.

  –    Enfin, entre le 27 octobre 2022 et le 14 novembre 2023, M. Kasturi a finalement proposé une toute nouvelle formule d'intéressement par la contractualisation d'actions fantômes d'une filiale américaine de Kitsune Creative, Maison Kitsune Inc. (« **MK Inc.** »). Un tel mécanisme, inconnu du droit français, différait sensiblement des outils d'intéressement qui avaient été envisagés préalablement. Kitsuné Creative n'a pas accepté la documentation qui lui a été présentée.

---

[7]    **Pièce Kitsuné Creative 6**, Courrier de résiliation du contrat de travail du 28 mars 2024

Kitsuné Creative *c.* Vinod Kasturi
Tribunal de commerce de Paris
Assignation

19. Il s'ensuit que M. Kasturi n'a jamais souscrit à aucun instrument d'instrument émis par Kistune Creative.

### (a) Juillet-Septembre 2016 : l'échec des négociations quant à la clause relative à l'engagement de Kitsuné Creative de proposer un plan de BSPCE

#### (i) Les premiers échanges relatifs à la mise en place d'un plan d'intéressement en mars 2016

20. Concomitamment aux premiers échanges sur sa rémunération, M. Kasturi et les représentants du groupe Kitsuné ont également échangé quant à la possibilité que ce dernier puisse bénéficier d'un plan d'intéressement au sein du capital de Kitsuné Creative.

21. La toute première évocation de cet intéressement est intervenue en mars 2016 lorsque M. Kasturi a formulé ses prétentions salariales en réponse à la demande de la dirigeante de Kitsuné, Audrey Castel Oster[8]. Celui-ci a alors indiqué qu'il souhaitait percevoir

> « *$200K salary plus 3% equity (based on market comps); reimbursement for travel and other business-related expenses* »

22. Le 15 mars 2016, Gildas Loaec, co-fondateur du groupe Kitsuné, lui a immédiatement répondu « *equity in Kitsuné America ?* » afin de comprendre auprès de quelle entité— et partant de quel périmètre de performance—le plan d'intéressement serait indexé.

23. Le 16 mars 2016, M. Kasturi lui a répondu que sa proposition visait un plan d'intéressement au niveau de la holding dès lors que la croissance aux Etats-Unis et au Canada bénéficierait le groupe Kitsuné à une échelle plus globale.[9]

24. Le 18 mars 2016, Mme Castel Oster a répondu ne pas être en mesure de revenir vers lui immédiatement eu égard aux engagements importants que cela représentait pour le groupe et ses actionnaires.

25. Si M. Kasturi est revenu le 19 mars 2016 avec quelques compléments d'information sur le sujet du salaire et de l'estimation des charges patronales afférentes aux salaires bruts, il n'abordait en revanche pas la question du plan d'intéressement.

---

[8]    **Pièce Kitsuné Creative 7**, Courriel de V. Kasturi à A. Castel Oster du 14 mars 2024

[9]    **Pièce Kitsuné Creative 8**, Courriel de M. Kasturi au groupe Kitsuné du 16 mars 2016

4

Kitsuné Creative *c.* Vinod Kasturi
Tribunal de commerce de Paris
Assignation

26.  A cette période, aucun accord n'est par conséquent entériné ni sur la rémunération, ni sur les modalités de l'intéressement, ni même seulement sur l'idée même d'un intéressement.

>  **(ii)    5 juillet 2016 : la proposition du groupe Kitsuné de mise en place d'un intéressement par voie de bons de souscription de parts de créateur d'entreprise (BSPCE)**

27.  Le 5 juillet 2016, Mme Castel Oster a écrit à M. Kasturi afin de lui communiquer les premiers termes que le groupe serait en mesure de lui proposer s'agissant du plan d'intéressement qui avait été évoqué en mars :

>  « *We can offer a system of equity warrants in Kitsuné Creative (BSPCE, in French – this system has to be under French law as Kitsuné Creative holding is based in France, but you'll have to do your own research about capital gain taxation in US as this will be different from ours in France)*
>
>  *We had in mind:*
>
>  *\*0,5 after 1 year of activity with MK*
>
>  *\*0,5 after 2 years of activity with MK*
>
>  *\*0,5 after 3 year of activity with MK*
>
>  *This offer will be detailed and formalized by our lawyer M. Fouter in cc, and will be set up at the occasion of the fundraising which may happen soon (I will update you about this in a separate email).* »

28.  Dans ce même courriel, elle concluait en ces termes :

>  « *If this 1st elements of our proposal meet your expectations, we can quickly move forward in:*
>
>  •  *Going much deeper details of 2016/2017 objectives for US/Canada*
>
>  •  *Issuing a contract of employment, via our US lawyer*
>
>  •  *Discussing equity warrants system with M. Fouter.* »

29.  Ainsi, le groupe Kitsuné indiquait à M. Kasturi que, si les premiers éléments contenus dans leur proposition retenaient son attention, alors ils pourraient avancer ensemble vers (*i*) des discussions plus approfondies quant aux objectifs pour l'année 2016/2017 pour les Etats-Unis et le Canada, (*ii*) faire préparer le contrat de travail par leur conseil de

5

Kitsuné Creative *c.* Vinod Kasturi
Tribunal de commerce de Paris
Assignation

droit américain, et, enfin, (*iii*) « *discuter* » du plan de BSPCE avec M. Fouter, le juriste fiscaliste du groupe Kitsuné[10].

30. Le 8 juillet 2024, M. Kasturi a répondu au groupe Kitsuné, son email ne contenant aucune remarque s'agissant des premiers éléments transmis quant à la forme que pourrait prendre son plan d'intéressement mais concentrant l'ensemble de ses observations sur sa rémunération salariale. Celui-ci soulignait à cet égard, « *qu'avant de pouvoir accepter, il était nécessaire d'échanger sur les conditions de rémunération*. Il ajoutait que $100.000 était une réduction significative par rapport à sa proposition initiale, laquelle s'élevait à $200.000, et souhaitait savoir si le groupe Kitsuné serait en mesure d'améliorer son offre à $150.000[11].

31. Le même jour, Mme Castel Oster a écrit à M. Kasturi afin de lui indiquer que le groupe Kitsuné était prêt à accepter sa proposition de rémunération à $150.000, soulignant que toutes les autres conditions demeuraient celles figurant dans son courriel du 5 juillet 2016.

32. Celle-ci indiquait en outre que le groupe avait reçu deux lettres d'intention des sociétés Stripe International et Neo Investment pour des prises de participation. Elle expliquait que le groupe Kitsuné lui proposait que soit mis en place son plan de BSPCE à cette occasion, mais que le principe de l'offre d'intéressement demeurait en tout état de cause et ne serait pas conditionné à un évènement financier telle qu'une levée de fonds[12]. Elle concluait en lui demandant de revenir vers eux afin que l'avocat du groupe Kitsuné puisse entamer la préparation de la documentation idoine.

33. Toujours le 8 juillet 2016, M. Kasturi a répondu afin de faire part de son acceptation de la rémunération à $150.000. S'agissant des levées de fonds, il exprimait son enthousiasme à l'idée que plusieurs investisseurs du secteur de la consommation souhaitent investir dans Kitsuné, et qu'il se tenait à leur disposition pour la phase de *due diligence*, si besoin, mais également pour échanger sur les objectifs 2016/2017.

34. Le 11 juillet 2016, Mme Castel Oster a indiqué à M. Kasturi être en lien avec le conseil américain du groupe en vue de formaliser le contrat de travail et que ce même conseil prendrait attache avec leur conseil français, Maître Fouter, s'agissant des BSPCE. Elle lui indiquait en outre qu'il serait bien qu'il puisse rencontrer les autres personnes clés de l'équipe française.

---

[10]    *Ibid.*

[11]    **Pièce Kitsuné Creative 9**, Courriel de V. Kasturi à Kitsuné Creative du 8 juillet 2024

[12]    **Pièce Kitsuné Creative 10**, Courriel de A. Castel Oster à V. Kasturi du 11 juillet 2016

6

Kitsuné Creative *c.* Vinod Kasturi
Tribunal de commerce de Paris
Assignation

35.  Le même jour, M. Kasturi a répondu qu'il reverrait le contrat avec son conseil dès réception et qu'il se tenait à leur disposition pour rencontrer les membres clés de l'équipe parisienne[13]. Il abordait ensuite trois autres sujets opérationnels concernant le P&L et les commandes pour la saison 2017.

### (iii)     Septembre 2016 : le refus de M. Kasturi de se voir attribuer des BSPCE

36.  Si les Parties ont rapidement pu trouver un accord sur les conditions salariales de M. Kasturi au sein de MK Inc., elles ne sont en revanche jamais parvenues à convenir de la nature même de l'instrument d'intéressement qui devait être émis par Kitsuné Creative au profit de M. Kasturi, celui-ci ayant refusé que son intéressement prenne la forme d'une allocation de BSPCE.

37.  Le 9 septembre 2016, conformément à ce à quoi il s'était engagé, le groupe Kitsuné a fait parvenir une première mouture du projet de contrat de travail à M. Kasturi. S'agissant du plan d'intéressement, le projet de contrat prévoyait l'engagement suivant :

> « *1.7 Equity Warrants.  Upon implementation by Kitsuné Créative of an equity warrant plan (commonly referred to in France as "BSPCE"), the timing of which is uncertain since it depends upon the closing of a fundraising transaction by Kitsuné Créative, equity warrants shall be awarded to Executive.  The number of warrants to be awarded to Executive, as well as the terms and conditions thereof (including, without limitation, award date, exercise price, vesting requirements and all other material features) shall be set forth in a written document provided to Executive as soon as practicable, but in no event later than the date that similar information is provided to employees of affiliates of Company to whom equity warrants are awarded.* »

38.  La clause envisagée à l'article 1.7 formalisait ainsi la volonté de Kitsuné de proposer à M. Kasturi de souscrire à terme à un plan de BSPCE dont les termes seraient à définir ultérieurement.

