UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MAISON KITSUNE, INC.,

                  Plaintiff,

    -against-

VINOD KASTURI,

                  Defendant.

VINOD KASTURI,

                  Counterclaimant and
                  Third-Party Plaintiff,

    -against-

MAISON KITSUNE, INC, and KITSUNE
CREATIVE SAS,

                  Counterclaim and Third-
                  Party Defendants.

Case No. 1:24-cv-04431-ALC

**DECLARATION OF CAMERON A. WELCH IN OPPOSITION OF
PLAINTIFF/COUNTER-DEFENDANT MAISON KITSUNE, INC'S
MOTION TO DISMISS COUNTERCLAIMS**

I, CAMERON A. WELCH, hereby declare under penalty of perjury, that the following

statements are true and correct to the best of my knowledge:

1.    I am an attorney-at-law admitted to practice in the State of New York, and a

member of Cole Schotz, P.C., counsel for Defendant/Counterclaim and Third-Party Plaintiff Vinod

Kasturi ("Kasturi").

2.    I submit this declaration in opposition to Plaintiff/Counterclaim Defendant Maison

Kitsune Inc's ("Kitsune America") motion to dismiss Kasturi's counterclaims.

68201/0001-48874761v2

2

3.      Attached hereto as "Exhibit A" is a true and correct copy of the employment agreement draft sent by Audrey Castel Oster to Vinod Kasturi in or about July 2016.

4.      Attached hereto as "Exhibit B" is a true and correct copy of the email correspondence between Vinod Kasturi, Gildas Loaec, and Audrey Castel dated July 8, 2016.

5.      Attached hereto as "Exhibit C" is a true and correct copy of the email correspondence between Colin J. Kirby and Oliver DuPont, dated May 9, 2024, and the draft complaint attached thereto.

6.      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: November 21, 2024                               /s/Cameron A. Welch
        New York, New York                             CAMERON A. WELCH

68201/0001-48874761v2

# EXHIBIT A

This EMPLOYMENT AGREEMENT (the "Agreement") dated August __, 2016 by and between Maison Kitsuné, Inc., a company incorporated under the laws of New York ("Company"), and Vinod Kasturi ("Executive").

WHEREAS, Company, a second-tier subsidiary of Kitsuné Créative, operates a fashion business in the United States, and Executive has unique skills that will enable Company to succeed; and

WHEREAS, Company and Executive desire to enter into a contract to provide for Executive's employment by Company upon the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing facts and mutual agreements set forth below, the parties agree as follows:

1.      Employment.  Company hereby agrees to employ Executive in New York City, its principal place of business, and Executive hereby accepts such employment and agrees to perform his duties in accordance with the terms and conditions set forth in this Agreement.

1.1     Duties.  Executive shall serve as General Manager of Company and shall perform all duties incident to such position and such other duties (including, without limitation, duties for Kitsuné Music, Inc. and other affiliates of Company) as Company may from time to time assign to him.  A general, non-exclusive description of the Executive's duties is attached to this Agreement as an addendum, and Company may from time to time modify this description in any way that it, in its sole and absolute discretion, deems fit.  In addition to serving as General Manager, Executive agrees to serve, for no additional compensation, as an officer of Company in order to facilitate banking and other business transactions on behalf of Company; the officer position that Executive shall hold shall be determined by Company in its sole and absolute discretion.

1.2     At Will Employment.  Executive's employment shall be on an at will basis. As a result, except as otherwise specifically provided in this Agreement, either Executive or Company may, without liability, terminate Executive's employment at any time and for any reason or no reason.

1.3     Standard of Conduct.  Executive agrees at all times to act pursuant to the highest standard of professional conduct, to use his best efforts to carry out his duties as specified in Sections 1.1 and 4.1, and to devote substantially all of his business time, attention and energy thereto.

1.4     Compensation.  Company shall pay Executive a base annual salary of one hundred fifty thousand dollars ($150,000.00) payable in accordance with the Company's normal payroll practices. Company shall periodically review Executive's base annual salary and may, in its sole and absolute discretion, increase it from time to

time.  Company shall also pay Executive a bonus of twenty-five thousand dollars ($25,000.00) per calendar year (pro-rated for partial years of service) provided that Executive achieves such performance objectives for the calendar year as are determined by Company and otherwise performs his duties during the calendar year in accordance with the terms of this Agreement.  The determination of whether Executive has satisfied the conditions for payment of the bonus shall be made by Company in good faith, and the payment of a bonus for one calendar year shall not automatically entitle Executive to a bonus for any other calendar year.  Company shall periodically review the Executive's conditional bonus amount and may, in its sole and absolute discretion, increase it from time to time.

1.5     Benefits.  While employed by Company, Executive shall receive U.S. health cover under such insurance policy or other arrangement as Company shall, in its sole and absolute discretion, provide, subject to such deductibles and benefit and premium co-pays as may be provided under the insurance policy or other arrangement.  Executive shall also participate in such other employee benefit programs as Company may, in its sole and absolute discretion, establish for the benefit of its employees (including, without limitation, retirement programs and disability programs).

1.6     Reimbursement of Expenses; Vacation.  Executive shall be entitled to reimbursement of reasonable and satisfactorily documented expenses (including, without limitation, travel expenses) related to his employment by Company, subject to a dollar cap per calendar year (pro-rated for partial years of service) that is specified by Company in its sole and absolute discretion.  Executive shall be entitled to time off for major U.S. legal holidays and to four (4) weeks of vacation per calendar year (pro-rated for partial years of service), to be taken at such times as mutually agreed upon by Executive and Company. Unless otherwise agreed to by Company, unused vacation time will be forfeited as of December 31 of each calendar year.

1.7     Equity Warrants.  Upon implementation by Kitsuné Créative of an equity warrant plan (commonly referred to in France as "BSPCE"), the timing of which is uncertain since it depends upon the closing of a fundraising transaction by Kitsuné Créative, equity warrants shall be awarded to Executive.  The number of warrants to be awarded to Executive, as well as the terms and conditions thereof (including, without limitation, award date, exercise price, vesting requirements and all other material features) shall be set forth in a written document provided to Executive as soon as practicable, but in no event later than the date that similar information is provided to employees of affiliates of Company to whom equity warrants are awarded.

1.8     No Other Compensation.  Irrespective of whether Executive performs duties for Company or any of its affiliates, Executive shall not be entitled to any compensation or benefits other than what is specified in Sections 1.4 through 1.7.

