**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MAISON KITSUNE, INC.,

           Plaintiff,

    -against-

VINOD KASTURI,

           Defendant.

Case No. 1:24-cv-04431-ALC

VINOD KASTURI,

           Counterclaimant and
           Third-Party Plaintiff,

    -against-

MAISON KITSUNE, INC, and KITSUNE
CREATIVE SAS,

           Counterclaim and Third-
           Party Defendants.

### DECLARATION OF VINOD KASTURI IN OPPOSITION TO THIRD-PARTY DEFENDANT KITSUNE CREATIVE SAS'S MOTION TO DISMISS COUNTERCLAIMS

1. I am Defendant, Counterclaimant and Third-Party Plaintiff in this action, and I thus have personal knowledge of the facts stated below.

### Kitsune Parent Recruits Me to Spearhead Kitsune America

2. In or around February 2015, I met Gildas Loaec, Kitsune Parent's[1] co-founder and Chief Executive Officer ("Loaec") at the NoMad Hotel in New York City and again in a coffee shop in SoHo. At the time, Kitsune Parent was conducting business in the United States primarily

---

[1] Unless otherwise stated, all capitalized terms have the same meaning as they do in Kasturi's Opposition to Kitsune America's Motion to Dismiss (ECF #25).

68201/0001-49926940

through a third-party franchise and distribution partner, but was looking to develop its own U.S. based subsidiary, Kitsune America.

3.      Between 2015 and 2016 I developed a business relationship with Loaec and began consulting with him regarding Kitsune Defendants' anticipated capital infusion, restructuring, and expansion in the North American market.

4.      On or around February 25, 2016, Loaec, on behalf of Kitsune Parent, invited me to be "the head" of their wholly owned subsidiary, Kitsune America. A true and correct copy of the February 25, 2016 correspondence is attached hereto as *Exhibit A*.

### Kitsune Parent Negotiates the Terms of My Employment, Including the Initial Equity Grant

5.      On or about March 7, 2016, Audrey Castel Oster, Managing Director of Kitsune Parent ("Oster"), contacted me by email regarding my potential employment with Kitsune America. *See* Ex. A. Between March and July 2016, we continued to negotiate the terms of my potential employment with Kitsune America.

6.      I initially asked for a base salary of $200,000.00 and an equity grant of 3%. However, Oster responded that that proposed salary was high in comparison to Kitsune Parent's current salary ranges for its French employees. *See* Ex. A. We continued negotiations.

7.      On or about July 5, 2016, Oster reached out to me with a detailed offer of employment, including compensation terms. Oster wrote, "We've considered your offer and come back with a counter-offer. . . ." Kitsune Defendants' July 5 offer included "$100K salary" and "$25K extra bonus paid yearly, upon achievement of agreed performance objectives." Kitsune Defendants' written offer of compensation further provided:

> **[W]e can offer a system of equity warrants in *Kitsuné Creative…[Kitsune Parent]***
> **We had in mind:**

2

> **\* 0,5 [0.5%] after 1 year of activity with [Kitsune America]**
> **\*0,5 [0.5%] after 2 years of activity with [Kitsune America]**
> **\*0,5 [0.5%] after 3 years of activity with [Kitsune America]**
>
> This offer will be detailed and formalized by our lawyer M. Fouter in cc, and will be set up at the occasion of fundraising which may happen soon (I will update you about this in a separate email).

*See* Ex. A (emphases added). Oster continued, stating that Kitsune Defendants' July 5 offer also included "reimbursement for travel and other business-related expenses, in the limit of a yearly agreed budget" and "health insurance," and provided an expected start date of September 1, 2016. *Id.*

8. I ultimately accepted the job offer, which included the Initial Equity Grant, on or about July 8, 2016.

9. In or around July 2016, Oster sent me a draft of the employment agreement. In addition to the above-described provisions, the draft employment agreement contained a provision that issued me an equity grant in Kitsune Parent, as discussed during our negotiations. A true and correct copy of the draft employment agreement is attached hereto as *Exhibit B*. A later version of the draft employment agreement, as reviewed by and agreed to by Oster, also reflected the Initial Equity Grant. A true and correct copy of the later draft employment agreement is attached hereto as *Exhibit C*.

