# EXHIBIT B

This EMPLOYMENT AGREEMENT (the "Agreement") dated August __, 2016 by and between Maison Kitsuné, Inc., a company incorporated under the laws of New York ("Company"), and Vinod Kasturi ("Executive").

WHEREAS, Company, a second-tier subsidiary of Kitsuné Créative, operates a fashion business in the United States, and Executive has unique skills that will enable Company to succeed; and

WHEREAS, Company and Executive desire to enter into a contract to provide for Executive's employment by Company upon the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing facts and mutual agreements set forth below, the parties agree as follows:

1.      Employment.  Company hereby agrees to employ Executive in New York City, its principal place of business, and Executive hereby accepts such employment and agrees to perform his duties in accordance with the terms and conditions set forth in this Agreement.

1.1     Duties.  Executive shall serve as General Manager of Company and shall perform all duties incident to such position and such other duties (including, without limitation, duties for Kitsuné Music, Inc. and other affiliates of Company) as Company may from time to time assign to him.  A general, non-exclusive description of the Executive's duties is attached to this Agreement as an addendum, and Company may from time to time modify this description in any way that it, in its sole and absolute discretion, deems fit.  In addition to serving as General Manager, Executive agrees to serve, for no additional compensation, as an officer of Company in order to facilitate banking and other business transactions on behalf of Company; the officer position that Executive shall hold shall be determined by Company in its sole and absolute discretion.

1.2     At Will Employment.  Executive's employment shall be on an at will basis. As a result, except as otherwise specifically provided in this Agreement, either Executive or Company may, without liability, terminate Executive's employment at any time and for any reason or no reason.

1.3     Standard of Conduct.  Executive agrees at all times to act pursuant to the highest standard of professional conduct, to use his best efforts to carry out his duties as specified in Sections 1.1 and 4.1, and to devote substantially all of his business time, attention and energy thereto.

1.4     Compensation.  Company shall pay Executive a base annual salary of one hundred fifty thousand dollars ($150,000.00) payable in accordance with the Company's normal payroll practices. Company shall periodically review Executive's base annual salary and may, in its sole and absolute discretion, increase it from time to

time.  Company shall also pay Executive a bonus of twenty-five thousand dollars ($25,000.00) per calendar year (pro-rated for partial years of service) provided that Executive achieves such performance objectives for the calendar year as are determined by Company and otherwise performs his duties during the calendar year in accordance with the terms of this Agreement.  The determination of whether Executive has satisfied the conditions for payment of the bonus shall be made by Company in good faith, and the payment of a bonus for one calendar year shall not automatically entitle Executive to a bonus for any other calendar year.  Company shall periodically review the Executive's conditional bonus amount and may, in its sole and absolute discretion, increase it from time to time.

1.5     Benefits.  While employed by Company, Executive shall receive U.S. health cover under such insurance policy or other arrangement as Company shall, in its sole and absolute discretion, provide, subject to such deductibles and benefit and premium co-pays as may be provided under the insurance policy or other arrangement. Executive shall also participate in such other employee benefit programs as Company may, in its sole and absolute discretion, establish for the benefit of its employees (including, without limitation, retirement programs and disability programs).

1.6     Reimbursement of Expenses; Vacation.  Executive shall be entitled to reimbursement of reasonable and satisfactorily documented expenses (including, without limitation, travel expenses) related to his employment by Company, subject to a dollar cap per calendar year (pro-rated for partial years of service) that is specified by Company in its sole and absolute discretion.  Executive shall be entitled to time off for major U.S. legal holidays and to four (4) weeks of vacation per calendar year (pro-rated for partial years of service), to be taken at such times as mutually agreed upon by Executive and Company. Unless otherwise agreed to by Company, unused vacation time will be forfeited as of December 31 of each calendar year.

1.7     Equity Warrants.  Upon implementation by Kitsuné Créative of an equity warrant plan (commonly referred to in France as "BSPCE"), the timing of which is uncertain since it depends upon the closing of a fundraising transaction by Kitsuné Créative, equity warrants shall be awarded to Executive.  The number of warrants to be awarded to Executive, as well as the terms and conditions thereof (including, without limitation, award date, exercise price, vesting requirements and all other material features) shall be set forth in a written document provided to Executive as soon as practicable, but in no event later than the date that similar information is provided to employees of affiliates of Company to whom equity warrants are awarded.

1.8     No Other Compensation.  Irrespective of whether Executive performs duties for Company or any of its affiliates, Executive shall not be entitled to any compensation or benefits other than what is specified in Sections 1.4 through 1.7.

