# EXHIBIT C

FH Draft 10/23/22

This EMPLOYMENT AGREEMENT (the ""Agreement"") dated as of October [____] 2022November___, 2023 (the "Signing Date") by and among Maison Kitsune, Inc., a company incorporated under the laws of New York (""Company""), the Parent (as defined below), and Vinod Kasturi (""Executive"").

WHEREAS, Company, a direct or indirect wholly-owned subsidiary of Kitsune Creative, a French simplified joint-stock company (SAS) (""Parent""), operates a fashion, food, coffee and lifestyle business in the United States & Canada, and Executive has unique skills that will enable Company to succeed; and

WHEREAS, Executive is currently employed by Company, and Company and Executive desire to enter into a contract to provide for Executive'sExecutive's continued part-time employment by Company upon the terms and conditions set forth in this Agreement, including, without limitation, the cash and non-cash compensation obligations and rights with respect thereto.

NOW, THEREFORE, in consideration of the foregoing facts and mutual agreements set forth below, the parties agree as follows:

1.    Employment. Company hereby agrees to employ Executive in New York City, its principal place of businessremotely with the ability of the Executive to work in the Company's offices in accordance with the Company's applicable policies, and Executive hereby accepts such employment and agrees to perform his duties in accordance with the terms and conditions set forth in this Agreement.

2.    1.1 Duties. Executive shall serve as Chief Executive Officer (the "CEO") of Company and shall perform all duties incident to such position and such other duties (including, without limitation, duties for Kitsune Music, Inc., Cafe Kitsune Inc., Kitsune Ventures LLC, and other affiliates of Company) as Company may from time to time assign to him. A general, non-exclusive description of the Executive's initial duties is attached to this Agreement as Schedule A. Company may, upon written notice to Executive (whether in the form of a new schedule to this Agreement or otherwise), from time to time modify the description of his duties in any way in its discretion and otherwise consistent with this Agreement. In addition to serving as CEO, Executive shall serve, for no additional compensation, as an officer of Company in order to facilitate banking and other business transactions on behalf of Company; the officer position that Executive shall hold shall be determined by Company in its sole and absolute discretion.. Executive is expected to work two (2) business days per week and during those days shall perform the following tasks: (i) support for the US teams in the resolution of day-to-day operational and logistical issues for retail MK and CK; (ii) oversee US communications and marketing, legal and financial issues; (iii) build local teams for the opening of CK+MK LA store, Hudson MK store and Boerum Hill archive store; (iv) help HQ team to find a way to work with ORBISS on financial control, accounting, administrative matters and cashflows/payments questions; (v) provide a link between HQ and the US teams via participation in the codir as scheduled (replacement by Morgan accepted when we are scheduled); (vi) setting and validating OTBs (product ranking, compliance with HQ guidelines and pricing); (vii) monitoring commercial performance and proposing adjustments in the event of underperformance; (viii) help HQ and ORBISS prepare and validate budget forecasts (revised in September) and ensure that validated budgets are adhered to; and (ix) follow market opportunities in terms of brand or artistic collaboration, financial opportunities of MK and CK retail development for financial years 23/24

FH10932137.6

and reporting to HQ.

3.    ~~1.2~~ At Will Employment. ~~Executive's~~Executive's employment shall be on an at will basis. As a result, except as otherwise specifically provided in this Agreement, either Executive or Company may, without liability, terminate ~~Executive's~~Executive's employment at any time arid for any reason or no reason.

4.    ~~1.3~~ Standard of Conduct; Outside Activities. Executive agrees at all times to act pursuant to the highest standard of professional conduct~~,~~ and to use his best efforts to carry out his duties as specified in ~~Sections 1.1 and 4.1, and to devote substantially all of his business time, attention and energy thereto. Executive shall, however, be entitled to manage his personal investments and engage in charitable, educational, religious, civic and similar types of non-business activities to the extent that such activities do not inhibit or prohibit the performance of Executive's duties hereunder or adversely reflect upon or inhibit the business of Company or its affiliates.~~this agreement. The Company understands that Executive may perform services for other entities, but Executive agrees that he shall not divulge any Company confidential information nor shall he divert any business opportunities from the Company to any other entity.