39.  En effet, s'agissant des éléments essentiels du plan de BSPCE à venir, la clause 1.7 stipulait que tant (*i*) le nombre de BSPCE à allouer que (*ii*) les termes et conditions applicables (à savoir notamment la date d'allocation, le prix d'exercice des BSPCE, les conditions de *vesting*) seraient stipulés dans un document écrit futur.

---

[13]   **Pièce Kitsuné Creative 11**, Courriel de V. Kasturi à A. Castel Oster du 11 juillet 2016

Kitsuné Creative *c.* Vinod Kasturi
Tribunal de commerce de Paris
Assignation

40. Le 29 septembre 2016, M. Kasturi a répondu au groupe Kitsuné en lui communiquant une version amendée du projet de contrat de travail.

41. S'agissant du plan de BSPCE, la mouture adressée par M. Kasturi supprimait intégralement la clause proposée pour la remplacer par les termes suivants :

> « *1.7 Equity Award. As soon as practicable, but in no event later than November 21, 2016, Company or Parent shall issue Executive in a reasonably lawful, tax- and economically efficient manner, an equity award in the form of a warrant or similar instrument (the "Award"). The Award shall entitle Executive to purchase or obtain a number of Ordinary Shares in the Parent equal to one and one half percent (1.5%) of the equity of the Parent on a fully diluted, post-financing basis, treating all equity issued or reserved for issuance under the Parent's equity incentive plans as issued and outstanding. The Award shall vest, contingent on Executive's continued service to the Company, Parent or any of their affiliates, in thirty six (36) substantially equal monthly increments, with the first such increment vesting on the on fifteenth (15th) day of the month immediately following the month in which Executive began providing services to the Company; provided, however, the 50% of the Award shall automatically vest in the event Executive is terminated without Cause (as defined below) or resigns for Good Reason (as defined below); provided, further, that 100% of the Award shall automatically vest upon the Parent's acquisition, merger, change in control or similar transaction.* »[14]

42. La nouvelle proposition de M. Kasturi différait en tous points de celle formulée par Kitsuné, en particulier sur tous ses éléments essentiels :

- Sur la **nature** de l'offre : alors que la proposition faite par Kitsuné Creative consistait à s'engager à proposer, dans un avenir proche et sous réserve de la survenance d'un évènement financier, à M. Kasturi la possibilité de souscrire à un plan d'émission de BSPCE qui serait ouvert à certains cadres de l'équipe de direction, celle de M. Kasturi prévoyait un engagement ferme de lui octroyer des valeurs mobilières équivalentes à 1.5% des actions ordinaires de la Société.

- Sur l'**objet de l'offre** : alors que la proposition de Kitsuné Creative portait sur des BSPCE dont la quotité demeurait à définir, celle de M. Kasturi prévoyait, au lieu et place des BSPCE, l'octroi de *warrants* donnant accès à 1.5% du capital social et libéré et sur une base pleinement diluée.

---

[14]    **Pièce Kitsuné Creative 12**, Projet de contrat de travail du 29 septembre 2016, Clause 1.7

8

Kitsuné Creative *c.* Vinod Kasturi
Tribunal de commerce de Paris
Assignation

– Sur les conditions afférentes à l'allocation : alors que la proposition de Kitsuné Creative renvoyait à plus tard la détermination des conditions de l'émission, lesquelles seraient celles seraient applicables à tous les porteurs de BSPCE, la contre-offre de M. Kasturi fixait d'ores et déjà un calendrier d'acquisition du droit d'exercice (*vesting*).

43. Au surplus, la contre-proposition de M. Kasturi ne mentionnait pas le prix d'exercice de l'option qui devait lui permettre d'acquérir des actions ordinaires.

44. Les changements opérés par M. Kasturi en particulier s'agissant de l'article 1.7 n'ont pas manqué de surprendre la direction du groupe Kitsuné, cette dernière ne comprenant pas pourquoi ce dernier revenait sur la nature même de l'outil d'intéressement proposé.

45. L'éloignement de la position des parties tant sur la nature de l'outil d'intéressement que sur les modalités d'attribution de celui-ci a entraîné un arrêt pur et simple des négociations.

### (b) Juin 2020-janvier 2021 : le rejet par le groupe Kitsuné de la demande de M. Kasturi d'allocation d'actions gratuites

46. Le 5 juin 2020, le conseil de M. Kasturi a écrit à Mme Castel Oster afin de l'informer qu'il représentait les intérêts de M. Kasturi dans le cadre de la négociation et la conclusion de son *Executive Agreement*.[15]

47. Il en profitait pour communiquer un nouveau projet comprenant plusieurs modifications substantielles aux projets échangés les 6 et 29 septembre 2016 :

– S'agissant de la composante salariale, le projet proposait un élargissement de ses missions, M. Kasturi prévoyant d'agir également comme dirigeant de la société Café Kitsuné Inc., ainsi qu'une revalorisation de sa rémunération annuelle à $190.000 ;

– S'agissant du plan d'intéressement, le préambule stipulait que Kitsuné Creative souhaitait lui allouer des actions gratuites, proposition que l'on retrouvait ensuite à la clause 1.7, une nouvelle fois intégralement retravaillée, aux termes de laquelle M. Kasturi proposait dorénavant que :

> « *1.7 Equity Distribution. Company shall issue shares to Executives equaling 3% equity in the Company ("Shares"). On the effective date of this Agreement, Company shall gift to Executives shares equaling 1.5% equity in the Company. The Company shall gift the remaining 1.5% equity to Executive on a monthly basis beginning on the effective date of this Agreement and continuing in equal monthly installments over the course of three (3) years following the*

---

[15]  **Pièce Kitsuné Creative 13,** Courriel de M. Yankovich à A. Castel Oster du 5 juin 2020

Kitsuné Creative *c.* Vinod Kasturi
Tribunal de commerce de Paris
Assignation

> *effective date of this Agreement. All Shares received by Executive shall vest immediately. The complete terms and conditions of the Executive's equity warrant (including, without limitation, terms relating to permissible times and manner of exercise) shall be set forth in a written document provided to Executive at the time that the equity warranted is awarded to him. The Company and executive will mutually determine the structure of the equity warrants to minimize tax impact to the Executive. »*[16]

48. Cette nouvelle proposition reconnaissait également que les termes complets de l'intéressement seraient déterminés dans un document écrit futur établi à l'occasion de l'octroi des titres.

49. Plus fondamentalement, cette nouvelle proposition émise par M. Kasturi le 5 juin 2020 constituait un important changement de paradigme dès lors qu'il était désormais question, en plus d'un plan d'intéressement sous une forme future restant à déterminer (*cf.* les deux dernières phrases de la clause), que Kitsuné Creative lui alloue 3% de son capital en actions gratuites.

50. En d'autres termes, M. Kasturi souhaitait non seulement souscrire à un plan d'intéressement dont les éléments matériels restaient à déterminer, mais il souhaitait également que lui soit octroyé à titre gratuit un nombre d'actions ordinaires équivalent à 3% du capital de la société.

51. Là encore, extrêmement surpris par la teneur de cette nouvelle proposition et de l'agressivité des prétentions économiques qui y étaient formulées, M. Kasturi souhaitant dorénavant se voir allouer des actions gratuites, pratique qui n'avait jamais été celle de l'actionnariat du groupe Kitsuné jusqu'alors, Kitsuné n'y a pas donné suite.

52. M. Kasturi n'a pas relancé le groupe Kitsuné.

53. Le 4 janvier 2021, Mme Castel Oster a écrit à M. Kasturi afin de lui souhaiter la bonne année. Elle lui indiquait également qu'après validation auprès de Raphaël Grand (Direction Administratif et Financier du groupe Kitsuné) et Axelle Hicter (Directrice des Ressources Humaines), le groupe Kitsuné acceptait les nouvelles conditions du contrat de travail, toutes portant sur une revalorisation salariale, telles que proposées par M. Kasturi en juin 2020.

54. Elle précisait en particulier qu'à l'exception de la clause 1.7 relative à l'intéressement, toutes les modifications lui convenaient. A cet égard, elle relevait que l'intéressement devait faire l'objet d'un accord distinct (ce qui avait toujours été la position des parties

---

[16] **Pièce Kitsuné Creative 14**, Projet de contrat du 5 juin 2020

10

Kitsuné Creative *c.* Vinod Kasturi
Tribunal de commerce de Paris
Assignation

jusque-là, tant dans l'offre du 5 juillet 2016 que dans celles du 9 septembre et du 29 septembre 2016) qui devrait être revu par leur conseil en droit des sociétés.

55.   Plus fondamentalement si elle faisait savoir que l'accord à venir ne serait pas radicalement distinct en son principe, le mécanisme d'intéressement devrait comprendre des clauses de *vesting* et de *bad leaver*.

56.