2.        Confidential Information; Non-Interference; Non-Solicitation

2.1        Confidential Information.  Executive acknowledges that by reason of his employment by Company, Executive will have access to certain confidential and proprietary information relating to the Company's business, which may include, but is not limited to, trade secrets, trade "know-how," product development techniques and plans, customer lists and addresses, supplier lists and addresses (including, without limitation, information concerning fashion designers, fabric suppliers, clothing manufacturers, artists  and musical performers who have a relationship with Company), financing and funding arrangements, cost and pricing information, distribution arrangements, marketing and sales techniques, strategy and programs, computer programs and software and financial information (collectively referred to as "Confidential Information"). Executive acknowledges that such Confidential Information is a valuable and unique asset of Company, and Executive agrees that he will not, unless expressly authorized in writing by Company, at any time during the course of Executive's employment use, directly or indirectly, any Confidential Information or divulge or disclose any Confidential Information to any individual or entity except in connection with the performance of the Executive's duties for Company and in a manner consistent with the Company's policies regarding Confidential Information. Executive also agrees that at any time after the termination of  his employment, he will not, directly or indirectly, use any Confidential Information or divulge or disclose any Confidential Information to any individual or entity, unless such information is in the public domain through no fault of Executive or except when required to do so by a court of law, by any governmental agency having supervisory authority over the business of Company or by any administrative or legislative body (including a committee thereof) with apparent jurisdiction to order Executive to divulge, disclose or make accessible such information. All written Confidential Information (including, without limitation, in any computer or other electronic format) which comes into the Executive's possession during the course of his employment shall remain the property of Company. Except as required in the performance of the Executive's duties for Company, or unless expressly authorized in writing by Company, Executive shall not remove any written Confidential Information from the Company's premises, except in connection with the performance of the Executive's duties for Company and in a manner consistent with the Company's policies regarding Confidential Information. Upon termination of the Executive's employment, Executive agrees to return immediately to Company all written Confidential Information (including, without limitation, in any computer or other electronic format) in his possession.  For all purposes of this Section 2, each reference to "Company" shall be deemed to be a reference to Company and each of its affiliates.

2.2        Non-Interference and Non-Solicitation.  Executive agrees that as long as the Agreement remains in effect and for a period of one (1) year after its termination, Executive will not (i) disrupt or otherwise interfere with, or attempt to disrupt or otherwise interfere with, directly or indirectly, any relationship between Company and its suppliers (including, without limitation, any fashion designers, fabric

suppliers, clothing manufacturers, artists or musical performers who have a relationship with Company), any relationship between Company and its customers, or any relationship between Company and its business partners, joint-venturers, banks, capital backers or funders, or other individuals or entities with which it has business affiliations, or (ii) induce or attempt to induce, directly or indirectly, any individual to leave his or her employment with Company.

2.3    Remedies. Executive acknowledges and agrees that his obligations under this Section 2 are necessary and reasonable in order to protect Company and its businesses, and Executive expressly agrees that monetary damages would be inadequate to compensate Company for any breach by Executive of this Section 2. Accordingly, Executive acknowledges and agrees that any violation or threatened violation of this Section 2 will cause irreparable injury to Company and that, in addition to any other remedies that may be available in law, in equity or otherwise, Company shall be entitled to obtain injunctive relief against the threatened breach of this Section 2 or the continuation of any such breach by Executive without the necessity of proving actual damages.

2.4    Survival. The provisions of this Section 2 shall survive the termination of this Agreement.

3.    Termination.

3.1    Termination by Company. Company may terminate the Executive's employment with or without Cause and without prejudice to any right or remedy to which Company or Executive may be entitled at law or in equity or under this Agreement. If Company terminates the Executive's employment for Cause, Company shall specify an immediate termination date and need not provide advance written notice thereof to Executive. If Company chooses to terminate the Executive's employment without Cause, Company shall provide Executive with thirty (30) days advance written notice of the termination date. For purposes of this Section 3.1, "for Cause" means that Executive (i) violates any provisions of this Agreement (including, without limitation, Section 4.1), (ii) is guilty of (or pleads guilty to) any felony, (iii) commits any act of embezzlement, misappropriation, concealment or conversion of any money or property of Company or any of its affiliates, (iv) engages in willful misconduct or gross dereliction of his duties, (v) engages in any behavior, either with respect to employees of Company or any of its affiliates or in any other manner, which may subject Company to liability, or (vi) refuses to perform his duties satisfactorily or to follow directions after notice of such refusal to perform duties satisfactorily or to follow directions is given to him. This Agreement shall terminate as of the Executive's termination date, and Executive shall be entitled to base salary and benefits for the period until such termination date but not for any period thereafter (with a pro rata bonus being paid for the calendar year of

- 4 -

termination only if the termination is without Cause and Company in its sole and absolute discretion determines to pay it).

3.2    Termination by Executive's Death or Disability.  This Agreement shall terminate upon the Executive's death and/or a finding of permanent physical or mental disability that is expected to result in death or to be of a continuous duration of at least twelve (12) months and that renders Executive unable to perform his usual and essential duties for Company.  Executive shall be entitled to base salary and benefits for the period until the date of death or a finding of disability but not, except as may be provided under any disability plan in which he is participating, for any period thereafter (with a pro rata bonus being paid for the calendar year of death or disability only if Company in its sole and absolute discretion determines to pay it).

3.3    Voluntary Termination by Executive.  Executive may voluntarily terminate his employment for any reason by providing to Company sixty (60) days' prior written notice of the resignation date.  Company may accept the resignation date specified in the notice or may, in its sole and absolute discretion, determine that the Executive's employment shall terminate prior to the resignation date specified in the notice, in which case the termination date specified by Company shall be deemed to be the Executive's resignation date. This Agreement shall terminate as of the Executive's resignation date, and Executive shall be entitled to base salary and benefits for the period until such resignation date but not for any period thereafter (with a pro rata bonus being paid for the calendar year of termination only if Company in its sole and absolute discretion determines to pay it).

4.    General Provisions.

4.1    Actions by Company.  All actions by and decisions of Company in connection with any aspect of the Executive's employment by Company (or termination thereof) shall be undertaken or made by Gildas Loaëc in his capacity as an officer of Company or by any individual (other than Executive) to whom Gildas Loaëc has delegated the authority to take such actions or make such decisions.  Executive shall report to Gildas Loaëc in performing his duties under Section 1.1, and Executive understands and agrees that he shall follow such directions as Gildas Loaëc provides to him with regard to the nature of his duties and the manner in which he performs them. Executive understands and agrees that irrespective of whatever position in Company he may hold, he shall have no power or authority whatsoever to take any action by or make any decision of Company in connection with any aspect of his employment by Company (or termination thereof).  Notwithstanding anything to the contrary hereinbefore provided in this Section 4.1, Executive shall have the power and authority to act on behalf of Company in adopting, implementing and administering employee benefit plans for the benefit of the Company's employees provided that he does so with the express written consent of Gildas Loaëc (or any individual to whom he has delegated such power of consent) and further provided that any determination of the Executive's status under any

- 5 -

such employee benefit plan shall be made by Gildas Loaëc (or any individual other than Executive to whom he has delegated the authority to make such determination).

4.2    Non-disparagement.  Executive agrees that both during and after his employment by Company, he will not disparage, directly or indirectly, Company, its affiliates, their products, or their owners, directors, officers or employees.  Company agrees that both during and after his employment by Company, it will not unreasonably disparage, directly or indirectly, Executive.

4.3    No Waiver.  Failure of any party at any time to enforce any provisions of this Agreement or any rights or to exercise any elections shall in no way be considered to be a waiver of such provisions, rights or elections and shall in no way affect the validity of this Agreement. The exercise by any party of any rights or elections under this Agreement shall not preclude or prejudice such party from exercising the same or any other right under this Agreement irrespective of any previous action taken.