10. The same draft employment agreements contained *New York choice of law and venue provisions and specifically identify Kitsune Parent (attn: Oster) as the notice party on behalf of the employer*.

11. Oster also repeatedly acknowledged and validated the Initial Equity Grant for *seven years*, including during negotiations of an additional, subsequent grant of equity in or around July 2021, and on or about October 11, 2021.

68201/0001-49926940

**Kitsune Parent Was Involved in the
Day-to-Day Operations of Kitsune America**

12.    I remained employed as Chief Executive Officer of Kitsune America from September 1, 2016 through March 28, 2024. During my time leading Kitsune America, I played an integral role in advising and executing global strategies with Loaec, Oster, and other members of the headquarters and international executive teams, spanning collection merchandising, product expansion, PR, collaborations, web development, digital marketing, international partnerships, capital raising, new business lines and overall brand direction.

13.    I reported directly to Loaec and Oster, and I was in regular contact with the Global Chief Financial Officer (originally Pierre Vigne, then Jerome Baillon and finally Raphael Grand), who was located in Paris.  By way of example, a true and correct copy of email correspondence between myself, Loaec, Oster, and Grand regarding Kitsune America's financials and operational decisions is attached hereto as *Exhibit D*.  As Exhibit D reflects, Kitsune Parent often made managerial level decisions regarding Kitsune America's operations, including decisions made without my involvement.

14.    Kitsune Parent also directed Kitsune America to pay for Loaec's personal vacation rental in Los Angeles, where he stayed with his family.

15.    Loaec and Masaya Kuroki (Kitsune Parent's co-founder) regularly visited the United States to conduct business on behalf of Kitsune America, including but not limited to: (i) reviewing and approving all retail locations prior to lease signing; (ii) reviewing and approving the suppliers and menus for the Kitsune America cafes, etc.; (iii) overseeing the design and construction standards of the Kitsune America storefronts; and (iv) visiting the Kitsune America storefronts to ensure the brand and customer experience was up to Kitsune Parent's standards.

4

68201/0001-49926940

16.    Prior to and during my time at Kitsune America, the executives and/or employees of Kitsune Parent were often involved in and inserted themselves into the day-to-day operations of Kitsune America, such as:

i.    retaining the New York-based law firm Emmet, Marvin, & Martin to incorporate New York subsidiaries (a true and correct copy of the retainer is attached hereto as *Exhibit E*) and draft my employment agreement;

ii.    directing board appointments and officer changes for Kitsune America (a true and correct copy of March 9, 2015 correspondence is attached hereto as *Exhibit F*);

iii.    Remi Le Hong (then-Kitsune Parent Marketing & Communications Director) and Than-ha Nguyen (then-Kitsune Parent Communications & PR Manager), serving as the "day to day" contact for Kitsune America's public relations team (a true and correct copy of the Scope of Work is attached hereto as *Exhibit G*); and

iv.    approving and guaranteeing leases for the New York-based Kitsune America storefront (a true and correct copy of the Letter of Intent and Lease are attached hereto as *Exhibits H, §33 and I*, respectively).

17.    Kitsune Parent also guaranteed to the lease for the Los Angeles-based Kitsune America storefront.

18.    At all times I was working for Kitsune America on behalf of Kitsune Parent, and reporting to Kitsune Parent, I was residing in New York or Los Angeles.

5

68201/0001-49926940

19.     Put simply, Kitsune Parent is no stranger to the United States, and its efforts to convince this Court it has no interaction with the United States such that the dispute over my entitlement to damages for the equity grant I never received is entirely a French matter is incorrect.

20.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: May 2, 2025
     Los Angeles, California

*Vinod Kasturi*
VINOD KASTURI

6

68201/0001-49926940