2.    Confidential Information; Non-Interference; Non-Solicitation

2.1    Confidential Information.  Executive acknowledges that by reason of his employment by Company, Executive will have access to certain confidential and proprietary information relating to the Company's business, which may include, but is not limited to, trade secrets, trade "know-how," product development techniques and plans, customer lists and addresses, supplier lists and addresses (including, without limitation, information concerning fashion designers, fabric suppliers, clothing manufacturers, artists  and musical performers who have a relationship with Company), financing and funding arrangements, cost and pricing information, distribution arrangements, marketing and sales techniques, strategy and programs, computer programs and software and financial information (collectively referred to as "Confidential Information"). Executive acknowledges that such Confidential Information is a valuable and unique asset of Company, and Executive agrees that he will not, unless expressly authorized in writing by Company, at any time during the course of Executive's employment use, directly or indirectly, any Confidential Information or divulge or disclose any Confidential Information to any individual or entity except in connection with the performance of the Executive's duties for Company and in a manner consistent with the Company's policies regarding Confidential Information. Executive also agrees that at any time after the termination of  his employment, he will not, directly or indirectly, use any Confidential Information or divulge or disclose any Confidential Information to any individual or entity, unless such information is in the public domain through no fault of Executive or except when required to do so by a court of law, by any governmental agency having supervisory authority over the business of Company or by any administrative or legislative body (including a committee thereof) with apparent jurisdiction to order Executive to divulge, disclose or make accessible such information. All written Confidential Information (including, without limitation, in any computer or other electronic format) which comes into the Executive's possession during the course of his employment shall remain the property of Company. Except as required in the performance of the Executive's duties for Company, or unless expressly authorized in writing by Company, Executive shall not remove any written Confidential Information from the Company's premises, except in connection with the performance of the Executive's duties for Company and in a manner consistent with the Company's policies regarding Confidential Information. Upon termination of the Executive's employment, Executive agrees to return immediately to Company all written Confidential Information (including, without limitation, in any computer or other electronic format) in his possession.  For all purposes of this Section 2, each reference to "Company" shall be deemed to be a reference to Company and each of its affiliates.

2.2    Non-Interference and Non-Solicitation.  Executive agrees that as long as the Agreement remains in effect and for a period of one (1) year after its termination, Executive will not (i) disrupt or otherwise interfere with, or attempt to disrupt or otherwise interfere with, directly or indirectly, any relationship between Company and its suppliers (including, without limitation, any fashion designers, fabric

- 3 -

suppliers, clothing manufacturers, artists or musical performers who have a relationship with Company), any relationship between Company and its customers, or any relationship between Company and its business partners,  joint-venturers, banks, capital backers or funders, or other individuals or entities with which it has business affiliations, or (ii) induce or attempt to induce, directly or indirectly, any individual to leave his or her employment with Company.

2.3    Remedies.  Executive acknowledges and agrees that his obligations under this Section 2 are necessary and reasonable in order to protect Company and its businesses, and Executive expressly agrees that monetary damages would be inadequate to compensate Company for any breach by Executive of this Section 2. Accordingly, Executive acknowledges and agrees that any violation or threatened violation of this Section 2 will cause irreparable injury to Company and that, in addition to any other remedies that may be available in law, in equity or otherwise, Company shall be entitled to obtain injunctive relief against the threatened breach of this Section 2 or the continuation of any such breach by Executive without the necessity of proving actual damages.

2.4    Survival.    The provisions of this Section 2 shall survive the termination of this Agreement.

3.    Termination.

3.1    Termination by Company.    Company may terminate the Executive's employment with or without Cause and without prejudice to any right or remedy to which Company or Executive may be entitled at law or in equity or under this Agreement.  If Company terminates the Executive's employment for Cause, Company shall specify an immediate termination date and need not provide advance written notice thereof to Executive.  If Company chooses to terminate the Executive's employment without Cause, Company shall provide Executive with thirty (30) days advance written notice of the termination date.  For purposes of this Section 3.1, "for Cause" means that Executive (i) violates any provisions of this Agreement (including, without limitation, Section 4.1), (ii) is guilty of (or pleads guilty to) any felony, (iii) commits any act of embezzlement, misappropriation, concealment or conversion of any money or property of Company or any of its affiliates, (iv) engages in willful misconduct or gross dereliction of his duties, (v) engages in any behavior, either with respect to employees of Company or any of its affiliates or in any other manner, which may subject Company to liability, or (vi) refuses to perform his duties satisfactorily or to follow directions after notice of such refusal to perform duties satisfactorily or to follow directions is given to him.  This Agreement shall terminate as of the Executive's termination date, and Executive shall be entitled to base salary and benefits for the period until such termination date but not for any period thereafter (with a pro rata bonus being paid for the calendar year of

- 4 -

termination only if the termination is without Cause and Company in its sole and absolute discretion determines to pay it).

3.2     Termination by Executive's Death or Disability.  This Agreement shall terminate upon the Executive's death and/or a finding of permanent physical or mental disability that is expected to result in death or to be of a continuous duration of at least twelve (12) months and that renders Executive unable to perform his usual and essential duties for Company.  Executive shall be entitled to base salary and benefits for the period until the date of death or a finding of disability but not, except as may be provided under any disability plan in which he is participating, for any period thereafter (with a pro rata bonus being paid for the calendar year of death or disability only if Company in its sole and absolute discretion determines to pay it).