5.    ~~1.4 Compensation. At the Company's first regular payroll release date after the Signing Date, the Company shall pay Executive a lump sum signing bonus equal to [one hundred ninety-seven thousand three hundred twenty-nine dollars ($197,329.00)], payable in accordance with the Company's normal payroll practices.¹~~Base Salary. As of the Signing Date, Company shall pay Executive a base ~~annual salary of two hundred twenty-five thousand dollars ($225,000.00) ("Base Annual Salary")~~salary of $23,333 per month, less applicable taxes, payable in accordance with the ~~Company's~~Company's normal payroll practices. ~~Company shall review Executive's Base Annual Salary, on an annual basis, and shall increase it to commensurate with increases in salaries of other members of the Company's and the Parent's executive team and management; provided, however, Company may, in its sole discretion, increase, maintain, or reduce the Executive's Base Annual Salary; provided, further, any such maintenance or reduction may only be effected if Executive first receives a detailed annual performance review by the Company or by Parent, including a rationale for such maintenance or reduction~~

6.    ~~.~~Bonus Payments. Company shall also pay Executive:

(a) a non-discretionary bonus of up to seventy-five thousand dollars ($75,000.00) ("~~Annual~~Guaranteed Bonus Payment") ~~per calendar year, beginning with fiscal year 2021-2022 (pro-rated for partial years of service) that is based on each year's performance objectives and qualitative evaluation; the determination as to whether Executive has satisfied the conditions for payment of the Annual Bonus Payment shall be made by Company in good faith and in a reasonable fashion, and the payment of a bonus for one calendar year shall not automatically entitle Executive to a bonus for any other calendar year. Company shall periodically review the Executive's conditional bonus amount and may, in its sole and absolute discretion, increase it from time to time.~~, payable within twenty (20) business days of the Signing Date.

---

¹ ~~NTD: Amount due in respect of shortfalls in salary and bonuses for the fiscal years ending March 31, 2021 and 2022, and salary for the present year as follows:~~
~~FYE 3/31/3021 Salary $25k ($190-$165) + Bonus $25k ($25-$0) = $50k~~
~~FYE 3/31/3022 Salary $60K ($225-$165) + Bonus $75K ($75-$0) = $135k~~
~~FYE 3/31/3023 Salary $12,329 ($46,233-$33,904)~~
~~Memorialized as lump sum to avoid any negative tax implication.~~

(b) a discretionary performance bonus of up to thirty thousand dollars ($30,000.00), payable within twenty (20) days of the end of the 2023 fiscal year and provided that the Company hits its EBITDA target ("Performance Bonus Payment"). If Executive is terminated without Cause on or prior to December 31, 2023, Executive shall be eligible for a pro rata payment of the Performance Bonus Payment in the event that the calculation of the financials at the end of the last quarter of Executive's employment are on target to hit the EBITDA target for the Company.

7.      1.5 Benefits. While employed by Company, Executive shall receive U.S. health coverage under such insurance policy or other arrangement as Company shall, in its discretion, provide to similarly situated employees in the United States, subject to such deductibles and benefit and premium co-pays as may be provided under the insurance policy or other arrangement, provided that in any case Company shall indemnify Executive for any costs that Executive actually incurred to the extent Executive would not have incurred such costs had Executive received health coverage effective January 1, 2018. Likewise, Executive shall be covered by the Company's directors and officers policies or other arrangements that Company provides to other similar situated employees and executive management of the Parent. Executive shall also participate in such other employee benefit programs as Company may, in its sole and absolute discretion, establish for the benefit of similarly situated employees in the United States and executive management of the Parent (including, without limitation, retirement programs and disability programs).

8.      1.6 Reimbursement of Expenses; Vacation. Executive shall be entitled to reimbursement of reasonable and satisfactorily documented expenses (including, without limitation, travel expenses) related to his employment by Company. Executive shall be entitled to time off for major U.S. legal holidays and to four (4) weeks of vacation per calendar year (pro-rated for partial years of service), to be taken at such times as reasonably determined by Executive and reasonably acceptable to Company. Unless otherwise agreed to by Company, unused vacation time will be forfeited as of December 31 of each calendar year, except as required under applicable law.

9.      1.7 Equity Grant. As soon as practicable, and in any event within thirty (30) days of the execution date of this Agreement Signing Date, Company or its designee shall issue ordinary shares of Parent to Executive in an amount equal to the sum of (i) the Initial Shares and (ii) the Secondary Shares, as set forth below. If for any reason, the Company or Parent fail to issue the Initial Shares and/or the Secondary Shares in a timely fashion, the Company and Parent shall be obligated to provide Executive with contractual payment rights commensurate with the value of the Initial Shares and/or Secondary Shares (including the Valuation True-up, as defined below), pursuant to a mutually acceptable written instrument (the "Economic Rights Contract").

9.1      (i) [66] ordinary shares of Parent (the "Initial Shares"), which shall be fully vested at the time of grant. Company represents and warrants that such Initial Shares would have represented no less than 1.5% of the total amount of issued and outstanding share capital, calculated on a fully diluted basis, assuming the exercise of all convertible securities or securities reserved under any equity warrant plan (commonly referred to in France as "'BSPCE'"), or any similar plan, as of September 26, 2016 (the "2016 Target Date"). Executive shall be entitled to acquire the Initial Shares free and clear, upon exercise at a price per share denominated in euros equal to the price per share at which warrants were issued or would have been issued to employees of Parent in France in September 2016, which shall not exceed a valuation of

FH10932137.6

EU€~~[~~30,000,000~~]~~. If and to the extent the Initial Shares cannot be issued in such a manner to avoid adverse tax consequences in respect of the Initial Shares, to a greater extent than Executive would have been subject to had the Initial Shares been issued on the 2016 Target Date, the Company shall provide a cash bonus to Executive in an amount adequate to make Executive whole in respect of such shortfall (a "Valuation True-Up").

9.2 ~~(ii)~~ An additional ~~27~~14.4 ordinary shares of Parent (the "Secondary Shares", and together with the Initial Shares, the "Equity Grant"), ~~subject to upward or downward adjustment in accordance with the Equivalence Calculation set forth on Schedule B. Provided, notwithstanding the foregoing, such downward adjustment with respect to the Equivalence Calculation shall not be in excess of 0.25% of the total amount of issued and outstanding share capital, calculated on a fully diluted basis. The~~of which 11.7 Secondary Shares shall ~~vest in 60 substantially~~be vested and the remaining 2.25 Secondary Shares shall vest in five (5) equal monthly increments, with the first increment vesting on ~~September 1, 2021 (the "2021 Target Date") and the remaining 59 increments vesting on the first of each month thereafter, until the last increment vests on August 1, 2026~~November 1, 2023; provided, however, upon a change in control of Parent all such Secondary Shares shall immediately vest and become exercisable~~. Company represents and warrants that such initial 27 Secondary Shares represents no less than 0.5% of the total amount of issued and outstanding share capital, calculated on a fully diluted basis, assuming no adjustment is made pursuant to the Equivalence Calculation and the exercise of all convertible securities or securities reserved under any BSPCE, or any similar plan, as of the 2021 Target Date~~. Executive shall be entitled to acquire the Secondary Shares free and clear, upon exercise at a price per share denominated in euros equal to the price per share at which warrants were issued or would have been issued to employees of Parent in France as of ~~the~~September 1, 2021 ~~Target Date~~. If and to the extent the Secondary Shares cannot be issued in such a manner to avoid adverse tax consequences in respect of the Secondary Shares, to a greater extent than Executive would have been subject to had the Secondary Shares been issued on the September 1, 2021 ~~Target Date~~, the Company shall provide a Valuation True-Up.

9.3 ~~1.8 Equity[2]. As soon as practicable after implementation by Parent of a BSPCE and in no event later than the time that Parent first awards equity warrants under such plan to its employees in France, Parent shall award one or more equity warrants to Executive, which shall represent or be exercisable for the Initial Shares and the Secondary Shares. The equity interests issued in respect of the Equity Grant shall not be subject to restrictions on transfer except for restrictions reasonably required under applicable securities law. The Company and Executive will mutually determine the structure of the Equity Grant to minimize adverse tax consequences to the Executive. After the Secondary Shares have fully vested, Company and Executive will accept the terms of the Company's future incentive plan.~~ Notwithstanding anything herein to the contrary, the Company's failure to provide or execute definitive documentation with respect to the Equity Grant shall not alleviate or otherwise affect the duties and obligations of the Company or its affiliates or the entitlement of Executive to such Equity Grant. Irrespective of the form of Equity Grant, Executive and his assigns, as the holder of the Equity Grant, shall be entitled to all the rights, privileges and preferences (including, without limitation, as it relates to dividends or distributions to holders of capital stock) as a holder of ordinary shares of Parent would be entitled to receive, had such holder received such ordinary shares ~~at~~on the ~~2016 Target Date or 2021 Target Date, as applicable~~dates set forth herein.

10. ~~1.9~~ No Other Compensation~~; Affiliates~~. Irrespective of whether Executive

---

[2] ~~**NTD**: Foley Hoag to prepare phantom equity plan and agreements.~~

performs duties for Company or any of its affiliates, Executive shall not be entitled to any compensation or benefits other than what is specified in ~~Sections 1.4 through 1.8 in respect of his duties hereunder. Notwithstanding anything herein to the contrary, the obligations of the Company hereunder shall be deemed to apply to the Parent, and the Parent and its affiliates hereby indemnify Executive for any breach or non-performance of the Company and the Parent hereunder.~~<u>this Agreement.</u>

<u>11.</u>    ~~2.~~<u>Confidential Information; Non-Interference; Non-Solicitation</u>

~~2.1~~    <u>11.1</u>    <u>Confidential Information</u>. Executive acknowledges that by reason of his employment by Company, Executive will have access to certain confidential and proprietary information relating to the ~~Company's~~<u>Company's</u> business, which may include, but is not limited to, trade secrets, trade ~~"~~<u>"</u>know-how,~~"~~<u>"</u> product development techniques and plans, customer lists and addresses, supplier lists and addresses (including, without limitation, information concerning fashion designers, fabric suppliers, clothing manufacturers, artists and musical performers who have a relationship with Company), financing and funding arrangements, cost and pricing information, distribution arrangements, marketing and sales techniques, strategy and programs, computer programs and software and financial information (collectively referred to as ~~"~~<u>"</u>Confidential Information~~"~~<u>"</u>). Executive acknowledges that such Confidential Information is a valuable and unique asset of Company, and Executive agrees that he will not, unless expressly authorized in writing by Company, at any time during the course of ~~Executive's~~<u>Executive's</u> employment use~~, directly or indirectly,~~ any Confidential Information or divulge or disclose any Confidential Information to any individual or entity except in connection with the performance of the ~~Executive's~~<u>Executive's</u> duties for Company and in a manner consistent with the ~~Company's~~<u>Company's</u> policies regarding Confidential Information. Executive also agrees that at any time after the termination of his employment, he will not~~, directly or indirectly,~~ use any Confidential Information or divulge or disclose any Confidential Information to any individual or entity, unless such information is in the public domain through no fault of Executive or except when required to do so by a court of law, by any governmental agency having supervisory authority over the business of Company or by any administrative or legislative body (including a committee thereof) with apparent jurisdiction to order Executive to divulge, disclose or make accessible such information. All written Confidential Information (including, without limitation, in any computer or other electronic format) which comes into the ~~Executive's~~<u>Executive's</u> possession during the course of his employment shall remain the property of Company. Except as required in the performance of the ~~Executive's~~<u>Executive's</u> duties for Company, or unless expressly authorized in writing by Company, Executive shall not physically remove any written Confidential Information from the ~~Company's~~<u>Company's</u> premises, except in connection with the performance of the ~~Executive's~~<u>Executive's</u> duties for Company and in a manner consistent with the ~~Company's~~<u>Company's</u> policies regarding Confidential Information. Upon termination of the ~~Executive's~~<u>Executive's</u> employment, Executive agrees to return immediately to Company all written Confidential Information (including, without limitation, in any computer or other electronic format) in his possession. For all purposes of this Section ~~2~~<u>11</u>, each reference to ~~"~~<u>"</u>Company~~"~~<u>"</u> shall be deemed to be a reference to Company and each of its affiliates.

~~2.1~~    <u>11.2</u>    <u>Non-Interference</u> <u>and Non-Solicitation.</u> Executive agrees that as long as the Agreement remains in effect and for a period of one (1) year after its termination, Executive will not (i) disrupt or otherwise interfere with, or attempt to disrupt or otherwise interfere with~~, directly or indirectly,~~ any relationship between Company and any of its suppliers (including, without limitation, any fashion designers, fabric suppliers, clothing manufacturers, artists or musical performers who have a relationship with Company), any relationship between

Company and its customers, or any relationship between Company and its business partners, joint-venturers, banks, capital backers or funders, or other individuals or entities with which it has business affiliations, or (ii) induce or attempt to induce, ~~directly or indirectly,~~ any individual to leave his or her employment with Company; provided, however, such restrictions shall not apply with respect to (a) individuals or entities with whom Executive did not interact in the six months preceding his termination, or (b) responses to general solicitations.

~~2.2~~ 11.3 <u>Remedies.</u> Executive acknowledges and agrees that his obligations under this Section ~~2~~11 are necessary and reasonable in order to protect Company and its businesses, and Executive expressly agrees that monetary damages would be inadequate to compensate Company for any breach by Executive of this Section ~~2~~11. Accordingly, Executive acknowledges and agrees that any violation or threatened violation of this Section ~~2~~11 may cause irreparable injury to Company and that, in addition to any other remedies that may be available in law, in equity or otherwise, Company shall be entitled to obtain injunctive relief against the threatened breach of this Section ~~2~~11 or the continuation of any such breach by Executive ~~without the necessity of proving actual damages~~.

~~2.3~~ 11.4 <u>Survival.</u> The provisions of this Section ~~2~~11 shall survive the termination of this Agreement.

12. ~~3.~~ <u>Termination.</u>

<u>12.1 Term of Employment. Company and Executive Agree that this Agreement will terminate effective April 1, 2024 (the "Term"). Company and Executive agree to discuss whether to end the employment relationship or extend the term of the Agreement prior to the end of the Term.</u>

12.2 ~~3.1~~ <u>Termination</u> <u>by</u> <u>Company.</u> Company may terminate the ~~Executive's~~<u>Executive's</u> employment with or without Cause and without prejudice to any right or remedy to which Company or Executive may be entitled at law or in equity or under this Agreement.

12.3 ~~3.2~~ <u>Termination by Company for Reasons other than Cause</u>. If Company terminates the ~~Executive's~~<u>Executive's</u> employment for reasons other than Cause <u>prior to the Term</u>, Company shall provide Executive with thirty (30) days advance written notice of the termination date. Company may require Executive to continue performing services under this Agreement during the notice period, or it may require Executive to cease performing his services during all or part of the notice period (although if Company requires Executive to cease performing his services, Executive shall nevertheless assist whatever employee succeeds to his position and otherwise fully cooperate with Company throughout the notice period). This Agreement shall terminate as of the ~~Executive's~~<u>Executive's</u> termination date, and<u>, provided that Executive signs a separation agreement and general release in favor of the company which includes the removal of Executive as President with respect to the Company and any of its Affiliates,</u> irrespective of whether Executive continues working during the notice period, Executive shall be entitled to base salary and benefits until such termination date<u>,</u> and shall be entitled to a pro rata bonus for ~~the calendar year in which the termination date falls~~ subject to the ~~performance~~ conditions ~~and determined in accordance with the principles of good faith and reasonableness~~ specified in Section ~~1.4. In addition, Executive shall be entitled to a lump sum~~

~~FH10932137.6~~

~~severance payment equal in amount to one month's current base salary multiplied by the number of complete calendar years of the Executive's employment with Company (not to exceed six calendar years in the aggregate). For the avoidance of doubt, a calendar  year shall be taken into account only if Executive remains employed with Company (including the notice period) from January 1 through December 31 of the year, and under no circumstances shall Executive's severance payment exceed six months' base salary. If Executive becomes entitled to a lump sum severance payment, Company shall pay such amount to him within thirty (30) days of his termination date. For avoidance of doubt, the Company and Executive agree that the term of Executive's employment began on September 1, 2016.~~<u>6.</u>

<u>12.4</u>     ~~3.3~~ Termination by Company for Cause. ~~If Company terminates Executive's employment for Cause, Company shall provide Executive with fifteen (15) days advance written notice of the termination date. Company may require Executive to continue performing services under this Agreement during the notice period, or it may require Executive to cease performing his services during all or part of the notice period (although if Company requires Executive to cease performing his services, Executive shall nevertheless assist whatever employee succeeds to his position and otherwise fully cooperate with Company throughout the notice period).~~ For purposes of this ~~Section 3.3, "~~<u>Agreement, "</u>for Cause~~"~~<u>"</u> means that Executive (i) ~~violates~~<u>materially breaches</u> any provisions of this Agreement ~~(including, without limitation, Section 4.1) after thirty~~<u>after ten</u> (~~30~~<u>10</u>) days advance written notice of such violation is given to him (referencing this provision of this Agreement), and Executive fails to correct such violation, (ii) is guilty of (or pleads guilty to or no contest to) any felony, (iii) commits any act of embezzlement, misappropriation, concealment or conversion of any money or property of Company or any of its affiliates, (iv) engages in willful misconduct or gross dereliction of his duties, (v) engages in any behavior, either with respect to employees of Company or any of its affiliates or in any other manner, which has a negative reputational impact on Company and which subjects Company to liability in contravention of directives made by the Company, or (vi) refuses to perform his duties satisfactorily or to follow directions and fails, in the case of each of (i), (iv), (v) or (vi), after written notice of such violation, conduct, or refusal is given to him and for ~~thirty~~<u>ten</u> (~~30~~<u>10</u>) days immediately thereafter, Executive fails to correct such violation, conduct, or refusal. This Agreement shall terminate as of the ~~Executive's~~<u>Executive's</u> termination date, and irrespective of whether Executive continues working during the notice period, Executive shall be entitled to base salary and benefits for the period until such termination date but shall not be entitled to a pro rata bonus for the calendar year of termination or to any severance payment.

<u>12.5</u>     ~~3.4~~ Termination by ~~Executive's~~<u>Executive's</u> Death or Disability. This Agreement shall terminate upon the ~~Executive's~~<u>Executive's</u> termination of employment due to death and/or a finding of permanent physical or mental disability that is expected to result in death or to be of a continuous duration of at least twelve (12) months and that renders Executive unable to perform his usual and essential duties for Company. Executive shall be entitled to base salary and benefits for the period until the date of death or a finding of disability but not, except as may be provided under any disability plan in which he is participating, for any period thereafter (with a pro rata bonus being paid for the calendar year of death or disability subject to the performance conditions and determined in accordance with the principles of good faith and reasonableness specified in Section ~~1.4~~<u>6</u>).

<u>12.6</u>     ~~3.5~~ Voluntary Termination by Executive. Executive may voluntarily terminate his employment <u>prior to the end of the Term</u> for any reason by providing to

Company sixty (60) days'" prior written notice of the termination date. Company may require Executive to continue performing services under this Agreement during the notice period, or it may require Executive to cease performing his services during all or part of the notice period (although if Company requires Executive to cease performing his services, Executive shall nevertheless assist whatever employee succeeds to his position and otherwise fully cooperate with Company throughout the notice period). This Agreement shall terminate as of the Executive'sExecutive's termination date, and irrespective of whether Executive continues working during the notice period, Executive shall be entitled to base salary and benefits until such termination date (with a pro rata bonus being paid for the calendar year of termination subject to the performance conditions and determined in accordance with the principles of good faith and reasonableness specified in Section 1.4), but Executive shall not be entitled to any severance payment.

13.   4. General Provisions.

13.1   4.1 Actions by Company. All actions by and decisions of Company in connection with any aspect of the Executive'sExecutive's employment by Company (or termination thereof) shall be undertaken or made by Gildas Loaec in his capacity as an officer of Company or by any individual (other than Executive) to whom Parent has delegated the authority to take such actions or make such decisions. Executive shall report to Gildas Loaec in performing his duties under Section 1.12, and Executive understands and agrees that he shall follow such directions as Gildas Loaec or such other delegee provides to him with regard to the nature of his duties and the manner in which he performs them. Executive understands and agrees that irrespective of whatever position in Company he may hold, he shall have no power or authority whatsoever to take any unilateral action by or make any decision of Company in connection with any aspect of his employment by Company (or termination thereof). Notwithstanding anything to the contrary hereinbefore provided in this Section 4.113.1, Executive shall have the power and authority to act on behalf of Company in adopting, implementing and administering employee benefit plans for the benefit of the Company'sCompany's employees provided that he does so with the express written consent of Gildas Loaec (or any individual to whom Parent has delegated such power of consent)  and further provided that any determination of the Executive'sExecutive's status under any such employee benefit plan shall be made by Gildas Loaec (or any individual other than Executive to whom Parent has delegated the authority to make such  determination), it being understood that Executive shall be entitled to participate in all employee benefit plans that are applicable to all similarly-situated employees or executives of Company or its affiliates.

13.2   4.2 Non-disparagement. Executive agrees that both during  and for a period of one year after his employment by Company, he will not disparage, directly or indirectly, Company, its affiliates, their products, or their owners, directors, officers or employees. Company agrees that both during and after his employment by Company, it will not disparage, directly or indirectly, Executive.

13.3   4.3 No Waiver. Failure of any party at any time to enforce any provisions of this Agreement or any rights or to exercise any elections shall in no way be considered to be a waiver of such provisions, rights or elections and shall in no way affect the validity of this Agreement. The exercise by any party of any rights or elections under

this Agreement shall not preclude or prejudice such party from exercising the same or any other right under this Agreement irrespective of any previous action taken.

13.4    4.4 Notices. All notices and other communications in connection with this Agreement shall be in writing and shall be deemed to have been given when hand delivered or mailed by registered or certified mail or email as follows (provided that notice of change of address shall be deemed given only when received):

If to Company, to:

Audrey Castel Oster Kitsune France
10, rue Chauchat
75009 Paris France

Email:
If to Executive, to:

100 Atlantic Ave., Apartment G9
Brooklyn, New York 11201
United States of America

or to such other names or addresses as Company or Executive, as the case may be, shall designate by notice to each other person entitled to receive notices in the manner specified in this Section 13.4.

13.5    4.5 Governing Law; Jurisdiction; Waiver of Jury Trial. This Agreement shall be governed by and construed in accordance with the laws of the State of New York (without regard to its choice of law principles). Any controversy or claim arising out of or relating to this Agreement shall be brought solely in the federal or state courts having jurisdiction over New York County, New York, to whose exclusive jurisdiction the parties hereby irrevocably submit. Both parties hereby expressly waive the right to a trial by jury.

13.6    4.6 Severability. If any provision of this Agreement is determined to be illegal or unenforceable, then such illegal or unenforceable provision shall be modified by the proper court to the extent necessary and possible to make such provision enforceable, and such modified provision and all other provisions of this Agreement shall be given effect separately from the provisions or portion thereof determined to be illegal or unenforceable and shall not be affected thereby.

13.7    4.7 Successors and Assigns. Since this is a personal service contract, Executive may not assign this Agreement. Company may assign its rights under this Agreement at any time without the written consent of Executive, so long as Company or its assignee complies with the material terms of this Agreement. The rights and obligations of Company under this Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of Company, and the Executive'sExecutive's rights under this Agreement shall inure to the benefit of and be binding upon his heirs and executors. The Company'sCompany's affiliates shall be express third party beneficiaries of this Agreement.

FH10932137.6

13.8    4.8 Affiliates. For purposes of this Agreement, the term "affiliates" shall include all corporations that are parents (including Parent), subsidiaries or brother- sister corporations of Company, as well as all other entities, whether organized in corporate or any other form, that share any common ownership with Company or any of such corporations, and all joint ventures, partnerships and other business combinations of any kind that Company or any of such corporations or entities have entered into with any other individual or entity.

13.9 4.9 Taxes. All compensation to which Executive is entitled as an employee (including, without limitation, base salary, bonus, equity warrant and severance pay) shall be subject to applicable federal, state and city tax withholding and other applicable tax requirements. Company agrees to comply with all of its withholding and other applicable tax requirements as it relates to the compensation of Executive.

13.10    4.10 Entire Agreement. This Agreement supersedes all prior agreements and understandings between the parties, oral or written. No modification, amendment or termination of this Agreement shall be valid unless it is in writing signed by each party to this Agreement.

13.11    4.11 Counterparts/Electronic Signature. This Agreement may be executed in one or more counterparts, each of which shall for all purposes be deemed to be an original. This Agreement may be executed by facsimile signatures, electronic (i.e. email) or portable document format ("".PDF"") that shall be deemed originals; facsimile signatures or PDF signatures shall be treated as original signatures; and facsimile or PDF copies of this Agreement shall be treated as original copies of this Agreement.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first written above.

COMPANY:

MAISON KITSUNE, INC.

By:    _____

Name: ~~Gildas Loaec~~
Title: Vice President


~~PARENT:~~

~~KITSUNE CREATIVE~~


~~By:~~   -_____
~~Name: [_____]~~
~~Title: [_____]~~

EXECUTIVE:

_____

VINOD KASTURI


~~By:~~   -_____

**Schedule A**

**Initial Duties - Performance  Objectives**

**Initial Duties:**

Maison Kitsune Inc. and Kitsune Music Inc. re-opening + being

operational Organize back office of Maison Kitsune Inc., Cafe Kitsune

Inc. and Kitsune Music Inc.
> P&L short and long run/ performances objectives and KPIs, according to general strategy discussed with MK Board of  Directors
> Advise MK France Board of Directors on costs of US/Canada operations
> set up the basis of our future NY company: partners (legal, accountancy, banks, subsidies, taxes, etc.) + offices + showroom
> Advise on (or engage specialists to advise on):
> > • cash flows and day-to-day  treasury
> > • legal issues of back office and activities of MK  Inc. and CK Inc.
> > • administrative matters (back office and activities of MK  Inc. and CK Inc.)
> > • operations         (transportation,  deliveries,  logistic,  customs,  IT and connection with MK Paris  ERP)

Team organization, recruitment and management

Performing or engaging specialists to do the following
> Staff recruitment according to Maison Kitsune criteria / build a team with hierarchy, roles, responsibilities and missions
> Spread through the teams the company working philosophy : open-minded staff, autonomy, dynamic, English speaking
> Focus and raise staff interest in sales performance, via appropriate management processes and techniques
> Trainings : supervision and organization of sales training, collection training, customer service training *I* create and update book of procedures and commercial speech in stores *I* Regular interviews
> Coordinating staff and information circulation between MK France to MK US/Canada and to retail team = have the shop staffs very sharp in any news related to the brand (music, events, products, capsule, etc.)
> inter-stores planning checking

Advise on retail strategy and store openings
> develop strategy in US/Canada, in accordance with
> Direction new stores opening strategy
> review store opening details: location, work, team, offer, all layouts, image, communication and marketing + legal and financial issue shall be closely followed up with MK France Board of Directors
> Feedbacks for Paris teams, notably on products sales (top and flops)... In order

FH10932137.6

~~to have Paris studio integrate the local specs~~

~~Wholesale strategy~~

~~develop wholesales strategy in US/Canada, in accordance with MK France Board of Directors~~

~~Supervise prospection, new accounts signature, sales in Paris and USA/Canada, trainings, follow up on sell-through, merchandise, brands environments, etc.~~

~~Set up a real commercial strategy / key point = push the sales, orders and incomes and in the same time consider image of the brand in the choice of accounts, still being selective~~

~~Feedbacks for Paris teams, notably on products sales (top and flops)... In order to have Paris studio integrate the local specs~~

~~KPI and performances analysis, followed by actions recommendations~~

~~push each sales point to be aware and highly interested in performances : sales, sales by categories, stock issues, attendance, conversion rate, average shopping cart~~

~~change these analysis into appropriate actions : commercial promo actions, events, incentive in teams, stock reallocation, push on social networks communities, etc.~~

~~have all reports needed from MK France commercial teams, in order to have appropriate buyings~~

~~benchmark on US/Canada market + work on local positioning on the market (in term of price point, brand environments, etc.) / communication of these elements to MK France office to integrate the major market recommendations into our collection work~~

~~Supervision of all local communication and marketing around the brand~~

~~define local comm$^0$ /marketing strategy closely with MK France and decide budget, means and priorities~~

~~**PR** work and missions supervision~~

~~community management supervision ==> content + communication + development of local social networks (social network = key point of Maison Kitsune comm$^0$ strategy)~~

~~Focus on synergies between music, events, cafe and clothes~~

~~set up a yearly program (in link with MK France office) of events, events in stores, local commercial actions, music, potentially press days, etc.~~

~~Stores image and promo actions in stores~~

~~communication re: events or any news in store (sales, capsule collection coming, new good coming etc.) / in link with our MK France communication/marketing team~~

~~coordination of the merchandising, display and windows~~

~~uniforms, image of the shop staffs~~

*[Link-to-previous setting changed from on in original to off in modified.]*.

Case 1:24-cv-04431-ALC    Document 39-3    Filed 05/02/25    Page 15 of 17

Local partnership and collaborations

Work with MK France communication/marketing team:
    advise on local partnership and collaborations offers (negotiation, legal, financial and operations)
    partnership and collaborations

**Performance Objectives:**

**TARGETS FY 2021-2022 (April 1, 2021 to March 31, 2022)**

- Net Sales: $13,996K
- Opex Excluding Logistics & Digital Marketing: $4,245K
- Capex: $770K

**TARGETS FY2022-2023 (April 1, 2022 to March 31, 2023)**

- Net Sales: $10,042K[3]
- Opex Excluding Logistics & Digital Marketing: $7,577K
- Capex: $376K

---

[3] **NTD**: Parent to add finalized wholesale net sales estimate.

*[Link-to-previous setting changed from on in original to off in modified.]*.

Case 1:24-cv-04431-ALC    Document 39-3    Filed 05/02/25    Page 16 of 17

**Schedule B**

Equivalence Calculation

The number of Secondary Shares shall be increased or decreased at a rate of 2 ordinary shares for each 5% increment by which the US EBITDA Percentage at the time of the Equivalence Calculation exceeds or falls short of the US EBITDA Target Percentage. Provided, notwithstanding the foregoing, such downward adjustment with respect to the Equivalence Calculation shall not be in excess of 0.25% of the total amount of issued and outstanding share capital, calculated on a fully diluted basis.

As used above, the US EBITDA Percentage means, in the Equivalence Calculation of the Secondary Shares, the portion of EBITDA attributable to the Company or other US operations (including Canada, Latin America, etc.) as a percentage of the total EBITDA for the Parent in such year. For purposes of the US EBITDA percentage, the portion of the EBITDA attributable to the Company and other US operations shall equal the consolidated EBITDA of all US operations (including America Wholesale invoiced from HQ) adjusted to i) reflect the gross margin on a consolidated basis (e.g. excluding intercompany premiums and mark ups) and excluding intercompany operating expenses (management fees and license fees) and ii) reflect a [____%] share of the overhead costs to Parent and all of its affiliates, allocated in proportion to the revenues of all US operations provided however, notwithstanding anything to the contrary, during the vesting period of the Secondary Shares the US EBITDA Target Percentage shall not exceed [19]%.[4]

EBITDA means earnings before interest, taxes, depreciation and amortization. Illustrative example below.

---

[4] **NTD**: Parent to add updated target; designated to capture an unexpected exit in the mid-term.

| Summary report: Litera Compare for Word 11.3.0.46 Document comparison done on 1/2/2024 11:21:48 AM | |
|---|---|
| **Style name:** Default Style | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://work.foleyhoag.com/FOLEYHOAGUS/10932137/6 | |
| **Modified DMS:** iw://work.foleyhoag.com/FOLEYHOAGUS/10932137/12 | |
| **Changes:** | |
| Add | 139 |
| Delete | 250 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 389 |