57.   M. Kasturi n'a jamais répondu à ce courriel.

### (c)   Juillet-octobre 2021 : la reprise des négociations

58.   Le 8 juillet 2021, face à l'incapacité des parties à trouver un accord et devant le nouveau silence de M. Kasturi, Mme Castel Oster a écrit à ce dernier afin de lui communiquer une nouvelle proposition du groupe Kitsuné relative à son intéressement.

59.   L'offre qui était faite portait cette fois sur un intéressement dans MK Inc., la filiale américaine que M. Kasturi dirigeait.

60.   Si elle comprenait des précisions supplémentaires sur certaines des clauses essentielles du futur contrat d'intéressement, elle demeurait en revanche imprécise sur l'objet même du contrat à venir, à savoir la nature juridique que devrait prendre l'intéressement. En effet, ainsi qu'il était indiqué, il convenait encore de déterminer s'il s'agirait de *stock options* salariés ou d'actions fantômes sous réserve que cela suive la même mécanique des *stock options* traditionnelles[17].

61.   Enfin, elle invitait ce dernier à lui adresser ses questions et ses observations afin qu'elle les transmette ensuite à M. Grand, le Directeur Administratif et Financier du groupe Kitsuné.

62.   Le 26 juillet 2021, M. Kasturi a écrit à Mme Castel Oster afin lui faire part de son inquiétude, la nouvelle offre du groupe Kitsuné étant, selon lui, contraire à certains des points, selon lui, précédemment arrêtés, à savoir :

  -   une allocation de 3% (et non de 1.5%) ;

  -   un *vesting* (le calendrier d'acquisition de l'option) qui aurait débuté dès le 19 septembre 2016 et serait donc déjà acquis ;

---

[17]   **Pièce Kitsuné Creative 15**, Courriel de A. Castel Oster à V. Kasturi du 8 juillet 2021

11

Kitsuné Creative *c.* Vinod Kasturi
Tribunal de commerce de Paris
Assignation

> – enfin, dès lors que l'intéressement devait être dans Kitsuné Creative (ou son équivalence économique), il ne devrait y avoir aucune différence quant au calcul de la valeur de marché.

63. Il indiquait enfin que cela faisait maintenant 5 ans qu'il était question de cet accord et qu'il souhaitait vraiment que cela se formalise le plus rapidement possible. Il demandait ainsi que le groupe Kitsuné confirme que les conditions ci-dessus (à savoir celles qu'il visait dans son propre courriel) ne changeraient pas, ce qui lui permettrait ainsi de préparer la documentation contractuelle.

64. Il est aisé de comprendre pourquoi M. Kasturi souhaitait bénéficier d'un intéressement au niveau de la holding du groupe Kitsuné : les chiffres de la filiale américaine qu'il dirigeait depuis 5 ans étaient mauvais, celle-ci accumulant des pertes et ne maintenant son activité qu'à l'aide du soutien financier de sa maison mère. L'activité américaine différait en cela sensiblement des autres filiales géographiques, notamment européennes et asiatiques où les résultats étaient très bons.

65. L'approche de M. Kasturi pouvait surprendre dès lors que ce dernier souhaitait en somme bénéficier d'un intéressement sur un périmètre de résultat qui n'était pas le sien et profiter de la rentabilité générée par le travail des équipes européennes et asiatiques qui n'étaient pas les siennes.

66. Le lundi 20 septembre 2021, Mme Castel Oster a écrit à M. Kasturi afin de lui indiquer que son intéressement serait évoqué jeudi et qu'elle souhaitait savoir quelles étaient ses prétentions salariales sur une base d'un intéressement équivalent à 1.5% de Kitsuné Creative[18].

67. Le 23 septembre 2021, M. Kasturi a écrit à Mme Castel Oster afin de lui communiquer un document retraçant les bonus qu'il s'estimait en droit de percevoir[19].

68. Le 11 octobre 2021, Mme Castel Oster a écrit à M. Kasturi afin de lui faire part de la nouvelle proposition de rémunération salariale faite par le groupe, à savoir un fixe à hauteur de $225.000 et $75.000 de variable soumis à certains objectifs. S'agissant du plan d'intéressement, elle confirmait que l'intéressement devait se calculer sur l'équivalent de 1.5% de Kitsuné Creative mais souhaitait avoir son retour sur l'équivalence de calcul avec MK Inc. sur la base du document excel préparé par M. Grand[20].

---

[18]  **Pièce Kitsuné Creative 16**, Courriel de A. Castel Oster à V. Kasturi du 20 septembre 2021

[19]  **Pièce Kitsuné Creative 17**, Courriel de V. Kasturi à A. Castel Oster du 23 septembre 2021

[20]  **Pièce Kitsuné Creative 18**, Courriel de A. Castel Oster à V. Kasturi du 11 octobre 2021

12

Kitsuné Creative *c.* Vinod Kasturi
Tribunal de commerce de Paris
Assignation

69.    M. Kasturi n'a jamais répondu à ce courriel.

### (d)    Janvier 2022 : nouvelle reprise des négociations et nouveau changement souhaité par M. Kasturi

70.    Le 5 janvier 2022, Mme Castel Oster a à nouveau écrit à M. Kasturi afin de lui souhaiter une bonne année. Elle indiquait qu'elle espérait qu'ils seraient enfin en mesure de trouver un accord sur le « *package* », soulignant qu'il n'était pas sain que ces discussions durent éternellement. Elle ajoutait par ailleurs qu'une fois un accord trouvé sur le plan d'intéressement, ils pourraient ensuite traiter les points afférents aux objectifs pour l'année 2022-2023[21]. Enfin, il était proposé qu'un entretien téléphonique se tienne rapidement pour clôturer ces points.

71.    Le même jour, M. Kasturi a remercié Mme Castel Oster et indiqué qu'il avait enfin été en mesure de réfléchir à la dernière offre qui lui avait été faite (à savoir celle formulée dans le courriel du 11 octobre 2021[22].

72.    Le 10 janvier 2022, M. Kasturi a écrit un courriel à Gildas Loaëc et Mme Castel Oster dans les termes suivants :

> « *I have always put my sweat and tears into the brand and have succeeded in growing the US company considerably, while sacrificing my own personal benefits.*
>
> *While I highly value my position and will continue to negotiate in good faith, I am not willing to further compromise my worth to the company, which is well established.*
>
> *As you know, I was particularly concerned after the misunderstanding over my equity, which is being substantially lowered from the 3% previously documented, back to 1.5%, the original amount issued 5 years ago, before we embarked on our partnership.*
>
> *While I agree this is still rewarding, the most motivating driver for me to extend my deep commitment to the brand over the long-term, would be to grant an additional 0.5% vesting over the next 5 years. This would allow me to reach 2% after 10 years of service to the company, which I believe*

---

[21]    **Pièce Kitsuné Creative 19**, Courriel de A. Castel Oster à V. Kasturi du 5 janvier 2022

[22]    **Pièce Kitsuné Creative 20**, Courriel de V. Kasturi à A. Castel Oster du 5 janvier 2022

13

Kitsuné Creative c. Vinod Kasturi
Tribunal de commerce de Paris
Assignation

> *to be fair and equitable, especially after seeing my track record and dedication.*
>
> *If this is achievable, I would be greatly appreciative and accept the major terms you last presented, with some clarification on targets and the equivalence calculation (as I previously wrote, there should not be a separate valuation if there is a change of control in the holding company - since I was originally promised warrants in Kitsuné Creative).*
>
> *Please let me know your thoughts, so we can finally wrap this up and focus our time and efforts on continuing to move the company forward. I look forward to discussing tomorrow.* »

73.    Le 24 janvier 2022, Mme Castel Oster a écrit à M. Kasturi ainsi qu'à M. Grand afin de convenir d'une réunion de travail sur Teams. Elle expliquait qu'elle avait déjà été en mesure d'obtenir l'accord de principe du groupe Kitsuné sur un supplément de 0,5% d'intéressement acquis sur un calendrier de *vesting* de 5 ans, soulignant que le plan d'intéressement devrait en revanche s'établir sur une mécanique d'équivalence entre MK Inc. et Kitsuné Creative[23].

### (e)    27 octobre 2022 : la nouvelle offre formulée par M. Kasturi d'un plan d'intéressement structuré sous la forme d'actions fantômes

74.    Le 27 octobre 2022, M. Kasturi a écrit à Mme Castel Oster afin de lui communiquer un projet de contrat de travail actualisé comprenant les derniers amendements. S'agissant du plan d'intéressement, ce dernier indiquait que le cabinet Foley Hoag avait inclus de nouvelles propositions de stipulations concernant l'allocation d'intéressement et le calcul de l'équivalence entre MK Inc. et Kitsuné Creative. Il expliquait que plusieurs notes de bas de pages avaient été incluses relativement à des demandes d'information sur des points encore en discussion (notamment la formule de calcul de la valeur de marché). Le cabinet Foley Hoag était également en train de finaliser la préparation des termes et conditions du *Phantom Stock Plan* (plan d'actions fantômes) et les notifications d'allocation. Enfin, M. Kasturi remerciait les dirigeants du groupe Kitsuné pour leur patience, expliquant que la construction de la nouvelle proposition d'intéressement avait pris plus de temps que prévu eu égard à la difficulté d'identifier

---

[23]    **Pièce Kitsuné Creative 21**, Courriel de A. Castel Oster à V. Kasturi et R. Grand du 24 janvier 2022

14

Kitsuné Creative *c.* Vinod Kasturi
Tribunal de commerce de Paris
Assignation

un mécanisme permettant de réduire le frottement fiscal tant pour le groupe Kitsuné que pour sa propre personne[24].

75.    Il convient de préciser que M. Kasturi a fait régler les honoraires de ses conseils, le cabinet Foley Hoag, par la société MK Inc. et ce, à l'insu de Kitsune Creative et sans jamais avoir sollicité l'autorisation de la direction de Kitsune Creative.

76.    M. Kasturi avait notamment joint un projet de contrat de travail comprenant (une nouvelle fois) une nouvelle mouture de la clause 1.7, laquelle avait là encore été intégralement rerédigée, mais également une nouvelle clause 1.8 prévoyant l'allocation future de BSPCE

> « *1.7 Equity Grant. As soon as practicable, and in any event within thirty (30) days of the execution date of this Agreement, Company or its designee shall issue ordinary shares of Parent to Executive in an amount equal to the sum of (i) the Initial Shares and (ii) the Secondary Shares, as set forth below. If for any reason, the Company or Parent fail to issue the Initial Shares and/or the Secondary Shares in a timely fashion, the Company and Parent shall be obligated to provide Executive with contractual payment rights commensurate with the value of the Initial Shares and/or Secondary Shares (including the Valuation True-up, as defined below), pursuant to a mutually acceptable written instrument (the "Economic Rights Contract").*
>
> > *(i)    [66] ordinary shares of Parent (the "Initial Shares"), which shall be fully vested at the time of grant.  Company represents and warrants that such Initial Shares would have represented no less than 1.5% of the total amount of issued and outstanding share capital, calculated on a fully diluted basis, assuming the exercise of all convertible securities or securities reserved under any equity warrant plan (commonly referred to in France as "BSPCE"), or any similar plan, as of September 26, 2016 (the "2016 Target Date"). Executive shall be entitled to acquire the Initial Shares free and clear, upon exercise at a price per share denominated in euros equal to the price per share at which*

---

[24]    **Pièce Kitsuné Creative 22**, Courriel de V. Kasturi à A. Castel Oster (copie Foley Hoag) du 27 octobre 2022

15

Kitsuné Creative *c.* Vinod Kasturi
Tribunal de commerce de Paris
Assignation

*warrants were issued or would have been issued to employees of Parent in France in September 2016, which shall not exceed a valuation of EU€[30,000,000]. If and to the extent the Initial Shares cannot be issued in such a manner to avoid adverse tax consequences in respect of the Initial Shares, to a greater extent than Executive would have been subject to had the Initial Shares been issued on the 2016 Target Date, the Company shall provide a cash bonus to Executive in an amount adequate to make Executive whole in respect of such shortfall (a "Valuation True-Up").*

(ii)    *An additional 27 ordinary shares of Parent (the "Secondary Shares", and together with the Initial Shares, the "Equity Grant"), subject to upward or downward adjustment in accordance with the Equivalence Calculation set forth on* Schedule B*. Provided, notwithstanding the foregoing, such downward adjustment with respect to the Equivalence Calculation shall not be in excess of 0.25% of the total amount of issued and outstanding share capital, calculated on a fully diluted basis. The Secondary Shares shall vest in 60 substantially equal monthly increments, with the first increment vesting on September 1, 2021 (the "2021 Target Date") and the remaining 59 increments vesting on the first of each month thereafter, until the last increment vests on August 1, 2026; provided, however, upon a change in control of Parent all such Secondary Shares shall immediately vest and become exercisable. Company represents and warrants that such initial 27 Secondary Shares represents no less than 0.5% of the total amount of issued and outstanding share capital, calculated on a fully diluted basis, assuming no adjustment is made pursuant to the Equivalence Calculation and the exercise of all convertible securities or securities reserved under any BSPCE, or any similar plan, as of the 2021 Target Date. Executive shall be entitled to acquire the Secondary*

16

Kitsuné Creative *c.* Vinod Kasturi
Tribunal de commerce de Paris
Assignation

> *Shares free and clear, upon exercise at a price per share denominated in euros equal to the price per share at which warrants were issued or would have been issued to employees of Parent in France as of the 2021 Target Date. If and to the extent the Secondary Shares cannot be issued in such a manner to avoid adverse tax consequences in respect of the Secondary Shares, to a greater extent than Executive would have been subject to had the Secondary Shares been issued on the 2021 Target Date, the Company shall provide a Valuation True-Up.*

> *1.8    Equity. As soon as practicable after implementation by Parent of a BSPCE and in no event later than the time that Parent first awards equity warrants under such plan to its employees in France, Parent shall award one or more equity warrants to Executive, which shall represent or be exercisable for the Initial Shares and the Secondary Shares. The equity interests issued in respect of the Equity Grant shall not be subject to restrictions on transfer except for restrictions reasonably required under applicable securities law. The Company and Executive will mutually determine the structure of the Equity Grant to minimize adverse tax consequences to the Executive. After the Secondary Shares have fully vested, Company and Executive will accept the terms of the Company's future incentive plan. Notwithstanding anything herein to the contrary, the Company's failure to provide or execute definitive documentation with respect to the Equity Grant shall not alleviate or otherwise affect the duties and obligations of the Company or its affiliates or the entitlement of Executive to such Equity Grant. Irrespective of the form of Equity Grant, Executive and his assigns, as the holder of the Equity Grant, shall be entitled to all the rights, privileges and preferences (including, without limitation, as it relates to dividends or distributions to holders of capital stock) as a holder of ordinary shares of Parent would be entitled to receive, had such holder received such ordinary shares at the 2016 Target Date or 2021 Target Date, as applicable* (citation omise)

77.    Une fois encore, comme en 2016 et 2020, la direction de Kitsuné n'a pas manqué d'être surprise par ces nouvelles clauses 1.7 et 1.8, qui n'avaient jamais figuré dans les précédents échanges et qui, de surcroit, envisageaient la mise en place d'un plan

17

Kitsuné Creative *c.* Vinod Kasturi
Tribunal de commerce de Paris
Assignation

d'actions fantômes dont les termes et conditions étaient inconnus et demeuraient encore à définir.

### (f)    Avril 2023 : les derniers pourparlers

78.    Le 4 avril 2023, M. Kasturi a relancé le groupe Kitsuné s'agissant de la nouvelle offre formulée en octobre 2022, précisant que la documentation s'agissant des actions fantômes suivrait dans un courriel séparé[25]. Il faisait par ailleurs état de certains montants qu'il estimait lui être dus s'agissant de sa rémunération salariale.

79.    Le même jour, Mme Castel Oster a répondu à M. Kasturi en indiquant que le groupe avait validé le règlement d'un montant de $155.000 au titre de ses arriérés de salaires. S'agissant du dernier bonus pour l'exercice 2021/2022, elle faisait valoir qu'un point tenant à l'accomplissement des objectifs devait encore être validé avec M. Grand.

80.    Aucune réponse n'était toutefois apportée sur le nouveau plan d'intéressement, celle-ci étant toujours dans l'attente de la proposition écrite des termes et conditions du plan d'actions fantômes qui avait été nouvellement suggéré fois en octobre 2022 par M. Kasturi[26].

81.    Le même jour, M. Kasturi a fait savoir qu'il avait demandé à Foley Hoag d'apporter de nouvelles modifications au projet de contrat de travail afin de prendre en considération les points validés par Kitsuné.

82.    Le 19 avril 2023, M. Kasturi a enfin été en mesure de communiquer pour la première fois une trame écrite de son projet de plan d'actions fantômes[27].

83.    Le 5 mai 2023, Mme Castel Oster a écrit à M. Kasturi pour le tenir informé de l'état d'avancement des négociations et de la revue en cours de la documentation contractuelle qui avait été communiquée par ce dernier et ses conseils.

84.    Reconnaissant que Kitsuné ne disposait pas des compétences en interne pour revoir une documentation aussi complexe, celle-ci indiquait qu'il leur serait nécessaire de prendre attache avec leurs conseils de droit américain afin qu'ils puissent procéder à une analyse des termes et conditions proposés.

---

[25]    **Pièce Kitsuné Creative 23**, Courriel de V. Kasturi à A. Castel Oster (copie Foley Hoag) du 4 avril 2023

[26]    **Pièce Kitsuné Creative 24**, Courriel de A. Castel Oster à V. Kasturi (copie Foley Hoag et R. Grand) du 4 avril 2023

[27]    **Pièce Kitsuné Creative 25**, Courriel de V. Kasturi à A. Castel Oster (copie Foley Hoag et R. Grand) du 19 avril 2023

Kitsuné Creative *c.* Vinod Kasturi
Tribunal de commerce de Paris
Assignation

85.    Sur les points principaux, elle suggérait en revanche comme condition préalable à toute avancée de (*i*) séparer les questions de négociation et conclusion du contrat de travail de celles du contrat d'intéressement (ce qui avait d'ailleurs déjà été suggéré à de multiples reprises) et (*ii*) synthétiser la mécanique du plan d'intéressement par actions fantômes (mécanisme inconnu du droit français). Elle insistait sur le fait qu'il leur serait utile de comprendre « *l'esprit* » de la documentation proposée avant de s'atteler à la revue analytique des conditions stipulées.

86.    Il s'ensuit qu'en mai 2023, les parties étaient encore loin d'être liées par un contrat d'intéressement, tant la philosophie que les stipulations étant encore ouvertes à discussion.

87.    Le 19 mai 2023, M. Kasturi est, enfin, revenu vers le groupe Kitsuné après avoir fait un point avec ses conseils. Ses commentaires figurant en vert directement dans le texte du courriel de Mme Castel Oster du 5 mai, il expliquait qu'un plan d'intéressement structuré sous la forme d'actions fantômes serait une formule plus simple que sous forme d'options ou d'actions traditionnelles. Il ajoutait qu'il était disponible avec son conseil pour échanger sur les points qui seraient incompris.

88.    Le 29 mai 2023, Mme Castel Oster a répondu dans la même chaine de mail, indiquant que la suite des échanges sur le sujet de l'intéressement serait prise en charge par M. Grand.

89.    Le 30 mai 2023, cette dernière est revenue vers lui pour lui indiquer que son avocate en droit du travail était prête pour avancer sur la conclusion du contrat de travail. En revanche, la discussion demeurait ouverte s'agissant de la documentation sur le plan d'intéressement.

90.    A cette même période, M. Kasturi avait en effet annoncé qu'il entendait quitter le groupe Kitsuné au plus tard en 2024 mais avait proposé de demeurer à la tête de MK Inc. deux jours par semaine afin d'assurer une transition avant qu'un nouveau dirigeant soit recruté.

91.    C'est sur cette question-là que, le 6 juin 2023, M. Kasturi a écrit à Mme Castel Oster afin de solliciter une rémunération forfaitaire annuelle d'au moins $90.000 pour un engagement de deux jours par semaine[28].

92.    La question des actions fantômes n'a plus jamais été abordée.

---

[28]    **Pièce Kitsuné Creative 26**, Courriel de V. Kasturi à A. Castel Oster du 6 juin 2023

19

Kitsuné Creative *c.* Vinod Kasturi
Tribunal de commerce de Paris
Assignation

### 1.4    La naissance du différend

#### (a)    La découverte des fautes de gestion commises par M. Kasturi

93.    Un audit mené en février 2024 a révélé que M. Kasturi avait commis plusieurs actes anormaux de gestion, constitutifs non seulement de fautes de gestion mais également passibles de sanctions pénales.

94.    En premier lieu, alors qu'il avait été convenu une réduction de son salaire annuel à la somme de $90.000 eu égard au fait qu'il ne consacrait plus que 2 jours par semaine à MK Inc. et le reste de son temps à sa nouvelle activité chez Market, il est apparu que celui-ci avait continué à se verser l'intégralité de sa rémunération, soit une somme avoisinant les $75.000.

95.    En second lieu, M. Kasturi a fait régler les honoraires facturés par le cabinet international Foley Hoag avec les fonds de MK Inc. pour un montant de $59.523,75 pour une période allant du 1er juillet 2023 au 31 janvier 2024.

96.    Cette pratique est d'autant plus choquante que ces fonds ont été utilisés pour financer le contentieux contre les sociétés Kitsuné pour lequel Foley Hoag a également été missionné.

97.    Ainsi, M. Kasturi a non seulement commis un abus de bien social, mais cet abus est de surcroit dirigé contre la société qu'il dirigeait et sa maison mère afin de les menacer d'un procès en vue de leur soutirer des fonds exorbitants.

#### (b)    La résiliation du contrat de travail le 28 mars 2024

98.    Le 28 mars 2024, au vu des agissements commis par M. Kasturi, les dirigeants du groupe Kitsuné ont pris la décision de résilier la mission de ce dernier avec effet immédiat.

#### (c)    Les menaces d'un procès avec jury devant les juridictions de New York contre Kitsuné Creative et MK Inc.

99.    Le 10 mai 2024, en l'absence d'accord entre les parties, le cabinet Foley Hoag a écrit au conseil de MK Inc. afin de lui communiquer un projet d'assignation contre MK Inc. et Kitsuné Creative. Dans leur courriel d'accompagnement, les conseils de M. Kasturi invitaient à prendre connaissance du document en indiquant qu'ils se tenaient à disposition pour « *sauter sur un call* [téléphonique] *et discuter des prochaines étapes* ». Foley Hoag ajoutait s'être en outre entretenu avec M. Kasturi et garder espoir de trouver une solution amiable au différend, sans délai ou coûts excessifs.[29]

---

[29]    **Pièce Kitsuné Creative 29**, Courriel de Foley Hoag à Dupont Law Group du 10 mars 2024

20

Kitsuné Creative *c.* Vinod Kasturi
Tribunal de commerce de Paris
Assignation

100. Dans son son projet d'assignation, M. Kasturi forme sept demandes distinctes contre MK Inc. et Kitsuné Creative, prises solidairement :

- En premier lieu, une demande de condamnation solidaire contre les sociétés Kitsuné à hauteur de USD 9.1 millions au titre de la prétendue violation de deux contrats.

- En second lieu, une demande de condamnation solidaire contre les sociétés Kitsuné à hauteur de USD 9.1 millions au titre d'un *promissory estoppel*.

- En troisième lieu, une demande de condamnation solidaire non-chiffrée contre les sociétés Kitsuné au titre d'un enrichissement sans cause.

- En quatrième lieu, une demande de condamnation solidaire non-chiffrée contre les sociétés Kitsuné au titre d'un *quantum meruit*.

- En cinquième lieu, une demande de condamnation solidaire non-chiffrée contre les sociétés Kitsuné au titre de la rémunération variable qui aurait dû lui être versée au titre de son contrat de travail.

- En sixième lieu, une demande de condamnation solidaire de USD 75.000 en droit californien eu égard à la résiliation prétendument abrupte de son contrat de travail le 28 mars 2024, quelques jours avant le terme du contrat, ce qu'il ne lui aurait pas permis de toucher son bonus de fin de mission.

- En septième lieu, une demande de condamnation solidaire de USD 75.000 en droit californien au motif que la résiliation prétendument abrupte de son contrat de travail le 28 mars constituerait une violation de l'ordre public californien.

101. Le projet d'assignation est en revanche étrangement silencieux sur un certain nombre de circonstances pourtant fondamentales quant à la caractérisation des droits respectifs des parties. En effet,

*Sur les fautes lourdes ayant justifié la résiliation de son contrat de travail avec effet immédiat :*

- M. Kasturi n'explique pas qu'il a utilisé les fonds de MK Inc. pour régler les honoraires du cabinet Foley Hoag, lequel a été missionné par ce dernier pour mener la présente action, pour un montant de plus de $59.000.

- M. Kasturi se fait tout aussi taisant sur le fait qu'alors qu'il avait été convenu une rémunération réduite durant la période pendant laquelle celui-ci n'officierait plus que deux jours par semaine, ce dernier s'est versé sa pleine rémunération, soit un excédent de plus de $68.000.

*Sur la distinction entre son contrat de travail et le prétendu plan d'intéressement*

- M. Kasturi n'a jamais été le salarié de Kitsuné Creative. Il a toujours été salarié de MK Inc., ce dernier exerçant ses fonctions de direction au sein de MK Inc. et

21

Kitsuné Creative *c.* Vinod Kasturi
Tribunal de commerce de Paris
Assignation

sa rémunération ayant été intégralement et systématiquement payée par MK Inc., ce qu'il ne peut pas ignorer puisqu'il supervisait lui-même le versement de sa propre rémunération.

Aussi, hormis d'organiser une confusion généralisée des contentieux et d'attraire l'actionnaire dans la cause, les demandes au titre de sa qualité de salarié contre Kitsuné Creative n'ont pas lieu d'être.

*Sur l'indemnisation qui serait due au titre de sa prétendue détention capitalistique*

- M. Kasturi est incapable de produire les contrats qui auraient été conclus et qui entérineraient (*i*) non seulement une validation d'une détention capitalistique sous la forme d'actions ordinaires de Kitsuné Creative, mais (*ii*) plus encore des conditions de liquidité qui lui permettraient aujourd'hui de bénéficier d'une valorisation de marché à hauteur de EUR 8 591 036.

- M. Kasturi est également dans l'incapacité de montrer un quelconque courriel dans lequel il pourrait être déduit le consentement de Kitsuné Creative à ses multiples contre-offres, Kitsuné Creative ayant toujours rappelé que le plan d'intéressement devrait être mis par écrit dans un acte séparé, lequel devrait comprendre tous les éléments essentiels à la mise en œuvre dudit plan.

- Plus fondamentalement encore, une lecture cursive de la correspondance démontre qu'en réalité les parties n'étaient même en accord sur la nature des valeurs mobilières qui avaient vocation à être émises dans le cadre du plan d'intéressement négocié.

102. Le projet d'assignation mentionne, enfin, qu'il est demandé que le procès se tienne en présence de jurés civil.

103. Il ressort du projet d'assignation transmis un magma de demandes relatives, d'une part, à la qualité de salarié de M. Kasturi auprès de MK Inc., mais également des demandes indemnitaires relatives à la prétendue violation d'un plan d'intéressement dont il s'estime être créancier.

104. La confusion massive opérée par M. Kasturi dans ce projet vise à faire croire que l'ensemble de ses prétentions seraient toutes liées les unes aux autres et qu'elles ne pourraient qu'être traitées qu'ensemble. Cette caractérisation factuelle intentionnellement confuse ne poursuit qu'un seul objectif : justifier la prétendue compétence des juridictions américaines à l'égard de Kitsuné Creative afin de contraindre cette dernière à transiger afin d'échapper à un contentieux devant les juridictions américaines nécessairement très onéreux.

105. Le projet d'assignation communiqué n'est autre qu'une mesure d'intimidation dans le but de forcer Kitsuné Creative à régler, à prix fort, un montant que Vinod Kasturi n'aurait jamais été en mesure de sécuriser en France pour les raisons ci-après exposées.

22

Kitsuné Creative *c.* Vinod Kasturi
Tribunal de commerce de Paris
Assignation

\* \* \* \*
\* \* \*
\*

## 2.    DISCUSSION

106.   Un différend s'est noué entre les parties quant à l'existence d'un accord sur la mise en place d'un plan d'intéressement.

107.   Contrairement à ce qui est soutenu par M. Kasturi et comme le rappel des faits l'a amplement démontré, il n'existe aucun accord sur les éléments essentiels qui permettraient de matérialiser un contrat d'intéressement susceptible d'exécution. Il n'existe pas non plus un engagement unilatéral de celle-ci de proposer un plan d'intéressement.

### 2.1    SUR L'APPLICATION DU DROIT FRANÇAIS

108.   Dans son projet d'assignation, M. Kasturi semble se reposer sur l'application du droit new-yorkais et du droit californien pour fonder ses demandes indemnitaires.

109.   Or, pour que de telles demandes indemnitaires soient valables, il incombe déjà à ce dernier à démontrer l'existence des conventions dont il se prétend le bénéficiaire et des obligations qui y seraient stipulées.

110.   La situation présentant des éléments d'extranéité, il convient de déterminer dans un premier temps la loi applicable à l'appréciation de l'existence d'un consentement.

111.   En droit, la loi applicable à la cession de parts sociales ou de titres d'une société est la loi du lieu de domiciliation du débiteur de l'obligation caractéristique, à savoir le lieu de domiciliation du cédant dans le cadre d'une cession de titres.

112.   En l'espèce, il est ici question des titres de la société Kitsuné Creative, une société française immatriculée au registre du commerce et des sociétés de Paris.

### 2.2    SUR L'ABSENCE DE CONSENTEMENT A LA MISE EN PLACE D'UN PLAN D'INTERESSEMENT

113.   M. Kasturi menace de demander la condamnation solidaire de MK Inc. et Kitsuné Creative à lui verser la somme de USD 9.1 millions correspondant aux bonus annuels pour 2017, 2019 et 2020 prétendument non payés ainsi qu'à la valeur de marché de 2% du capital de Kitsuné Creative à laquelle il aurait, selon lui, droit au titre des deux conventions d'allocation d'actions qui lui auraient été conclues avec Kitsuné Creative en 2016 (1,5%) puis en 2022 (0,5%).

114.   Plus précisément, M. Kasturi indique dans son projet de *Complaint*

23

Kitsuné Creative *c.* Vinod Kasturi
Tribunal de commerce de Paris
Assignation

- d'une part, que, s'agissant de ses conditions financières d'entrée en tant que Président salarié chez MK Inc., un contrat aurait été pleinement formé en juillet 2016, lequel contiendrait notamment la promesse d'une allocation à son bénéfice de 1,5% de titres à raison d'un *vesting* de 0,5% par an et étalé sur trois ans ;

il considère,

- d'autre part, être le bénéficiaire d'une seconde promesse que les demandeurs auraient faite début 2022 de lui allouer 0,5% de titres supplémentaires.

115. Pour ces raisons, il envisage de soulever devant les juridictions américaines, au premier chef, la responsabilité contractuelle des sociétés Kitsuné (*breach of contract*) et au deuxième chef, le non-respect par Kitsuné de ses promesses unilatérales (*promissory estoppel*) notamment.

116. Toutefois, en raison de l'application du droit français au présent litige (*supra* 2.1), c'est à l'aune des principes du droit français des contrats qu'il convient d'examiner si M. Kasturi pourrait valablement se prévaloir d'une inexécution contractuelle et/ou d'un non-respect par les sociétés Kitsuné de promesses qu'elles lui auraient faites.

117. Ainsi qu'il va être démontré, de telles demandes ne sauraient prospérer devant les juridictions françaises en l'absence de rencontre des volontés et de consentement des parties qu'il s'agisse du contrat ou encore même des promesses invoquées.

118. Au préalable, il convient de rappeler les principes régissant la formation des contrats ainsi que ceux régissant les promesses en droit français.

### (a)    En droit

119. Selon M. Kasturi, un premier contrat aurait été conclu en juillet 2016.

120. C'est donc à la lumière des principes régissant la formation des contrats antérieurs à la réforme du droit des obligations du 10 février 2016 (entrée en vigueur pour partie le 1er octobre 2016 et applicable aux contrats conclus postérieurement à son entrée en vigueur) qu'il convient de déterminer si un contrat a été conclu dans la présente affaire.

121. Si l'ancien Code civil n'était pas très explicite sur la question de la formation du contrat, ce que la réforme du droit des obligations du 10 février 2016 est venue pallier en introduisant dans le Code un chapitre entier consacré au sujet[30], en pratique, les principales règles avaient toutefois déjà été posées par la jurisprudence :

---

[30]    Voir les articles 1112 à 1121, sous-section I, Les négociations, et sous-section II, L'offre et l'acceptation, Chapitre II, La formation du contrat, Sous-Titre Premier, Le contrat, Titre troisième, Des sources d'obligations

24

Kitsuné Creative *c.* Vinod Kasturi
Tribunal de commerce de Paris
Assignation

> « *Curieusement, le code de 1804 ne contenait aucune disposition relative à l'accord des volontés. Cette lacune est désormais comblée. Consacrant pour l'essentiel les solutions qui avaient été dégagées par la jurisprudence, les auteurs de la réforme traitent la question de manière assez détaillées aux articles 1113 à 1121 du Code civil.* »[31]

122. En particulier, pour que le contrat puisse être valablement formé, le consentement de chacune des parties devait avoir été recueilli[32], ce qui impliquait un accord de chacune d'entre elles, lequel se manifeste par une offre, d'un côté, et une acceptation, de l'autre.

123. Faute de rencontre des volontés ou d'acceptation des parties des conditions posées par l'autre, en particulier les éléments considérés comme essentiels du contrat[33], celui-ci n'est pas valablement formé.

124. S'agissant de l'offre de contracter, la jurisprudence antérieure à la réforme exigeait déjà qu'elle soit ferme et précise[34] afin que l'acceptation puisse porter sur tous les éléments essentiels du futur contrat.

125. Tous ces principes figurent désormais dans le Code civil.

126. Tout d'abord, aux termes de l'article 1113 du Code civil,

> « *Le contrat est formé par la rencontre d'une offre et d'une acceptation par lesquelles les parties manifestent leur volonté de s'engager. Cette volonté peut résulter d'une*

---

[31] Droit civil, les Obligations, F. Terré, P. Simler, Y. Lequette, F. Chénedé, Dalloz, 12ème édition, para 162

[32] Article 1108 (ancien) du Code civil

[33] Cass. civ. 3, 2 mai 1978

« *Mais attendu qu'ayant, en vertu de son pouvoir souverain d'appréciation, estimé d'une part que certaines modalités ordinairement accessoires, telles que la date du paiement du solde du prix ou la date de prise de possession des lieux, avaient en l'espèce été tenues, par la venderesse, comme des éléments constitutifs de son consentement, et qu'il ne résultait pas, d'autre part, de l'ensemble des éléments de la cause la preuve qu'un accord fut intervenu ni sur la date du paiement du solde, ni sur la date d'entrée en jouissance des lieux, la cour d'appel a pu en déduire que le contrat de vente ne s'était pas formé ; qu'ayant ainsi constaté l'absence d'accord, ce qui exclut nécessairement toute ratification, la cour d'appel, par ce seul motif, a justifié sa décision ; que le moyen ne peut être accueilli ;* »

[34] Cass. com., 29 juin 1993, n°91-20.380

« *attendu, d'une part, que par une appréciation souveraine, l'arrêt a décidé que la lettre de la société Chanel accompagnée du document contractuel adressée le 18 mai 1988 à la société Parfumerie Plus constituait une « offre précise complète et ferme » dont l'acceptation par cette dernière était établie par la signature qu'elle avait apposée sous ce contrat le 25 mai 1988 sans aucune réserve et avant toute rétractation de l'offre ; que la cour d'appel n'avait donc pas à effectuer d'autres recherches ;* »

25

Kitsuné Creative *c.* Vinod Kasturi
Tribunal de commerce de Paris
Assignation

> *déclaration ou d'un comportement non équivoque de son*
> *auteur ».*

127. Il résulte de la disposition qui précède que la volonté de toutes les parties doit se manifester (peu importe la forme de son expression, expresse ou tacite) pour pouvoir conclure à une « *rencontre des volontés* » et donc à un contrat valablement formé.

128. L'article 1114 du Code civil définit ensuite la notion d'offre et ses effets :

> *« L'offre, faite à personne déterminée ou indéterminée,*
> *comprend les éléments essentiels du contrat envisagé et*
> *exprime la volonté de son auteur d'être lié en cas*
> *d'acceptation. A défaut, il y a seulement invitation à entrer*
> *en négociation. »*

129. Conformément au texte précité, l'offre doit être ferme et son contenu précis, c'est-à-dire contenir les éléments essentiels du contrat envisagé. A défaut, comme le rappelle le Code civil, il s'agit d'une simple « *invitation à entrer en négociation* ».

130. Comme le rappelle la doctrine,

> *« Autrement dit, l'offre, encore nommé pollicitation, est la*
> *proposition de conclure un contrat, à des conditions*
> *déterminées, de telle sorte que son acceptation suffit à la*
> *formation de celui-ci. »*[35]

131. S'agissant de la durée d'une offre, la Cour de cassation avait, dès avant la réforme du droit des obligations, considéré « *qu'un délai raisonnable (est) nécessairement contenu dans toute offre de vente non assortie d'un délai précis.*[36] »

132. Consacrant la solution jurisprudentielle de la caducité de l'offre au-delà d'un certain temps, l'article 1117, alinéa 1 reproduit ci-après, permet d'éviter une acceptation formulée trop tardivement, parfois plusieurs années après l'émission de l'offre :

> *« L'offre est caduque à l'expiration du délai fixé par son*
> *auteur ou, à défaut, à l'issue d'un délai raisonnable. [...] »*

133. De façon classique enfin, le Code civil rappelle à l'article 1118 que l'acceptation est un acte juridique unilatéral et qu'elle doit être pure et simple ; à défaut, il ne s'agit pas d'une acceptation mais d'une contre-proposition, autrement dit, une nouvelle offre :

---

[35]  Droit civil, les Obligations, F. Terré, P. Simler, Y. Lequette, F. Chénedé, Dalloz, 12ème édition, para 165

[36]  Cass. civ. 3, 30 mai 2009

26

Kitsuné Creative *c.* Vinod Kasturi
Tribunal de commerce de Paris
Assignation

> « *L'acceptation est la manifestation de volonté de son auteur d'être lié dans les termes de l'offre.*
>
> [...]
>
> *L'acceptation non conforme à l'offre est dépourvue d'effet, sauf à constituer une offre nouvelle.* »

134. M. Kasturi invoque par ailleurs le non-respect de la promesse unilatérale qui lui aurait été faite début 2022 de bénéficier d'une augmentation de son intéressement à hauteur de 0,5 % du capital de Kitsuné Creative.

135. Sur ce point, les nouvelles dispositions du Code civil sont applicables et prévoient à l'article 1124 :

> « *La promesse unilatérale est le contrat par lequel une partie, le promettant accorde à l'autre, le bénéficiaire, le droit d'opter pour la conclusion d'un contrat dont les éléments essentiels sont déterminés, et pour la formation duquel ne manque que le consentement du bénéficiaire. La révocation de la promesse pendant le temps laissé au bénéficiaire pour opter n'empêche pas la formation du contrat promis. Le contrat conclu en violation de la promesse unilatérale avec un tiers qui en connaissait l'existence est nul.* »

136. Ainsi qu'il va être à présent démontré, l'application des principes rappelés ci-dessus conduit à écarter l'existence d'un contrat valablement formé en 2016 ; il en est de même de la promesse unilatérale alléguée de 2022.

### (b) En fait : aucune rencontre des volontés n'est jamais intervenue entre M. Kasturi et Kitsuné Creative

137. Ainsi qu'il a été amplement exposé dans le rappel des faits, il n'est pas possible de soutenir qu'un contrat aurait été conclu entre M. Kasturi et la société Kitsuné Crative que ce soit en 2016 ou après pour les raisons exposées ci-après.

### (i) Le projet de contrat de travail transmis le 9 septembre 2016 par Kitsuné ne contenait ni une offre de souscrire un plan de BSPCE, ni une promesse unilatérale de la part de Kitsuné

138. La proposition faite à M. Kasturi de souscrire à un plan de BSPCE telle que figurant à Kitsuné dans son projet de contrat transmis le 9 septembre 2016 ne contenait aucun des éléments essentiels nécessaires à la qualification juridique d'une offre ou d'une promesse.

27

139. En effet, l'article 1.7 figurant dans le projet de contrat de travail était taisant sur la plupart des conditions essentielles du plan d'intéressement envisagé ; mieux encore, l'article 1.7 rappelait expressément que :

- Le calendrier était incertain ;

- Le nombre de BSPCE consenti était indéterminé ; *et*

- Les termes et conditions d'exercice des BSPCE parmi lesquels, notamment, leur date d'octroi, leur prix d'exercice, les conditions de *vesting* ainsi que tous les autres éléments essentiels à ce type de plan

seraient à déterminer ultérieurement dans une future documentation écrite[37].

140. Comme il a été rappelé plus haut, la formation d'un contrat ne peut intervenir que pour autant qu'il y ait matière à acceptation, à savoir une offre, laquelle, pour être valable, doit être claire et précise, c'est-à-dire contenir les éléments essentiels du futur contrat.

141. Or, ici, faute de contenir aucun des éléments du plan d'intéressement envisagé, il ne pouvait donc pas s'agir d'une offre au sens du droit des obligations. Au mieux, Kitsuné a ici formulé une proposition de négocier ultérieurement un plan de BSPCE.

142. Faute d'offre au sens du droit français, il n'est donc pas possible de considérer qu'un contrat aurait pu être formé sur cette seule base.

143. Pour les mêmes raisons, en l'absence des éléments essentiels du futur contrat, il n'est pas non plus possible de considérer que l'article 1.7 aurait contenu une promesse unilatérale faite par Kitsuné d'octroi d'un plan de BSPCE. Au mieux, s'agissait-il d'une proposition d'entrer en négociation ultérieurement sur un plan de BSPCE.

144. En tout état de cause, même à considérer que l'article 1.7 du projet de contrat aurait contenu une offre, M. Kasturi l'a intégralement rejetée.

### (ii) M. Katsuri a intégralement rejeté la proposition de négocier un plan de BSPCE formulée à la clause 1.7 du projet de contrat de travail

145. Le 29 septembre 2016, M. Kasturi a adressé à Kitsuné le projet de contrat de travail revu par ses soins et contenant ses modifications.

146. Or, s'agissant de l'article 1.7 du projet, celui-ci a non seulement été intégralement raturé mais il a également été réécrit par M. Kasturi en des termes très différents.

---

[37]    **Pièce Kitsuné Creative 30**, Projet de contrat de travail du 9 septembre 2016

Kitsuné Creative *c.* Vinod Kasturi
Tribunal de commerce de Paris
Assignation

147. Comme exposé précédemment, la contre-proposition de M. Kasturi différait sur l'ensemble des éléments matériels de celle reçue de la part de Kitsuné Creative :

- La nature de l'intéressement : octroi ferme de valeurs mobilières et non plus des BSCPE ;

- La quantité et les conditions afférentes à l'allocation des valeurs mobilières.

148. Ainsi, la contre-proposition formulée par M. Kasturi étant radicalement distincte de celle qui lui avait été adressée, elle ne peut s'analyser que comme un rejet de l'offre initiale, laquelle perdait dès lors ses effets.

149. En outre, la contre-proposition formulée par M. Kasturi était elle-aussi sans effet, ce que rappelle le Code civil qui dispose à l'article 1118 qu'une acceptation en des termes différents est « *dépourvue d'effet* ».

150. En tout état de cause, à supposer même qu'elle ait été acceptée par Kitsuné Creative, la mouture de la clause 1.7 telle que proposée par M. Kasturi demeurait toujours incomplète eu égard aux éléments essentiels que doit comporter un plan d'intéressement par l'octroi d'option (BSPCE ou options) dès lors que le prix d'exercice était absent.

151. Aucune rencontre des volontés n'est par conséquent intervenue.

### (iii)   Surabondamment, l'offre contenue à l'article 1.7 est en tout état de cause devenue caduque

152. Outre qu'elle a été expressément rejetée, l'offre figurant au projet de contrat de travail transmis le 9 septembre 2016 est devenue caduque, faute pour M. Kasturi de s'être intéressé au sujet pendant près de 4 ans.

153. Il sera en effet rappelé que, postérieurement aux échanges de l'été 2016, M. Kasturi ne s'est plus manifesté jusqu'à juin 2020, soit près de quatre ans plus tard.

154. Il va de soi que le délai « *raisonnable* » pendant lequel une offre doit être maintenue ne peut être d'une durée aussi longue.

155. Pour l'ensemble des raisons qui précèdent, il sera donc jugé qu'aucun contrat n'a jamais été conclu entre M. Kasturi et Kitsuné en 2016 s'agissant de l'octroi d'un plan de BSPCE faute du moindre échange des volontés matérialisant un tel accord.

### (iv)   Aucune rencontre des volontés n'est intervenue par la suite

156. Comme indiqué précédemment, postérieurement aux premières négociations de 2016, les parties n'ont plus jamais échangé sur le sujet avant juin 2020, date à laquelle un

29

Kitsuné Creative *c.* Vinod Kasturi
Tribunal de commerce de Paris
Assignation

projet de contrat de travail là encore très différent de celui de 2016 (et contenant une nouvelle mouture de la clause 1.7) a été adressé par le conseil de M. Kasturi.

157. S'en est suivi un nouveau 'silence radio' complet entre les parties jusqu'à début 2022 où se sont tenus de nouveaux échanges dont la teneur confirme une fois encore l'éloignement des positions et surtout le fait qu'aucun des éléments essentiels des conditions d'entrée au capital de M. Kasturi n'était encore convenu entre elles.

158. La conduite de M. Kasturi elle-même dément sa thèse d'une rencontre des volontés en juillet 2016 et janvier 2022.

159. Tout d'abord, si M. Kasturi estimait réellement qu'il avait conclu un contrat en juillet 2016 le rendant titulaire d'un instrument d'intéressement au capital de Kitsune Creative, il est permis de se demander pour quelle raison celui-ci a néanmoins continuer à solliciter les dirigeants du groupe sur cette question. De même, si M. Kasturi était effectivement bénéficiaire d'un contrat d'intéressement, l'on ne peut s'expliquer pourquoi ce dernier a continué à proposer de nouvelles formules d'intéressement incompatibles et insusceptibles de se cumuler à son premier contrat.

160. C'est bien parce que M. Kasturi savait qu'il n'existait aucun accord sur la forme comme sur le fond de l'intéressement que celui-ci a persisté dans la négociation de son intéressement.

161. En outre, si M. Kasturi estimait réellement qu'il n'était pas nécessaire de recueillir dans une documentation précise et écrite l'ensemble des éléments essentiels du plan d'intéressement en question, alors pourquoi ce dernier en a-t-il adressé une préparée par le cabinet Foley Hoag LLP en novembre 2023 pour la mise en place d'actions fantômes ?

162. Sa démarche s'explique précisément parce que des mécaniques contractuelles aussi complexes que celle d'un plan d'émission de BSPCE ou encore de *stock options* ou encore d'actions fantômes requiert la préparation d'une document complète régissant l'ensemble des points de sa mise en œuvre, ce qui, jusqu'à cette date, n'avait jamais été même proposé par M. Kasturi ou par Kitsuné Creative.

163. C'est en effet sur la base de cette documentation complète que les Parties devaient ensuite débattre et négocier de la teneur des droits octroyés à l'une ou l'autre dans les stipulations rédigées.

164. Cette documentation, présentée pour la première fois le 15 novembre 2023 et portant sur un plan d'intéressement d'actions fantômes, n'a pas été acceptée par Kitsuné Creative qui n'a pas compris ce changement de soudain de choix d'instrument d'intéressement. Kitsuné Creative n'a pas non plus accepté le choix de M. Kasturi de

30

Kitsuné Creative *c.* Vinod Kasturi
Tribunal de commerce de Paris
Assignation

revenir sur un acquis des négociations tenues en 2020-2021 s'agissant de la mise en place d'un mécanisme d'ajustement afin que l'intéressement de M. Kasturi soit indexé de manière prépondérante à la valeur générée par son périmètre, à savoir les filiales américaines et canadiennes.

165. Aussi, faute d'un accord, il ne peut y avoir de contrat, que ce soit en juillet 2016 ou après.

### 2.3   A TITRE SUBSIDIAIRE, SUR LA PRESCRIPTION DES DEMANDES DE M. KASTURI

166. Subsidiairement, même à considérer que les parties auraient conclu un contrat en juillet 2016 (*quod non*), une action visant à voir sanctionner une éventuelle responsabilité contractuelle des sociétés Kitsuné devant les juridictions françaises, serait immanquablement déclarée irrecevable pour la simple raison qu'elle est prescrite.

167. En effet, le délai de prescription des actions personnelles, applicable ici, est de cinq ans conformément à l'article 2224 du Code civil qui prévoit :

> « *Les actions personnelles ou mobilières se prescrivent par cinq ans à compter du jour où le titulaire d'un droit a connu ou aurait dû connaître les faits lui permettant de l'exercer.* »

168. L'action en responsabilité contractuelle que M. Kasturi envisage de lancer aujourd'hui, interviendrait plus de huit ans après la conclusion du contrat allégué ; elle serait donc très largement prescrite.

169. En effet, si M. Kasturi considère qu'un engagement contractuel a été pris à son égard par les sociétés Kitsuné, force est de constater qu'il ne s'est jamais plaint de son non-respect et qu'il n'a, à aucun moment, tenté d'en obtenir l'exécution. Et pour cause, celui-ci continuait à solliciter de nouvelles formules d'intéressement auprès du groupe.

170. En particulier, il n'a jamais mis en demeure les sociétés Kitsuné de s'exécuter ; il n'a pas plus initié d'action à leur encontre de sorte que le délai de cinq ans a couru sans être jamais interrompu.

171. Une telle action devrait par conséquent être déclarée irrecevable comme tardive et prescrite.

* * * *
* * *
*

172. Pour l'ensemble des raisons qui précèdent, il est demandé au Tribunal de commerce de céans de condamner M. Kasturi à régler la somme de 20.000 euros au titre de l'article 700, ainsi qu'aux entiers dépens.

31

Kitsuné Creative *c.* Vinod Kasturi
Tribunal de commerce de Paris
Assignation

## PAR CES MOTIFS

*Vu l'article 1108 (ancien) du Code civil*
*Vu les articles 1113 et suivants du Code civil,*
*Vu les moyens qui précèdent,*
*Vu les pièces versées aux débats,*

Il est demandé au Tribunal de commerce de Paris de :

*A titre principal,*

- JUGER qu'il n'existe pas un contrat entre Monsieur Vinod Kasturi et Kitsuné Creative relatif à un plan d'intéressement au capital de Kitsuné Creative au bénéfice de Monsieur Kasturi ;

- JUGER qu'il n'existe pas de promesse de contrat entre Monsieur Vinod Kasturi et Kitsuné Creative relatif à un plan d'intéressement au capital de Kitsuné Creative au bénéfice de Monsieur Kasturi ;

*A titre subsidiaire,*

- JUGER que la demande indemnitaire de Monsieur Vinod Kasturi au titre du contrat conclu en juillet 2016 est prescrite ;

*En tout état de cause,*

- CONDAMNER Monsieur Vinod KASTURI à payer à la société KITSUNÉ CREATIVE la somme de 20.000 euros au titre des frais irrépétibles par application des dispositions de l'article 700 du code de procédure civile ; et

- CONDAMNER Monsieur Vinod KASTURI aux entiers dépens.

**SOUS TOUTES RESERVES**

32

Kitsuné Creative *c.* Vinod Kasturi
Tribunal de commerce de Paris
Assignation

## LISTE DES PIECES

| | |
|---|---|
| **Pièce Kitsuné Creative 1** | Extrait d'immatriculation Kitsuné Creative du 12 mai 2024 |
| **Pièce Kitsuné Creative 2** | Passeport de Vinod Kasturi |
| **Pièce Kitsuné Creative 3** | Courriel de G. Loëc à V. Kasturi du 25 février 2016 |
| **Pièce Kitsuné Creative 4** | Echange de courriels entre V. Kasturi, G. Loëc et A. Castel Oster entre le 25 février 2016 et 11 juillet 2016 |
| **Pièce Kitsuné Creative 5** | Courriel de A. Castel Oster à V. Kasturi (copie D. Kimball) du 9 septembre 2016 |
| **Pièce Kitsuné Creative 6** | Courrier de résiliation du contrat de travail du 28 mars 2024 |
| **Pièce Kitsuné Creative 7** | Courriel de V. Kasturi à A. Castel Oster du 14 mars 2024 |
| **Pièce Kitsuné Creative 8** | Courriel de M. Kasturi au groupe Kitsuné du 16 mars 2016 |
| **Pièce Kitsuné Creative 9** | Courriel de V. Kasturi à Kitsuné Creative du 8 juillet 2024 |
| **Pièce Kitsuné Creative 10** | Courriel de A. Castel Oster à V. Kasturi du 11 juillet 2016 |
| **Pièce Kitsuné Creative 11** | Courriel de V. Kasturi à A. Castel Oster du 11 juillet 2016 |
| **Pièce Kitsuné Creative 12** | Projet de contrat de travail du 29 septembre 2016, Clause 1.7 |
| **Pièce Kitsuné Creative 13** | Courriel de M. Yankovich à A. Castel Oster du 5 juin 2020 |
| **Pièce Kitsuné Creative 14** | Projet de contrat du 5 juin 2020 |
| **Pièce Kitsuné Creative 15** | Courriel de A. Castel Oster à V. Kasturi du 8 juillet 2021 |
| **Pièce Kitsuné Creative 16** | Courriel de A. Castel Oster à V. Kasturi du 20 septembre 2021 |
| **Pièce Kitsuné Creative 17** | Courriel de V. Kasturi à A. Castel Oster du 23 septembre 2021 |
| **Pièce Kitsuné Creative 18** | Courriel de A. Castel Oster à V. Kasturi du 11 octobre 2021 |
| **Pièce Kitsuné Creative 19** | Courriel de A. Castel Oster à V. Kasturi du 5 janvier 2022 |
| **Pièce Kitsuné Creative 20** | Courriel de V. Kasturi à A. Castel Oster du 5 janvier 2022 |
| **Pièce Kitsuné Creative 21** | Courriel de A. Castel Oster à V. Kasturi et R. Grand du 24 janvier 2022 |
| **Pièce Kitsuné Creative 22** | Courriel de V. Kasturi à A. Castel Oster (copie Foley Hoag) du 27 octobre 2022 |
| **Pièce Kitsuné Creative 23** | Courriel de V. Kasturi à A. Castel Oster (copie Foley Hoag) du 4 avril 2023 |

33

Kitsuné Creative *c.* Vinod Kasturi
Tribunal de commerce de Paris
Assignation

| | |
|---|---|
| **Pièce Kitsuné Creative 24** | Courriel de A. Castel Oster à V. Kasturi (copie Foley Hoag et R. Grand) du 4 avril 2023 |
| **Pièce Kitsuné Creative 25** | Courriel de V. Kasturi à A. Castel Oster (copie Foley Hoag et R. Grand) du 19 avril 2023 |
| **Pièce Kitsuné Creative 26** | Courriel de V. Kasturi à A. Castel Oster du 6 juin 2023 |
| **Pièce Kitsuné Creative 27** | Réservée |
| **Pièce Kitsuné Creative 28** | Annexe A (Tableau de calcul) |
| **Pièce Kitsuné Creative 29** | Courriel de Foley Hoag à Dupont Law Group du 10 mars 2024 |
| **Pièce Kitsuné Creative 30** | Projet de contrat de travail du 9 septembre 2016 |

34