4.4    Notices.  All notices and other communications in connection with this Agreement shall be in writing and shall be deemed to have been given when hand delivered or mailed by registered or certified mail as follows (provided that notice of change of address shall be deemed given only when received):

> If to Company, to:
>
> Audrey Castel Oster
> Kitsuné France
> 10, rue Chauchat
> 75009 Paris
> France
>
> If to Executive, to:
>
> _____
> New York, New York
> United States of America

or to such other names or addresses as Company or Executive, as the case may be, shall designate by notice to each other person entitled to receive notices in the manner specified in this Section.

4.5    Governing Law; Jurisdiction; Waiver of Jury Trial.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York (without regard to its choice of principles).  Any controversy or claim arising out of or relating to this Agreement shall be brought solely in the federal or state courts having jurisdiction over New York County, New York, to whose exclusive

jurisdiction the parties hereby irrevocably submit.  Both parties hereby expressly waive the right to a trial by jury.

4.6    Severability.  If any provision of this Agreement is determined to be illegal or unenforceable, then such illegal or unenforceable provision shall be modified by the proper court to the extent necessary and possible to make such provision enforceable, and such modified provision and all other provisions of this Agreement shall be given effect separately from the provisions or portion thereof determined to be illegal or unenforceable and shall not be affected thereby.

4.7    Successors and Assigns.  Since this is a personal service contract, Executive may not assign this Agreement. Company may assign its rights under this Agreement at any time without the written consent of Executive, so long as Company or its assignee complies with the material terms of this Agreement. The rights and obligations of Company under this Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of Company, and the Executive's rights under this Agreement shall inure to the benefit of and be binding upon his heirs and executors. The Company's affiliates shall be express third party beneficiaries of this Agreement.

4.8    Affiliates.  For purposes of this Agreement, the term "affiliates" shall include all corporations that are parents, subsidiaries or brother-sister corporations of Company, as well as all other entities, whether organized in corporate or any other form, that share any common ownership with Company or any of such corporations, and all joint ventures, partnerships and other business combinations of any kind that Company or any of such corporations or entities have entered into with any other individual or entity.

4.9    Entire Agreement.   This Agreement supersedes all prior agreements and understandings between the parties, oral or written. No modification, amendment or termination of this Agreement  shall be valid unless it is in writing signed by each party to this Agreement.

4.10    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall for all purposes be deemed to be an original.

- 8 -

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first written above.

MAISON KITSUNE, INC.

By: _____

        Name: Gildas Loaëc
        Title: Vice President

VINOD KASTURI

By: _____

# EXHIBIT B

**De :** Vinod Kasturi <vrkasturi@gmail.com>
**Date :** vendredi 8 juillet 2016 20:52
**À :** Gildas Loaec <gildaskitsune@me.com>
**Cc :** Audrey Castel <audrey.casteloster@kitsune.fr>, masaya kuroki <masayakuroki@me.com>, Antoine Fouter <a.fouter@velvet-avocats.com>
**Objet :** Re: Offer Vinod Kasturi - General Manager US/Canada

Absolument, bon week-end!

--V

On Fri, Jul 8, 2016 at 1:10 PM, Gildas Loaec <gildaskitsune@me.com> wrote:

Great stuff

U have also to speak french 😄 ..
One day

Envoyé de mon iPhone

Le 8 juil. 2016 à 18:07, Vinod Kasturi <vrkasturi@gmail.com> a écrit :

Dear Gildas, Masaya and Audrey,

Thank you for meeting my salary request, I'm very pleased to accept the offer. I look forward to working with you and the Kitsuné team to achieve the goals outlined with the position.

Re: fundraising, great to see multiple consumer-focused investors reach the valuation target and enter the data room. Please don't hesitate to reach out if you have questions during the diligence process. Also, I'm available to further discuss 2016/2017 US & Canada objectives and the latest retail takeover plans at your convenience.

Thanks again for your support and confidence in my abilities.

Best,
Vinod

On Fri, Jul 8, 2016 at 10:12 AM, Audrey CASTEL OSTER <audrey.casteloster@kitsune.fr> wrote:
Dear Vinod,

First of all, thanks to renew your enthusiasm and engagement, we deeply appreciate !

After discussing it with Gildas, we'd be OK to upgrade our offer to $150K.
The whole other conditions stay as below.

In a separate email, you we are asking where we are with fundraising :
we've received 2 LOI from
- Stripe - http://www.stripe-intl.com/en/outline/ - offered 5M for 17%
- NEO Investment - http://neoinvestmentpartners.com/en/ - offered 4M for 17%, but Rothschild is discussing with them
- we are also moving forward with Cassia Investment -http://cassiainvestments.com/

Both Stripe and NEO will enter in data room very soon and we do hope getting the closing done by September.
We are offering you having the equity warrants set up at the occasion of the fundraising, but this offer is binding and not subjected to fundraising.

Let us know your thought about a lll this and I'll let our lawyer work on detailed employment contract.

Many thanks,
Audrey

# EXHIBIT C



From: **Kirby, Colin J.** <ckirby@foleyhoag.com>
Date: Thu, May 9, 2024 at 10:19 PM
Subject: Draft Complaint - Vinod Kasturi
To: Olivier DuPont <odupont@dupontlawgroup.com>
Cc: Haney, Robert P. <rhaney@foleyhoag.com>, Rizkallah, Leah <lrizkallah@foleyhoag.com>, Smith, Jack C <jcsmith@foleyhoag.com>, Rollins, Abani <arollins@foleyhoag.com>


Olivier,


I hope all is well.


Per our discussions of last week, please find attached our draft of the complaint we've prepared on this matter.


Please have a look.  Once you've been able to review, I think it would make sense for us to jump on the phone and discuss next steps.  Separately, I've had a few discussions with Vinod and remain hopeful we can find an amicable resolution on the matter without undue delay and cost.


All the best,

Colin


**Colin Kirby (he / him) | Partner**

**Foley Hoag LLP**
ckirby@foleyhoag.com

M: 805-252-2590

1

Linkedin

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| VINOD KASTURI | ) |
| | ) |
| Plaintiff, | ) Index No. _____ |
| | ) |
| -against- | ) |
| | ) **COMPLAINT** |
| MAISON KITSUNE, INC. and | ) |
| KITSUNE CREATIVE SAS, | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |

Plaintiff Vinod Kasturi ("Plaintiff" or "Kasturi"), as and for his Complaint against

Maison Kitsune, Inc. ("Kitsune America"), a New York corporation, and Kitsune Creative SAS,

a limited liability company by shares organized under the laws of France ("Kitsune Parent," and

collectively with Kitsune America, the "Defendants"), alleges as follows:

## INTRODUCTION

1.      In 2016 Plaintiff Vinod Kasturi left a lucrative finance career to become the Chief

Executive Officer and Head of Kitsune America, a position which offered reduced salary and

bonus compensation.  He did so based on the explicit, written agreement with Defendants that

promised Kasturi would receive a specific grant of equity in the Kitsune Parent and annual bonus

compensation.

2.      Plaintiff served as Chief Executive Officer and Head of Kitsune America for over

seven years, growing Defendants' North American business across multiple new business lines

and contributing substantially to the increased level of the Kitsune Parent's brand awareness,

revenues and profitability in this period.

1

3.       During the course of Kasturi's employment with Defendants, management frequently delayed authorization and payment of portions of Kasturi's compensation. In some cases, Defendants paid the compensation weeks, months or even years after it was earned.

4.       While Plaintiff was hard at work building Kitsune America and growing Defendants' brand, Defendants repeatedly acknowledged, validated and expressed their intention to fulfill their contractual obligation to issue to Plaintiff the equity stake he bargained for prior to commencing his employment in 2016.

5.       Despite Defendants dragging their feet on the administrative step of documenting the bargained-for equity grant, Plaintiff trusted that Defendants would honor the parties' contract, and exercised patience in the face of Defendants' delays. All the while, Plaintiff dutifully performed in his role as head of Kitsune America and remained steadfast in his mission to build Defendants' American business.

6.       In March 2023, Kasturi informed Defendants that he had received another offer to lead a new fashion brand, which he was inclined to accept.  In doing so, Kasturi agreed to work diligently and manage the transition period.  The parties agreed that Kasturi would formally cease being an employee of Kitsune on March 31, 2024, a Sunday, making his last day of work March 29, 2024.

7.       Throughout his lengthy transition period, Kasturi was characteristically diligent, thorough, efficient, and effective in completing his transitionary duties for Defendant. Kasturi was thus surprised when, in January 2024, Defendants revealed for the first time their intention to deprive Kasturi of the equity and overdue bonuses Defendants were contractually obligated to provide, and which were fundamental to Kasturi's decision to engage with Defendant so many years before.

2

8.      When Kasturi insisted Defendants honor the parties' agreement concerning the equity grants and satisfy all unpaid compensation, Defendants, without any discussion or warning, terminated Kasturi after close of business on March 28, 2024, mere hours before his scheduled voluntary departure, the terms and compensation for which had been previously negotiated and agreed to among the parties.

## THE PARTIES

9.      Plaintiff Vinod Kasturi is an individual and citizen of the State of California with residence at 1423 Elevado Street, Los Angeles, California 90026.  Kasturi served as Chief Executive Officer of Defendant Kitsune America from September 2016 through March 2024.

10.     Defendant Kitsune Parent is a limited liability company organized by shares under the laws of France. Kitsune Parent is a global lifestyle brand comprised of a clothing, footwear, personal care & accessories line (Maison Kitsuné), specialty coffee & hospitality division (Café Kitsuné), and a music label business (Kitsuné Musique).

11.     Defendant Kitsune America is a company incorporated under the laws of New York with its principal place of business located at 248 Lafayette Street, New York, New York. Kitsune America is a wholly owned subsidiary of Kitsune Parent and encompasses the brand's North American operations.

## JURISDICTION

12.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §1332(a) and 28 U.S.C. §1367 because Plaintiff is a citizen of California, Defendant Kitsune America is a citizen of New York, Defendant Kitsune Parent is a foreign party with no U.S. domicile, and the amount in controversy exceeds $75,000.

3

13.     This Court has personal jurisdictional over Defendant Kitsune America because it is incorporated and headquartered in New York State.

14.     This Court has personal jurisdiction over Defendant Kitsune Parent under N.Y. C.P.L.R. § 302(a)(1) because it "transacts business within the state or contracts anywhere to supply goods or services in the state."  Defendant Kitsune Parent willingly hired and contracted with Plaintiff in New York State and employed Plaintiff within the state. The exercise of personal jurisdiction over Defendants is consistent with the Due Process clauses of the Fifth and Fourteenth Amendments to the U.S. Constitution.

15.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because Kitsune America is headquartered in this district and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## FACTUAL ALLEGATIONS

### Kasturi Meets Defendants' Co-Founder and Provides Complimentary Consulting Services

16.     In or around February 2015, Plaintiff Vinod Kasturi met Gildas Loaec, Kitsune Parent 's co-founder and Chief Executive Officer ("Loaec").

17.     At the time, Kasturi was employed full-time as a corporate development executive at Vevo LLC, a premium music and entertainment company based in New York. Kasturi enjoyed a competitive compensation package, including an equity package, with his then-employer.

18.     At the time, Defendants had limited indirect operations in North America and were seeking opportunities to raise additional capital and expand business independently in the United States.

4

19.     Between 2015 and 2016, Kasturi, who was passionate about the Maison Kitsune brand, and Defendants developed a working relationship. Kasturi began consulting with Loaec regarding Defendants' anticipated capital infusion and expansion in the North American market.

20.     Kasturi provided Loaec business feedback and insights and substantial consulting work without compensation for nearly a year between February 2015 and February 2016. For example, Kasturi provided valuation analyses, advised the Kitsune Parent on potential international investors, assisted it in negotiations with its U.S.-based distributor, and provided consultation on North American-focused brand and marketing strategies.

21.     On or about February 25, 2016, Loaec contacted Kasturi and expressed Defendants' interest in hiring Kasturi as "the head" of Kitsune America. Loaec asked Kasturi, "What would be the ideal time you would need to terminate your job at Vevo" and wrote, "I feel [it] would be great to have a chance for Maison [K]itsune to collaborate with [you] in the States." Ex. A.

22.     Kasturi replied positively to Loaec's interest in engaging him as a full-time employee of Defendants, writing: "I am still very interested in joining the Kitsune team as Head of America. As we have discussed, I am constantly thinking about ways to grow the company's presence in the US & Canada, and think I bring unique passion and skill to the table." Kasturi continued, "I know things have been moving faster than anticipated, and as I mentioned last year in NY, my initial plan was to finish at least one year at Vevo (ending in June), so I need to spend some time thinking through my own priorities and responsibilities." Ex. A.

23.     Kasturi then asked Loaec to provide an "ideal timeline" for terminating his employment at Vevo and commencing full-time employment with Defendants, and for additional details on the "job responsibilities" and "compensation/benefits." Kasturi noted that he was

5

"[v]ery excited to continue the conversation" regarding the opportunity to join Defendants as Head of Americas. Ex. A.

**The Parties Negotiate and Enter into an**
**Agreement Regarding Kasturi's Employment**

24.    On or about March 7, 2016, Audrey Castel Oster, Managing Director of Kitsune Parent ("Oster"), contacted Kasturi by email regarding his potential employment with Defendants. Oster asked Kasturi to provide information, including (1) the salary level he had in mind; (2) an explanation of the salary system in the U.S.; and (3) additional expected costs associated with Kasturi's employment. Ex. A.

25.    In the same email, Oster provided a detailed description of the role and responsibilities for the position as "Head of Maison Kitsuné USA/CANADA," which included reopening and operating Kitsune's American operations at Maison Kitsune Inc. and Kitsune Music Inc. (together, the "American Operations"). This piece of Kasturi's role would require he serve as the focal point for all American Operations, including through modeling expected profits and losses, developing performance objectives, recruiting and building the team, and overseeing administrative matters.

26.    From the outset of the parties' negotiations regarding Kasturi's potential employment with Defendants, Kasturi made clear that an equity interest in the Kitsune Parent was of paramount importance to his decision of whether to leave his current employer and an express condition for him to commence full-time employment with Kitsune America.

27.    Kasturi responded to Oster's inquiries regarding his expectations on compensation, proposing: "$200K salary plus 3% equity (based on market comps); reimbursement for travel and other business-related expenses." Ex. A.

28.     On or about March 15, 2016, Loaec responded to Kasturi's email regarding his proposal on salary and compensation with a series of questions, including whether the 3% equity Kasturi outlined would be in Kitsune America or Kitsune Parent. Ex. A.

29.     On or about March 16, 2016 Kasturi replied to Loaec's inquiries. On the question of whether the 3% equity included in Kasturi's compensation proposal referred to equity in Kitsune America, Kasturi responded: "My proposal is for the equity at the corporate-level; Growth in the US & Canada business will benefit Kitsune globally, and the other way around too . . . In my mind, we are one team, and carving out America would be counterproductive." Kasturi continued, "As I will be working in a capacity that directly affects the revenue of the company, equity is a powerful motivating force, and provides incentive to be even more invested in the future success of the company." Kasturi also noted, "[a]s reference, my current job at Vevo includes salary, annual bonus and equity compensation." Ex. A.

30.     On or about March 18, 2016, Oster followed up by email, thanking Kasturi for the additional information and stating, "We can't answer right now on your offer." Oster noted that Kasturi's proposed salary-level was high in comparison to the company's current salary ranges and wrote, "[w]e are now exploring ideas of other possible compensations, and will come back to you shortly with a more precise feedback." Oster thanked Kasturi for offering to help Defendants build the "P&L for US/Canada" during his free time and indicated Kitsune Parent's interest in moving forward with this pre-employment P&L collaboration. Ex. A.

31.     On or about March 19, 2016, Kasturi emailed Oster noting, "I am open to discussing, and look forward to reviewing your more specific feedback and ideas about alternative compensation structures." Kasturi also offered that they could "make progress on this in parallel to working on the P&L." Ex. A.

7

32.     Between mid-March and early July 2016, Kasturi continued to provide complimentary consulting work to Defendants without compensation, including, for example, working on a forecasted P&L structure for the American Operations and reviewing historical financials regarding Defendants' U.S. distribution.

33.     On or about July 5, 2016, Oster reached out to Kasturi with a detailed offer of employment, including compensation terms. Oster wrote, "We've considered your offer and come back with a counter-offer. . . ." The Defendants' July 5 offer included "$100K salary" and "$25K extra bonus paid yearly, upon achievement of agreed performance objectives." Defendants' written offer of compensation further provided:

> **[W]e can offer a system of equity warrants in Kitsuné Creative** (BSPCE, in French …)
>
> **We had in mind:**
> **\* 0,5 after 1 year of activity with MK**
> **\* 0,5 after 2 years of activity with MK**
> **\* 0,5 after 3 years of activity with MK**
>
> This offer will be detailed and formalized by our lawyer M. Fouter in cc, and will be set up at the occasion of fundraising which may happen soon (I will update you about this in a separate email).

Ex. A (emphases added). Oster continued that Defendants' July 5 offer also included "reimbursement for travel and other business-related expenses, in the limit of a yearly agreed budget" and "health insurance," and an expected start date of September 1, 2016. Ex. A.

34.     On or about July 8, 2016, Kasturi responded to Defendants' offer of July 5. Kasturi wrote:

> **Before I can accept**, I would like to discuss the compensation terms. The current salary offer of $100k is a meaningful reduction from my initial proposal of $200K – which I based on my experience, research on comparable [General Manager] salaries and the extensive responsibilities for the role. I completely understand the need to maintain general alignment with Kitsuné France salaries, but I would like to see if we can

8

come to a compromise at $150K. . . . If you can see to making this **improvement to your offer**, I know my performance will show a strong return.

Ex. A (emphases added).

35.     On or about the same day, Oster responded to Kasturi confirming that Defendants agreed to a salary of $150,000 for Kasturi's offer of employment. Oster wrote, "After discussing with Gildas [Loaec], we'd be OK to upgrade our offer to $150K. **The whole other conditions stay as below** [referring to Oster's July 5 email]." The conditions "below" included the equity grant detailed in Oster's July 5 email. As Oster specifically provided in her July 8 email, "We are offering you having the equity warrants set up at the occasion of fundraising, **but this offer is binding and not subjected to fundraising**." Ex. A (emphases added).

36.     Accordingly, on or about July 8, 2016, Defendants had made Kasturi a written offer for full-time employment as head of Kitsune America (the "July 2016 Offer") on the following specific terms: (1) a base salary of $150,000; (2) annual bonuses of $25,000 subject to achievement of certain performance objectives; (3) a grant of equity warrants totaling a 1.5% interest in Kitsune Parent, which would vest over the course of three years, with 0.5% vesting at the end of each of Kasturi's first three years of employment (the "Initial Equity Grant"); (4) reimbursement for travel and other business-related expenses within an agreed-upon annual budget; (5) health insurance coverage; and (6) a start date of September 1, 2016.

37.     On or about July 8, 2016 Kasturi formally accepted Defendants' July 2016 Offer, creating a binding contract between and among the parties (the "July 2016 Agreement"). Kasturi wrote, "Thank you for meeting my salary request, **I'm very pleased to accept the offer**. I look forward to working with you and the Kitsuné team to achieve the goals outlined with the position." Ex. A (emphasis added).

9

38.     Loaec and Oster reacted to Kasturi's acceptance of Defendants' offer with enthusiasm. Loaec wrote, "Great stuff" and Oster wrote, "Absolument, bon week-end!" ("Absolutely, have a good week-end" in French). Ex. A.

39.     The July 2016 Agreement included all material terms concerning Kasturi's employment with Defendants, including the description of the role, the start date, and the specific terms of Kasturi's compensation, which included a base salary, an annual bonus, and the size, form, and vesting structure of the Initial Equity Grant. Other than vesting over three years of employment, there were no additional conditions or limitations imposed on the Initial Equity Grant.

40.     Through the July 2016 Agreement, Defendants made a clear and unambiguous promise to provide Kasturi with the Initial Equity Grant on the terms set forth in the Agreement.

41.     Defendants further promised that the agreed-upon terms of Kasturi's employment would be "formalize[d]" in an "employment contract." Ex. A.

42.     Based on the July 2016 Agreement, Kasturi left his employment at Vevo and commenced employment with Defendants.

43.     Consistent with the July 2016 Agreement, Kasturi commenced employment with Defendants on September 1, 2016 as Chief Executive Officer of Kitsune America.

44.     Kasturi relied on Defendants' promise in the July 2016 Agreement and subsequent promise to formalize the Agreement when he left his employment and commenced employment with Defendants with the understanding that Defendants would provide the compensation set forth in writing in the July 2016 Agreement.

10

**Defendants Engage in a Prolonged Pattern
of Delay and Avoidance in Documenting the Initial Equity Grant**

45.     After Kasturi accepted the position, Defendants began engaging in a prolonged pattern of delaying and avoiding their obligations under the July 2016 Agreement.

46.     Kasturi remained employed as Chief Executive Officer of Kitsune America from September 1, 2016 through March 28, 2024.

47.     In his over seven years leading Defendants' American Operation, Kasturi opened the brand's first independent flagship, café, restaurant, bar and art gallery in the territory, expanded the company's presence to Hawaii and Los Angeles, and set up its first operations in Canada, growing the North America retail network to a total of nine stores (five Maison Kitsune fashion boutiques and four Cafe Kitsune coffeeshop locations). Kasturi localized the management and logistics of the company's U.S. e-commerce (and launched a new investment arm, Kitsune Ventures). For its music label, Kasturi managed a myriad of brand partnerships and the production of hundreds of events during the course of his employment. Kasturi also spearheaded significant wholesale growth.

48.     All-in-all, Kasturi grew consolidated North America sales exponentially between 2017 and 2023. Outside of North America, Kasturi introduced and negotiated collaborations with global partners, generating millions of dollars in creative fees and product sales for Kitsune Parent.

49.     Similarly, Kasturi often advised and executed on global strategies with Loaec, Oster, headquarters and international executive teams, spanning collection merchandising, PR, collaborations, web development, digital marketing, international partnerships, capital raising and general brand direction. These expansion efforts and associated brand awareness

11

substantially contributed to global growth including the signing of lucrative international licenses.

50.    Based on the vesting schedule set forth in the July 2016 Agreement, 0.5% of the agreed-upon Initial Equity Grant vested in September 1, 2017; another 0.5% vested in September 1, 2018; and the remaining 0.5% equity vested in September 1, 2019, at which point the entire Initial Equity Grant of 1.5% had fully vested.

51.    For seven years, Defendants repeatedly acknowledged and validated the Initial Equity Grant contained in July 2016 Agreement and represented to Kasturi that they were working to document the Grant.

52.    At no point in this time period did Defendant ever claim that they did not agree to the Initial Equity Grant, nor did they communicate to Kasturi a refusal to satisfy the Initial Equity Grant. Instead, Defendants continually promised to make good on their obligations under the July 2016 Agreement and indicated to Kasturi that they were directing company counsel to prepare documentation of the issuance of the Initial Equity Grant.

53.    Defendants also suggested modifications to the Initial Equity Grant in which Defendants confirmed and acknowledge the Initial Equity Grant provided for in the July 2016 Agreement.

54.    For example, in or around July 2021, in connection with discussions among the parties concerning a potential modification to the Initial Equity Grant and an additional grant of equity, whereby Defendants proposed replacing the Initial Equity Grant with an equity grant in Kitsune America rather than Kitsune Parent, Defendants acknowledged that the parties had initially agreed on a 1.5% grant in the Kitsune Parent.

12

55.     Kasturi never agreed to Defendants' proposed modifications to the Initial Equity Grant contained in the July 2016 Agreement.

56.     By further example, on or about October 11, 2021, in communications concerning Kasturi's compensation for the time period from 2020 through 2022, Defendants again acknowledged that the parties had agreed to a 1.5% equity grant in the Kitsune Parent.  In fact, on or about October 11, 2021, Oster provided **"Regarding equity:** As said, we'll stick to 1,5% of Kitsuné Creative, taht [sic] we find already really rewarding."

57.     During the course of his employment with Defendants, notwithstanding Defendants' delay in preparing the administrative documentation representing the issuance of the Initial Equity Grant, all Parties understood that the essential terms of the Initial Equity Grant— including the size of the grant, the form of the grant, and the vesting schedule attending the grant—were determined and agreed upon by all Parties, that the grant was binding, and that the company was working to provide the promised documentation.

58.     Kasturi repeatedly raised the issue of documenting his Initial Equity Grant and Defendants repeatedly assured Kasturi of their intentions to do so.

59.     Despite Defendants' assurance, they continued to delay full documentation of the Initial Equity Grant with shifting excuses.

### Defendants Agree to Provide Additional Equity Compensation to Kasturi

60.     In or around January 2022, Kasturi responded to Oster's October 11, 2021 email regarding his compensation package, Kasturi wrote, "As you know, I was particularly concerned after the misunderstanding over my equity, which is being substantially lowered from the 3% previously documented, **back to 1.5%, the original amount issued 5 years ago**, before we embarked on our partnership." Kasturi continued, "the most motivating driver for me to extend

my deep commitment to the brand over the long-term[] would be **to grant an additional 0.5% vesting over the next 5 years**. This would allow me to reach 2% after 10 years of service to the company, which I believe to be fair and equitable, especially after seeing my track record and dedication."

61.    In or around February 2022, Defendants agreed to provide Kasturi with the additional 0.5% (the "Secondary Equity Grant"), beyond the 1.5% represented by the Initial Equity Grant. During the first quarter of 2022, the parties agreed that the Secondary Equity Grant would vest over five years in 60 substantially equal monthly installments. At Defendants' request, the parties agreed that the Secondary Equity Grant would be subject to an equivalence adjustment based on the contributions of Kasturi, Kitsune America, and North American operations relative to the Kitsune Parent.

**Defendants Fail to Pay Kasturi's Promised Annual Bonus for Three Years**

62.    In addition to the base salary and Initial Equity Grant contained in the July 2016 Agreement, Defendants also promised to pay Kasturi an annual bonus of $25,000.

63.    Defendants never set forth any performance objectives for Kasturi's receipt of the $25,000 and never reviewed Kasturi against any performance metrics.

64.    Defendants paid Kasturi the $25,000 annual bonus for fiscal years ending 2018 and 2021.

65.    However, Defendants failed to pay Kasturi's annual bonus in fiscal years ending 2017, 2019, and 2020.

66.    While Kasturi did not receive his annual bonus in these three years, he understood and reasonably expected that the bonuses would be paid at a later date because, during the course

14

of Kasturi's employment, Defendants had a common practice of deferring earned compensation and paying it at a later date as "back pay."

67.    For example, for the fiscal year ending March 2021, Defendants delayed payment to Kasturi of $25,000 in salary and $25,000 in bonus, which it ultimately paid as "back pay" in or around April 2023. For the fiscal year ending March 2022, Defendants delayed payment to Kasturi of $60,000 in salary, which it paid as "back pay" in or around April 2023. For the fiscal year ending March 2023, Defendants delayed payment to Kasturi of $45,000 in salary, which it paid as "back pay" in or around April 2023.

68.    This pattern of delaying compensation to Kasturi and paying it later as back pay created uncertainty as to when Kasturi could expect to receive his earned compensation, but it also created the reasonable expectation that Defendants would ultimately pay Kasturi his earned compensation at a later date.

69.    As a substantial equity owner, and given that Defendants were in a growth phase, Kasturi cooperated with Defendants regarding delays in his compensation based on his good-faith belief that Defendants would ultimately satisfy their obligations on compensation.  In fact, these financial subsidies did pay off for the company. From the fiscal year ending April 2017 to the fiscal year ending April 2023, the company's sales increased by 407% (growing from 22.3M EUR to 113.0M EUR). During Kasturi's employment, Kitsune Parent's earnings (or EBITDA) increased from 1.8M EUR to 11.1M EUR (+514%).

70.    However, after years of delay, Defendants ultimately terminated Kasturi without paying his earned bonuses of $25,000 per year for fiscal years 2017, 2019 and 2020, totaling $75,000.

**Kasturi Moves to a Reduced Employment Schedule and Moves to California**

71.    In the summer of 2023, Kasturi informed Defendants of his desire to move to a reduced work schedule and relocate from New York to California, with Defendants affirming that remote work was not an issue.

72.    In or around June 2023, the parties agreed that, subject to the execution of the definitive documentation regarding Kasturi's equity grants in the business, Kasturi would move to a reduced schedule, receiving a reduced annual salary of $100,000, an additional $75,000 to be paid on a pro-rata basis over the 10-month period from June 2023 to March 2024, an additional $75,000 retention bonus (the "Retention Bonus") to be paid in exchange for Kasturi remaining committed to the company until March 31, 2024 (the "Retention Period"), and a $30,000 performance bonus to be paid upon achieving a particular EBITDA target for the American Operations.

73.    Starting in or around June 2023, Kasturi began spending extended periods of time in California, in part to oversee the opening of Defendants' California-based café and store.

74.    Kasturi moved to California on a full-time basis in October 2023 and became a California resident at that time.

75.    Defendants were aware that Kasturi became a full-time resident of California in late 2023 and met with Kasturi in California on at least one occasion in or around November 2023.

**The Parties Begin Negotiating Kasturi's Separation and Defendants
Refuse to Provide the Initial Equity Grant and Unpaid Bonuses for the First Time**

76.    As of December 2023, Defendants had continued providing assurance that they would provide Kasturi documentation formally issuing him of the Initial Equity Grant but had not yet done so.

77.     Defendants also had not paid Kasturi's overdue bonuses for fiscal years ending 2017, 2019, and 2020.

78.     Around this time, Kasturi and Defendants expressed their mutual interest in separating after the completion of the 10-month period ending on March 31, 2024 as agreed by the parties in June of 2023.

79.     In anticipation of his separation, Kasturi began pushing Defendants to provide documentation of his Initial Equity Grant and satisfy all outstanding bonus compensation.

80.     The parties discussed these issues via a separation agreement and began negotiating such agreement.

81.     In or around December 2023, Kasturi provided Defendants with a draft separation agreement, which incorporated a proposed phantom-stock structure as a simplified and alternative mechanism to satisfy the Initial Equity Grant.

82.     Defendants refused to engage with the draft separation agreement and phantom-stock structure, and also did not provide any documentation of the Initial Equity Grant despite having specifically directed Plaintiff to prepare such materials.

83.     On or about January 4, 2024, Kasturi and Defendants, along with their respective counsel, had a telephone conference to discuss Kasturi's separation from the company. Defendants, for the first time, communicated their refusal to provide the Initial Equity Grant and to satisfy their obligations under the July 2016 Agreement.

84.     In particular, Defendants refused to engage with the proposed phantom-stock structure designed to mirror the economic benefit of the Initial Equity Grant and the Secondary Equity Grant, and instead, offered Kasturi a "settlement" payment of $150,000.

17

85.     Defendants' "settlement" offer in no way reflected the economic value or benefits of the Initial Equity Grant or the Secondary Equity Grant.

86.     Under the terms of the July 2016 Agreement, the Initial Equity Grant's 1.5% stake in Kitsune Parent represented 66 shares. The Secondary Equity Grant represented 27 shares, of which 14 would have vested in the ordinary course before Kasturi's termination, under the terms of the Secondary Equity Grant's vesting schedule.

87.     On information and belief, the economic value of the Initial Equity Grant of 1.5% and the Secondary Equity Grant of 0.5% in Kitsune Parent, as of February 2024, was approximately €5.87 million ($6.34 million USD). Moreover, the losses incurred by Kasturi from the tax implications of failing to receive such grants in their promised forms and at their promised times constitute a further approximately €2.47 million ($2.66 million USD). Accordingly, Kasturi has suffered damages from Defendants' failure to convey the grants of approximately €8.4 million ($9.1 million USD), and Defendants' settlement offer represented less than two percent (2%) of the overall value attributable to the Initial Equity Grant and the Secondary Equity Grant, based on the evaluation of comparable companies in related industries, economic analysis based on Kitsune Parties' financial statements, or any other reasonable valuation metric.

### Defendants Terminate Kasturi Hours Prior to His Bonus Coming Due

88.     Between January and March 2024, Kasturi continued his reduced-time employment with Defendants in honor of his commitment to remain with the company until March 31, 2024.

89.     During this time, Kasturi continued to fulfill the responsibilities of his reduced-time role and made his best efforts to effectively transition his responsibilities in anticipation of his departure on March 31, 2024.

90.     Kasturi also continued efforts to engage with Defendants on documenting the Initial Equity Grant as agreed at the outset of his employment and secure his past due bonuses and Secondary Equity Grant.

91.     Without prior notice, Defendants abruptly terminated Kasturi's employment late in the evening of March 28, 2024, mere hours before Kasturi's $75,000 Retention Bonus coming due and Kasturi's scheduled departure from the company on March 31, 2024 (the last working day for which would have been Friday, March 29, 2024—the very next day).

92.     On information and belief, Defendants terminated Kasturi's employment in bad faith, abruptly, and without notice to avoid paying the $75,000 Retention Bonus, which Defendants had promised to Kasturi in exchange for his continued employment with the company through March 31, 2024.

93.     On information and belief, Defendants' bad faith termination was designed to allow Defendants to enjoy the benefits of Kasturi's continued employment for 289 of the 290 days of the Retention Period and to avoid paying the Retention Bonus promised in exchange for that continued employment. It was also punishment for insisting on the Initial Equity Grant provided in the July 2016 Agreement.

**FIRST CAUSE OF ACTION**
**(Breach of Contract)**

94.     Plaintiff re-alleges and incorporates by reference the allegations contained in the foregoing paragraphs 1 to 93 as if set forth fully herein.

19

95.    Through the July 2016 Agreement, in consideration of Kasturi's leaving his prior employment and commencing work as Chief Executive Officer and Head of Kitsune America, Defendants offered to provide Kasturi with a base salary of $150,000, $25,000 annual performance bonuses, and the Initial Equity Grant, on the terms set forth in the Agreement.

96.    Plaintiff accepted the offer, forming a binding contract.

97.    Plaintiff performed the contract in full.

98.    In or about the first quarter of 2022, in consideration of an additional 0.5% equity in Kitsune Parent, beyond the Initial Equity Grant, as well as his existing salary and bonus compensation, Kasturi offered to continue his employment with Kitsune America. Defendants accepted the offer and agreed to provide Kasturi the Secondary Equity Grant. Kasturi fully performed his obligations through his continued work for Kitsune America until his termination.

99.    In or around January 2024, Defendants materially breached these agreements by refusing to pay promised annual bonuses in 2017, 2019, and 2020 and refusing to document the promised Initial Equity Grant and the Secondary Equity Grant.

100.    Plaintiff suffered in excess of $9.1 million of losses as a result of Defendants' breaches, for which Defendants are liable.

## SECOND CAUSE OF ACTION
### (Promissory Estoppel)

101.    Plaintiff re-alleges and incorporates by reference the allegations contained in the foregoing paragraphs 1 to 100 as if set forth fully herein.

102.    Through the July 2016 Agreement, Defendants made a clear and unambiguous promise to provide Kasturi with a base salary of $150,000, $25,000 annual performance bonuses, and the Initial Equity Grant, on the terms set forth therein. During the course of Kasturi's employment, Defendants continually promised to convey the agreed-upon Initial Equity Grant

20

and the annual bonuses. In or about the first quarter of 2022, Defendants further promised to compensate Kasturi by providing the Secondary Equity Grant.

103.    Kasturi reasonably and foreseeably relied on Defendants' promises, which Defendants made after negotiation between the parties as to the terms of Kasturi's employment, and which induced Kasturi to leave his employment in 2016 and commence employment with Defendants on September 1, 2016, and which induced Kasturi to continue working for Defendants for over seven years.

104.    As a result of Defendants' failure to honor their promise, including their withholding of the Initial Equity Grant, annual bonuses for fiscal years 2017, 2019, and 2020, and the Secondary Equity Grant, Kasturi has been injured in excess of $9.1 million USD.

### THIRD CAUSE OF ACTION
### (Unjust Enrichment)

105.    Plaintiff re-alleges and incorporates by reference the allegations contained in the foregoing paragraphs 1 to 104 as if set forth fully herein.

106.    Defendants were enriched through the value they received from Kasturi's uncompensated labor performed as Chief Executive Officer and Head of Kitsune America.  In particular, that value of Kasturi's performance is reflected by the compensation terms set forth in the July 2016 Agreement, including the 1.5% interest in Kitsune Parent that Defendants have wrongfully withheld. Defendants have been further enriched through the bonuses promised to Kasturi, for fiscal years 2017, 2019, and 2020, that they have wrongfully withheld, as well as through the wrongful withholding of the Secondary Equity Grant.

107.    Defendants' enrichment came directly at Kasturi's expense, as it reflects the amount Kasturi otherwise would have obtained had Defendants fulfilled their promises. Kasturi performed valuable labor for over seven years without receiving agreed-upon compensation.

21

108.    It is against equity and good conscience to permit Defendants to retain the excess value they have extracted from Kasturi's work by refusing to pay his promised compensation.

### FOURTH CAUSE OF ACTION
### (Quantum Meruit)

109.    Plaintiff re-alleges and incorporates by reference the allegations contained in the foregoing paragraphs 1 to 108 as if set forth fully herein.

110.    From September 1, 2016 through March 28, 2024, Kasturi provided services to Defendants in good faith, as Chief Executive Officer and Head of Kitsune America.

111.    Defendants accepted those services.

112.    Kasturi reasonably expected to be compensated for those services, in the amount and manner that he had negotiated for with Defendants in July 2016, including compensation in the form of the Initial Equity Grant, all annual non-discretionary bonuses, and, in February 2022, the Secondary Equity Grant.

113.    The value of those services that was negotiated-for at arms' length and the reasonable value of those service is reflected in the compensation terms set forth in the July 2016 Agreement and the terms of the Secondary Equity Grant.

### FIFTH CAUSE OF ACTION
### (New York Labor Law, Article 6)

114.    Plaintiff re-alleges and incorporates by reference the allegations contained in the foregoing paragraphs 1 to 113 as if set forth fully herein.

115.    New York Labor Law § 198(3) provides, in relevant part: "All employees shall have the right to recover full wages, benefits and wage supplements and liquidated damages accrued during the six years previous to the commencing of such action…"

116.    New York Labor Law § 193 provides, in relevant part, that "No employer shall make any deduction from the wages of an employee, except deductions which…are expressly

22

authorized in writing by the employee and are for the benefit of the employee, provided that such authorization is voluntary and only given following receipt by the employee of written notice of all terms and conditions of the payment and/or its benefits and the details of the manner in which deductions will be made."

117.    Kasturi's annual bonus of $25,000 for fiscal years 2017, 2019 and 2020 are non-discretionary compensation which Kasturi earned as of the conclusion of each fiscal year.

118.    Defendants' failure to pay Kasturi's annual bonuses for 2019 and 2020 was a failure to pay all wages due and/or an unlawful deduction of wages.

119.    By virtue of the foregoing, Kasturi has been damaged in an amount to be determined at trial, but in no event less than the value of his unpaid 2019 and 2020 bonuses, liquidated damages equal to 100% of the foregoing amounts, and Plaintiff's attorney's fees and costs.

## SIXTH CAUSE OF ACTION
### (California Wage Claim)

120.    Plaintiff re-alleges and incorporates by reference the allegations contained in the foregoing paragraphs 1 to 119 as if set forth fully herein.

121.    As of October, 2023 Kasturi was a resident of California. All subsequent work performed for Kitsune America was performed in California with Defendants awareness.

122.    On March 28, 2024, Defendants terminated Kasturi's employment without notice.

123.    As of that date, Kasturi had earned, but had not been paid, the agreed upon Retention Bonus in the amount of $75,000.

124.    This bonus constitutes "wages" under California law. Cal. Lab. Code § 200(a).

125.    Under California law, Kasturi's wages earned and unpaid were due and payable "at the time of discharge." Cal. Lab. Code § 201.

23

126. Defendants have not paid Kasturi's earned and unpaid wages since his discharge, and they remain liable for these wages.

127. Further, pursuant to a statutory penalty, Kitsune America is additionally liable for Kasturi's wages, "at the same rate" as under his employment, for an additional 30 days following the discharge date. Cal. Lab. Code § 203.

128. Additionally, Defendants are liable for Kasturi's attorneys fees and costs, Cal. Lab. Code § 218.5(a), and prejudgment interest, *id.* § 218.6.

129. By virtue of the foregoing, Kasturi has been damaged in an amount to be determined at trial, but in no event less than the value of his unpaid Retention Bonus and attorney's fees and costs.

### SEVENTH CAUSE OF ACTION
### (California Tortious Discharge)

130. Plaintiff re-alleges and incorporates by reference the allegations contained in the foregoing paragraphs 1 to 129 as if set forth fully herein.

131. Kasturi's wrongful termination violated fundamental public policy of the state of California and therefore gives rise to a claim in tort. *See Tameny v. Atl. Richfield Co.*, 27 Cal. 3d 167 (1980).

132. Kasturi was employed by Kitsune America from September 1, 2016 until his termination on March 28, 2024.

133. Had Kasturi not been terminated, his employment was scheduled to conclude on March 31, 2024 and Defendants were obligated to pay the $75,000 Retention Bonus.

134. In exchange for Kasturi's agreement to remain employed with Kitsune America in a reduced-time capacity for the Retention Period, Defendants promised Kasturi the Retention

Bonus of $75,000, conditioned only on his remaining employed with Kitsune America through March 31, 2024.

135.    On information and belief, Defendants' decision to terminate Kasturi two days before his employment was due to conclude and his Retention Bonus would come due was motivated by the intent to avoid paying the Retention Bonus.

136.    The decision to terminate an employee in order to avoid promptly paying amounts owed to that employee, including bonuses, violates fundamental public policy of the State of California, as established in California Labor Code § 201 and *Gould v. Maryland Sound Indus., Inc.* 31 Cal. App. 4th 1137, 1147 (1995).

137.    Defendants' wrongful termination harmed Kasturi, including by denying him the $75,000 Retention Bonus to which he is entitled.

## PLAINTIFF DEMANDS A JURY TRIAL

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

a.    Award Plaintiff its costs and attorney's fees incurred in prosecuting this action; and

b.    For such other relief as may be just and proper.

Dated:  April [X], 2024
        New York, NY

Respectfully submitted,

/s/_____
Robert Haney
Leah S. Rizkallah
FOLEY HOAG LLP

25

1301 Avenue of the Americas
25th Floor
New York, NY 10019
*Counsel for Plaintiff*