3.3     Voluntary Termination by Executive.  Executive may voluntarily terminate his employment for any reason by providing to Company sixty (60) days' prior written notice of the resignation date.  Company may accept the resignation date specified in the notice or may, in its sole and absolute discretion, determine that the Executive's employment shall terminate prior to the resignation date specified in the notice, in which case the termination date specified by Company shall be deemed to be the Executive's resignation date. This Agreement shall terminate as of the Executive's resignation date, and Executive shall be entitled to base salary and benefits for the period until such resignation date but not for any period thereafter (with a pro rata bonus being paid for the calendar year of termination only if Company in its sole and absolute discretion determines to pay it).

4.     General Provisions.

4.1     Actions by Company.  All actions by and decisions of Company in connection with any aspect of the Executive's employment by Company (or termination thereof) shall be undertaken or made by Gildas Loaëc in his capacity as an officer of Company or by any individual (other than Executive) to whom Gildas Loaëc has delegated the authority to take such actions or make such decisions.  Executive shall report to Gildas Loaëc in performing his duties under Section 1.1, and Executive understands and agrees that he shall follow such directions as Gildas Loaëc provides to him with regard to the nature of his duties and the manner in which he performs them. Executive understands and agrees that irrespective of whatever position in Company he may hold, he shall have no power or authority whatsoever to take any action by or make any decision of Company in connection with any aspect of his employment by Company (or termination thereof).  Notwithstanding anything to the contrary hereinbefore provided in this Section 4.1, Executive shall have the power and authority to act on behalf of Company in adopting, implementing and administering employee benefit plans for the benefit of the Company's employees provided that he does so with the express written consent of Gildas Loaëc (or any individual to whom he has delegated such power of consent) and further provided that any determination of the Executive's status under any

- 5 -

such employee benefit plan shall be made by Gildas Loaëc (or any individual other than Executive to whom he has delegated the authority to make such determination).

4.2    Non-disparagement.  Executive agrees that both during and after his employment by Company, he will not disparage, directly or indirectly, Company, its affiliates, their products, or their owners, directors, officers or employees.  Company agrees that both during and after his employment by Company, it will not unreasonably disparage, directly or indirectly, Executive.

4.3    No Waiver.  Failure of any party at any time to enforce any provisions of this Agreement or any rights or to exercise any elections shall in no way be considered to be a waiver of such provisions, rights or elections and shall in no way affect the validity of this Agreement. The exercise by any party of any rights or elections under this Agreement shall not preclude or prejudice such party from exercising the same or any other right under this Agreement irrespective of any previous action taken.

4.4    Notices.  All notices and other communications in connection with this Agreement shall be in writing and shall be deemed to have been given when hand delivered or mailed by registered or certified mail as follows (provided that notice of change of address shall be deemed given only when received):

If to Company, to:

Audrey Castel Oster
Kitsuné France
10, rue Chauchat
75009 Paris
France

If to Executive, to:

_____
New York, New York
United States of America

or to such other names or addresses as Company or Executive, as the case may be, shall designate by notice to each other person entitled to receive notices in the manner specified in this Section.

4.5    Governing Law; Jurisdiction; Waiver of Jury Trial.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York (without regard to its choice of principles).  Any controversy or claim arising out of or relating to this Agreement shall be brought solely in the federal or state courts having jurisdiction over New York County, New York, to whose exclusive

- 6 -

jurisdiction the parties hereby irrevocably submit.  Both parties hereby expressly waive the right to a trial by jury.

4.6     Severability.  If any provision of this Agreement is determined to be illegal or unenforceable, then such illegal or unenforceable provision shall be modified by the proper court to the extent necessary and possible to make such provision enforceable, and such modified provision and all other provisions of this Agreement shall be given effect separately from the provisions or portion thereof determined to be illegal or unenforceable and shall not be affected thereby.

4.7     Successors and Assigns.  Since this is a personal service contract, Executive may not assign this Agreement. Company may assign its rights under this Agreement at any time without the written consent of Executive, so long as Company or its assignee complies with the material terms of this Agreement. The rights and obligations of Company under this Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of Company, and the Executive's rights under this Agreement shall inure to the benefit of and be binding upon his heirs and executors. The Company's affiliates shall be express third party beneficiaries of this Agreement.

4.8     Affiliates.  For purposes of this Agreement, the term "affiliates" shall include all corporations that are parents, subsidiaries or brother-sister corporations of Company, as well as all other entities, whether organized in corporate or any other form, that share any common ownership with Company or any of such corporations, and all joint ventures, partnerships and other business combinations of any kind that Company or any of such corporations or entities have entered into with any other individual or entity.

4.9     Entire Agreement.   This Agreement supersedes all prior agreements and understandings between the parties, oral or written. No modification, amendment or termination of this Agreement  shall be valid unless it is in writing signed by each party to this Agreement.

4.10    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall for all purposes be deemed to be an original.

- 8 -

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first written above.

MAISON KITSUNE, INC.

By:

Name: Gildas Loaëc
Title: Vice President

VINOD KASTURI

By: