# EXHIBIT I

**JARV LLC,**
Landlord

to

**MK LAFAYETTE LLC,**
Tenant

**LEASE**

Dated as of ~~February~~ March 3 , 2017

The Premises located in that certain cooperative apartment building known as:

248 Lafayette Street
New York, New York

000426-008/00058606-10          {000426-008/00058606-10}

## Table of Contents

Page

DEFINITIONS        1

ARTICLE I DEMISE OF PREMISES; TERM ................................................................4

SECTION 1.1    DEMISE..................................................................................4
SECTION 1.2    TERM; COMMENCEMENT DATE; EXPIRATION DATE .................5
SECTION 1.3    LANDLORD'S WORK; TENANT'S WORK ...................................5
SECTION 1.4    COMMENCEMENT DATE ........................................................6
SECTION 1.5    RENT COMMENCEMENT DATE; FREE RENT .............................7
SECTION 1.6    RENEWAL OPTION ...............................................................7
SECTION 1.7    INTENTIONALLY DELETED......................................................9
SECTION 1.8    NET LEASE ..........................................................................9

ARTICLE II RENT ..............................................................................................10

SECTION 2.1    FIXED RENT; ADDITIONAL RENT............................................10
SECTION 2.2    MANNER OF PAYMENT .........................................................11
SECTION 2.3    CALCULATION OF ANNUAL FIXED RENT FOR RENEWAL TERMS.....11

ARTICLE III REAL ESTATE TAXES ....................................................................11

SECTION 3.1    TENANT'S TAX PAYMENT .....................................................11
SECTION 3.2    TAX STATEMENT AND TIMING OF TAX PAYMENT ....................11
SECTION 3.3    ADJUSTMENTS TO TENANT'S TAX PAYMENT............................12
SECTION 3.4    TAX REFUNDS ....................................................................12
SECTION 3.5    PRORATED ALLOCATION ......................................................13
SECTION 3.6    TAX STATEMENT BINDING ....................................................13
SECTION 3.7    NO RENT REDUCTION...........................................................13
SECTION 3.8    SURVIVAL...........................................................................13
SECTION 3.9    INTENTIONALLY OMITTED.....................................................13
SECTION 3.10   NON-PAYMENT OF ADDITIONAL RENT ...................................13

ARTICLE IV CONDITION OF PREMISES .............................................................13

SECTION 4.1    CONDITION OF PREMISES.....................................................14
SECTION 4.2    CERTIFICATE OF OCCUPANCY................................................14

ARTICLE V USE OF PREMISES ..........................................................................15

SECTION 5.1    USE....................................................................................15
SECTION 5.2    ADVERTISING .....................................................................16
SECTION 5.3    PROHIBITED CONDUCT ........................................................17
SECTION 5.4    WINDOW CLEANING .............................................................17
SECTION 5.5    ADDITIONAL USE COVENANTS ..............................................17

ARTICLE VI TENANT'S PROPERTY ...................................................................18

SECTION 6.1    TENANT'S PROPERTY ..........................................................18

ARTICLE VII UTILITIES ....................................................................................18

SECTION 7.1    UTILITIES...........................................................................18
SECTION 7.2    LANDLORD'S LIABILITY ......................................................19
SECTION 7.3    STOPPAGE OR INTERRUPTION OF SERVICES ...........................20
SECTION 7.4    SPRINKLER .........................................................................20

ARTICLE VIII VARIOUS COVENANTS.................................................................21

SECTION 8.1    VARIOUS COVENANTS ..........................................................21
SECTION 8.2    REPAIRS BY CORPORATION ..................................................28

000426-008/00058606-10            {000426-008/00058606-10}

| | | |
|---|---|---|
| SECTION 8.3 | REPAIRS BY TENANT | 28 |
| SECTION 8.4 | CORPORATION'S INSURANCE. | 29 |
| SECTION 8.5 | VIOLATIONS | 30 |

**ARTICLE IX COMPLIANCE WITH LAWS** .......... **30**

| | | |
|---|---|---|
| SECTION 9.1 | COMPLIANCE WITH LAWS | 30 |
| SECTION 9.2 | FIRE RATING AGENCIES | 30 |

**ARTICLE X ASSIGNMENT AND SUBLETTING** .......... **31**

| | | |
|---|---|---|
| SECTION 10.1 | ASSIGNMENT, SUBLETTING AND OTHER TRANSFERS | 31 |

**ARTICLE XI CHANGES BY LANDLORD** .......... **38**

| | | |
|---|---|---|
| SECTION 11.1 | CHANGES BY LANDLORD | 38 |

**ARTICLE XII CASUALTY** .......... **39**

| | | |
|---|---|---|
| SECTION 12.1 | DAMAGE GENERALLY | 39 |
| SECTION 12.2 | EXPRESS AGREEMENT | 41 |

**ARTICLE XIII CONDEMNATION** .......... **41**

| | | |
|---|---|---|
| SECTION 13.1 | CONDEMNATION | 41 |
| SECTION 13.2 | AWARD | 41 |
| SECTION 13.3 | CONDEMNATION FOR A LIMITED PERIOD | 42 |

**ARTICLE XIV ACCIDENTS TO SANITARY AND OTHER SYSTEMS** .......... **42**

| | | |
|---|---|---|
| SECTION 14.1 | ACCIDENTS TO SANITARY AND OTHER SYSTEMS | 42 |

**ARTICLE XV SUBORDINATION; NON-TERMINABILITY OF LEASE** .......... **42**

| | | |
|---|---|---|
| SECTION 15.1 | SUBORDINATION | 42 |
| SECTION 15.2 | NON-TERMINABILITY OF LEASE | 43 |
| SECTION 15.3 | PROPRIETARY LEASES | 45. |

**ARTICLE XVI RIGHT TO PERFORM COVENANTS OF TENANT** .......... **46**

| | | |
|---|---|---|
| SECTION 16.1 | TENANT'S DEFAULT | 46 |
| SECTION 16.2 | PAYMENTS | 46 |
| SECTION 16.3 | LATE PAYMENTS DEEMED TO BE ADDITIONAL RENT | 46 |

**ARTICLE XVII ESTOPPEL CERTIFICATES** .......... **47**

| | | |
|---|---|---|
| SECTION 17.1 | ESTOPPEL CERTIFICATES | 47 |

**ARTICLE XVIII CONDITIONAL LIMITATION** .......... **47**

| | | |
|---|---|---|
| SECTION 18.1 | CONDITIONAL LIMITATION | 47 |
| SECTION 18.2 | LEGAL AND OTHER COSTS | 48 |

**ARTICLE XIX RE-ENTRY BY LANDLORD; DAMAGES; END OF TERM** .......... **48**

| | | |
|---|---|---|
| SECTION 19.1 | RE-ENTRY BY LANDLORD | 48 |
| SECTION 19.2 | DAMAGES | 48 |
| SECTION 19.3 | RENT ACCELERATION | 49 |
| SECTION 19.4 | OTHER REMEDIES | 49 |
| SECTION 19.5 | RIGHT TO INJUNCTION | 50 |
| SECTION 19.6 | CERTAIN WAIVERS | 50 |

**ARTICLE XX NOTICES** .......... **50**

| | | |
|---|---|---|
| SECTION 20.1 | NOTICES | 50 |

**ARTICLE XXI MISCELLANEOUS** .......... **51**

SECTION 21.1    LIMITATION OF LANDLORD'S LIABILITY ................................................51
SECTION 21.2    ENTIRE AGREEMENT ................................................................................51
SECTION 21.3    NO WAIVER, ETC. ....................................................................................52
SECTION 21.4    ORAL MODIFICATION ..............................................................................52
SECTION 21.5    SURRENDER AND HOLDING OVER ............................................................52
SECTION 21.6    SEVERABILITY ........................................................................................53
SECTION 21.7    ATTORNEYS' FEES ...................................................................................53
SECTION 21.8    BROKER ..................................................................................................54
SECTION 21.9    SUCCESSORS AND ASSIGNS ....................................................................54
SECTION 21.10   CONSENT ................................................................................................54
SECTION 21.11   POSTPONEMENT OF PERFORMANCE ........................................................55
SECTION 21.12   EXPRESS PROVISION TO THE CONTRARY ..................................................55
SECTION 21.13   LENDER CONSENT ...................................................................................55
SECTION 21.14   NO AIR RIGHTS .......................................................................................55
SECTION 21.15   INTENTIONALLY OMITTED ......................................................................56
SECTION 21.16   OFFER .....................................................................................................56
SECTION 21.17   INTENTIONALLY DELETED .......................................................................56
SECTION 21.18   COUNTERPARTS .......................................................................................57
SECTION 21.19   RULE OF CONSTRUCTION .........................................................................57
SECTION 21.20   SAFETY AND SECURITY. ..........................................................................57
SECTION 21.21   ADDITIONAL REPRESENTATIONS. .............................................................57
SECTION 21.22   WAIVER OF CONSEQUENTIAL, SPECIAL AND PUNITIVE DAMAGES. ............57
SECTION 21.23   CITY PLANNING COMMISSION SPECIAL PERMIT. .......................................57

**ARTICLE XXII QUIET ENJOYMENT...........................................................................58**

SECTION 22.1    QUIET ENJOYMENT...................................................................................58

**ARTICLE XXIII ALTERATIONS ..................................................................................58**

SECTION 23.1    ALTERATIONS...........................................................................................58

**ARTICLE XXIV HAZARDOUS SUBSTANCES AND WASTE ........................................60**

SECTION 24.1    DEFINITIONS.............................................................................................60
SECTION 24.2    TENANT'S REPRESENTATIONS ..................................................................60
SECTION 24.3    NOTICES ..................................................................................................60
SECTION 24.4    INDEMNIFICATION ....................................................................................61
SECTION 24.5    LANDLORD'S CONSENT ............................................................................61

**ARTICLE XXV SIGNAGE AND ACCESS ......................................................................61**

SECTION 25.1    LANDLORD CONSENT TO SIGNAGE ...........................................................62
SECTION 25.2    INTERIOR DISPLAYS AND SIGNAGE...........................................................62
SECTION 25.3    FAÇADE CHANGES ....................................................................................63
SECTION 25.4    VIOLATION OF REQUIREMENTS .................................................................63

**ARTICLE XXVI LATE CHARGES ................................................................................63**

SECTION 26.1    LATE CHARGES .......................................................................................63

**ARTICLE XXVII EXCAVATIONS .................................................................................64**

SECTION 27.1    EXCAVATIONS ..........................................................................................64

**ARTICLE XXVIII SECURITY DEPOSIT .......................................................................64**

**ARTICLE XXIX CORPORATION ..................................................................................65**

SECTION 29.1    CORPORATION .........................................................................................65

**ARTICLE XXX INTENTIONALLY DELETED ...............................................................67**

**ARTICLE XXXI INTENTIONALLY DELETED...............................................................68**

**ARTICLE XXXII ANTI-TERRORISM REQUIREMENTS**................................................................**68**

    SECTION 32.1     ANTI-TERRORISM REQUIREMENTS ...........................................................68

**ARTICLE XXXIII GUARANTY** .........................................................................................**68**

    SECTION 33.1     GUARANTY.........................................................................................68

**ARTICLE XXXIV NO RECORDATION** ............................................................................**68**

    SECTION 34.1     NO RECORDATION ..............................................................................68

**SURRENDER DECLARATION** ..........................................................................................**7**

**W I T N E S E T H:**...........................................................................................................**7**

LEASE (this "Lease"), dated as of ~~February~~ Manila 3 , 2017, between JARV LLC, a New York limited liability company having an office at 428 Broadway, Suite 310, New York, New York 10013 ("Landlord") and MK LAFAYETTE LLC, a New York limited liability company having an address at c/o Emmet, Marvin & Martin, LLP, 120 Broadway, New York, New York 10271 ("Tenant").

## WITNESSETH:

WHEREAS, Landlord is the owner of fifty (50) shares of City Studios Inc. (the "Corporation"), the owner of the building located at 248 Lafayette Street, New York, New York (the "Building"), and Landlord is the tenant of a portion of the first floor and a portion of the lower level of the Building pursuant to those certain Proprietary Leases, dated October 4, 2013 between the Corporation, as Lessor and Landlord, as Lessee; and

WHEREAS, Tenant is desirous of leasing a portion of the first floor and a portion of the lower level of the Building, and Landlord is willing to lease that space to Tenant, on the terms and conditions hereinafter set forth.

NOW, THEREFORE, Landlord and Tenant agree as follows:

## ARTICLE OF DEFINITIONS

Definitions

As used herein:

"Additional Rent" shall have the meaning set forth in Section 2.1B.

"Alterations" shall have the meaning set forth in Section 23.1(A).

"Bankruptcy Code" shall have the meaning set forth in Section 15.2(A).

"Base Tax Year" shall mean the twelve (12) month period from July 1, 2018 through June 30, 2019.

"Building" shall have the meaning set forth in the Preamble.

"CGL" shall have the meaning set forth in Section 8.1(K)(1).

"Commencement Date" shall have the meaning set forth in Section 1.4.

"Cooperative Documents" shall have the meaning set forth in Section 29.1.

"Corporation" shall have the meaning set forth in Section 29.1.

"Cure Period" shall have the meaning set forth in Section 16.1.

"Destruction Date" shall have the meaning set forth in Section 12.1(B).

"Environmental Laws" shall have the meaning set forth in Section 24.1.

"Expiration Date" shall have the meaning set forth in Section 1.2(A).

"Fixed Rent" shall have the meaning set forth in Section 2.1(A).

"Governmental Authority" shall mean "the United States of America, the City of New York, County of New York, or State of New York, or any political subdivision, agency, department, commission, board, bureau or instrumentality of any of the foregoing, now existing or hereafter created, having jurisdiction over the Building.

"Guarantor" shall have the meaning set forth in Section 33.1.

"Guaranty" shall have the meaning set forth in Section 33.1.

"Hazardous Substances or Waste" shall have the meaning set forth in Section 24.1 .

"HVAC" shall have the meaning set forth in Section 8.3(A).

"Landlord" shall have the meaning set forth in the Preamble.

"Landlord Parties" shall have the meaning set forth in Section 8.1(I).

"Landlord's Work" shall have the meaning set forth in Section 1.3(A).

"Laws" shall have the meaning set forth in Section 11.1(A).

"Lease" shall have the meaning set forth in the Preamble.

"Lease Term" shall have the meaning set forth in Section 1.2(A).

"Lease Year" shall mean, for the first Lease Year, the period commencing on the Commencement Date and ending on the last day of the month of the following year in which the day immediately preceding the anniversary of the Commencement Date occurs; and for any subsequent Lease Year, each successive twelve (12) month period occurring thereafter.

"Mortgage" shall have the meaning set forth in Section 15.1.

"Notice" shall have the meaning set forth in Section 20.1

"Partial Lease Year" shall mean that part of the Lease Term that is less than a complete Lease Year that occurs prior to the first Lease Year. All Fixed Rent, if applicable, and Additional Rent shall be pro-rated on a daily and/or monthly basis in any Partial Lease Year.

"Permitted Use" shall have the meaning set forth in Section 5.1.

"Premises" shall have the meaning set forth in Section 1.1.

"Real Estate Taxes" shall mean that portion of all real estate taxes, sewer rents, water

frontage charges, business improvement district and other assessments, special or otherwise, levied, assessed or imposed by the City of New York or any other taxing authority upon or with respect to the Building, and in connection with the real property located at and known as 248 Lafayette Street, New York, New York (currently designated as Block 496, Lot 5, or such other tax lots that may result from the same real property that current constitutes Lot 5 in Block 496) and all taxes assessed or imposed with respect to the rentals payable hereunder other than general income, gross receipts and excess profits taxes (except that general income, gross receipts and excess profits taxes shall be included if covered by the provisions of the following sentence), which, in each such case are charged to the Landlord by the Corporation, whether as part of the regular maintenance charges payable to the Corporation by Landlord and/or imposed separately upon the Landlord by the Corporation. Real Estate Taxes shall also include Landlord's portion of any taxes, charges or assessments levied, assessed or imposed by any taxing authority in addition to or in lieu of the present method of real estate taxation, provided such additional or substitute taxes, charges and assessments are computed as if the Building were the sole property of Landlord subject to said additional or substitute tax, charge or assessment including, but not limited to, any occupancy, gross receipts, rental, income, franchise, transit or other tax. Real Estate Taxes shall exclude penalties for late payment, transfer tax, unincorporated business, franchise, capital stock, excise, corporate, succession, estate, inheritance, capital, levy or income, profit or revenue tax to the extent same are not in lieu of the present method of taxation. With respect to any Tax Year, all Tax Expenses shall be considered as part of the Real Estate Taxes for such Tax Year. Tenant hereby waives any right to institute or join in tax certiorari proceedings or other similar proceedings contesting the amount or validity of any Real Estate Taxes.

"Renewal Notice" shall have the meaning set forth in Section 1.6.

"Renewal Term" shall have the meaning set forth in Section 1.6.

"Rent" shall have the meaning set forth in Section 2.1(B).

"Rent Commencement Date" shall have the meaning set forth in Section 1.5.

"Responsible Party" shall have the meaning set forth in Section 29.1(E).

"Security Deposit" shall have the meaning set forth in Section 28.1(A).

"Sign Items" shall have the meaning set forth in Section 25.1.

"Special Cause of Loss Form" shall have the meaning set forth in Section 8.1(I)(1)(i).

"Subsequent Year" shall mean each Tax Year commencing within the Term of this Lease that shall be subsequent to the Base Tax Year.

"Substantial completion" shall have the meaning set forth in Section 1.4.

"Substantially completed" shall have the meaning set forth in Section 1.4.

"Superior Lease" shall have the meaning set forth in Section 15.1.

"Superior Lessor" shall have the meaning set forth in Section 15.1.

"Superior Mortgage" shall have the meaning set forth in Section 15.1.

"Superior Mortgagee" shall have the meaning set forth in Section 15.1.

"Tax Expenses" shall mean all expenses (including but not limited to customary and usual attorneys' fees, expert and other witnesses' fees and disbursements) incurred by Landlord in connection with any application or proceeding to reduce the assessed valuation of the Building for each Tax Year with respect to Real Estate Taxes or otherwise in contesting the validity or amount of any Real Estate Taxes or in obtaining a refund of Real Estate Taxes.

"Tax Statement" shall mean a statement setting forth the amount payable by Tenant for a specified Subsequent Year pursuant to Article III, which statement shall be accompanied by a copy of the applicable tax bill(s) and/or a maintenance statement or other statement from the Corporation.

"Tax Year" shall mean each 12-month period commencing July 1st and ending June 30th or any portion of which occurs during the Term of this Lease.

"Tenant" shall have the meaning set forth in the Preamble.

"Tenant Change" shall have the meaning set forth in Section 8.1(E).

"Tenant's Property" shall have the meaning set forth in Section 6.1.

"Tenant's Property Policy" shall the meaning set forth in Section 8.1(I)(1)(i).

"Tenant's Proportionate Share" shall mean fifty percent (50%). If the space owned by Landlord in the Building shall increase or decrease, then Tenant's Proportionate Share shall increase or decrease accordingly.

"Tenant's Tax Payment" shall have the meaning set forth in Section 3.1.

"Tenant's Work" shall have the meaning set forth in Section 1.3(B).

"Term" shall have the meaning set forth in Section 1.2(A)Section 1.2(A).

"Transferee" shall have the meaning set forth in Section 24.5.

## ARTICLE I

### Demise of Premises; Term

SECTION 1.1    Demise

(A)    Landlord hereby demises to Tenant and Tenant hereby hires from Landlord, subject to the covenants and agreements contained in this Lease, approximately 1,400

square feet of space on the ground floor of the Building and approximately 600 square feet of space on the lower level of the Building, as substantially described on Exhibit A attached hereto (collectively, the "Premises"). No vaults, vault space or area, whether or not enclosed or covered, not within the property line of the Building is leased hereunder, anything contained in or indicated on any sketch, blueprint or plan, or anything contained elsewhere in this Lease to the contrary notwithstanding. Landlord makes no representation as to the location of the property line of the Building. All vaults and vault space, if any, and all such areas not within the property line of the Building that Tenant may be permitted to use and/or occupy are to be used and/or occupied under a revocable license, and if any such license be revoked, or if such space or area be diminished or required by any federal, state or municipal authority or public utility, Landlord shall not be subject to any liability, nor shall Tenant be entitled to any compensation or diminution or abatement of Rent (as hereinafter defined), nor shall such revocation, diminution or requisition be deemed constructive or actual eviction. Any tax, fee or charge of municipal authorities for such vault or area used or occupied by Tenant shall be paid by Tenant.

SECTION 1.2    Term; Commencement Date; Expiration Date

(A)    The term of this Lease ("Lease Term" or "Term") shall begin on the Commencement Date (as hereinafter defined) and shall end, unless sooner terminated or renewed (as hereafter provided), on the date that is the last day of the Tenth (10th) Lease Year (as hereinafter defined) thereafter (such date, as the same may be extended pursuant to Section 1.6 hereof, the "Expiration Date").

(B)    Failure to Give Possession: If Landlord is unable to give possession of the Premises on the Commencement Date because of the holding-over or retention of possession of any tenant, undertenant, or occupants, or if the Premises are located in a building being constructed, because such building has not been sufficiently completed to make the Premises ready for occupancy, or because of the fact that a certificate of occupancy has not been procured, or for any other reason, Landlord shall not be subject to any liability for failure to give possession on said date and the validity of this Lease shall not be impaired under such circumstances, nor shall the same be construed in any wise to extend the term of this Lease, but the Rent payable hereunder shall be abated (provided Tenant is not responsible for the inability to obtain possession or complete construction) until after Landlord shall have given Tenant written notice that Landlord is able to deliver possession in the condition required by this Lease. If permission is given to Tenant to enter into the possession of the Premises or to occupy premises other than the Premises prior to the Commencement Date, Tenant covenants and agrees that such possession and/or occupancy shall be deemed to be under all the terms, covenants, conditions and provisions of this Lease, except the obligation to pay the Fixed Rent (as hereinafter defined) set forth in Section 2.1 hereof. The provisions of this Section 1.2(B) are intended to constitute "an express provision to the contrary" within the meaning of Section 223-a of the New York Real Property Law.

SECTION 1.3    Landlord's Work; Tenant's Work

(A)    Landlord shall not be required to perform any work to prepare the Premises for Tenant's occupancy other than the work described on Exhibit B attached hereto ("Landlord's Work"), which shall be performed at Landlord's sole cost and expense.

000426-008/00058606-10                  {000426-008/00058606-10}

5

Notwithstanding anything to the contrary contained herein, Landlord makes no representation or warranty that possession of the Premises shall be delivered on or before any particular date; provided, that (i) Landlord shall endeavor to cause the Commencement Date to occur not later than March 1, 2017, (ii) in the event that the Commencement Date shall not occur on or before March 15, 2017, then the Fixed Rent first coming due after the Rent Commencement Date shall abate one (1) additional day for each day during the period commencing on March 16, 2017 and ending on the Commencement Date, and (iii) in the event Landlord is unable to deliver the Premises to Tenant with Landlord's Work substantially completed (as hereinafter defined) by July 1, 2017, then Tenant shall thereafter have the right to terminate this Lease in which event Landlord shall return the Security Deposit and any other amounts pre-paid to Landlord by Tenant, and thereafter neither party shall have any further obligations or liability hereunder except as and to the extent same expressly survives the expiration of this Lease. In the event the applicable Governmental Authority rejects Landlord's application for the temporary Retail CO (without possibility of filing a revised application which might be approved), or the Landlord is otherwise unable, despite using due diligence and commercially reasonable efforts, to obtain the temporary Retail CO between the period of July 1, 2017 through December 31, 2017, Landlord shall have the right to terminate this Lease in which event Landlord shall return the Security Deposit and any other amounts pre-paid to Landlord by Tenant, and thereafter neither party shall have any further obligations or liability hereunder except as and to the extent same expressly survives the expiration of this Lease. In addition to, but separate from, Landlord's Work, Landlord agrees to diligently deliver to Tenant an ACP-5 for the entire Premises after Tenant has delivered to Landlord a set of plans for Tenant's Work sufficient for Landlord to obtain an ACP-5. Landlord agrees to remediate or encapsulate any and all asbestos-containing materials discovered in the basement portion of the Premises at any time during the Term, which is not introduced into the Premises by Tenant or any of its contractors, customers, employees, agents or representatives, if and to the extent that such remediation shall be required under applicable laws and to deliver the ACP-5 to Tenant.

(B)    At Tenant's sole expense, Tenant shall perform or cause the performance of Alterations (as defined below) in and to the Premises to prepare the same for the operation of Tenant's business therein ("Tenant's Work") in accordance with all terms, conditions and provisions contained in this Lease including, without limitation, Article XXIII hereof. Tenant shall submit plans and specifications for Tenant's Work to Landlord for approval by the Corporation. Landlord agrees to use commercially reasonable efforts to cooperate with Tenant in obtaining the Corporation's approval of Tenant's Work, but at no out-of-pocket cost to Landlord.

SECTION 1.4    Commencement Date

"Commencement Date" means the latest to occur of (i) the date upon which Landlord's Work is substantially completed, (ii) the date on which Landlord delivers notice to Tenant (which notice may be by electronic mail, provided such notice is also delivered by another method permitted under Section 20.1 hereof) that possession of the Premises is available to Tenant, (iii) the date on which Landlord delivers notice to Tenant that the Corporation has consented to this Lease and provides to Tenant a recognition agreement and estoppel certificate duly executed by the Corporation in favor of Tenant, which agreement and certificate shall be

substantially on the form attached hereto as Exhibit C and (iv) the date on which Landlord delivers notice to Tenant that Landlord's existing lender, Signature Bank, has consented to this Lease. The term "substantial completion" or "substantially completed" or words of similar import shall mean the date when Landlord's Work in the Premises then remaining to be done, if any, consists of minor "punchlist items" and shall have reached that stage of completion such that Tenant could either use or occupy the Premises or Tenant could then proceed to commence its Tenant's Work without unreasonable interference by reason of those items still required to complete Landlord's Work. Further, taking of possession of the Premises by Tenant or the commencement of construction by Tenant following Tenant's receipt of notice from Landlord of substantial completion of Landlord's Work in respect thereof, or otherwise, shall be conclusive evidence that substantial completion was, in fact, achieved. Within ten (10) days after the date that Tenant accepts possession of the Premises, Tenant shall advise Landlord of any "punchlist" items remaining to be completed. Landlord shall have ninety (90) days from the date that Tenant notifies Landlord of any additional punchlist items to complete such punchlist items. In completing such punchlist items, Landlord shall not unreasonably interfere with Tenant's performance of Tenant's Work or Tenant's occupancy of the Premises for the conduct of its business.

SECTION 1.5    Rent Commencement Date; Free Rent

Provided that Tenant is not then in monetary default or material non-monetary default hereunder beyond applicable cure or grace periods, Tenant's obligation to pay Fixed Rent hereunder shall commence on the date (the "Rent Commencement Date") that is ninety (90) days after the Commencement Date, it being expressly understood and agreed that in the event Tenant is in material (including without limitation, monetary) default under this Lease, beyond applicable cure or grace periods, prior to the date set forth above as the Rent Commencement Date, the Rent Commencement Date shall retroactively be deemed to be the Commencement Date. If at any time after the Rent Commencement Date, Tenant shall be in monetary default or material non-monetary default beyond applicable notice and cure periods, then Tenant shall be obligated to pay to Landlord on demand the amount of the unamortized portion of the Fixed Rent that was abated for the period between the Commencement Date and the Rent Commencement Date, amortized on a straight-line basis over the initial term of the Lease. If the Rent Commencement Date occurs on a day other than the first day of a calendar month, the Fixed Rent and Additional Rent payable for such month shall be prorated on a per diem basis based upon the actual number of days in such month. In addition to the foregoing, provided that Tenant is not then in material (including, without limitation, monetary) default hereunder beyond applicable cure or grace periods, Tenant shall not be obligated to pay Fixed Rent with respect to the one-month period commencing on the first day of the Second (2nd) Lease Year.

SECTION 1.6    Renewal Option

(A)    Landlord hereby grants Tenant the right and option to renew the Term of this Lease for one period of five (5) Lease Years (the "Renewal Term"), provided, however, that (i) Tenant is not in default under this Lease beyond applicable cure or grace periods and this Lease is in full force and effect at the time of the exercise of such option and as of the Expiration Date of the initial Term and (ii) Tenant herein named shall not have assigned or subleased the Premises or any part thereof to any party other than as expressly permitted herein. Tenant shall

000426-008/00058606-10                    {000426-008/00058606-10}

7

give notice to Landlord of Tenant's intention to exercise such option (a "Renewal Notice") not later than two hundred seventy (270) days prior to the then-effective Expiration Date, and Time Shall be of the Essence with respect to the giving of such notice. If Tenant timely delivers the Renewal Notice, this Lease shall be deemed to be extended pursuant to the Renewal Notice. The Renewal Term shall commence on the day following the then effective Expiration Date and shall end at midnight on the date that is five (5) Lease Years thereafter. All of the terms, covenants and conditions of this Lease shall continue in full force and effect during the Renewal Term, except that (i) the Fixed Rent during the Renewal Term (the "Renewal Rent") shall be as set forth in Article II hereof, and (ii) during the Renewal Term, Tenant shall have no further right to extend the Term of this Lease pursuant to this Section 1.6. Any termination, cancellation or surrender of Tenant's interest in this Lease at any time during the Term hereof, as the same may be extended, shall terminate any of Tenant's right to exercise renewal rights hereunder.

(B)    If Tenant timely delivers the Renewal Notice and is not otherwise in default beyond applicable cure or grace periods and this Lease is then in full force and effect, then commencing on the date that is one hundred eighty (180) days prior to the commencement of the Renewal Term (the "Determination Date"), Landlord and Tenant shall use good faith efforts to agree upon the Fair Market Rental Rate of the Premises as of such Determination Date. The "Fair Market Rental Rate" shall be ninety five percent (95%) of the then fair market rental value of the Premises, as of the Determination Date, taking into consideration all relevant factors including, without limitation, that (1) there shall be no brokerage commission payable, (2) there shall be no free rent period or other rental concession, (3) there shall be no tenant improvement allowance, (4) the scheduled Renewal Rent provides for interim increases, and (5) there shall be no period in which the Premises remains unoccupied during which Rent hereunder shall not be paid; provided, however, that in no event shall Tenant's personalty or Alterations be taken into account in connection with the calculation of the Fair Market Rental Rate.

(C)    If the parties hereto cannot agree on the Fair Market Rental Rate within sixty (60) days after the Determination Date, as aforesaid, then, Landlord shall notify Tenant in writing ("Landlord's Notice") of such failure, which Landlord's Notice shall be given promptly after the expiration of such sixty (60) day period, and which shall designate Landlord's Qualified Appraiser (as defined below) for purposes of initiating the arbitration process provided for herein and specifying Landlord's determination of the Fair Market Rental Rate ("Landlord's Determination"). For purposes hereof the term "Qualified Appraiser" shall mean a licensed real estate broker having at least fifteen (15) years' experience in the leasing of commercial retail real estate in New York City in the immediate vicinity of the Building. Within fifteen (15) days of delivery to Tenant of Landlord's Notice, Tenant shall notify Landlord in writing ("Tenant's Notice") of Tenant's Qualified Appraiser and specifying Tenant's determination of the Fair Market Rental Rate ("Tenant's Determination") as of the Determination Date. If the difference between Landlord's Determination and Tenant's Determination is less than Twenty-Five Thousand and 00/100 Dollars ($25,000.00) per Lease Year, then the average of such determinations shall be the Fair Market Rental Rate for purposes hereof. Landlord's Qualified Appraiser and Tenant's Qualified Appraiser shall have thirty (30) days from the date of Tenant's Notice to attempt to agree upon the Fair Market Rental Rate of the Premises for such Renewal Term. If Landlord's Qualified Appraiser and Tenant's Qualified Appraiser cannot so agree as to the Fair Market Rental Rate prior to the expiration of such thirty (30) day period, and the difference between Landlord's Qualified Appraiser's determination and Tenant's Qualified

Appraiser's determination exceeds Twenty Five Thousand and 00/100 Dollars ($25,000.00) per Lease Year for the then applicable Renewal Term, then together Landlord's Qualified Appraiser and Tenant's Qualified Appraiser shall select, within ten (10) days after expiration of such thirty (30) day period, a mutually agreeable third Qualified Appraiser (the "Third Qualified Appraiser") or if unable to so agree within such ten (10) day period, then Landlord's Qualified Appraiser and Tenant's Qualified Appraiser shall immediately apply to the president of the Real Estate Board of New York (or if such organization no longer exists, then by the head of a substantially similar organization operating in the New York City area) for the selection of a Qualified Appraiser who shall act as the Third Qualified Appraiser. The Third Qualified Appraiser shall render its decision as to the Fair Market Rental Rate of the Premises as of the Determination Date within thirty (30) days after the appointment of such Third Qualified Appraiser, by choosing either the Landlord's Determination or the Tenant's Determination with respect to the Premises. The decision of the Third Qualified Appraiser shall be binding and conclusive upon Landlord and Tenant hereunder. Each of Landlord and Tenant each shall bear the costs of its own Qualified Appraiser and shall bear the costs of the Third Qualified Appraiser, if any, equally.

(D)     Unless and until the Renewal Rent shall be determined in accordance herewith, Tenant shall pay Fixed Rent for the Renewal Term at the rate that is the average of Landlord's Determination and Tenant's Determination of the Fair Market Rental Rate of the Premises. Upon determination of the Renewal Rent by arbitration pursuant hereto, the Renewal Rent so determined shall be deemed to apply retroactively to the first day of the Renewal Term, and, within twenty (20) days after such determination, Tenant shall pay to Landlord an amount equal to the difference, if any, between (a) the Renewal Rent, as so determined, with respect to the period commencing on the first day of the Renewal Term and terminating on the last day of the month during which such determination occurs, and (b) the Fixed Rent theretofore paid by Tenant with respect to such period. Any excess Fixed Rent paid by Tenant to Landlord prior to the determination of the Renewal Rent shall be credited against the next due installment of Renewal Rent once determined as aforesaid.

SECTION 1.7     Intentionally Deleted

SECTION 1.8     Net Lease

(A)     This Lease is intended to be a "net lease", and except as may otherwise be expressly provided herein, Tenant shall have sole responsibility for the care, maintenance, management, operation, control, use and occupancy of the Premises in all respects, and Tenant shall be liable for and shall bear all of the costs and expenses of the operation and maintenance of the Premises. Except as otherwise expressly provided herein, Tenant shall not be entitled to any abatement, reduction, setoff, counterclaim, defense or deduction with respect to any Rent or other sum, charge, cost, expense, payment or deposit payable by Tenant hereunder, nor shall the obligations of Tenant hereunder be affected, by reason of, without limitation, any of the following: (i) any damage or destruction of the Premises or any part thereof, (ii) any taking of the Premises or any part thereof by condemnation or otherwise; (iii) any prohibition, limitation, restriction or prevention of Tenant's use, occupancy or enjoyment of the Premises or any part thereof, or any interference with such use, occupancy or enjoyment by any party other than Landlord or any party claiming by, through or under Landlord; (iv) any default by Landlord

under this Lease or under any other agreement; (v) the impossibility or illegality of performance by Landlord, Tenant or both; (vi) any action of any Governmental Authority; or (vii) any other cause whether similar or dissimilar to the foregoing.

(B)    Except as expressly provided to the contrary in this Lease, (i) the parties intend that the obligations of Tenant hereunder shall be separate and independent covenants and agreements and shall continue unaffected unless such obligations shall have been modified or terminated pursuant to an express provision of this Lease; and (ii) each provision hereof shall be separate and independent and the breach of any such provision by Landlord shall not discharge or relieve Tenant from its obligations to perform each and every covenant to be performed by Tenant hereunder.

(C)    Except as expressly provided to the contrary in this Lease, Tenant waives all rights to terminate or surrender this Lease and to any abatement or deferment of Rent or any other sum payable hereunder.

## ARTICLE II

### Rent

SECTION 2.1    Fixed Rent; Additional Rent

(A)    Annual fixed rent ("Fixed Rent"), commencing on the Rent Commencement Date, shall be paid in equal monthly installments in advance on the first day of each and every calendar month of every Lease Year of the Lease Term as set forth below (with the Fixed Rent for the first full calendar month that Fixed Rent is due hereunder payable on the date hereof), and, in the event that the Rent Commencement Date shall occur on a date other than the first day of a calendar month, then on the first day of the first calendar month next succeeding the month in which the Rent Commencement Date shall occur Tenant shall pay to Landlord a sum equal to $871.23 multiplied by the number of days in the period from the Rent Commencement Date to the last day of the month in which the Rent Commencement Date shall occur. The Fixed Rent shall be paid to Landlord during the following periods at the following rates:

| Lease Year | Annual Amount | Monthly Amount |
|:----------:|:-------------:|:--------------:|
| 1 | $318,000.00 | $26,500.00 |
| 2 | $327,540.00 | $27,295.00 |
| 3 | $337,366.20 | $28,113.85 |
| 4 | $347,487.19 | $28,957.27 |
| 5 | $357,911.80 | $29,825.98 |
| 6 | $368,649.16 | $30,720.76 |
| 7 | $379,708.63 | $31,642.39 |
| 8 | $391,099.89 | $32,591.66 |
| 9 | $402,832.89 | $33,569.41 |
| 10 | $414,917.87 | $34,576.49 |

000426-008/00058606-10                {000426-008/00058606-10}

(B)    In addition to Fixed Rent, Tenant shall pay to Landlord Additional Rent, commencing on the Commencement Date, as provided in Article III and elsewhere in this Lease (Fixed Rent and Additional Rent, collectively, "Rent"). All Rent shall be paid to Landlord, at its office, or at such other place or places as Landlord shall designate to Tenant, in lawful money of the United States of America.  For the purposes of this Lease, "Additional Rent" shall mean all sums of money, other than Fixed Rent, as shall become due and payable from Tenant to Landlord under or pursuant to this Lease.

SECTION 2.2     Manner of Payment

Tenant shall pay Rent as and when the same shall become due and payable, without demand therefor, and without any abatement, setoff or deduction whatsoever except as expressly provided in this Lease, and shall keep, observe and perform each and every covenant and agreement herein contained on its part to be kept, observed and performed.

SECTION 2.3     Calculation of Annual Fixed Rent for Renewal Terms

Annual Fixed Rent for the first Lease Year of the Renewal Term shall be the Fair Market Rental Rate as of the Determination Date, as determined as set forth in Section 1.6 hereof, and shall be paid in equal monthly installments in advance on the first day of each and every calendar month of such Lease Year. The Annual Fixed Rent for the second Lease Year of the Renewal Term and for each subsequent Lease Year during the Renewal Term shall be paid in equal monthly installments in advance on the first day of each and every calendar month of each such Lease Year in an amount equal to 103% of the Annual Fixed Rent payable during the immediately prior Lease Year.

## ARTICLE III

### Real Estate Taxes

SECTION 3.1     Tenant's Tax Payment

If in any Subsequent Year, Real Estate Taxes shall be greater than Real Estate Taxes for the Base Tax Year, then Tenant shall pay, in addition to the Fixed Rent, and as Additional Rent for such Subsequent Year, an amount (hereinafter "Tenant's Tax Payment") equal to Tenant's Proportionate Share of such increases.  Such Additional Rent shall be paid by Tenant notwithstanding the fact that Tenant may be exempt, in whole or in part, from the payment of any Real Estate Taxes due to Tenant's diplomatic, charitable, or otherwise tax exempt status, or for any other reason at all.

SECTION 3.2     Tax Statement and Timing of Tax Payment

(A)    Landlord shall furnish a Tax Statement to Tenant promptly after each June 30th and December 31st of each calendar year occurring during the Term with respect to Tenant's Tax Payment due for the immediately following six-month period, and Tenant shall pay Tenant's Tax Payment to Landlord with respect to such period within fifteen (15) days after receipt of

000426-008/00058606-10                    {000426-008/00058606-10}
11

such Tax Statement. In the event a maintenance or similar invoice from the Corporation does not specify the amount of such charges are allocable to Real Estate Taxes, the Landlord shall deliver an invoice to Tenant that calculates Tenant's Tax Payment based upon invoices for Real Estate Taxes generated by the New York City Department of Finance or any successor taxing agency.

(B)    At Landlord's option, Landlord may invoice Tenant and Tenant shall remit Tenant's Tax Payment for each Subsequent Year in monthly installments in an amount equal to one-twelfth (1/12) of Tenant's Tax Payment reasonably estimated by Landlord, which installments shall be due and payable as Additional Rent, and paid together with the monthly installment of Fixed Rent. Tenant's Tax Payment for each Subsequent Year shall be due and payable as Additional Rent, together with the monthly installment of Fixed Rent, in an amount equal to one-twelfth (1/12) of Tenant's Tax Payment reasonably estimated by Landlord. If the amount of such monthly payment exceeds the actual amount due for a Tax Year, the overpayment shall be credited to Tenant's next succeeding payment of Rent or refunded to Tenant if at the end of the Term Tenant does not owe any Rent or Additional Rent to Landlord. If the amount paid by Tenant shall be less than the actual amount due, Tenant shall pay the difference to Landlord by the later of (i) thirty (30) days after receipt of notice thereof from Landlord or (ii) the date that the next installment of Fixed Rent shall become due and payable. Landlord's failure to render a Tax Statement with respect to any Tax Year shall not prejudice Landlord's right thereafter to render a Tax Statement with respect to any such Tax Year nor shall the rendering of a Tax Statement prejudice Landlord's right thereafter to render a corrected Tax Statement for that Tax Year, provided that Tenant shall have no obligation to pay any amounts in respect of a Tax Statement or corrected Tax Statement which is not delivered to Tenant within eighteen (18) months after the end of the applicable Tax Year.

SECTION 3.3    Adjustments to Tenant's Tax Payment

Only Landlord or the Corporation shall be eligible to institute tax reduction or other proceedings to reduce the assessed valuation of the Building. In the event that the assessed valuation for any Tax Year occurring within the Lease Term is reduced (as a result of settlement, final determination of legal proceedings or otherwise) then (i) the Real Estate Taxes imposed upon the Building in respect of the applicable Tax Year shall be retroactively adjusted to reflect such reduction, (ii) Tenant's Tax Payment shall be adjusted accordingly, subject to adjustment for Tax Expenses as provided herein, and (iii) Tenant shall receive a credit against Tenant's Tax Payment in the amount of Tenant's Proportionate Share of such reduction as adjusted in accordance with the provisions hereof.

SECTION 3.4    Tax Refunds

If, after Tenant shall have paid Tenant's Tax Payment including Tenant's Proportionate Share of Tax Expenses with respect to any Tax Year, Landlord shall receive a refund of any portion of the Real Estate Taxes with respect to such Tax Year by final determination of legal proceedings, settlement or otherwise, Landlord shall promptly after receiving such refund pay Tenant its Proportionate Share of such refund or, at Landlord's option if the Lease Term shall not have expired or been terminated, credit Tenant's Proportionate Share

000426-008/00058606-10                    {000426-008/00058606-10}

12

of such refund against the next succeeding installment(s) of Rent coming due.

SECTION 3.5    Prorated Allocation

In the event this Lease shall expire or terminate on a day other than the last day of a Subsequent Year, Tenant's Tax Payment for such Subsequent Year shall be prorated as of the date of such expiration or termination, so that Tenant shall be required to pay only such proportion thereof as the portion of such Subsequent Year prior to such expiration or termination bears to the entire Subsequent Year.

SECTION 3.6    Tax Statement Binding

Any Tax Statement sent to Tenant shall be binding upon Tenant unless, within ninety (90) days after such statement is sent, Tenant shall send a written notice to Landlord objecting to such statement and specifying the respects in which such statement is claimed to be incorrect.  Pending the determination of such dispute Tenant shall pay all amounts of the Additional Rent shown on such statement, and such payment and acceptance shall be without prejudice to Tenant's position.

SECTION 3.7    No Rent Reduction

In no event shall the Rent (exclusive of the adjustments described in this Article III) be reduced by virtue of any decrease in Real Estate Taxes.

SECTION 3.8    Survival

The expiration or termination of this Lease during any Tax Year for any part or all of which there is Additional Rent payable under this Article III shall not affect the rights or obligations of the parties hereto respecting such Tax Year, and any statement relating to Tenant's Tax Payment with respect to such Tax Year may be sent to Tenant subsequent to, and all such rights and obligations shall survive, any such expiration or termination, provided that Tenant shall have no obligation to pay any amounts in respect of a Tenant's Tax Payment if the statement relating thereto is not delivered to Tenant within eighteen (18) months after the end of such Tax Year.  Any payments due under such statement shall be payable within twenty (20) days after such statement is sent to Tenant.

SECTION 3.9    Intentionally Omitted

SECTION 3.10    Non-Payment of Additional Rent

Any Additional Rent due under this Lease shall be collectible by Landlord in the same manner as the Fixed Rent, and Landlord shall have all rights with respect thereto as it has with respect to the Fixed Rent, including all remedies for non-payment thereof.

**ARTICLE IV**

**Condition of Premises**

000426-008/00058606-10                    {000426-008/00058606-10}

13

SECTION 4.1     Condition of Premises

Notwithstanding anything to the contrary set forth in this Lease or in the Exhibits hereto, Tenant warrants, represents and acknowledges:

(A)     It has inspected the Premises, is fully familiar with the physical condition and state of repair thereof and all other matters relating to this Lease, and, subject to Landlord's Work, agrees to accept the Premises "as is", in its present state and condition, subject to reasonable use, wear, tear and natural deterioration, without any reduction, set-off, or abatement of Rent and without any charge to Landlord whatsoever for any change in such state and condition by reason thereof subsequent to the date of this Lease.

(B)     Before entering into this Lease, Tenant has made such examination of the Premises and all other matters affecting or relating to this Lease as it deemed necessary.  In entering into this Lease, Tenant has not been induced by and has not relied upon any representations, warranties or statements, whether express or implied, made by Landlord or any agent employee or other representative of Landlord, or any other person representing or purporting to represent Landlord, that are not expressly set forth in this Lease, whether or not such representations, warranties or statements were made in writing or orally.

(C)     Tenant further acknowledges that, except with respect to Landlord's obligation to deliver a temporary or final Certificate of Occupancy permitting the Premises to be used for retail use (the "Retail CO"), Landlord has not made any representation as to whether Tenant's use is permitted under any zoning laws or under any certificates of occupancy for the Building of which the Premises forms a part.  Moreover, in the event a new or amended certificate of occupancy is required as a result of any proposed alteration by Tenant, then Tenant shall diligently proceed to cause amendment of the Retail CO and shall be obligated to pay any and all amounts required to be paid in connection therewith, including, but not limited to, permit fees, architect's fees and any other cost and/or expense incurred by either Landlord (out-of-pocket only) or Tenant as a result of obtaining a new certificate of occupancy or amending the present certificate of occupancy on behalf of Tenant at Tenant's request.

SECTION 4.2     Certificate of Occupancy

Landlord agrees, at Landlord's sole expense, to (i) diligently perform all work necessary to obtain the Retail CO, (ii) at all times during the Term, maintain a temporary or final certificate of occupancy that permits the Premises to be used for retail use, and (iii) obtain a Final Retail CO (as hereinafter defined) as soon as reasonably possible after the issuance of a temporary Retail CO.  Landlord shall endeavor to deliver to Tenant copies of any renewed temporary Retail CO and the Final Retail CO.  In the event that Landlord does not obtain a final certificate of occupancy that permits the Premises to be used for retail use (the "Final Retail CO") by the date that is the three (3) year anniversary of the Commencement Date, the Fixed Rent shall be reduced by twenty-five percent (25%) until such time as the Final Retail CO is obtained. Notwithstanding anything to the contrary contained herein, in the event that no valid Retail CO exists and a Governmental Authority takes affirmative actions to cause Tenant to cease business operations at the Premises as a result thereof, Tenant's obligation to pay Rent shall abate until such time as a valid Retail CO is obtained.  The period of time in which Tenant is entitled to an

abatement of Rent as a result of the foregoing shall be referred to as the "CO Rent Abatement Period." In the event the duration of the CO Rent Abatement Period is in excess of one hundred twenty (120) days, Tenant shall have the right to terminate this Lease in which event Landlord shall return the Security Deposit and any other amounts pre-paid to Landlord by Tenant, and shall pay to Tenant the Tenant Build-Out Expense (as hereinafter defined), and thereafter neither party shall have any further obligations or liability hereunder except as and to the extent same expressly survives the expiration of this Lease.  As used in this Section 4.2, the "Tenant Build-Out Expense" shall mean, as of the time of determination, the unamortized portion (amortized on a straight-line basis over the initial term of the Lease) of the actual cost of the Tenant's initial build-out of the Premises, based upon expenses documented and provided to Landlord prior to or after Tenant opening for business to the public at the Premises.  In no event shall the Tenant Build-Out Expense payable to Tenant hereunder exceed Seventy-Five Thousand Dollars ($75,000.00).  In the event the duration of the CO Rent Abatement Period is in excess of one hundred eighty (180) days, provided that Landlord used due diligence and commercially reasonable efforts (which may include the obligation to spend a reasonable amount of money in connection therewith) during such period to cause a temporary Retail CO to be issued, and the failure of such temporary Retail CO to be issued was not the result of Landlord's bad acts or Landlord's failure to act, then after the expiration of such one hundred eighty (180) day period, Landlord shall have the right to terminate this Lease in which event Landlord shall return the Security Deposit and any other amounts pre-paid to Landlord by Tenant, and shall pay to Tenant the Tenant Build-Out Expense (as defined above), and thereafter neither party shall have any further obligations or liability hereunder except as and to the extent same expressly survives the expiration of this Lease.  If Landlord shall terminate this Lease in accordance with the preceding sentence, Landlord shall not lease the Premises or any portion thereof to another tenant for retail use within twelve (12) months after the termination of this Lease unless Landlord shall first offer Tenant in writing the right to lease the Premises upon the same terms and conditions as are set forth in this Lease for the balance of the Term of this Lease (had this Lease not been terminated) and Tenant shall fail to accept such offer in writing within thirty (30) days.

## ARTICLE V

### Use of Premises

SECTION 5.1     Use

The ground floor portion of the Premises shall be used solely for the sale at retail of clothing, accessories and footwear and the lower level shall be used solely for storage related to the business conducted on the ground floor (the "Permitted Use") and for no other purpose whatsoever.  If and to the extent that the Special Permit (as hereinafter defined) and all applicable Laws permit the installation of a food and beverage kitchenette (which shall include a sink, microwave, refrigerator, coffee/expresso machine and other small foodservice appliances) in the Premises for the use solely by Tenant's employees (and not for service to the public), then such use shall be deemed to be part of the Permitted Use, but only to the extent that it is an accessory use to a primary use of the Premises that is a non-food and non-beverage use; provided, however, that (1) Landlord makes no representation or warranty that any such use will

000426-008/00058606-10                {000426-008/00058606-10}

ever be permitted; (2) Tenant shall be responsible for any filings, certificates, approvals and applications in connection therewith (including without limitation any amendment to the certificate of occupancy and/or the Special Permit) and the same shall be at Tenant's sole cost and expense; (3) such use is subject to the approval of the Corporation; (4) Landlord shall have the right to review and reasonably approve, at Tenant's sole cost and expense, any such application and/or filing (it being agreed that Landlord shall use commercially reasonable efforts to cooperate with Tenant in connection therewith at no out-of-pocket cost to Landlord); and (5) any Alteration in connection therewith shall be subject to Landlord's prior written approval (if such approval shall be required under Section 23.1 hereof). In the event Tenant assigns this Lease or subleases the Premises in accordance with the provisions of Article X below, Tenant shall be permitted to change the Permitted Use, provided that such use (i) is in compliance with all applicable Laws (as hereinafter defined), including without limitation the Retail CO and the Special Permit, and is otherwise in compliance with this Lease (including without limitation Section 5.3 below); (ii) is permitted in writing by the Corporation; and (iii) does not include the service of food or drink in any capacity that is then prohibited by the Corporation or any document, declaration, instrument or agreement to which the Corporation is bound (including without limitation, the Special Permit). Notwithstanding anything to the contrary contained herein, Landlord agrees to use commercially reasonable efforts to cooperate with Tenant in obtaining the Corporation's approval and the approval of the applicable Governmental Authorities to permit food and drink service at the Premises by Tenant or any entity related to the Tenant that has common ownership and control with Tenant, but at no out-of-pocket cost to Landlord, it being agreed that, upon receipt of such approvals, such food and drink service shall be deemed to be part of the Permitted Use. Tenant hereby acknowledges that as of the date hereof, all food and drink service is prohibited at the Premises, and Landlord makes no representation or warranty to the Tenant that the Corporation and/or the applicable Governmental Authorities will ever consent to food and drink service at the Premises. Tenant shall comply with all Laws relating to the Premises and Tenant's use thereof, including without limitation, Laws requiring the Premises to be closed on Sundays or any other days or hours, health, safety and building codes, and any permit or license requirements. Landlord makes no representation that the Premises are suitable for Tenant's purposes. In no event shall the Tenant use the Premises or any part thereof for conducting therein a discount or second-hand store, auction, distress or fire sale or bankruptcy or going-out-of-business sale, provided that the foregoing shall not prohibit Tenant from conducting customary retail store sales such as end-of-season sales and close-out sales in accordance with applicable laws. Landlord reserves the right, in Landlord's sole and absolute discretion, to determine the uses to which other space in or in the vicinity of the Building shall be put.

SECTION 5.2    Advertising

Tenant shall not:

(A)    use any advertising medium such as loudspeakers, sound amplifiers or flashing lights that may be heard or seen outside the Premises; or

(B)    subject to the provisions of Section 25.1 hereof, install any banner, flag or the like on the exterior of the Building without the specific prior approval of Landlord other than any banner with the words "Grand Opening" or words of similar import, which banner shall be

permitted during the first ninety (90) days of the Term only.

SECTION 5.3    Prohibited Conduct

Tenant shall not, without the consent of Landlord, use, or permit the use of the Premises or any part thereof for: (1) demonstrations to the public; (2) except as may be expressly permitted pursuant to Section 5.1 above, the sale of candy, food, cigarettes, cigars, tobacco, newspapers, magazines, beverages or similar items or for the preparation, dispensing or consumption of food or beverages in any manner whatsoever; (3) manufacturing, printing or electronic data processing, except for the operation of normal business office equipment and machines for Tenant's own requirements, as distinguished from operation for commercial hire or for the sale of products or services to others; (4) rendition of medical, dental or other diagnostic or therapeutic services; (5) maintenance of any gambling or gaming activities or any political activities or any club activities, whether public or private, or a school of any kind or an employment or placement agency; (6) the offices or business of a governmental or quasi-governmental bureau, department or agency, foreign or domestic, including an autonomous governmental corporation or diplomatic or trade mission; (7) an employment agency, executive search firm or similar enterprise or vocational training center or classrooms; (8) a telephone or secretarial or a messenger service; (9) a company engaged in the business of renting office or desk space; (10) a public finance (personal loan) business (other than a savings bank); (11) operate any coin or token operated vending machine or similar device for the sale of any goods, foods or beverages, including, without limitation, amusement devices (12) the sale, lease or rental of video tapes or DVDs; or (13) any use prohibited by the Cooperative Documents. In addition, Tenant agrees not to bring, or permit to be brought, any obscene or pornographic material into the Premises, and shall not permit or conduct any obscene, nude, or semi-nude live performances at the Premises, nor shall Tenant permit the use of the Premises for nude modeling, or for so-called "rubber-goods" shops, or as a sex club of any sort, or as a "massage parlor". Tenant agrees further that Tenant will not permit any of these uses by any sublessee or assignee of the Premises. This Section shall directly bind any successors in interest to Tenant. Notwithstanding anything to the contrary contained herein, in the event of a breach of this Lease arising from a violation of any of the provisions of this Article V, Tenant shall cure the same within five (5) business days of receipt of a notice from Landlord. Pornographic material is defined for purposes of this Section as any written or pictorial matter with prurient appeal and any objects or instruments that are primarily concerned with lewd or prurient sexual activity. Obscene material is defined here as it is in New York Penal Law §235.00.

SECTION 5.4    Window Cleaning

Tenant will not clean nor require, permit, suffer or allow any window in the Premises to be cleaned from the outside in violation of Section 202 of the New York State Labor Law or any other applicable law or of the Rules of the Board of Standards and Appeals, or of any other Board or body having or asserting jurisdiction.

SECTION 5.5    Additional Use Covenants

Tenant shall, throughout the Term of this Lease, operate the business located at the Premises in a reputable manner and in a manner that shall not detract from the character or

appearance of the Building.  Accordingly, Tenant shall (i) keep and maintain the Premises and Tenant's personal property and signs therein or thereon and the exterior and interior portions of all windows, doors and all glass or plate glass in a neat, clean, sanitary and safe condition; (ii) clean the inside and outside of the storefronts whenever necessary, in the reasonable judgment of Landlord; (iii) apply for, secure, maintain and comply with all licenses or permits (other than the Retail CO to be obtained by Landlord pursuant to Section 4.1(C) above) that may be required for the conduct by Tenant of the Permitted Use and to pay, if, as and when due all license and permit fees and charges of a similar nature in connection therewith and provide Landlord with copies thereof upon request; and, (iv) keep the Premises neat and clean, free from waste, offensive odors, and, in orderly and sanitary condition, free of vermin, rodents, bugs and other pests, including, but not limited to keeping the sidewalk adjacent to the Premises, from the edge of the storefront until 18" into the street free from refuse, snow, ice and debris.

## ARTICLE VI

### Tenant's Property

SECTION 6.1    Tenant's Property

All fixtures, equipment, improvements and installations attached to, or built into, the Premises at the commencement of or during the Term ("Tenant's Property"), other than Moveable Property (as hereinafter defined) shall be and remain part of the Premises and be deemed the property of Landlord.  Landlord is hereby granted the benefit of any applicable lien on Tenant's Property located in or on the Premises as may be permitted under the laws of New York to secure the performance of Tenant's obligations and this Lease shall be deemed to be a security agreement.  Tenant shall not remove or permit the removal of Tenant's Property until the lien has been removed and all defaults under this Lease have been cured.  If Tenant is in default, Landlord shall be entitled to pursue such remedies and institute such actions and proceedings to enforce such lien as are permitted by law.  Upon demand by Landlord, Tenant will execute UCC Financing Statements pertaining to all property on the Premises.  Landlord agrees to subordinate its security interest to institutional financing to be procured by Tenant, provided said financing is not excessive and the proceeds are utilized to improve the Premises. Prior to the expiration or earlier termination of this Lease, Tenant shall remove all or part of Tenant's Property that constitutes Moveable Property from the Premises, and Tenant shall repair, or shall reimburse Landlord upon demand for the cost of repairing, any damage to the Premises or the Building occasioned by such removal.  Any of Tenant's Property that constitutes Moveable Property that shall not be removed as aforesaid may be removed by Landlord at Tenant's expense or, if not so removed, shall be deemed to have been abandoned by Tenant. "Moveable Property" means all moveable furniture, equipment and any other items that are the property of Tenant, and shall be deemed to include, without limitation, all shelving, lighting, fixtures and artwork, whether or not the same are affixed to the Premises.

## ARTICLE VII

### Utilities

SECTION 7.1    Utilities

It is specifically understood and agreed that, except as expressly provided in this Lease (including, without limitation, Exhibit B attached hereto), Landlord shall not be required to furnish or provide any services whatsoever, including, but not limited to, utilities, heat, sewer, air conditioning, gas, electricity, cleaning service, exterminating services, garbage removal, security or any other kind of service or utility in or to the Premises, except that Landlord shall ensure that not less than 200 amps of electricity and water for normal lavatory and drinking purposes are supplied at all times to the entry points in the Premises. Tenant's consumption of electricity shall be measured for all purposes by a separate meter, as presently installed, or if not so installed, to be installed by Landlord at Landlord's expense in the lower level of the Premises as described on Exhibit B attached hereto. Throughout the duration of Tenant's occupancy, Tenant shall, at Tenant's sole cost and expense, keep said meters and installation equipment in good working order and repair. Tenant shall arrange with the utility companies to obtain electricity and shall pay directly to the utility companies for the electricity consumed on the Premises and if Tenant shall fail to perform such maintenance or make such payment, Landlord shall have the right, but not the obligation, after fifteen (15) days' notice to Tenant, to perform such maintenance or pay such charges and in such event, Tenant shall within twenty (20) days of Landlord's demand therefor, pay to Landlord, as Additional Rent, an amount equal to the reasonable and actual out-of-pocket cost of such maintenance or the amount expended by Landlord to pay such charges, plus interest on such amount at the rate set forth in Section 16.2 hereof from the date of such payment by Landlord to the date Tenant makes its payment to Landlord. Landlord shall supply cold water to the Premises at no additional charge to Tenant.

Tenant shall at all times comply with the rules, regulations, terms and conditions applicable to service, equipment, wiring and requirements of the public utility supplying electricity to the Building. Tenant shall not use any electrical equipment that, in Landlord's reasonable judgment, would exceed the capacity of the feeders, risers and other electrical installations serving the Premises or interfere with the electrical service to other tenants of the Building. In the event that, in Landlord's reasonable judgment, Tenant's electrical requirements necessitate installation of an additional riser, risers or other proper and necessary equipment, Landlord shall notify Tenant of same. Within fifteen (15) days after receipt of such notice, Tenant shall either cease such use of such additional electricity or shall request that additional electrical capacity (specifying the amount requested) be made available to Tenant. Landlord, in Landlord's reasonable judgment shall determine whether to make available such additional electrical capacity to Tenant and the amount of such additional electrical capacity and the same necessitates installation of an additional riser, risers or other proper and necessary equipment including, without limitation, any switchgear, the same shall be installed by Landlord at Tenant's sole cost and expense, and shall be chargeable and collectible as Additional Rent and paid within thirty (30) days after the rendition of a bill to Tenant therefor, together with reasonable supporting documentation. Tenant shall make no alterations or additions to the electrical system in the Building without the prior written consent of Landlord, and if required by the Cooperative Documents, the Corporation.

Tenant shall, at Tenant's sole cost and expense, enter into a contract with a trash removal and disposal company fully licensed to remove and dispose of trash in New York, which company shall regularly remove Tenant's trash from the Premises and dispose of same.

SECTION 7.2    Landlord's Liability

000426-008/00058606-10                    {000426-008/00058606-10}

Landlord shall in no manner be liable for any failure, inadequacy or defect in the character or supply of alternating electric current, gas, water or steam furnished to the Premises by any public or private service company or any other supplier thereof if such inadequacy or defect is not due to the negligence or willful misconduct of Landlord, its agents, servants or employees (Landlord shall in any event, to the extent the same is within its control, use commercially reasonable efforts to minimize the effect of such failure, inadequacy or defect and to eliminate the same at the earliest practicable time).

SECTION 7.3    Stoppage or Interruption of Services

Landlord or the Corporation may stop or interrupt the supply of alternating electric current, gas, water, chilled water or steam at such times as may be necessary and for as long as may reasonably be required by reason of accidents, strikes, the making of repairs, alterations or improvements, inability to secure a proper supply of fuel, gas, water, electricity, labor or supplies or by reason of any cause beyond the reasonable control of Landlord or the Corporation; provided, however, that Landlord shall use its commercially reasonable efforts (except in an emergency) such that any such stoppage or interruption for the purpose of making any repair, alteration or improvement shall be made at such times and in such manner as to minimize any unreasonable interference with Tenant's use of the Premises, and Landlord shall give reasonable prior notice of not less than three (3) days (except in the event of emergency, when notice shall not be required) of the anticipated commencement, duration and nature thereof. Except as provided below in this Section 7.3, Tenant shall not be entitled to any abatement of Rent or other compensation nor shall this Lease or any of Tenant's obligations hereunder be affected by reason of such stoppage or interruption. Notwithstanding the foregoing to the contrary, in the event Landlord takes any action that causes the electricity or water service to the Premises to be interrupted for more than five (5) consecutive business days, and the Tenant ceases business operations at the Premises as a result thereof during the period of such interruption, Tenant's obligation to pay Rent shall abate commencing on the day after such five (5) consecutive business day period, and shall resume upon the earlier to occur of: (i) resumption of regular electricity and/or water service (as applicable) to the Premises, or (ii) resumption by Tenant of business operations at the Premises.

SECTION 7.4    Sprinkler

Anything elsewhere in this Lease to the contrary notwithstanding, if the Corporation, the Insurance Services Office or any bureau, department or official of the federal, state or city government require or recommend the installation of a sprinkler system or that any changes, modifications, alterations, or additional sprinkler heads or other equipment be made or supplied in an existing sprinkler system by reason of Tenant's business, or the location of partitions, trade fixtures, or other contents of the Premises, Tenant shall, at Tenant's expense, promptly make such sprinkler system installations, changes, modifications, alterations, and supply additional sprinkler heads or other equipment as required, whether the work involved shall be structural or non-structural in nature. Notwithstanding the foregoing, Landlord shall have the right, at Landlord's option and at Tenant's expense, make such sprinkler system installations, changes, modifications and/or alterations, as required.

**ARTICLE VIII**

000426-008/00058606-10                    {000426-008/00058606-10}

20

**Various Covenants**

SECTION 8.1      Various Covenants

Tenant shall:

(A)      take good care of the Premises, keep the Premises in a neat and clean condition and pay the cost of any injury, damage or breakage done by Tenant or by its employees, licensees or invitees, except as provided in Section 9.1 and Article XII;

(B)      observe and comply with the reasonable rules and regulations as Landlord at any time may adopt, promulgate and communicate on reasonable notice to Tenant (any consent or approval by Landlord required under any of such rules and regulations not to be unreasonably withheld or delayed); a list of the current Rules and Regulations are attached hereto as Exhibit D; provided, however, that in the event of a conflict between any Rules and Regulations (whether attached hereto or hereinafter adopted by Landlord), the provisions of this Lease shall govern and be binding;

(C)      permit Landlord and/or the Corporation, and any holder of an underlying mortgage, and their agents, contractors and representatives, on reasonable notice and accompanied by an authorized representative of Tenant (except in an emergency), to enter the Premises at such hours as shall not unreasonably interfere with Tenant's business (i) to inspect the same, (ii) to comply with any law, order or requirement of any Governmental Authority or insurance body or (iii) to exercise any right reserved to Landlord under Article XI or elsewhere in this Lease, provided that Landlord shall use its commercially reasonable efforts (except in an emergency) such that any such entry shall be made at such times and in such manner as to minimize any interference with Tenant's use of the Premises;

(D)      make no claim against Landlord for any injury or damage to Tenant or to any other person or for any damage to, or loss (by theft or otherwise) of, or loss of use of, any property of any other person, unless caused by the willful misconduct or negligence of Landlord, its agents, servants or employees;

(E)      make no alteration, change, addition, improvement, repair or replacement in, to, or about, the Premises (a "Tenant Change") without the prior consent of Landlord, and the Corporation, if required by the Cooperative Documents, in accordance with Article XXIII hereof.

(F)      promptly and duly pay all costs and expenses incurred for or in connection with any Tenant Change and discharge, within forty-five (45) days after Tenant's receipt of notice thereof, by payment, bonding or otherwise as provided by law any mechanic's or other lien created against the Building in connection with any Tenant Change;

(G)      not violate, or permit the violation of, any condition imposed by the standard "all risk" insurance policy issued for similar buildings in the City of New York, and not do, suffer or permit anything to be done, or keep, suffer or permit anything to be kept, in the Premises that would increase the fire or other casualty insurance rate on the Building or the

property therein, or that would result in insurance companies of good standing refusing to insure the Building or any such property in amounts and against risks as reasonably determined by Landlord from time to time; provided, however, that if insurance is available, Tenant shall not be in default hereunder if Tenant shall pay to Landlord the amount of any increase in the insurance premiums resulting from any increase in the insurance rate;

(H)    permit Landlord, at reasonable times upon reasonable notice and accompanied by an authorized representative of Tenant (and in a manner designed to avoid interference with the normal conduct of Tenant's business in the Premises) to show the Premises during usual business hours to any prospective purchaser or lender/mortgagee and, during the last nine (9) months of the Term, to any prospective lessee of the Premises;

(I)    Tenant's Insurance.

(1)    Tenant, at Tenant's expense, shall obtain and keep in full force and effect:

(i)    An insurance policy for Tenant's Property and Alterations made by Tenant, in either case to the extent insurable under the available standard forms of "Special Cause of Loss Form" insurance policies, in an amount equal to one hundred percent (100%) of the replacement value thereof and include coverage for the perils of flood, windstorm, earthquake and mechanical/equipment breakdown, and provide coverage extensions for demolition and increased cost of construction, civil authority and utility service interruption. The policy shall name both Tenant and Landlord, as their respective interests may appear, and include business interruption for any time during which the Premises are fully or partially untenantable due to an occurrence covered by the insurance policy. Such business interruption insurance shall include rental value insurance in an amount equal to not less than the Rent for a period of at least (12) months. The property policy where applicable, shall include plate glass coverage for all plate glass in the Premises and store front (the insurance policy described in this clause (1) being referred to herein as "Tenant's Property Policy").

(ii)    A policy of commercial general liability insurance, including without limitation, contractual liability coverage covering the indemnity agreement contained in this Lease, for the benefit of Landlord, Landlord's parent, any subsidiaries, Landlord's managing agent, Landlord's lender/mortgagee and/or ground lessor and their respective officers, directors, employees, successors, assignors and any other party Landlord may designate (collectively referred to as "Landlord Parties", each of which shall be named as additional insured under the policy), and Tenant, as their respective interests may appear. The general liability policy shall include the following minimum limits of insurance: General Aggregate (other than products/completed operations) limit $2,000,000; Products/Completed Operations Aggregate limit $2,000,000; Each Occurrence limit $1,000,000; Personal and Advertising Injury limit $1,000,000; Tenants Legal Liability limit $1,000,000; Medical Expenses limit $5,000. Such insurance policy shall (i) be an occurrence basis policy; (ii) be primary to all other insurance applicable to the Premises and operations on the Premises; and (iii) provide "first dollar" coverage. In the event that such insurance policy covers multiple locations, the General Aggregate shall apply "per location".

(iii)   Workers compensation insurance as required by law.

(iv)   Intentionally omitted.

(v)   Umbrella – Umbrella form or Excess liability insurance providing, at a minimum, "following form" coverage over the insurance policies referred to in (ii) and (iii) herein with a limit of not less than $3,000,000 per occurrence and per aggregate.

(vi)   Any insurance policies or endorsements required by the Corporation pursuant to the Cooperative Documents.

(2)   Tenant's insurance policies shall contain a provision that (i) no act or omission of Tenant shall affect or limit the obligation of the insurer to pay the amount of any loss sustained, and (ii) the policy is non-cancelable with respect to the Landlord Parties unless at least thirty (30) days of advance written notice is given to Landlord, except that Tenant's insurance policies may be cancelable on no less than ten (10) days of advance written notice to Landlord for non-payment of premium. If Tenant receives any notice of cancellation or any other notice from the insurance carrier that may adversely affect the coverage of the insureds under Tenant's insurance policies, then Tenant shall promptly deliver to Landlord a copy of such notice.

(3)   Tenant shall cause Tenant's insurance policies to be issued by reputable and independent insurers that are (i) permitted to do business in the State of New York, and (ii) rated in Best's Insurance Guide, or any successor thereto, as having a general policyholder rating of A and a financial rating of at least VIII (it being understood that if such ratings are no longer issued, then such insurer's financial integrity shall conform to the standards that constitute such ratings from Best's Insurance Guide as of the date hereof).

(4)   Tenant has the right to satisfy Tenant's obligation to carry Tenant's Property Policy and Liability Policy with a blanket insurance policy if such blanket insurance policy provides, on a per occurrence basis or per location basis, that a loss that relates to any other location does not impair or reduce the level of protection available for the Premises below the amount required by this Lease.

(5)   With respect to any loss resulting:

(i)   from property damage liability, bodily injury liability, personal and advertising injury liability, and /or medical payments (as these terms are generally understood in insurance policies then in effect covering automobile liability, commercial general liability, and/or workers compensation and employers liability), and/or

(ii)   from or for damage to Tenant's property, or to property under Tenant's care, custody, or control (including any indirect or consequential loss arising from such property damage),

which loss is covered by any insurance carried (or required to be carried under this Lease) by or for the benefit of Tenant, Tenant (and any person and/or entity claiming through Tenant) hereby releases Landlord Parties and waives any claim, based on negligence or otherwise, against

000426-008/00058606-10                    {000426-008/00058606-10}

23

Landlord Parties. Any deductible and/or self-insured retention under such insurance shall be deemed to be insurance carried by or for the benefit of Tenant.

This waiver of rights of recovery by Tenant also applies to any work done, being done or to be done by, for, or on behalf of Tenant by any contractor of Tenant, and shall survive the termination of such work or completion of such job or work.

(6)     On or prior to the Commencement Date, Tenant shall deliver to Landlord appropriate certificates of insurance required to be carried by Tenant pursuant to this Section 8.1(I), including evidence of waivers of subrogation and naming of additional insureds in either case as required by Section 8.1(I)(5). Tenant shall deliver to Landlord appropriate certificates of insurance covering each renewal or replacement of such insurance policies (and copies of such insurance policies, if specifically requested by Landlord), at least ten (10) days prior to the expiration of such policy.

(7)     If (i) Tenant (or any other person claiming by, through or under Tenant) uses the Premises for any purpose other than the Permitted Use, and (ii) the use of the Premises by Tenant (or such other person) causes the premium for any insurance policy carried by Landlord to exceed the premium that would have otherwise applied therefor if Tenant (or such person) used the Premises for the Permitted Use, then Tenant shall pay to Landlord, as Additional Rent, an amount equal to such excess, on or prior to the thirtieth (30th) day after the date that Landlord gives to Tenant an invoice therefor. Nothing contained in this Section 8.1(I)(7) expands Tenant's rights under Article V hereof.

(8)     Landlord shall have the right, at any time and from time to time during the Term, on not less than thirty (30) days' notice to Tenant, to require that Tenant increase the amounts and/or types of coverage required to be maintained under this Article VIII to the amounts or coverages then customary for first-class retail stores in the vicinity of the Building, to the extent reasonably related to the nature of the business activities of the occupants of the Premises and customer traffic in the Premises.

(9)     Tenant shall replace, at the expense of Tenant, any and all plate and other glass damaged or broken from any cause whatsoever in and about the Premises. Notwithstanding anything contained in the foregoing, Tenant shall be permitted to self-insure with respect to plate glass if Tenant is not able to obtain insurance coverage for this exposure at commercially reasonable rates.

(10)     At the expiration or any earlier termination of this Lease, Tenant shall terminate its occupancy of, and quit and surrender to Landlord, the Premises broom-clean and in good condition except for (i) ordinary wear and tear, (ii) loss or damage by fire or other casualty, and (iii) any other loss or damage with respect to which Tenant is relieved from liability pursuant to Section 12.1.

(J)     Tenant's Indemnity.

(1)     Tenant will defend, indemnify and save harmless each of the Landlord Parties from and against any and all damages, costs, reasonable attorney's fees, liability

000426-008/00058606-10          {000426-008/00058606-10}

24

and expense arising from (i) Tenant's use and occupancy of the Premises; (ii) any breach of this Lease by Tenant; (iii) any other act or omission by Tenant or by any other person or entity for whose acts or omissions Tenant is legally responsible, and (iv) any and all claims, action, complaints, allegations or suits instituted against Tenant, its subtenants or its assignees, or against Landlord, its agents, employees or affiliates, by any person or entity, including, without limitation, customers, contractors, agents or employees of other tenants, licensees, concessionaires, or agents or employees of Tenant, in connection with loss of life, bodily injury, personal injury, emotional or mental injury or distress, and/or damage to property occurring in, on or about, or arising out of Tenant's use of the Premises and/or the Premises, its entranceways or its adjacent sidewalks or loading areas, and in addition, with respect to Tenant's contractors, occurring anywhere on or about the Premises, regardless of whether caused in whole or in part by any negligent or intentional act or omission of Tenant, its subtenants, assignees, agents, employees, licensees, concessionaires, customers and/or invitees, contractors, or any other person or entity. Without limiting the generality of the foregoing, Tenant specifically acknowledges that the indemnity undertaking herein shall apply to claims in connection with or arising out of any "Alteration" as described in Article XXIII, the use or consumption of any utilities in the Premises under Article VII, any repairs or other work by or for Tenant under Section 8.3 and the transportation, use, storage, maintenance, generation, manufacturing, handling, disposal, release or discharge of any "Hazardous Substances or Waste" as described in Article XXIV (whether or not such matters shall have been theretofore approved by Landlord).

(2)    Tenant agrees to indemnify and save Landlord harmless from and against any and all bills for labor performed and equipment, fixtures and materials furnished to Tenant and applicable sales taxes thereon as required by New York law and from and against any and all liens, bills or claims therefor or against the Premises or the Building in connection with Alterations by Tenant and from and against all losses, damages, costs, expenses, suits and claims whatsoever in connection with Alterations by Tenant. The Premises and the Building shall at all times be free of liens for labor and materials supplied or claimed to have been supplied to Tenant.

(3)    The indemnity undertaking herein by Tenant shall not apply to the extent the loss, injury, or damage referred to herein is caused by or results from the negligence or willful misconduct of the Landlord Parties, or where and to the extent such indemnification by Tenant would be void by statute or under law. Tenant's indemnification of each Landlord Party, with respect to any claim, action, complaint, allegation or suit instituted against any of the Landlord Parties by an employee of Tenant or Tenant's agent, shall apply fully as set forth hereinabove and without defense or setoff pursuant to any Workers' Compensation laws. This indemnification provision shall be interpreted to be enforced to the full extent permitted by law.

(4)    Intentionally Deleted.

(5)    If any provision of this Tenant's Indemnification paragraph were to be held invalid in its current form by the law of any jurisdiction under which it is construed, then such provision shall be amended to the minimum extent necessary to comply with such law, and the provision shall be deemed to have always existed in such amended form in such jurisdiction. Tenant's obligations under this Indemnification paragraph shall survive the expiration, early termination or modification of this Lease. Each of the Landlord Parties shall

also be entitled to partial indemnification from Tenant and/or contribution from Tenant for the Landlord Party's pro rata share of liability, and/or any sums that the Landlord Party may be compelled to pay in excess of its pro rata share of liability, even where a loss arises from the joint negligence of a Landlord Party and another party.

(K)    Contractor Insurance.

(1)    During the course of Tenant's Work and Alterations pursuant to Article XXIII, in addition to any other insurance that may be required under this Lease, Tenant shall cause its contractor(s) to provide and maintain in full force and effect during the Term of this Lease, all warranty periods and other periods as specified herein, insurance policies providing coverages as specified below, with limits of liability not less than those shown herein:

a.    Commercial General Liability ("CGL") with a limit of not less than $2,000,000 General Aggregate Limit; $2,000,000 Products-Completed Operations Aggregate; $1,000,000 Personal & Advertising Injury Limit and $1,000,000 Each Occurrence Limit. The CGL insurance policy shall be endorsed to provide a separate general aggregate for this project.

b.    "Builders' risk" insurance upon the entire Tenant's Work and Alterations to the full insurable value thereof. This insurance shall include the interests of Landlord and Tenant (and their respective contractors and subcontractors of any tier to the extent of any insurable interest therein) in Tenant's Work and Alterations and shall insure against the perils of fire and extended coverage and shall include "special form" (previously known as all-risk) insurance for physical loss or damage including, without duplication of coverage, theft vandalism and malicious mischief. If portions of Tenant's Work, are stored off the site of the Building or in transit to said site are not covered under said "special form" (previously known as all-risk) insurance, then Tenant shall effect and maintain similar property insurance on such portions of the work. Any loss insured under said "builders' risk" insurance is to be adjusted with Landlord and Tenant with loss payable to Landlord, contractor and subcontractors as their respective interest may appear.

c.    Intentionally omitted.

d.    Statutory Workers' Compensation, Disability Benefits and employer's liability insurance covering all contractor employees associated with this agreement, with employers liability limits of $500,000/$500,000/$500,000, or such higher amounts as may be required from time to time by any employee benefit acts or other statutes applicable where the work is to be performed, and in any event sufficient to protect Tenant's contractor from liability

under the aforementioned acts.

       e.      Property insurance on the contractor's property, including but not limited to tools and equipment not intended to be incorporated in the Work.

       f.      Intentionally deleted.

       g.      Tenant's contractor will provide an umbrella liability insurance policy which covers the same liabilities as the liability insurance policies required in subsections a, b, d, e & f above $3,000,000 in excess of the contractor's liability insurance policies required in subsections a, b, d, e & f above.

      (2)      CGL insurance shall be written on ISO occurrence form CG 00 01 (or a substitute form providing equivalent coverage) and shall cover liability arising from premises, operations, independent contractors, products-completed operations, personal injury and advertising injury, and liability assumed under an insured contract (including the tort liability of another assumed in a business contract). There shall be no endorsements or modification of the CGL limiting the scope of coverage for liability arising from pollution, explosion, collapse or underground property damage.

      (3)      Landlord, Landlord Parties, any managing agent and such other parties as Landlord may designate, shall be included as Additional Insured parties ("Additional Insured") under the CGL, using ISO Additional Insured Endorsement CG 20 10 or its equivalent. Such policy shall include coverage for said Additional Insured with respect to liability arising out of completed operations of contractor, and which coverage shall be maintained in effect for the benefit of Additional Insured for a period of two (2) years following final acceptance. Additional Insured shall also be included as Additional Insured under the commercial umbrella policy. It is agreed that Additional Insured coverage as required in this subparagraph shall apply as primary insurance. Tenant shall cause its contractor to (x) be responsible for and (y) release Additional Insured from all liability for loss or damage to all tools, equipment, structures, property of employees and other property, the capital cost of which is not included in the cost of the work. Tenant shall cause its contractor to maintain "special form" insurance on such property in an amount equal to the full replacement value.

      (4)      Tenant shall cause its contractor to waive all rights against Additional Insured, Additional Insured's engineers, their respective affiliates, directors, officers, employees and agents from all liability for recovery of damages to the extent these damages are covered by the property, the commercial general liability, business auto liability, workers compensation and employers' liability, or commercial umbrella liability insurance maintained pursuant to this Lease.

      (5)      All insurance policies required shall be issued by a licensed, reputable, and financially stable insurance company, rate A, VIII or better in A.M. Best Rating Guide. Landlord may reject insurance written by any insurer it deems in an unsatisfactory financial condition.

(6)     Use of any subcontractor by the Tenant's contractor must be approved in writing by Landlord, which approval shall not be unreasonably withheld, conditioned or delayed.  The insurance requirements herein for Tenant's contractor, shall also apply to subcontractors.  Landlord, at its option and for its sole benefit, and its sole expense, may purchase and maintain such other insurance as it may deem necessary for the project. The purchase and maintenance of any type of insurance by Landlord shall in no way be construed or deemed to limit, discharge, waive or release the Tenant's contractor from any of its obligations under this Lease or to be a limitation on the nature or extent of said obligations.

(7)     Tenant shall cause its contractor to not commence work until all insurance required hereunder has been obtained and approved by Landlord. Approval of the insurance by Landlord shall not relieve or decrease the liability of the Tenant or Tenant's contractor hereunder.

(8)     Certificate of Insurance:

Prior to commencing the work, Tenant shall cause Tenant's contractor to furnish Landlord with a certificate(s) of insurance, executed by a duly authorized representative of each insurer, showing compliance with the insurance requirements set forth above. All certificates shall indicate "per project aggregate" as regards to the CGL coverage. All certificates shall provide 30 days' written notice to Additional Insured parties prior to the cancellation or material change of any insurance referred to therein (10 days for non-payment of premium).All certificates shall indicate "This insurance is primary" to Landlord's insurance coverage. Failure of Landlord to demand such certificate or other evidence of full compliance with these insurance requirements or failure of Landlord to identify a deficiency from evidence that is provided shall not be construed as a waiver of Tenant's obligation to cause Tenant's contractor to maintain such insurance.

SECTION 8.2     Repairs by Corporation

Landlord shall have no obligation to maintain, repair or replace any portion of the Building or Premises.  In the event any item of maintenance, repair or replacement is the obligation of the Corporation rather than Landlord pursuant to the Cooperative Documents, Landlord shall, upon Tenant's request, use commercially reasonable efforts (without the obligation to spend money) to cause the Corporation to effectuate any such item of maintenance, repair or replacement but shall not have any obligation to Tenant to effectuate same, as more particularly provided in Section 29.1(E) hereof.  Landlord shall have no liability to Tenant upon the Corporation's failure or delay to effectuate any item of maintenance, repair or replacement. If any damage is caused by any act, alteration, negligence or omission of Tenant, Tenant shall be required to repair such damage, or reimburse Landlord, within thirty (30) days after demand, for the reasonable out-of-pocket cost thereof, if Landlord in its sole discretion elects to make such repair.  Nothing contained herein shall require Landlord to undertake any such work.  All other repairs to the Premises shall be at Tenant's sole cost and responsibility.

SECTION 8.3     Repairs by Tenant

(A)     Tenant, at its sole cost and expense, shall keep the Premises, stairways, sidewalks, curbs and the windows to the Premises, if any of the foregoing exist, clean and in

000426-008/00058606-10                    {000426-008/00058606-10}

28

good repair and condition and free of accumulation of dust, rubbish, snow and ice; provided, however, that Tenant shall not be required to keep such sidewalks in good repair and condition (it being understood that the same is the Corporation's responsibility under the Cooperative Documents). Tenant shall install, maintain, operate, repair and replace, at its sole cost and expense Tenant's heating, ventilation and air conditioning system and equipment ("HVAC"), the utilities, plumbing and electrical and all other systems serving and located within the Premises. In the event that a violation is placed against Tenant, Landlord, Corporation and/or the Premises, caused by Tenant's actions or omissions by the Department of Buildings, the Environmental Control Board, or any other governmental/municipal, administrative or legal agency, with regard to the sidewalks adjoining the Premises for accumulation of rubbish, snow or ice then Tenant shall remedy any such violation and pay any fines, penalties and interest related to such violation. In the event Tenant fails to comply with its obligations hereunder, then Landlord shall have the right but not the obligation to perform such obligations, after thirty (30) days' notice to Tenant, and charge Tenant the reasonable out-of-pocket costs incurred by Landlord as Additional Rent, and Tenant shall pay same within thirty (30) days of being billed for same. Tenant waives the benefit of any applicable law purporting to allocate Tenant's responsibility for repairs other than as set forth in this Lease or affording Tenant any right to make repairs at the expense of Landlord or to terminate this Lease on the basis of any necessary repairs. Notwithstanding anything to the contrary contained herein, Tenant shall be responsible for the repair and maintenance of all parts of the Premises, except that Tenant shall not be responsible for repairing, maintaining or replacing any structural elements of the Premises (except in the event the need for such repair, maintenance or replacement is as a result of the act, alteration, negligence or omission of Tenant).

(B)    Tenant shall not place a load upon any floor in the Premises or in the Building exceeding the lesser of one hundred twenty (120) pounds per square foot "live load" or the limit allowed by applicable law. If Tenant shall move any safe, heavy machinery, heavy equipment, business machines, freight, bulky matter or fixtures into or out of the Building and such safe, machinery, equipment, freight, bulky matter or fixtures requires special handling, Tenant shall employ only persons holding a master rigger's license to do said work. All work in connection therewith shall comply with all legal and insurance requirements and any rules and regulations for the Building that may be adopted by the Corporation from time to time during the term of this Lease, and the reasonable rules and regulations adopted by Landlord from time to time, and shall be done at any time, provided that if such work is reasonably likely to materially interfere with the operation of the Building or unreasonably interfere with the use and occupancy of the Building by other tenants, then such work shall be done during such hours as Landlord may reasonably designate. Business machines and mechanical equipment shall be placed and maintained by Tenant at Tenant's expense in settings sufficient in Landlord's reasonable judgment to absorb and prevent vibration, noise and annoyance.

SECTION 8.4    Corporation's insurance.

Landlord agrees not to take any action or cast any vote to cause the Corporation to reduce the limits or type of insurance coverage that it currently maintains. In the event the Corporation is considering reducing such insurance, Landlord agrees to request that the Corporation refrain from such action.

SECTION 8.5    Violations

In the event any violation from the Department of Buildings, the Environmental Control Board, or any other governmental/municipal, administrative or legal agency is placed against Landlord, the Corporation, the Premises or the Building as a result of Tenant's use of the Premises, Tenant's Alterations or Tenant's acts or omissions and such violation (i) impedes Landlord's ability to perform its obligations under any other lease for space in the Building, or (ii) impedes the ability of Landlord, the Corporation or any other tenant of the Building to obtain permits from the New York City Department of Buildings or any other governmental/municipal agency, or (iii) impedes Landlord's, the Corporation's or any other Tenant's ability to obtain a temporary or permanent certificate of occupancy, then in addition to Tenant's obligation to cure such violation and pay any and all fines, penalties and interest related thereto, Tenant shall be obligated to reimburse Landlord, within ten (10) days of Landlord's demand therefor, any and all expenses actually and reasonably incurred by Landlord in connection with such violation(s).

## ARTICLE IX

## Compliance With Laws

SECTION 9.1    Compliance with Laws

Tenant, at its expense, shall comply with all Laws (whether any Laws are in effect on, or enacted or made effective after, the date hereof, whether contemplated or foreseen on the date hereof or not) that shall impose any violation, order or duty upon Landlord, the Building the Corporation or Tenant with respect to the Premises arising out of or relating to (i) Tenant's manner of use thereof, (ii) the performance of any alterations by Tenant, (iii) any cause or condition created by Tenant or (iv) the breach of any of Tenant's obligations under this Lease. Nothing herein shall require Tenant to make structural repairs or alterations unless Tenant has, by its manner of use of the Premises or method of operation therein, violated any such Laws with respect thereto, or if such structural repair or alteration is necessitated by any of Tenant's Alterations. Tenant's "manner of use" or "method of operation" or similar words, as used in this Lease, shall be deemed to refer to any unique use of the Premises by Tenant that is not normal and customary for retail tenants generally in the Building or comparable buildings. Tenant may, after securing Landlord to Landlord's commercially reasonable satisfaction against all damages, interest, penalties and expenses, including, without limitation, reasonable attorney's fees, by cash deposit or by surety bond in an amount and in a company reasonably satisfactory to Landlord, contest and appeal any such Laws provided same is done with reasonable promptness and provided such appeal shall not subject Landlord or Corporation to prosecution for a criminal offense or constitute a default under any lease or mortgage under which Landlord or Corporation may be obligated, or cause the Premises or the Building or any part thereof to be condemned or vacated. Subject to the last sentence of Section 1.3(A), the foregoing shall require Tenant to do all work and shall require Tenant to perform, at its sole cost and expense, asbestos abatement and abatement of any other hazardous or toxic material that may become necessary by reason of any Tenant installation, alteration, improvement or work, or otherwise.

SECTION 9.2    Fire Rating Agencies

Tenant at its expense shall comply with all requirements imposed by any applicable fire rating bureau or other body exercising similar functions in connection with the Premises that affect the same and shall not use the Premises in a manner that shall increase the rate of fire insurance of Landlord or of any other tenant, in effect prior to this Lease.  If Tenant's use of the Premises increases the fire insurance rate, Tenant shall reimburse Landlord for all such increased costs.

## ARTICLE X

## Assignment and Subletting

SECTION 10.1    Assignment, Subletting and Other Transfers

(A)    Tenant, for itself, its heirs, distributees, executors, administrators, legal representatives, successors and assigns expressly covenants that it shall not transfer, assign, hypothecate, mortgage or otherwise encumber this Lease, nor underlet, or suffer or permit the Premises or any part thereof to be used by others, without the prior written consent of Landlord in each instance except as otherwise expressly provided in Section 10.1(B).  The indirect or direct transfer of the majority of the stock of a corporate tenant or the majority partnership interest of a partnership tenant or the majority of the membership interest of a limited liability company tenant shall be deemed an assignment.  If this Lease be assigned, or if the Premises or any part thereof be underlet or occupied by anybody other than Tenant, Landlord may, after default by Tenant continuing beyond any applicable notice or cure period, collect rent from the assignee, undertenant or occupant, and apply the net amount collected to the rent herein reserved, but no such assignment, underletting, occupancy or collection shall be deemed a waiver of the covenant, or the acceptance of the assignee, undertenant or occupant as Tenant, or a release of Tenant from the further performance by Tenant of covenants on the part of Tenant herein contained.  The consent by Landlord to an assignment or underletting shall not in any way be construed to relieve Tenant from obtaining the express consent in writing of Landlord to any further assignment or underletting.

(B)    Notwithstanding anything to the contrary contained in Section 10.1(A), the following shall govern:

(1)    Prohibition Without Consent.  If Tenant shall at any time or times during the Term desire to assign this Lease or sublet all of the Premises, Tenant shall give notice thereof to Landlord, which notice shall be accompanied by (i) an executed term sheet or letter of intent setting forth the principal terms of the proposed assignment or sublease, the effective or commencement date of which shall be not less than thirty (30) nor more than one hundred and eighty (180) days after the giving of such notice, (ii) a statement setting forth in reasonable detail the identity of the proposed assignee or subtenant, the nature of its business and its proposed use of the Premises, and (iii) current financial information with respect to the proposed assignee or subtenant, including, without limitation, its most recent financial report, which shall have been certified by its chief financial officer or an independent public accountant.  In the case of a proposed assignment of this Lease or proposed sublease of the Premises for all or substantially all of the remaining Term of this Lease, the aforesaid notice shall be deemed an offer from Tenant to Landlord whereby Landlord (or Landlord's designee) may, at its option, terminate this

000426-008/00058606-10                    {000426-008/00058606-10}

Lease. Said option may be exercised by Landlord by notice to Tenant at any time within thirty (30) days after the aforesaid notice has been given by Tenant to Landlord; and during such thirty (30) day period Tenant shall not assign this Lease nor sublet such space to any person.

(2)    Termination by Landlord.  If Landlord exercises its option to terminate this Lease as provided in subsection 10.1(B)(1) above, then this Lease shall end and expire on the date that such assignment or sublet was to be effective or commence, as the case may be, and the Rent due hereunder shall be paid and apportioned to such date. If Landlord exercises its option to terminate this Lease pursuant to 10.1(B)(1) above, Landlord shall be free to and shall have no liability to Tenant if Landlord should lease the Premises (or any part thereof) to Tenant's prospective assignee or subtenant. If Landlord exercises such option to terminate this Lease during the first five (5) years of the initial Term of this Lease and Tenant's prospective assignee or subtenant is a bona-fide third party not related to Tenant who has agreed in an executed term sheet or letter of intent to reimburse Tenant for all or a portion of Tenant's Build-Out Expense, which reimbursable amount is stated in the term sheet or letter of intent and is to be paid by the prospective assignee or subtenant to Tenant as a condition to such prospective assignee or subtenant receiving possession of the Premises, then Landlord shall, prior to the termination of this Lease, reimburse Tenant for such Tenant's Build-Out Expense which Tenant's prospective assignee or subtenant had agreed to pay, but not in excess of $100,000.

(3)    Intentionally omitted.

(4)    Conditions for Landlord's Approval.  In the event Landlord does not exercise its option provided to it pursuant to 10.1(B)(1) above (or if such option shall not apply to the proposed sublease) and provided that Tenant is not in material (including, without limitation, monetary) default of any of Tenant's obligations under this Lease beyond any applicable notice or cure period as of the time of Landlord's consent, and as of the effective date of the proposed assignment or commencement date of the proposed sublease, Landlord's consent (which must be in writing and form reasonably satisfactory to Landlord) to the proposed assignment or sublease shall not be unreasonably withheld (and shall be provided or withheld within thirty (30) days of Tenant's request for such consent), provided and upon condition that:

(i)    Tenant shall have complied with the provisions of Section10.1(B)(1) above and Landlord shall not have exercised its option under said Section10.1(B)(1) above within the time permitted therefor;

(ii)    In Landlord's sole but reasonable judgment the proposed assignee or subtenant is engaged in a business or activity, and the Premises will be used in a manner, that (i) in Landlord's sole judgment, is in keeping with the then standards of the Building and/or with the standards of comparable buildings located in the vicinity of the Building, (ii) is limited to the use of the Premises for the Permitted Use, and (iii) will not violate any negative covenant as to use contained in the Proprietary Leases;

(iii)    The proposed assignee or subtenant is a reputable person or entity of good character and with sufficient financial worth considering the responsibility involved, and Landlord has been furnished with reasonable proof thereof;

(iv)    Intentionally omitted;

(v)    The form of the proposed sublease or instrument of assignment (i) shall be in form reasonably satisfactory to Landlord and (ii) shall comply with the applicable provisions of this Article X;

(vi)    Any sublease shall be a sublease for all of the Premises;

(vii)    The rental and other terms and conditions of the sublease are the same as those contained in the executed term sheet or letter of intent furnished to Landlord pursuant to Section 10.1(B)(1) above;

(viii)    Tenant shall reimburse Landlord within thirty (30) days after demand for the reasonable out-of-pocket costs (not to exceed $5,000) that may be incurred by Landlord in connection with said assignment or sublease, including without limitation, the costs of making investigations as to the acceptability of the proposed assignee or subtenant and the reasonable legal costs incurred in connection with the granting of any requested consent;

(ix)    Tenant shall not have advertised or publicized in any way the availability of the Premises without prior notice to Landlord, nor shall any advertisement state the name (as distinguished from the address) of the Building or the proposed rental;

(x)    The proposed subtenant or assignee shall not be entitled, directly or indirectly, to diplomatic or sovereign immunity and shall be subject to the service of process in, and the jurisdiction of the courts of New York State;

(xi)    Intentionally Deleted;

(xii)    The proposed assignee or sublessee, concurrently with the delivery of the assignment or sublease agreement, as the case may be, delivers to Landlord a mutually certified statement of the full extent of the consideration, if any, to be paid to Tenant by the assignee or the sublessee for or by reason of such assignment or sublease, as the case may be, (including, but not limited to, sums paid for the sale of Tenant's fixtures, leasehold improvements, equipment, furniture, furnishings or other personal property); and

(xiii)    The Guarantor (as defined below) shall remain fully liable under the Guaranty (as defined below), unless, in the case of an assignment, the principal(s) of the proposed assignee executes a good-guy guaranty in favor of Landlord substantially in the form of Exhibit E attached hereto, which guarantor is acceptable to Landlord in its sole discretion, in which event Landlord shall release the Guarantor from its obligations under the Guaranty from and after the effective date of the assignment.

(5)    Reactivation of Termination Option.  In the event that (i) Landlord fails to exercise its option under Section 10.1(B)(1) above (where such option shall apply to the proposed assignment or sublease) and consents to a proposed assignment or sublease, and (ii) Tenant fails to execute and deliver the assignment or sublease to which Landlord consented within ninety (90) days after the giving of such consent, then Tenant shall again comply with all of the provisions and conditions of this subsection B above before assigning this Lease or

000426-008/00058606-10                    {000426-008/00058606-10}

33

subletting the Premises.

(6)     Sublease Provisions.  With respect to each and every sublease or subletting authorized by Landlord under the provisions of this Lease, it is further agreed that:

(i)     No subletting shall be for a term ending later than one (1) day prior to the Expiration Date of this Lease;

(ii)     No sublease shall be delivered, and no subtenant shall take possession of the Premises or any part thereof, until an executed counterpart of such sublease has been delivered to Landlord;

(iii)     Each sublease shall provide that it is subject and subordinate to this Lease and to the matters to which this Lease is or shall be subordinate, and that in the event of termination, re-entry or dispossession by Landlord under this Lease, Landlord may, at its option, take over all of the right, title and interest of Tenant, as sublessor, under such sublease, and such subtenant shall, at Landlord's option, attorn to Landlord pursuant to the then executory provisions of such sublease, except that Landlord shall not (a) be liable for any previous act or omission of Tenant under such sublease, (b) be subject to any counterclaim, offset or defense not expressly provided in such sublease and that theretofore accrued to such subtenant against Tenant, or (c) be bound by any previous modification of such sublease or by any previous prepayment of more than one (1) month's Fixed Rent.  The provisions of this Article X shall be self-operative and no further instrument shall be required to give effect to this provision.

(iv)     If any Laws require that any asbestos or other hazardous material contained in or about the Premises be dealt with in any particular manner in connection with any alteration of the Premises, then, subject to the last sentence of Section 1.3(A) hereof, it shall be the subtenant's obligation, at the subtenant's expense, to deal with such asbestos or any other hazardous material in accordance with all such Laws.

(v)     Each subletting pursuant to this Article X shall be subject to all of the covenants, agreements, terms, provisions and conditions contained in this Lease. Notwithstanding any such subletting to any subtenant and/or acceptance of Fixed Rent or Additional Rent by Landlord from any subtenant, (x) the Guarantor shall remain fully liable under the Guaranty, (y) Tenant shall remain fully liable for (i) the payment of the Rent due and to become due hereunder and (ii) the performance of all the covenants, agreements, terms, provisions and conditions contained in this Lease on the part of Tenant to be performed, and (z) all acts and omissions of any licensee or subtenant, or anyone claiming under or through any subtenant, that shall be in violation of any of the obligations of this Lease shall be deemed to be a violation by Tenant.  Tenant further agrees that notwithstanding any such subletting, no other and further subletting of the Premises by Tenant or any person claiming through or under Tenant shall or will be made except upon compliance with and subject to the provisions of this Article X.  If Landlord shall decline to give its consent to any proposed assignment or sublease, or if Landlord shall exercise its option under Section 10.1(B)(1), Tenant shall indemnify, defend and hold harmless Landlord against and from any and all loss, liability, damages, costs and expenses (including reasonable counsel fees) resulting from any claims that may be made against Landlord

by the proposed assignee or sublessee.

(7)     Profits.  If Landlord shall give its consent to any assignment of this Lease or to any sublease, Tenant shall in consideration therefor, pay to Landlord, as Additional Rent the following sums:

(i)     in the case of an assignment, an amount equal to fifty percent (50%) of all sums and other considerations paid to Tenant by the assignee for or by reason of such assignment (including, but not limited to, sums paid for the sale of Tenant's fixtures, leasehold improvements, equipment, furniture, furnishings or other personal property, less, in the case of a sale thereof, the then net unamortized or undepreciated cost thereof determined on the basis of Tenant's federal income tax returns) less all expenses reasonably and actually incurred by Tenant in connection with such assignment, including, without limitation, brokerage commissions, advertising costs, legal fees, and tenant improvements, provided that Tenant shall submit to Landlord a receipt evidencing the payment of such expenses (or other proof of payment as Landlord shall reasonably require); and

(ii)     in the case of a sublease, fifty percent (50%) of any rents, additional charges or other consideration payable under the sublease to Tenant by the subtenant that is in excess of the Rent accruing during the term of the sublease in respect of the sublease space pursuant to the terms hereof (including, but not limited to, sums paid for the sale or rental of Tenant's fixtures, leasehold improvements, equipment, furniture or other personal property, less, in the case of the sale thereof, the then net unamortized or undepreciated cost thereof determined on the basis of Tenant's federal income tax returns), less all expenses reasonably and actually incurred by Tenant in connection with such sublease, including, without limitation, brokerage commissions, advertising costs, legal fees and tenant improvements, provided that Tenant shall submit to Landlord a receipt evidencing the payment of such expenses (or other proof of payment as Landlord shall reasonable require).  The sums payable under this subsection Section 10.1(B)(7)(ii) shall be paid to Landlord as and when payable by the subtenant to Tenant.

(8)     Permitted Transfers.  Notwithstanding anything to the contrary contained in this Article 10 and without any Landlord consent, recapture or profit sharing, provided, and on the condition, that, Tenant shall not then be in material (including, without limitation, monetary) default hereunder beyond any applicable notice or cure period, this Lease may be assigned and Tenant shall have the right to sublease the entire Premises, without the consent of Landlord to (x) any corporation, limited liability company or other legal entity into which or with which Tenant may be merged or consolidated, or which shall purchase all or substantially all of the assets or a controlling interest in the stock or ownership interests of Tenant (or any entity which directly or indirectly owns Tenant), (y) to any Affiliate (which term "Affiliate" shall mean any entity, directly or indirectly, through one or more intermediaries, which controls, is controlled by or is under common control with Tenant, as such terms are defined below, or is a partner of Tenant) or (z) any successor entity created by merger, reorganization, recapitalization or acquisition of Tenant, provided each of the following conditions shall be complied with:

(i)     If such assignment of the entire Premises shall be to a successor by merger or consolidation, reorganization or recapitalization or by acquisition of

000426-008/00058606-10                    {000426-008/00058606-10}

35

assets or a controlling interest in the stock of Tenant, such successor shall have acquired all or all of substantially all of the assets or a controlling interest in the stock, and assumed all of the liabilities, of Tenant, and shall have total assets and total net worth at least equal to the greater of the total of the assets and total net worth, respectively, of Tenant as of (i) the date of this Lease and (ii) the day immediately prior to the date of the assignment.

(ii)    If such assignment or sublease of the entire Premises shall be to an Affiliate, such Affiliate shall have assumed all of the liabilities hereunder of Tenant, and Tenant shall have expressly agreed, in writing, to continue to remain liable under the Lease, and Guarantor shall have expressly agreed, in writing, to remain liable under the Guaranty; provided, that with respect to such Affiliate, any future transaction or occurrence whereby it ceases to be an Affiliate shall not be deemed to be a Permitted Transfer (as herein defined) under this Section 10.1(B)(8) (but rather shall be deemed an assignment or sublease requiring Landlord's consent as provided hereinabove).

(iii)    The assignee shall at all times use the Premises for only the Permitted Use.

(iv)    The transaction shall be made for a good faith operating business purpose, and not intended to evade compliance with the provisions of this Article concerning assignment.

(v)    Landlord shall be given a duplicate original counterpart of the instrument of assignment, or if none then of the instrument effecting the assignment, within ten (10) business day following the effective date thereof.

For the purposes of this Subsection (8): (x) "control" shall mean the power by ownership or contract, effectively to control the operations and management of the entity controlled along with some equity ownership; and (y) "net worth" shall be deemed to mean an entity's equity, as reported in such entity's annual financial statements, less the intangible assets of such entity, including but not limited to, copyrights, trademarks, trade names, licenses, patents, franchises, goodwill, operating rights and deferred financing costs. Any assignment or sublease by Tenant pursuant to this Section 10(B)(8) to an Affiliate or in connection with a sale or merger shall be for a legitimate, bona fide purpose and not, either directly or indirectly, to transfer the leasehold created hereby in order to circumvent this Article 10. Any such assignment or sublease to an Affiliate shall only constitute a Permitted Transfer if and for so long as the assignee or sublessee, as applicable, remains an Affiliate of Tenant, and upon cessation of such affiliation Tenant shall treat the assignee or sublessee, as applicable, as an unrelated third party and the transfer provisions of this Article 10 shall apply to such assignee or sublessee, as applicable. Any transaction meeting the requirements of this Subsection (8) shall be referred to as a "Permitted Transfer".

(9)    Assumption by Assignee. Any assignment or transfer of this Lease shall be made only if, and shall not be effective until, the assignee shall execute, acknowledge and deliver to Landlord an agreement in form and substance satisfactory to Landlord whereby the assignee shall assume the obligations of this Lease on the part of Tenant to be performed or

observed after the effective date of the assignment and whereby the assignee shall agree that the provisions in this Article X, shall, notwithstanding such assignment or transfer, continue to be binding upon it in respect of all future assignments and transfers. The original named Tenant covenants that, notwithstanding any assignment or transfer, whether or not in violation of the provisions of this Lease, and notwithstanding the acceptance of Rent by Landlord from an assignee, transferee, or any other party, the original named Tenant shall remain fully liable for the payment of the Rent and for the other obligations of this Lease on the part of Tenant to be performed or observed and the Guarantor shall remain fully liable under the Guaranty.

(10)    Liability by Tenant.  The joint and several liability of Tenant and any immediate or remote successor in interest of Tenant and the due performance of the obligations of this Lease on Tenant's part to be performed or observed shall not be discharged, released or impaired in any respect by any agreement or stipulation made by Landlord extending the time, or modifying any of the obligations, of this Lease, or by any waiver or failure of Landlord to enforce any of the obligations of this Lease; provided, however, that any such extension or modification made after this Lease is assigned to a entity that is not an Affiliate of Tenant shall not be binding on Tenant so as to increase any of its obligations or liabilities under this Lease.  In no event shall any assignment of this Lease or sublease of all or any portion of the Premises, whether or not in violation of the terms and conditions of this Article X,  release Tenant of any liability hereunder or release Guarantor or any liability under the Guaranty.

(11)    Re-entry by Landlord.  If Landlord shall recover or come into possession of the Premises before the date herein fixed for the termination of this Lease, Landlord shall have the right, at its option, to take over any and all subleases or sublettings of the Premises or any part thereof made by Tenant and to succeed to all the rights of said subleases and sublettings or such of them as it may elect to take over.  Tenant hereby expressly assigns and transfers to Landlord such of the subleases and sublettings as Landlord may elect to take over at the time of such recovery of possession, such assignment and transfer not to be effective until the termination of this Lease or re-entry by Landlord hereunder or if Landlord shall otherwise succeed to Tenant's estate in the Premises, at which time Tenant shall upon request of Landlord, execute, acknowledge and deliver to Landlord such further instruments of assignment and transfer as may be necessary to vest in Landlord the then existing subleases and sublettings. Every subletting hereunder is subject to the condition and by its acceptance of and entry into a sublease, each subtenant thereunder shall be deemed conclusively to have thereby agreed from and after the termination of this Lease or re-entry by Landlord hereunder of or if Landlord shall otherwise succeed to Tenant's estate in the Premises, that such subtenant shall waive any right to surrender possession or to terminate the sublease and, at Landlord's election, such subtenant shall be bound to Landlord for the balance of the term of such sublease and shall attorn to and recognize Landlord, as its Landlord, under all of the then executory terms of such sublease, except that Landlord shall not (i)  be liable for any previous act, omission or negligence of Tenant under such sublease, (ii)  be subject to any counterclaim, defense or offset not expressly provided for in such sublease, which theretofore accrued to such subtenant against Tenant, (iii) be bound by any previous modification or amendment of such sublease or by any previous prepayment of more than one (iv) month's rent and additional rent, which shall be payable as provided in the sublease, or (v)  be obligated to perform any work in the subleased space or the

Building or to prepare them for occupancy beyond Landlord's obligations under this Lease, and the subtenant shall execute and deliver to Landlord any instruments Landlord may reasonably request to evidence and confirm such attornment. Each subtenant or licensee of Tenant shall be deemed automatically upon and as a condition of occupying or using the Premises or any part thereof, to have given a waiver of the type described in and to the extent and upon the conditions set forth in this Article X.

## ARTICLE XI

## Changes by Landlord

SECTION 11.1    Changes by Landlord

(A)    Landlord and the Corporation shall have the right, without the same constituting an eviction or constructive eviction of Tenant in whole or in part and without any abatement of the Rent or liability to Tenant, to (i) place (and have access to) ducts, beams, pipes, joints, foundations, supports and conduits through the Premises (without a reduction or reconfiguration of the useable area of the Premises, except to a de minimis extent), (ii) enter the Premises at reasonable times upon reasonable prior notice, which may be oral (but prior notice shall not be required in an emergency), to inspect the Premises, to show the Premises to others or to perform any work Landlord deems necessary to the Premises or the Building (including the Building systems) or for the purpose of complying with all laws, codes, rules, statutes, ordinances, requirements and regulations of all federal, state and municipal governments, and the appropriate departments, commissions, boards, and officers thereof, and in accordance with the orders, rules and regulations imposed by any applicable fire rating bureau or other body exercising similar functions in connection with the Premises (collectively, "Laws"), (iii) alter, maintain or repair the Building (including the Building systems) or the Land and (iv) take all material into the Premises that may be required in connection with any of the matters described in this Section. If Tenant is not present when Landlord or the Corporation desires to enter the Premises, Landlord or Landlord's contractors may enter the Premises (by force, in the event of an emergency) without liability to Tenant.

(B)    Except as may be provided in this Lease, all exterior walls of the Building, core corridor walls, and exterior doors and entrances (other than surfaces facing the interior of the Premises and doors and entrances servicing only the Premises), balconies, terraces, vaults, Building systems outside of the Premises and all other portions of the Building outside of the Premises are reserved to Landlord for Landlord's use, are not part of the Premises, and Landlord may have access thereto through the Premises.

(C)    Landlord shall exercise Landlord's rights under this Article XI in a manner that minimizes interference with the conduct of Tenant's business in the Premises and damage to the Premises, Tenant's Work and Tenant's Property (all of which shall promptly be repaired by Landlord, at its expense), it being understood and agreed that where feasible Landlord shall not exercise Landlord's rights under this Article XI during Tenant's hours of operation.

(D)    Landlord or the Corporation shall be entitled to erect scaffolding or

000426-008/00058606-10              {000426-008/00058606-10}
38

sidewalk sheds from time to time on and around the Building. In the event Landlord or the Corporation shall install or cause to be installed any scaffolding, sidewalk shed or any other protective structure on all or any portion of the storefront portion of the Premises, Landlord shall use commercially reasonable efforts to minimize the period of time during which such scaffolding, sidewalk shed or other protective structure must remain in place, to the extent practicable, and the extent to which the same shall impair the visibility of the Premises. In the event any such scaffolding, sidewalk sheds or other protective measures remain on all or any portion of the storefront portion of the Premises for a period in excess of ninety (90) consecutive days, upon Tenant's request, Landlord shall use commercially-reasonable efforts to cause the Corporation to remove such structure as soon as possible (but without any obligation for Landlord to spend any money in connection therewith). In the event Landlord, after using such commercially reasonable efforts, is unsuccessful in causing such structure be removed, Tenant may contact the Corporation to request that the structure be removed, provided that Landlord shall have the right to be a participant in any such communication with the Corporation. All scaffolding or sidewalk sheds, to the extent reasonably practicable and to the extent installed by the Landlord, shall be double height, so as to clear any existing Tenant signs, lights and windows. In the event Tenant's signage or store windows are blocked, upon Tenant's request, but only to the extent permitted by applicable Laws, Landlord shall, at its sole cost and expense, install signage identifying Tenant by its trade name on the face of such scaffolding, sidewalk shed or other protective structure, at a location directly in front of Tenant's business storefront, which signage shall be prepared by Tenant at Tenant's sole cost and expense, it being understood and agreed that Landlord shall not place any advertising or signage, except where required by law, on the portion of the scaffolding directly in front of the Premises. In no event shall Tenant be entitled to any abatement, setoff or counterclaim against Rent as a result of the placement of scaffolding or sidewalk sheds on or around the Building of which the Premises forms a part.

## ARTICLE XII

### Casualty

SECTION 12.1    Damage Generally

(A)    Subject to Section 12.1(B), if any part of the Premises shall be damaged by fire or other casualty, Tenant shall give prompt notice thereof to Landlord and Landlord, after the collection of insurance proceeds attributable to such damage, shall with reasonable diligence repair or, to the extent that such repairs are the responsibility of the Corporation pursuant to the Cooperative Documents, use commercially reasonable efforts to cause the Corporation to repair (as more particularly provided in Section 29.1(E) hereof), such damage to any part of the Premises, the repair of which is Landlord's obligation hereunder (and not the obligation of the Corporation pursuant to the Cooperative Documents), in a manner and at times that do not unreasonably interfere with Tenant's use of the Premises. Notwithstanding anything to the contrary contained herein, Landlord shall not be required to repair or restore any of Tenant's property or any alteration or leasehold improvement made by Tenant or for Tenant at Tenant's expense. Rent shall not be reduced or abated during the period of such repair, restoration or rebuilding even if the improvements are not tenantable; provided, however, that in the event Tenant maintains the insurance required in Section 8.1(I)(1)(i) above and Tenant's rental value insurance pays Landlord the Rent due hereunder, then Tenant's obligation to pay the Rent shall

000426-008/00058606-10                    {000426-008/00058606-10}

39

abate during such time that Landlord receives the full amount of the Rent from Tenant's insurance company until the earlier to occur of (x) the date that Landlord no longer receives the full amount of the Rent; and (y) the date upon which the Premises shall be repaired or restored. Landlord shall not be liable for any inconvenience or annoyance to Tenant or injury to the business of Tenant resulting in any way from the undertaking of such repair.

(B)    Notwithstanding Section 12.1(A), if the Building shall be substantially destroyed by fire or other casualty and if in the reasonable opinion of the Corporation it would not be economically feasible to rebuild the Building and the Corporation elects not to rebuild, then Landlord shall by notice to Tenant within one hundred eighty (180) days after the date of such destruction (the "Destruction Date") terminate this Lease as of the Destruction Date and if such notice shall be given this Lease and the term and estate hereby granted shall terminate as of the Destruction Date with the same effect as if the Destruction Date were the Expiration Date of the term of this Lease and Tenant shall pay the Rent thereunder justly apportioned to the Destruction Date.

(C)    In the event Landlord or Tenant does not terminate this Lease in accordance with the provisions hereof, Landlord shall repair or rebuild the Premises (or use commercially reasonable efforts to cause the Corporation to repair or rebuild the Premises) in accordance with Paragraph (A).

(D)    Landlord shall have no obligation to carry insurance of any kind on Tenant's goods, furniture or furnishings or on Tenant's Property, and Landlord shall not be obligated to repair any damage thereto or to replace the same.

(E)    Notwithstanding anything to the contrary, Landlord's restoration obligations shall be limited to the amount of insurance proceeds actually received by Landlord less any deductible, and Landlord's shall only be required to restore the Premises to the condition it was in on the Commencement Date.

(F)    If the Premises shall be damaged by fire or other casualty to the extent of more than twenty-five (25%) of the cost of replacement thereof during the last year of the Term and Tenant does not elect to extend the Term as provided herein Landlord may terminate this Lease by notice to Tenant given within ninety (90) days after such event, and upon the date specified in such notice, which shall be not less than thirty (30) days not more than sixty (60) days after the giving of said notice, this Lease shall terminate and Tenant shall forthwith quit, and surrender the Premises to Landlord without prejudice to any rights either party may have against the other party prior to the termination of this Lease.

(G)    Notwithstanding anything to the contrary, if the Premises shall be damaged by fire or other casualty and the estimated time to repair or restore the same (as estimated by an independent architect or engineer selected by Landlord or the Corporation within thirty (30) days following the damage or casualty) shall exceed one hundred eighty (180) days (or, during the last year of the Term of this Lease, sixty (60) days), Tenant may terminate this Lease by notice to Landlord given within sixty (60) days after such event, and upon the termination date specified in such notice, which shall be not less than thirty (30) days not more than sixty (60) days after the giving of said notice, this Lease shall terminate and Tenant shall

forthwith quit, and surrender the Premises to Landlord without prejudice to any rights either party may have against the other party prior to the termination of this Lease. In addition, if Tenant shall not exercise its termination right pursuant to the preceding sentence and the Premises shall not be repaired and restored within the estimated time to repair or restore the same, Tenant may terminate this Lease by notice to Landlord, and upon the termination date specified in such notice, which shall be not less than thirty (30) days not more than sixty (60) days after the giving of said notice, this Lease shall terminate and Tenant shall forthwith quit, and surrender the Premises to Landlord without prejudice to any rights either party may have against the other party prior to the termination of this Lease.

SECTION 12.2    Express Agreement

This Lease shall be considered an express agreement governing any case of damage to or destruction of the Building or the Premises by fire or other casualty, and any law that purports to govern the absence of express agreement, including without limitation §227 of the Real Property Law of the State of New York, and any successor or other law of like import, shall have no application.

## ARTICLE XIII

## Condemnation

SECTION 13.1    Condemnation

(A)    If there shall be a taking of the entire Premises in condemnation proceedings or by any right of eminent domain, this Lease and the Term and estate hereby granted shall forthwith cease and terminate as of the earlier of the date of vesting of title in such taking or the date of taking of possession by the condemning authority.

(B)    In the event of a taking of a portion of the Premises in the manner described in subsection (A) above Tenant shall not be entitled to any abatement of Rent on account of such taking with respect to the portion of the Premises not so taken; provided, however, that Tenant shall be entitled to an abatement of Fixed Rent on account of such taking by a percentage, which shall be equal to a fraction, the numerator of which shall be the area of the portion of the Premises so taken and the denominator of which shall be the area of the entire Premises prior to such taking.

SECTION 13.2    Award

In the event of a taking of all of the Premises or the storefront, Landlord shall be entitled to receive the entire award in the condemnation proceeding, including any award made for the value of the estate vested by this Lease in Tenant, and Tenant hereby assigns to Landlord any and all right, title and interest of Tenant now or hereafter arising in or to any such award or any part thereof; provided, however, that nothing contained herein shall preclude Tenant from intervening in any such condemnation proceeding to claim or receive from the condemning authority any compensation to which Tenant may otherwise be lawfully entitled in such case in respect of Tenant's Property, for moving to a new location, or reimbursement for tenant

improvements, provided the same do not include any value of the estate vested by this Lease in Tenant and further provided the same do not in any way diminish the value of Landlord's award.

SECTION 13.3    Condemnation for a Limited Period

Notwithstanding the foregoing, if all or any portion of the Premises shall be condemned or taken for governmental occupancy for a limited period of less than ninety (90) days, this Lease shall not terminate, the Rent shall not be abated and Tenant shall be entitled to receive the entire award therefor (whether paid as damages, rent or otherwise) unless the period of governmental occupancy extends beyond the expiration of this Lease, in which case Landlord shall be entitled to such part of such award as shall be properly allocable to the cost of restoration of the Premises, and the balance of such award shall be apportioned between Landlord and Tenant as of the date of such expiration. If the termination of such governmental occupancy is prior to expiration of this Lease, Tenant shall to the extent of any award restore the Premises as nearly as possible to the condition in which they were prior to the condemnation or taking.

## ARTICLE XIV

## Accidents to Sanitary And Other Systems

SECTION 14.1    Accidents to Sanitary and Other Systems

Tenant shall give to Landlord prompt notice of any damage to, or defective condition in, any part of the Premises or any of the Building's mechanical, electrical or plumbing systems or equipment, and (i) Tenant shall promptly remedy any such damage or defective condition in the Premises and (ii) if any such damage or defective condition in the Building's mechanical, electrical or plumbing systems or equipment was caused by, or is attributable to, Tenant Alterations or the unreasonable or improper use of such system by Tenant or its employees, licensees or invitees, the actual out-of-pocket cost of the remedy thereof shall be paid by Tenant upon demand.

## ARTICLE XV

## Subordination; Non-Terminability of Lease

SECTION 15.1    Subordination

This Lease and all rights of Tenant hereunder are and shall be subject and subordinate to the Cooperative Documents and all ground leases, master leases, overriding leases and underlying leases, party wall agreements, reciprocal easements and operating agreements, façade and/or open space easements and other matters of record affecting the Land, the Building, and/or that portion of the Building of which the Premises are a part, now or hereafter existing, and to all loan security agreements, mortgages and assignments of leases and rents (each such mortgage or assignment is hereinafter referred to as a "mortgage") that may now or hereafter affect the Land and/or the Building and/or that portion of the Building of which the Premises are a part and/or any of such leases, whether or not such agreements and mortgages shall also cover other lands and/or buildings and/or leases, to each and every advance made or hereafter to be

made under such agreements and mortgages, and to all renewals, modifications, replacements and extensions of such leases and such agreements and mortgages and spreaders and consolidations of such mortgages. This Section shall be self-operative and no further instrument of subordination shall be required. In confirmation of such subordination, Tenant shall promptly execute, acknowledge and deliver any instrument that Landlord, the lessor under any such lease or the holder of any such loan security agreement or mortgage or any of their respective successors-in-interest may reasonably request to evidence such subordination. Any lease to which this Lease is, at the time referred to, subject and subordinate is herein called "Superior Lease" and the lessor of a Superior Lease or its successor in interest, at the time referred to, is herein called "Superior Lessor"; and any loan, loan security agreement or mortgage to which this Lease is, at the time referred to, subject and subordinate is herein called "Superior Mortgage" and the holder of a Superior Mortgage is herein called "Superior Mortgagee". Landlord hereby represents to Tenant that as of the date hereof there is no Superior Mortgagee other than Signature Bank and there is no Superior Lease. Landlord agrees, upon Tenant's prior written request, to request a commercially-reasonably subordination, non-disturbance and attornment agreement (each, an "SNDA") from any Superior Mortgagee and/or Superior Lessor; provided, however, that Landlord makes no warranty or guaranty that any Superior Mortgagee and/or Superior Lessor will provide an SNDA, and Tenant's liabilities and obligations hereunder shall in no way be effected by the failure to obtain any SNDA.

SECTION 15.2    Non-Terminability of Lease

(A)    Tenant's Interest Not Transferable. Neither Tenant's interest in this Lease, nor any estate hereby created in Tenant nor any interest herein, shall pass to any trustee or receiver or assignee for the benefit of creditors or otherwise by operation of law except as may specifically be provided pursuant to the United States Bankruptcy Code or any state bankruptcy, insolvency or similar statute, as amended from time to time (the "Bankruptcy Code").

(B)    Termination. In the event the interest or estate created in Tenant hereby shall be taken in execution or by other process of law, or if any guarantor of Tenant's obligations under this Lease or its or their executors, administrators or assigns, if any, shall be adjudicated insolvent or bankrupt pursuant to the provisions of any State Act or the Bankruptcy Code or if Tenant is adjudicated insolvent by a court of competent jurisdiction other than the United States Bankruptcy Court, or if a receiver or trustee of the property of Tenant or any Tenant's guarantor shall be appointed by reason of the insolvency or inability of Tenant or said guarantor to pay its debts, or if any assignment shall be made of the property of Tenant or any guarantor for the benefit of creditors, then and in any such events, to the extent permitted by applicable law, this Lease and all rights of Tenant hereunder shall automatically cease and terminate with the same force and effect as though the date of such event were the date originally set forth herein and fixed for the expiration of the Lease Term, and Tenant shall vacate and surrender the Premises but shall remain liable as hereinafter provided.

(C)    Tenant's Obligation to Avoid Creditors' Proceedings. Tenant or any guarantor aforesaid shall not cause or give cause for the appointment of a trustee or receiver of the assets of Tenant or such guarantor and shall not make any assignment for the benefit of creditors, or become or be adjudicated insolvent. The allowance of any petition under any insolvency law except under the Bankruptcy Code or the appointment of the trustee or receiver

000426-008/00058606-10                    {000426-008/00058606-10}
43

of Tenant or any guarantor or of the assets of either of them, shall be conclusive evidence that Tenant caused, or gave cause therefor, unless such allowance of the petition, or the appointment of the trustee or receiver, is vacated within ninety (90) days after such allowance or appointment. Any act described in this Section 15.2(C) shall be deemed a material breach of Tenant's obligations hereunder and an event of default, and this Lease shall thereupon automatically terminate to the extent permitted by applicable law. Landlord does, in addition, reserve any and all other remedies provided in this Lease or at law or in equity.

(D)    Rights and Obligations Under the Bankruptcy Code.    Upon filing of a petition  by or against Tenant under the Bankruptcy Code, Tenant, as debtor and/or as debtor in possession, and any trustee who may be appointed agree as follows: (i) to perform each and every obligation of Tenant under this Lease including, but not limited to, the manner of conduct of Tenant's business as provided in this Lease until such time as this Lease is either rejected or assumed by order of the United States Bankruptcy Court; (ii) to pay monthly in advance on the first day of each month as reasonable compensation for use and occupancy of the Premises an amount equal to all Rent otherwise due pursuant to this Lease; (iii) to reject or assume this Lease within sixty (60) days of the filing of such petition under Chapter 7 of the Bankruptcy Code or within one hundred twenty (120) days (or such shorter time as Landlord, in its sole discretion, may deem reasonable so long as notice of such period is given) of the filing of the petition under any other chapter; (iv) to give Landlord at least forty-five (45) days prior written notice of any proceeding relating to any assumption of this Lease; (v) to give at least thirty (30) days prior written notice of any abandonment of the Premises, any such abandonment to be deemed a rejection of this Lease; (vi) to do all other things of benefit to Landlord otherwise required under the Bankruptcy Code; (vii) to be deemed to have rejected this Lease in the event of the failure to comply with any of the above; and (viii)  to have consented to the entry of an order by an appropriate United States Bankruptcy Court providing all of the above, waiving notice and hearing of the entry of same.

(E)    No Waiver.    No default of this Lease by Tenant, either prior to or subsequent to the filing of such a petition, shall be deemed to have been waived unless expressly done so in writing by Landlord.

(F)    Other Obligations.    Included within and in addition to any other conditions or obligations imposed upon Tenant or its successor in the event of assumption and/or assignment under this Section 15.2 are the following: (i) the cure of any monetary defaults and the reimbursement to Landlord of pecuniary loss within no more than thirty (30) days of assumption and/or assignment; (ii) the deposit of an additional sum of money with Landlord equal to six (6) months' Rent, to be held as a security deposit to the extent permitted by the Bankruptcy Code or by an appropriate United States Bankruptcy Court; (iii) the use of the Premises only as set forth in this Lease and the quality, quantity and/or lines goods or services required to be offered for sale remaining unchanged; (iv) the reorganized debtor or assignee of such debtor in possession or of Tenants' trustee demonstrating in writing that it has sufficient background including, but not limited to substantial  experience and financial ability to operate out of the Premises in the manner contemplated in this Lease and meeting all other reasonable criteria of Landlord as did Tenant upon execution of this Lease; (v) the prior written consent of any lender/mortgagee to which this Lease has been assigned as collateral security; and, (vi) the Premises, at all times, remaining a single unit with no physical changes of any kind being made

to the Premises unless in compliance with the applicable provisions of this Lease.

SECTION 15.3    Proprietary Leases

(a)    Subject to the limitations set forth in Section 15.3(b) hereof, all of the terms, covenants and conditions of the Proprietary Leases, whether or not the same are expressly referred to herein, are incorporated by reference so that (except to the extent that they are inapplicable to, or modified by the provisions of, this Lease), for the purpose of incorporation by reference, each and every term, covenant and condition of the Proprietary Leases binding upon or inuring to the benefit of the landlord thereunder shall, in respect of this Lease, bind or inure to the benefit of Landlord, and each and every term, covenant and condition of the Proprietary Leases, binding upon or inuring to the benefit of the tenant thereunder other than those set forth in Section 15.3(b) below or as otherwise provided herein, shall, in respect of this Lease, bind or inure to the benefit of Tenant, with the same force and effect as if such terms, covenants and conditions were completely set forth in this Lease, and as if the words "premises", or words of similar import, wherever the same appear in the Proprietary Leases, were construed to mean "Premises" in this Lease, and as if the word "proprietary lease", or words of similar import, wherever the same appear in the Proprietary Leases, were construed to mean this "Lease", the word "lessor" was construed to mean "Landlord" and the word "lessee" construed to mean "Tenant".

(b)    Notwithstanding anything to the contrary, Tenant shall have no obligation to pay any amounts payable by Landlord under the Proprietary Leases or the other Cooperative Documents except to the extent expressly provided in this Lease.  In no event shall Tenant be liable for any amounts or liabilities under the Proprietary Leases or the other Cooperative Documents that (a) are the result of late payment fees, penalties, interest or the like assessed to Landlord under the Proprietary Leases unless caused by the late payment of Rent by Tenant, or (b) arise out of the negligence or intentional acts or omissions of Landlord.

(c)    Landlord represents and warrants to Tenant that, to the best of its knowledge, Landlord is not in default of its obligations under the Proprietary Leases or any of the other Cooperative Documents as of the date of the Lease, and Landlord agrees that it shall pay the maintenance fees required to be paid by landlord pursuant to the Proprietary Leases and other Cooperative Documents at all times during the Lease Term.

(d)    If any other express provisions of this Lease shall conflict with any of the provisions of the Proprietary Leases or other Cooperative Documents, such conflict shall be resolved in every instance in favor of the express provisions of this Lease but only as same may affect Landlord and Tenant.

(e)    Tenant does hereby, except to the extent of the gross negligence or intentional acts or omissions of Landlord, its agents, employees or contractors or Landlord's breach of this Lease or the Proprietary Leases, indemnify and hold Landlord harmless from and against any and all third party actions, claims, demands, damages, assessments, charges, costs and expenses (including reasonable attorneys' fees) based upon or incurred on account of the acts

000426-008/00058606-10                    {000426-008/00058606-10}

or omissions of Tenant, its agents, servants, employees or invitees, with respect to the breach of any of the terms, covenants or conditions of the Proprietary Leases to the extent the compliance is the obligation of Tenant hereunder.  In the event Tenant fails to fulfill any of the covenants of this Lease, in addition to the rights and remedies provided in this Lease, Landlord shall have all the rights and remedies against Tenant as the Corporation has against Landlord under the Proprietary Leases.

(f)    Landlord agrees to comply with any provisions of the Proprietary Leases to the extent the same is not the obligation of the Tenant hereunder, and further to the extent that Landlord's failure to comply with such provisions will adversely affect Tenant, or could result in the termination of the Proprietary Leases.

## ARTICLE XVI

## Right to Perform Covenants of Tenant

SECTION 16.1    Tenant's Default

If Tenant shall be in default under this Lease beyond any applicable notice and grace periods, Landlord may cure the same at the expense of Tenant (i) in the case of emergency or in case such default will result in a violation of law, a cancellation of an insurance policy maintained for the Building, or damage to the Building or to space leased to another tenant of the Building, immediately and without notice and (ii) in any other case, if such default continues after thirty (30) days from the date that Landlord gives Tenant notice of Landlord's intention to so perform the same (the "Cure Period"); provided, that if a default cannot with due diligence be cured within thirty (30) days from the date of such notice for causes beyond Tenant's reasonable control, the Cure Period shall be deemed extended if (a) promptly after the receipt of such notice, Tenant advises Landlord of Tenant's intention to institute all steps necessary to cure such default and (b) Tenant institutes and thereafter diligently prosecutes to completion all steps necessary to cure the same.

SECTION 16.2    Payments

Bills for all reasonable out-of-pocket costs and expenses incurred by Landlord in connection with any performance by it under Section 16.1 shall be payable within thirty (30) days after notice of the amount thereof together with interest thereon at six (6%) percent over the prime commercial lending rate at the time announced by Citibank, N.A. to be in effect at its principal office in New York City and shall be deemed Additional Rent hereunder.

SECTION 16.3    Late Payments deemed to be Additional Rent

If any cost, expense, charge, amount or sum (other than Fixed Rent) payable by Tenant as provided in this Lease is not paid when due, the same shall be due and payable by Tenant as Additional Rent hereunder and Landlord shall have the same remedy for failure to pay Additional Rent as it has for the failure to pay Fixed Rent.

## ARTICLE XVII

**Estoppel Certificates**

SECTION 17.1    Estoppel Certificates

(a)    Tenant shall, upon not less than fifteen (15) days' prior notice, execute, acknowledge and deliver to Landlord a statement (i) certifying that this Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified and stating the modifications), (ii) certifying the dates to which the Rent has been paid in advance, (iii) stating whether or not to the best knowledge of Tenant, Landlord is in default under this Lease, and if so, specifying such default and/or (iv) certifying to such other matters with respect to this Lease as may be reasonably requested. Any such certificate may be relied upon by any third party, prospective purchaser or lender/mortgagee of the Premises or any part thereof.

(b)    Landlord shall, upon not less than fifteen (15) days' prior notice, execute, acknowledge and deliver to Tenant a statement (i) certifying that this Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified and stating the modifications), (ii) certifying the dates to which the Rent has been paid in advance, (iii) stating whether or not to the best knowledge of Landlord, Tenant is in default under this Lease, and if so, specifying such default and/or (iv) certifying to such other matters with respect to this Lease as may be reasonably requested. Any such certificate may be relied upon by any third party, or prospective assignee of this Lease.

**ARTICLE XVIII**

**Conditional Limitation**

SECTION 18.1    Conditional Limitation

This Lease and the term and estate hereby granted are subject to the limitation that:

(A)    (i) in case Tenant shall default in the payment of any Rent on any date upon which the same becomes due and Tenant's previous five (5) Rent payments were timely made via wire transfer/ACH payment to Landlord, then if any such defaults shall continue for ten (10) business days after Landlord shall have given to Tenant a notice specifying such default, and (ii) in case Tenant shall default in the payment of any Rent on any date upon which the same becomes due and Tenant's previous five (5) Rent payments were paid other than timely payments via wire transfer/ACH payment to Landlord, then if any such defaults shall continue for five (5) business days after Landlord shall have given to Tenant a notice specifying such default or

(B)    in case Tenant shall default in the keeping, observance or performance of any covenant or agreement (other than a default of the character referred to in paragraph (A) of this Section 18.1), and if such default shall continue and shall not be cured by any person within thirty (30) days after Landlord shall have given to Tenant a notice specifying the same, (or, in the case of a default that pursuant to the express terms of this Lease has a shorter cure period, then within such period), or, in the case of a default that, for causes beyond Tenant's reasonable

000426-008/00058606-10                {000426-008/00058606-10}
47

control, cannot with due diligence be cured within such period of thirty (30) days, if Tenant (i) shall not, promptly upon the giving of such notice, advise Landlord of Tenant's intention duly to institute all steps necessary to cure such default or (ii) shall not duly institute and thereafter diligently prosecute to completion all steps necessary to cure the same, then, in any of such cases set forth in Section 18.1(A) or this Section 18.1(B) above, Landlord shall, in addition to any other remedies available to it at law or in equity, be entitled to give to Tenant a notice of intention to end the term of this Lease at the expiration of three (3) days from the date of the giving of such notice, and, in the event such notice is given, this Lease and the term and estate hereby granted shall terminate upon the expiration of such three (3) days with the same effect as if the last of such three (3) days were the expiration date of the term of this Lease, but Tenant shall remain liable for damages as provided herein or pursuant to law.  For the avoidance of doubt, the parties acknowledge that the 3-day notice of intention to end the term of this Lease is not an additional period within which Tenant may cure the specified default.

SECTION 18.2    Legal and Other Costs

Tenant acknowledges that if Tenant shall fail to timely comply with any of its monetary or material non-monetary obligations under this Lease, Landlord will incur unanticipated legal and other costs in the preparation and service of a notice advising Tenant of such failure, and that $1,000 is a reasonable estimate of such costs.  Tenant shall pay such sum as Additional Rent (in addition to any other sums required hereunder) within seven (7) days of the date of any such notice Landlord shall deliver to Tenant; provided, however, that Tenant shall not be obligated to pay such amount for the first notice delivered in any twelve-month period during the Term of this Lease.

**ARTICLE XIX**

**Re-Entry by Landlord; Damages; End of Term**

SECTION 19.1    Re-entry by Landlord

If this Lease shall terminate in accordance with the conditional limitation set forth in Section 18.1 or if the Term of this Lease shall expire under Section 1.2, Landlord or Landlord's agents and employees may immediately or at any time thereafter re-enter into or upon the Premises and dispossess Tenant therefrom, or any part thereof, either by summary dispossession proceedings, by any lawful action or proceeding at law, or by the use of peaceful self-help (including, without limitation by locking Tenant out of the Premises).  Landlord shall not be liable to indictment, prosecution or damages therefor, and may repossess the same, and may remove any persons therefrom, to the end that Landlord may have, hold and enjoy the Premises again as and of its first estate and interest therein. The words "re-enter", "re-entry", and "re-entering" as used in this Lease are not restricted to their technical legal meanings, and includes peaceful self-help.  Tenant acknowledges that no prior or subsequent court order or court process shall be necessary in connection with Landlord's use of self-help to re-enter the Premises.

SECTION 19.2    Damages

000426-008/00058606-10            {000426-008/00058606-10}
48

In the event of a termination of this Lease pursuant to <u>Section 18.1</u> above, Tenant shall pay to Landlord, as damages, at the election of Landlord, sums equal to the aggregate of all Fixed Rent and Additional Rent that would have been payable by Tenant had this Lease not terminated, payable upon the due dates therefor specified herein until the date hereinbefore set forth for the expiration of the Term; provided, however, that if Landlord shall relet all or any part of the Premises for all or any part of the period commencing on the day following the date of such termination and ending on the date hereinbefore set forth for the expiration of the Term, Landlord shall credit Tenant with the net rents received by Landlord from such reletting, when received, net of expenses incurred or paid by Landlord in terminating this Lease and re-entering the Premises and securing possession thereof, as well as the expenses of reletting, including altering and preparing the Premises for new tenants, brokers' commissions, and all other expenses properly chargeable against the Premises and the rental therefrom in connection with such reletting, it being understood that any such reletting may be for a period equal to or shorter or longer than said period; provided, further, that (i) in no event shall Landlord have any obligation to relet the Premises or any part thereof or be liable for refusal or failure to collect any rent due upon such reletting; (ii) in no event shall Tenant be entitled to receive any excess of such net rents over the sums payable by Tenant to Landlord hereunder, (iii) in no event shall Tenant be entitled, in any suit for the collection of damages pursuant to this paragraph to a credit in respect of any net rents from a reletting except to the extent that such net rents are actually received by Landlord prior to the commencement of such suit, and (iv) if the Premises or any part thereof should be relet in combination with other space, then proper apportionment on a square foot basis shall be made of the rent received from such reletting and of the expenses of reletting.

SECTION 19.3    <u>Rent Acceleration</u>

As an alternative to the remedy set forth in Section 19.2, Landlord may recover from Tenant, as liquidated damages, in addition to any unpaid Rent accrued to the date of such termination, an amount equal to the difference, for the unexpired portion of the term hereof, between: (1) the aggregate of all Rent reserved hereunder; and (2) the then fair and reasonable rental value of the Premises, both discounted at the rate of four (4%) percent per annum to present worth. However, nothing herein contained shall limit or prejudice the right of Landlord to prove and obtain as liquidated damages by reason of such termination an amount equal to the maximum allowed by the statute or rule in effect at the time when, and governing the proceedings in which such damages are to be proved, whether such amount be greater, equal to, or less than the amount of the difference referred to above. In determining the reasonable value of the Premises, the Rent realized by re-letting, if such re-letting be accomplished within a reasonable time after such dispossession or termination, shall be deemed prima facie to be the reasonable rental value. The terms of this Section 19.3 shall expressly survive the termination of this Lease.

SECTION 19.4    <u>Other Remedies</u>

Nothing herein contained shall be construed as limiting or precluding the recovery by Landlord against Tenant of any sums or damages to which, in addition to the damages particularly provided above, Landlord may lawfully be entitled by reason of any default hereunder on the part of Tenant.

000426-008/00058606-10                {000426-008/00058606-10}

49

SECTION 19.5    <u>Right to Injunction</u>

In the event of a breach or threatened breach on the part of either party with respect to any of the covenants or agreements on the part of or on behalf of the other to be kept, observed or performed, Landlord or Tenant shall also have the right of injunction. The specified remedies to which either party may resort hereunder are cumulative and are not intended to be exclusive of any other remedies or means of redress to which such party may lawfully be entitled at any time, and such party may invoke any remedy allowed at law or in equity as if specific remedies were not herein provided for. Tenant agrees that if Landlord has delivered a notice to cure pursuant to Article XIX and Tenant seeks a Yellowstone injunction or other preliminary injunction to extend and/or toll the cure period during the pendency of litigation to determine the propriety of the notice to cure or the existence of an alleged default, Tenant shall be required to pay Rent and Additional Rent to Landlord, without prejudice and as if such dispute did not exist, as a condition to obtaining such extension or tolling of the cure period. The failure to make such payments shall be an independent default subject to Section 18.1(A). Any such payments shall be without prejudice to the court's determination that Landlord shall be required to refund or credit to Tenant all or some of such payments.

SECTION 19.6    <u>Certain Waivers</u>

Tenant waives and surrenders all right and privilege that it might have under or by reason of any present or future law to redeem the Premises or to have a continuance of this Lease for the term hereof after Tenant is dispossessed or ejected therefrom by process of law or under the terms of this Lease. Tenant also waives the provisions of any law relating to notice and/or delay in levy of execution in case of any eviction or dispossession for nonpayment of Rent, or of any successor or other law of like import. Landlord and Tenant hereby waive trial by jury in any action, proceeding or counterclaim brought by either party against the other on any matters whatsoever arising out of or in any way connected with this Lease or Tenant's use or occupancy of the Premises.

**ARTICLE XX**

**<u>Notices</u>**

SECTION 20.1    <u>Notices</u>

Any notice, consent, approval, agreement, certification, request, bill, demand, statement, acceptance or other communication hereunder (a "<u>Notice</u>") shall be in writing and shall have been duly given or furnished if (i) sent by email provided that a confirmation copy of such email notice is also sent by one of the other methods listed herein, (ii) delivered in person, or (iii) mailed or dispatched postage prepaid by a recognized national air courier service such as Federal Express for next business day delivery, addressed to the party to which the same is to be delivered or given, in all cases, at such party's address(es) as set forth below or to such other address or addressee as said party may designate by a notice given pursuant hereto. All notices, demands and requests shall be effective upon receipt, if delivered in person; one (1) business day after being deposited with the recognized national air courier service as required above; or, if sent by email, on the effective date of the confirmation copy delivered in person or by

recognized national air courier service . Rejection or other refusal to accept or inability to deliver because of changed address of which notice was not given as required herein shall be deemed to be receipt of the notice, demand or request sent. Any notices hereunder shall for all purposes be deemed to have been sent by Landlord or Tenant, as applicable, if sent by such respective party's attorney.

All notices sent to Landlord shall be sent to:

> JARV LLC
> 428 Broadway, Suite 310
> New York, New York 10013
>
> With a copy to:
> Wachtel Missry LLP
> 885 Second Avenue, 47th Floor
> New York, New York 10017
> Attention: Morris Missry, Esq.

All notices sent to Tenant shall be sent to:

> MK Lafayette LLC
> c/o Emmet, Marvin & Martin, LLP
> 120 Broadway, Floor 32
> New York, New York 10271
> Attention:  J. Dudley B. Kimball, Esq.

## ARTICLE XXI

### Miscellaneous

SECTION 21.1    Limitation of Landlord's Liability

The covenants and agreements on the part of Landlord to be performed under this Lease shall be binding upon Landlord herein named only for so long as Landlord retains an interest in the Building and shall not survive the transfer of its interest in the Building (provided that nothing herein contained shall relieve Landlord from any liability hereunder accrued prior to the date of such transfer), and in the event of such transfer such covenants and agreements shall thereafter be binding upon each transferee of such interest, but only with respect to the period beginning with the date of such transfer and ending with the date of subsequent transfer of such interest. Notwithstanding any other provision in this Lease to the contrary, Tenant shall look solely to Landlord's interest in the Building for the recovery of any judgment against Landlord and in no circumstances shall Landlord or any partner, member, manager, shareholder, officer or director be personally liable nor shall Tenant have recourse to any other assets of Landlord for satisfaction of any claim Tenant may have against Landlord.

SECTION 21.2    Entire Agreement

000426-008/00058606-10                    {000426-008/00058606-10}

51

This Lease contains all of the agreements and understandings relating to the leasing of the Premises and the obligations of Landlord and Tenant in connection therewith and neither party nor any agent or representative of either thereof has made or is making, and neither party in executing and delivering this Lease is relying upon, any warranties or representations, except to the extent set forth in this Lease. All understandings and agreements heretofore made between Landlord and Tenant relating to the leasing of the Premises are merged in this Lease, which alone fully and completely expresses their agreement. The Exhibits annexed to this Lease are hereby incorporated herein and made a part hereof. Landlord and Tenant specifically acknowledge that they have had the opportunity to consult counsel of their choosing with respect to the negotiation of this Lease and the rights and obligations set forth herein. Any rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not apply to the interpretation of this Lease, or to any schedules or exhibits hereto.

SECTION 21.3    No Waiver, Etc.

The failure of Landlord or Tenant to insist in any instance upon the strict keeping, observance or performance of any covenant or agreement contained in this Lease or to exercise any election herein contained shall not be construed as a waiver or relinquishment for the future of such covenant or agreement, but the same shall continue and remain in full force and effect. No waiver by either Landlord or Tenant of any covenant or agreement contained in this Lease shall be deemed to have been made unless set forth in a writing executed by the party whose rights are being waived. No surrender of possession of any part of the Premises shall release Tenant from any of its obligations hereunder unless accepted by Landlord. The receipt and retention by Landlord, and the payment by Tenant, of Rent with knowledge of the breach of any covenant or agreement contained in this Lease shall not be deemed a waiver of such breach by either Landlord or Tenant.

SECTION 21.4    Oral Modification

This Lease sets forth the entire agreement between the parties, superseding all prior agreements and understandings, written or oral, and may not be altered or modified except in writing and signed by both parties.

SECTION 21.5    Surrender and Holding Over

Tenant shall deliver up and surrender to Landlord possession of the Premises upon the expiration or earlier termination of the Lease Term, broom clean, free of debris and Tenant's personal property, in good order, condition and state of repair (excepting ordinary wear and tear, damage by casualty or condemnation, and any repairs that are Landlord's obligation hereunder) and shall deliver the keys at the office of Landlord. If not sooner terminated as herein provided, this Lease shall terminate at the end of the Lease Term without the necessity of notice from either Landlord or Tenant to terminate the same; Tenant hereby waiving notice to vacate the Premises and agreeing that Landlord shall be entitled to the benefit of all provisions of law respecting the summary recovery of possession of premises from a tenant holding over to the same extent as if statutory notice had been given. If Tenant or any party claiming under Tenant remains in possession of the Premises, or any part thereof, after any termination of this Lease, no tenancy or interest in the Premises shall result therefrom, unless Landlord elects as hereinafter

provided, but such holding over shall be an unlawful detainer and all such parties shall be subject to immediate eviction and removal. If, without the consent of Landlord, Tenant or any party claiming under Tenant remains in possession of the Premises, or any part thereof, after any termination of this Lease, Landlord may, in addition to its other rights, elect at its sole option and discretion to treat such holding over by Tenant as the creation of a month-to-month tenancy subject to all of the terms, covenants and conditions as are set forth in this Lease insofar as the same are applicable to a month-to-month tenancy, except that the monthly Fixed Rent of such holdover, shall be (x) during the initial 45 days of the holdover, one hundred fifty (150%) percent and (y) thereafter, two hundred (200%) percent of the aggregate sum of the monthly Fixed Rent payable immediately prior to the termination of the Lease Term and the average monthly amount of all other Additional Rent and other charges paid by Tenant immediately prior to the termination of the Lease Term. If Tenant or any party claiming under Tenant shall holdover with Landlord's consent (negotiations between Landlord and Tenant, prior to the end of the Lease Term for a Lease Term extension, shall not be deemed Landlord's consent to a holdover) then such holding over shall be on such terms as Landlord and Tenant shall determine, or if no specific determination is made, then on a month-by-month basis, subject to all of the terms, covenants and conditions as set forth in this Lease insofar as the same are applicable to a month-to-month tenancy. The period of any holding over by Tenant as aforesaid, whether on a month-to-month basis or otherwise, shall be deemed an automatic extension of the initial Term or Renewal Term (as the case may be) for only a period concurrent with the period of such holding over. In the event Tenant or any party claiming under Tenant shall holdover without Landlord's consent and if Landlord incurs any expense in removing Tenant, any subtenant, or any other person holding by, through, or under Tenant or any subtenant, who has failed to so surrender the Premises or any part thereof, Tenant shall reimburse Landlord as Additional Rent for the cost and expense (including, without limitation, reasonable attorneys' fees, disbursements and court costs) of removing such subtenant or such person, and such obligation shall survive the expiration or earlier termination hereof.

### SECTION 21.6    Severability

If any covenant or agreement of this Lease or the application thereof to any person or circumstance shall be held to be invalid or unenforceable, then and in each such event the remainder of this Lease or the application of such covenant or agreement to any other person or any other circumstance shall not be thereby affected, and each covenant and agreement hereof shall remain valid and enforceable to the fullest extent permitted by law.

### SECTION 21.7    Attorneys' Fees

Whenever Landlord shall engage an attorney and/or incur any other expense in connection with any action or proceeding that Landlord may prosecute or defend to enforce or defend its rights hereunder against Tenant, Tenant shall pay all reasonable out-of-pocket costs incurred by Landlord, including reasonable attorneys' fees to be fixed by the court, provided that Landlord shall be the prevailing party in such action or proceeding, and such costs and attorneys' fees shall be made a part of the judgment such action. Whenever Tenant shall engage an attorney and/or incur any other expense in connection with any action or proceeding that Tenant may prosecute or defend to enforce or defend its rights hereunder against Landlord, Landlord shall pay all reasonable out-of-pocket costs incurred by Tenant, including reasonable attorneys'

fees to be fixed by the court, provided that Tenant shall be the prevailing party in such action or proceeding, and such costs and attorneys' fees shall be made a part of the judgment such action. If Landlord commences any detainer suit, summary proceedings or other action seeking possession of the Premises, Tenant agrees not to interpose by consolidation of actions, removal to chancery or otherwise, any counterclaim, claim for set-off, recoupment or deduction of Rent, or other claim seeking affirmative relief of any kind (except a mandatory or compulsory counterclaim which Tenant would forfeit if not so interposed).

### SECTION 21.8    Broker

Tenant and Landlord each hereby warrants to the other party that it has not employed or dealt with a broker, agent or finder in connection with this Lease other than Maxwelle NY and Atria Properties Commercial Real Estate Services (the "Brokers"). Tenant shall indemnify and hold Landlord harmless from and against any claim or claims for brokerage or other commissions asserted by any broker, agent or finder (other than the Brokers) employed by Tenant or with whom Tenant has dealt with in connection with this Lease. Landlord shall indemnify and hold Landlord harmless from and against any claim or claims for brokerage or other commissions asserted by any broker, agent or finder (including the Brokers) employed by Landlord or with whom Landlord has dealt with in connection with this Lease. Landlord shall pay the Brokers any and all commissions or other compensation payable to the Brokers in connection with this Lease pursuant to separate agreement(s).

### SECTION 21.9    Successors and Assigns

The covenants and agreements contained in this Lease shall bind and inure to the benefit of Landlord and Tenant, their respective successors and assigns and all persons claiming by, through or under them.

### SECTION 21.10    Consent

In the event that it is provided in this Lease that the exercise of any right by, or performance of any obligation of, Tenant shall be subject to the consent or approval of Landlord, and that the consent or approval of Landlord shall not be unreasonably withheld or delayed, then in any case in which Landlord shall withhold or delay its consent, and in the event that a determination of a court of competent jurisdiction shall be made that the withholding of consent or approval by Landlord was unreasonable, then the decision shall annul such withholding of consent or approval, such annulment being the sole remedy of Tenant; it being the intention of the parties hereto (as to which they are conclusively bound) that in no event shall any such withholding or delay of consent or approval by Landlord, or any decision with respect thereto: (i) impose any financial liability upon or result in any damages being recoverable from Landlord other than the recovery of Tenant's reasonable attorney fees; and/or (ii) create any right cognizable or remedy enforceable in favor of Tenant and against Landlord in law or equity or under any special statutory proceeding or at all; provided, however, that any such decision may also provide for an assessment of the costs of the proceeding with respect thereto as between Landlord and Tenant. Any consent or approval required of Landlord in any provision of this Lease may be withheld by Landlord in its sole discretion unless the provision requiring such consent or approval specifically states that Landlord shall not withhold such consent or approval

000426-008/00058606-10                    {000426-008/00058606-10}

unreasonably.

SECTION 21.11   Postponement of Performance

In the event that either party hereto shall be delayed or hindered in or prevented from the performance of any act required hereunder by reasons of strikes, labor troubles, inability to procure labor or materials, failure of power, restrictive governmental laws or regulations, riots, insurrection, war, Acts of God, fire or other casualty, condemnation or other reason of a similar or dissimilar nature beyond the reasonable control of the party delayed in performing work or doing acts required under the terms of this Lease, then performance of such act shall be excused for the period of the delay and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay.  Notwithstanding the foregoing, after the Commencement Date, which date shall be subject to a delay occasioned by the above causes, nothing contained in this Section shall operate to excuse Tenant from the prompt payment of Rent or any other payments or charges required by the terms of this Lease (except as otherwise specifically provided for pursuant to the terms of this Lease), or shall operate to extend the Lease Term.  Delays or failures to perform resulting from lack of funds shall not be deemed delays beyond the reasonable control of a party.  Nothing in this Section shall delay, limit or negate any of Tenant's rights expressly set forth in this Lease to abate Rent or terminate this Lease.

SECTION 21.12   Express Provision to the Contrary

If any provision of this Lease shall conflict in any respect with any law, statute, rule or regulation of any governmental or quasi-Governmental Authority having jurisdiction, then in such respect, to the extent permitted by law, the provisions of this Lease shall govern and control in lieu thereof and shall be deemed to be express provisions to the contrary of any such law, statute, rule or regulation.

SECTION 21.13   Lender Consent.  Landlord shall obtain any consents required by the current Superior Mortgagee on or before the Commencement Date (and as a condition to the occurrence thereof).

SECTION 21.14   No Air Rights

No rights to any view or to light or air over any property, whether belonging to Landlord or any other person, are granted to Tenant by the provisions of this Lease. Tenant acknowledges that it has no rights to any development rights, air rights or comparable rights appurtenant to the Premises and Tenant consents, without further consideration, to any utilization of such rights by Landlord.  Tenant shall promptly execute and deliver any instruments which may be reasonably requested by Landlord, including instruments merging zoning lots, evidencing such acknowledgment and consent.  The provisions of this Section 21.14 shall be construed as an express waiver by Tenant of any interest Tenant may have as a "party in interest" (as such term is defined in Section 12-10 of Zoning Lot of the Zoning Resolution of the City of New York) in the Premises.

If at any time any windows of the Premises are temporarily darkened or the light

or view therefrom is obstructed by reason of any repairs, improvements, maintenance or cleaning in or about the Property, Landlord shall have no liability therefor and Tenant shall not be entitled to any reduction or diminution of Tenant's obligations under this Lease. In the event any such darkening or obstruction occurs on all or any portion of the storefront portion of the Premises for a period in excess of ninety (90) consecutive days, upon Tenant's request, Landlord shall use commercially-reasonable efforts to cause the Corporation to remove the condition that is causing the darkening or obstruction as soon as possible (but without any obligation for Landlord to spend any money in connection therewith). In the event Landlord, after using such commercially reasonable efforts, is unsuccessful in causing such condition to be removed, Tenant may contact the Corporation to request that the condition be removed, provided that Landlord shall have the right to be a participant in any such communication with the Corporation.

SECTION 21.15    Intentionally Omitted

SECTION 21.16    Offer

Landlord and Tenant agree that this Lease is submitted to Tenant on the understanding that it shall not be considered an offer and shall not bind Landlord or Tenant in any way unless and until (i) Tenant has duly executed and delivered duplicate originals thereof to Landlord, (ii) Landlord has executed and delivered one fully-executed copy to Tenant or Tenant's attorney (which may be delivered via email in .pdf or similar electronic format) ("Execution Date"), and (iii) Landlord has obtained the written consent of the Corporation to this Lease (collectively, "Lease Conditions"). Landlord has requested the Corporation's consent to this Lease prior the Execution Date. During the twenty (20) day period after the Execution Date ("Submission Period"), (a) Landlord shall continue to use good faith and diligent efforts (without the obligation to spend money) to obtain the Corporation's consent for Landlord to enter into this Lease with Tenant. During the Submission Period, Tenant agrees that its execution of this Lease constitutes a firm offer to enter the same, which may not be withdrawn during such Submission Period. In reliance on the foregoing, Landlord may, at Landlord's option, deposit any security deposit and Rent, proceed with any alterations or improvements, and permit Tenant to enter the Premises and make alterations or improvements. If the Lease Conditions shall not be satisfied within twenty (20) days after the Execution Date, Tenant may revoke its offer to enter this Lease by sending notice thereof to Landlord before Landlord mails or delivers an executed copy of this Lease to Tenant and provides evidence of the Corporation's consent to this Lease. In such case, Landlord shall return any security deposit and Rent to Tenant, and Tenant shall promptly remove any alterations, improvements, fixtures or personal property made or placed in or upon the Premises by Tenant or its contractors, agents or employees and restore the same to good condition as required under this Lease. If Tenant shall seek to revoke its offer to enter this Lease in violation of the foregoing provisions, Landlord shall have the options of forfeiting and retaining any security deposit and Rent theretofore paid, as liquidated damages without executing and delivering this Lease to Tenant, or executing and delivering this Lease to Tenant and enforcing the same as a valid and binding lease agreement.

SECTION 21.17    Intentionally Deleted.

SECTION 21.18    Counterparts

This Lease shall be binding upon and inure to the benefit of the respective successors and assigns of the parties hereto. This Lease may be executed in one or more counterparts, each of which may be a so-called "pen" original, telecopy or electronic file portable data format (.PDF), each of which shall be deemed an original, and all of such counterparts shall together constitute one and the same instrument.

SECTION 21.19    Rule of Construction.

This Lease shall not be construed against the party preparing it but shall be construed as if both parties jointly prepared the agreement, and any uncertainty and ambiguity shall not be interpreted against any one party. Any law or regulation which provides that the language of a contract shall be construed against the drafter shall not apply to this Lease.

SECTION 21.20    Safety and Security.

Landlord shall have no obligation to provide any safety or security devices, services or programs for Tenant or the Building and shall have no liability for failure to provide the same or for inadequacy of any measures provided. Tenant shall, at its sole cost and expense, provide all safety and security devices, services and/or programs in and at the Premises during all hours that Tenant is open for business in accordance with Laws.

SECTION 21.21    Additional Representations.

Tenant hereby represents that (i) it has the due authority to enter into this Lease, (ii) is duly organized under the state of its formation and is qualified to conduct business in the State of New York, and (iii) all conditions precedent to execution of this Lease by Tenant have been satisfied.

SECTION 21.22    Waiver of Consequential, Special and Punitive Damages.

Landlord and Tenant hereby knowingly, voluntarily and intentionally waive any right they may have to consequential, special or punitive damages arising out of, under or in connection with this Lease or the transactions contemplated herein.

SECTION 21.23    City Planning Commission Special Permit.

Tenant is hereby provided with actual notice of that certain Special Permit granted to Landlord by the NYC City Planning Commission, dated September 7, 2016 (the "Special Permit"), and that certain letter from Landlord to Council Member Margaret Chin dated September 22, 2016 relating thereto, copies of which are attached hereto as Exhibit F. Landlord shall satisfy all conditions to the effectiveness of the Special Permit, to the extent not satisfied as of the date hereof, so that the Special Permit shall not expire or be revoked and shall remain in full force and effect for the entire Term of this Lease. Landlord shall not apply for any amendment, modification or termination of the Special Permit without Tenant's prior written consent.

000426-008/00058606-10                    {000426-008/00058606-10}

## ARTICLE XXII

### Quiet Enjoyment

SECTION 22.1     Quiet Enjoyment

Tenant, upon keeping, observing and performing all of the covenants and agreements of this Lease on its part to be kept, observed and performed, shall lawfully and quietly hold, occupy and enjoy the Premises during the term of this Lease from and against anyone claiming by, through or under Landlord.

## ARTICLE XXIII

### Alterations

SECTION 23.1     Alterations

(A)     Tenant shall not before or during the Term make or suffer to be made any alterations, additions or improvements (including, without limitation, Tenant's Work) in or to the Premises (herein collectively called "Alterations") without first obtaining Landlord's written consent thereto if such Alterations constitute Material Alterations (as hereinafter defined), and the consent of the Corporation if required pursuant to the Cooperative Documents, based on detailed plans and specifications submitted by Tenant and prepared by an architect licensed and registered in the State of New York.  Landlord's consent may be withheld in Landlord's sole discretion if Alterations will affect the foundation or structural elements of the Building or Premises, the structural soundness of the roof and/or exterior supports of the Building or any Building systems or the façade of the Building or trigger the requirement for additional code compliance or similar work not included in the Alterations ("Material Alterations").  Otherwise, Landlord's consent shall not be unreasonably withheld, conditioned or delayed.

(B)          All repairs, replacements, and reconstruction (including, without limitation, all Alterations) made by or on behalf of Tenant or any of Tenant's agents shall be made and performed (i) at Tenant's cost and expense and at any time which does not unreasonably interfere with the use and enjoyment of the Building by other tenants and occupants, subject to the Cooperative Documents and the rules and regulations imposed by the Corporation, (ii) by contractors or mechanics approved by Landlord, which approval shall not be unreasonably withheld, conditioned or delayed (iii) in such manner so as to be at least equal in quality of materials and workmanship to the original work or installation (if applicable), (iv) in accordance with the insurance requirements set forth in Section 8.1(K) hereof, (v) in accordance with the reasonable rules and regulations for the Building adopted by Landlord and/or the Corporation from time to time, and in accordance with all applicable Laws or governmental authorities having jurisdiction over the Premises, (vi)  so as not to unreasonably interfere with the use and enjoyment of the Building by Landlord, other tenants of the Building or any other persons, and (vii) in compliance with such other reasonable requirements as Landlord  may from time to time promulgate.

(1)    In connection with its performance of Tenant's Work and any Alterations, Tenant covenants and agrees as follows:

(i)    No Alteration shall at any time be made that shall impair the structural soundness or diminish the value of the Building.

(ii)    At the time Tenant requests Landlord's written consent to any Material Alteration, Tenant shall deliver to Landlord detailed plans and specifications therefor.  Tenant shall pay to Landlord any reasonable out-of-pocket fees or expenses incurred by Landlord (not to exceed $2,500.00) in connection with Landlord's submitting such plans and specifications, if it so chooses, to an architect or engineer selected by Landlord for review or examination and/or for supervision during performance of Alterations.  Landlord's approval of any plans or specifications does not relieve Tenant from the responsibility for the legal sufficiency and technical competency thereof.  The foregoing limit of Tenant's expenses in connection with Landlord's review of Tenant's plans and specifications shall not apply to any fees or expenses that the Corporation imposes to review Tenant's plans and specifications.

(iii)    Before commencement of any Alterations, Tenant, at its expense, shall obtain the necessary consents, authorizations and licenses from all federal, state and/or municipal authorities having jurisdiction over such work.  Upon request from Tenant, Landlord shall cooperate, and shall us commercially reasonable efforts to cause the Corporation to cooperate, in Tenant's efforts to obtain such consents, authorizations and licenses.

(iv)    Intentionally Deleted.

(v)    Intentionally Deleted.

(vi)    All work done in connection with any change or alteration shall be diligently prosecuted to its completion, done in a good and workmanlike manner, free of mechanics liens, pursuant to the plans or drawings prepared by a licensed architect previously submitted to Landlord.  Furthermore, all work done must be in compliance with the building and zoning laws, and with all other Laws, and Tenant shall procure and deliver to Landlord certificates of occupancy and all other certificates required by law to the extent necessitated by the Alterations performed by Tenant.

(vii)    If the performance of Alterations shall materially interfere with the comfort and/or convenience of other tenants in the Building or shall cause damage to or otherwise interfere with the occupancy of adjacent buildings, Tenant shall upon Landlord's demand remedy or remove the condition or conditions complained of.  Tenant further covenants and agrees to indemnify and save Landlord harmless from and against any and all claims, losses, damages, costs, expenses, suits and demands whatsoever made or asserted against Landlord by reason of the foregoing.

(viii)    After each Alteration has been completed, Tenant shall obtain and deliver to Landlord a "write-off" or a "letter of completion" or such other documentation satisfactory to Landlord from the applicable municipal authority evidencing that such Alteration is complete and in accordance with all legal requirements and shall thereafter

obtain and deliver to Landlord a change in the Retail CO if required by reason of the Alteration. Nothing herein shall be deemed to limit Landlord's right, if permitted under applicable law, to file or post notices of non-responsibility in the appropriate filing office or in the or on the Premises.

## ARTICLE XXIV

### Hazardous Substances and Waste

SECTION 24.1    Definitions

As used in this Lease, "Hazardous Substances or Waste" shall include, but not be limited to, dip tanks, wielding stations, spray booths and those materials defined by Environmental Laws as such. "Environmental Laws" shall include, but not be limited to, each and every federal, state and local law, statute, code, ordinance, regulation, rule or other requirement of Governmental Authorities having jurisdiction over the Building (including, but not limited to, consent decrees and judicial or administrative orders), relating to the environment, including but not limited to, those applicable for the storage, treatment, disposal, handling and release of any Hazardous Substances or Waste, all as amended or modified from time to time, including but not limited to, the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. §9601, et seq.), as amended by the Superfund Amendments and Reauthorization Act of 1986 (42 U.S.C. §9601-9675, et seq.) and as further amended ("CERCLA"); the Resource Conservation and Recovery Act of 1976, as amended (42 U.S.C. §6901, et seq.); the Clean Water Act, as amended (33 U.S.C. §1251, et seq.); the Clean Air Act, as amended (42 U.S.C. §7401, et seq.); the Federal Insecticide, Fungicide and Rodenticide Act, as amended (7 U.S.C. §136, et seq.); the Toxic Substance and Control Act of 1976, as amended (15 U.S.C. §2601, et seq.); and Emergency Planning and Community Right to Know Act of 1986, as may be amended from time to time (42 U.S.C. §11001 to 11050, et seq.), with regard to the storage of Hazardous Substances or Waste and petroleum products.

SECTION 24.2    Tenant's Representations

Tenant represents to Landlord that at all times, it shall: (i) comply with and take all action required by Environmental Laws (to the extent they relate to the specific manner in which Tenant uses and occupies the Building and the Premises) and maintain and operate the Premises in accordance therewith; (ii) at its own cost and expense maintain in effect any permits, licenses or other governmental approvals, if any, required by Environmental Laws for Tenant's specific use of the Premises; and (iii) promptly make all disclosures to Landlord and/or Governmental Authorities that may be required by Environmental Laws.

SECTION 24.3    Notices

If at any time Tenant shall become aware, or have reasonable cause to believe, that any Hazardous Substances or Waste has come to be located on or beneath the Premises, Tenant shall immediately give written notice of that condition to Landlord. In addition, Tenant shall immediately notify Landlord in writing of: (i) any enforcement, cleanup, removal or any other action instituted or threatened by Governmental Authorities pursuant to Environmental

000426-008/00058606-10                    {000426-008/00058606-10}

60

Laws with respect to the Premises; (ii) any claim made or threatened by any person against Tenant or the Premises, relating to damage, contribution, cost recovery, compensation, loss, or injury resulting from or claimed to result from Hazardous Substances or Waste; and (iii) any reports made to any Governmental Authorities arising out of or in connection with the foregoing. Tenant shall also furnish Landlord with copies of all reports, complaints, notices, warnings and claims made or received.

### SECTION 24.4    Indemnification

Tenant shall indemnify, defend by counsel reasonably acceptable to Landlord (for the purposes hereof, counsel selected by Tenant's insurer shall be deemed acceptable to Landlord), protect and hold harmless Landlord and each of Landlord's partners, directors, members, managers, owners of direct or indirect interest in Landlord, officers, employees, agents, successors and assigns, from and against any and all claims, liabilities, penalties, fines, judgments, forfeitures, losses, costs or expenses (including reasonable attorney's fees, consultants fees and experts fees) for the death of or injury to any person or damage to any property whatsoever, arising from or caused in whole or in part, directly or indirectly, by: (i) the presence in, on or under the Building or the Premises, or the discharge or release, in or from the Building or the Premises, of any Hazardous Substances or Waste to the extent that such presence, discharge or release is caused or created by Tenant or caused or created by Tenant's or its agents', employees', contractors' or invitees' use, operation and activities in the Building or the Premises, including but not limited to discharge or release as a result of Tenant alterations thereof and provided such Hazardous Substances or Waste did not exist on the Premises on or prior to the Commencement Date; or (ii) Tenant's failure to comply with Environmental Laws, where such compliance is Tenant's obligation.  For the purposes of this indemnity the acts or omissions of Tenant, its agents, employees, contractors or invitees, whether or not they are negligent, intentional, willful or unlawful, shall be attributable to Tenant, and Tenant's obligations shall survive the expiration of the Lease Term.

### SECTION 24.5    Landlord's Consent

Tenant acknowledges and agrees that it shall not be unreasonable for Landlord to withhold its consent to any proposed assignment, subletting or other transfer of Tenant's interest in this Lease (where such consent is required) nor shall Tenant have the right to assign, sublet or transfer this Lease or its interest therein, without Landlord's consent (if such transfer without consent is provided elsewhere in this Lease) if: (i) the anticipated use, or method of use, of the Premises by the proposed assignee, sublessee or transferee (collectively "Transferee") involves the generation, storage, use, treatment or disposal of Hazardous Substances or Waste; (ii) the proposed Transferee has been required by a prior landlord or Governmental Authority to take remedial action in connection with Hazardous Substances or Waste; or (iii) the proposed Transferee is subject to an enforcement order issued by Governmental Authorities pursuant to Environmental Laws.

## ARTICLE XXV

### Signage and Access

SECTION 25.1    Landlord Consent to Signage

(A)    Except as provided in Section 25.1(B) below, Tenant shall not exhibit, inscribe, paint or affix any sign, canopy, awning, banner, advertisement, graphics, notice or other lettering (collectively, "Sign Items") on any exterior portion of the Premises without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed, and the Corporation, if required pursuant to the Cooperative Documents, in each instance, but Tenant shall not be permitted to install any signs that obstruct the windows of the Premises or the Building unless Tenant obtains the prior written consent of the Corporation and the same comply with the provisions of Section 25.1(B) below.

(B)    Tenant shall obtain all approvals for such Sign Items required by any applicable governmental agency, including without limitation the New York City Landmarks Preservation Commission and the New York Department of Buildings and any replacement or successor agencies, and all such Sign Items shall be tasteful, non-offensive and appropriate to a first-class commercial building in New York City.  Subject to the foregoing, Landlord hereby grants Tenant exclusive use of all of Landlord's right to use the flagpole attached to the Premises, but without representation or warranty of any kind to Tenant except that Landlord represents to Tenant that Landlord has the exclusive right to use, or grant Tenant the exclusive right to use, such flagpole under the Cooperative Documents without the Corporation's consent (subject to Tenant's compliance with all Laws). Upon all such approvals, and upon the granting of Landlord's and the Corporation's consent, Tenant may install such approved Sign Items at Tenant's sole expense, in accordance with all applicable legal requirements.  Subject to the foregoing, upon installation of any Sign Items, such Sign Items shall not be removed, changed or otherwise modified in any material respect without Landlord's prior written approval, which approval shall not be unreasonably withheld, conditioned or delayed (subject to any approvals required to be obtained from the Corporation).  Tenant agrees to keep any canopy or awning installed on the exterior of the Premises in good condition and repair throughout the Term hereof at Tenant's sole cost and expense, including, without limitation, the periodic cleaning and replacement of the same, as reasonably required (or as reasonably requested by Landlord).

(C)    In the event the Corporation, Landlord or Landlord's representatives shall deem it necessary to remove any sign or the flag/flagpole in order to paint or to make any other repairs, alterations or improvements in or upon the Building or the Premises or any part thereof, Landlord or the Corporation shall have the right to do so, provided (i) the same be removed and replaced at Landlord's or the Corporation's expense, whenever the said repairs, alterations or improvements shall have been completed, (ii) Landlord shall use commercially reasonable efforts to perform (or cause the Corporation to perform) such repairs, alterations or improvements at such times and in such manner as to minimize any interference with Tenant's operation of its business in the Premises (but without the obligation of Landlord to spend any money in connection therewith), and (iii) Tenant shall have the right, at its expense, to install a banner or temporary sign identifying its business in the Premises on the exterior of the Premises or the Building during the period of such repairs, alterations or improvements, subject to Tenant's compliance with Laws.

SECTION 25.2    Interior Displays and Signage

Tenant may place in the windows any sign, decoration, letter, advertising matter, or other thing of any kind, including shades or blinds and neatly lettered professionally prepared signs and/or professionally prepared displays identifying Tenant and/or the services and products offered for sale; provided that any such signage, displays or decorations are approved, if required, by any applicable Governmental Authority, including without limitation the New York City Landmarks Preservation Commission and the New York Department of Buildings and any replacement or successor agencies, and the Corporation.

SECTION 25.3    Façade Changes

Landlord does not demise any portion of the exterior of the Premises or the Building or grant any rights with respect thereto. Accordingly, Tenant or anyone claiming by, through or under Tenant shall not alter the facade of the exterior of the Premises without Landlord's consent, which may be withheld in Landlord's sole and absolute discretion. Tenant shall not place or install or maintain on the exterior of the Premises any awning, canopy, banner, flag, pennant, aerial, antenna, advertisements or projections of whatsoever kind or nature. The provisions of this Section are subject to the provisions of Section 25.1 above.

SECTION 25.4    Violation of Requirements

Any signage, advertisement, notice or other lettering that shall be exhibited, inscribed, painted or affixed by or on behalf of Tenant in violation of the provisions of this Article XXV may be removed by Landlord and the cost of any such removal shall be paid by Tenant as Additional Rent.

# ARTICLE XXVI

## Late Charges

SECTION 26.1    Late Charges

(A)    If Tenant shall fail to pay all or any part of any Rent within ten (10) days after the same shall have become due and payable, Tenant shall pay as Additional Rent hereunder to Landlord a late charge of four ($.04) cents for each dollar of the amount of such Rent that shall not have been paid to Landlord when due. In addition to the foregoing, if Tenant fails to pay any Rent after its due date, Tenant shall pay interest thereon from the date due until the date paid at an annual rate equal to six (6) percentage points above the rate then most recently announced by Citibank, N.A., New York, New York, or its successor, as its corporate base lending rate, which rate may change from time to time, and such interest shall be deemed to be Additional Rent.

(B)    In the event Tenant pays any rent or other charge with a check that is, for any reason, refused for payment by the bank on which it is drawn, Tenant shall pay Landlord a $50 service charge.

(C)    The late charge and service charge described above shall be (i) payable on

000426-008/00058606-10                    {000426-008/00058606-10}

63

demand and (ii) without prejudice to any of Landlord's rights and remedies hereunder, at law or in equity, for nonpayment or late payment of rent or other sums, but shall be in addition to any such rights and remedies. No failure by Landlord to insist upon the strict performance by Tenant of Tenant's obligations to pay late charges, interests and service charges as provided in this Article shall constitute a waiver by Landlord of its right to enforce the provisions of this Article XXVI in any such instance or in any instance thereafter occurring. The provisions of this Article XXVI shall not be construed in any way to extend the grace periods or notice period provided for in this Lease.

## ARTICLE XXVII

### Excavations

SECTION 27.1    Excavations

If an excavation shall be made upon land adjacent to the Premises, or shall be authorized to be made, Tenant shall afford to the person causing or authorized to cause such excavation, license to enter upon the Premises for the purpose of doing such work as said person shall deem necessary to preserve the wall of the Building of which the Premises form a part from injury or damage and to support the same by proper foundations without any claim for damages or indemnity against Landlord, or diminution or abatement of rent.

## ARTICLE XXVIII

### Security Deposit

SECTION 28.1    Security Deposit.

(A)    Tenant shall have deposited with Landlord simultaneously with the execution of this Lease, the sum of One Hundred Thirty -Two Thousand Five Hundred and 00/100 ($132,500.00) Dollars as security (the "Security Deposit") for the faithful performance and observance by Tenant of the terms, provisions and conditions of this Lease. It is agreed that in the event Tenant defaults beyond applicable notice or cure period in respect of any of the terms, provisions and conditions of this Lease, including, but not limited to, the payment of Fixed Rent and/or Additional Rent, Landlord may use, apply or retain the whole or any part of the Security Deposit so deposited to the extent required for the payment of Fixed Rent and/or Additional Rent, or any other sum as to which Tenant is in default, or for any reasonable out-of-pocket sum which Landlord may expend or may be required to expend by reason of Tenant's default in respect of any of the terms, covenants and conditions of this Lease, including but not limited to, any damages or deficiency in the reletting of the Premises, whether such damages or deficiency accrued before or after summary proceedings or other re-entry by Landlord.

(B)    Intentionally omitted.

(C)    If Landlord applies or retains any portion of the cash deposit, Tenant, within ten (10) business days of Landlord's demand, shall deposit with Landlord cash equal to the amount so applied or retained so that Landlord shall have the full Security Deposit on hand at

000426-008/00058606-10                {000426-008/00058606-10}

all times during the term hereof. The failure by Tenant to deposit such additional amount within such ten (10) business day time period shall be deemed a material default pursuant to this Lease.

(D)    The Security Deposit (or such portion thereof as shall not have been applied by Landlord in accordance with Section 28.1(A) above) shall be returned to Tenant within thirty (30) days after the date fixed as the end of the Lease and after delivery of entire possession of the Premises to Landlord. In the event of a sale of Landlord's interest in the Premises, Landlord shall have the right to transfer the Security Deposit to the vendee or lessee and Landlord shall thereupon be released by Tenant from all liability for the return of such Security Deposit, and Tenant agrees to look to the new Landlord solely for the return of said Security Deposit, provided that Landlord shall notify Tenant of such transfer and the name and address of such new Landlord; and it is agreed that the provisions hereof shall apply to every transfer or assignment made of the Security Deposit to a new Landlord. Landlord shall deposit the Security Deposit into an interest-bearing account, provided that Landlord shall be entitled to deduct therefrom a 1% administrative fee, and shall pay the same to Tenant when paid by the depository bank, but no in event more frequently than annually. Tenant further covenants that it will not assign or encumber or attempt to assign or encumber the monies deposited herein as security, and that neither Landlord nor its successors or assigns shall be bound by any such assignment, encumbrance, attempted assignment or attempted encumbrance.

(E)    The required amount of the Security Deposit shall be reduced to One Hundred Six Thousand and 00/100 ($106,000.00) Dollars within fifteen (15) days after Tenant's written request, and upon the fulfillment of the following conditions: (i) Tenant having paid thirty-six (36) installments of fixed rent accruing hereunder; and (ii) Tenant is not then, and has not previously been, in default of any of its monetary obligations and, during the first thirty-six (36) full months of the Term after the Rent Commencement Date Tenant has not been in default of any of its material non-monetary obligations pursuant to this Lease more than three (3) times. Upon fulfillment of the foregoing conditions, Landlord shall return an amount of money to Tenant such that the resulting balance of the Security Deposit equals $106,000.00.

## ARTICLE XXIX

### Corporation

SECTION 29.1    Corporation

Tenant hereby acknowledges and agrees that the Building in which the Premises is located is owned by a cooperative apartment corporation, City Studios Inc. As such, this Lease and Tenant's use and occupancy of the Premises shall be subject and subordinate in all respects to all applicable provisions of the Corporation's Certificate of Incorporation, By-Laws and Offering Plan, as well as the Proprietary Leases (under which this Lease shall be deemed to be a sublease, for all necessary purposes related to the Corporation), the Corporation's rules and regulations, and the Corporation's other policies and governing documents (collectively, the "Cooperative Documents"; the corporation and/or the board thereof, hereafter, the "Corporation") whether or not such provisions or documents may be expressly referenced in this

Lease. The "Proprietary Leases" are collectively, those certain Proprietary Leases, each dated October 4, 2013, by and between the Corporation, as Lessor, and Landlord, as Lessee, for the first floor and basement in the Building. Landlord represents and warrants to Tenant that it has provided Tenant with true and complete copies of the Proprietary Leases, By-Laws and Offering Plan in Landlord's possession (after due inquiry to the Corporation with respect thereto) and, subject to receipt of the Retail CO, the use of the Premises for the Permitted Use does not and will not violate the Proprietary Leases and the other Cooperative Documents, and agrees not to amend or modify, or consent to the amendment or modification of, the Proprietary Leases or any of the other Cooperative Documents in any way that would materially and adversely affect Tenant's rights or obligations hereunder, or permit the Proprietary Leases or any of the other Cooperative Documents to be cancelled or terminated, without in each case Tenant's prior written consent. Landlord agrees to provide to Tenant copies of any and all amendments to the Proprietary Leases and other material Cooperative Documents promptly after Landlord's receipt thereof.

(A)    Without limiting the foregoing, Tenant agrees that it shall comply with the rules and regulations of the Corporation as well as Landlord's rules and regulations. Tenant's use of the Premises shall comply in all respects with the provisions of the Cooperative Documents.

(B)    Notwithstanding anything to the contrary contained herein, if at any time during the Term, Landlord shall receive notice from the Corporation, shareholders of the Corporation or occupants of the Building or other persons that any use or manner of use or the operation of the Premises or part thereof (whether or not such use or manner of use is otherwise in compliance with the provisions hereof) by Tenant or other persons claiming by, through or under Tenant, violates any provision of the Cooperative Documents or results in a breach of any duty or obligation that Landlord may have or owe to the Corporation, any shareholder of the Corporation or other occupant of the Building or other person, then Tenant hereby agrees to indemnify, defend and hold Landlord, its successors and assigns, harmless from and against any reasonable out-of-pocket cost, loss or expense (including reasonable attorney's fees) suffered or incurred by Landlord, its successor or assigns, in connection with any such claim and any action or proceeding thereon, such indemnification obligation to survive the expiration or other termination of this Lease.

(C)    If at any time, pursuant to law or the provisions of the Cooperative Documents, the Building shall cease to be owned as a cooperative apartment corporation, unless any condition exists pursuant to which this Lease may otherwise be terminated, then, this Lease shall continue in full force and effect between Tenant and the new owner of the Building and/or the Premises, except that this Lease shall be deemed modified to delete provisions relating to the Corporation that are no longer relevant. At the request of Landlord, Tenant will execute a modification of this Lease confirming such changes at that time.

(D)    Tenant acknowledges that certain matters may require the consent of the board of directors and/or lender/mortgagee(s) pursuant to the Cooperative Documents, and Tenant agrees that if any such party whose request is so required shall deny (or be deemed to have denied) its consent, then such denial (or deemed denial) of consent shall conclusively be deemed a reasonable basis for Landlord to deny its consent, without the necessity of Landlord

000426-008/00058606-10                    {000426-008/00058606-10}

bringing legal action against the party that has denied (or is deemed to have denied) such consent to determine the propriety of such denial and/or whether such party was acting reasonably with respect to such denial. Notwithstanding the foregoing, Landlord, at Tenant's expense, agrees upon written request from Tenant to promptly exercise commercially reasonable efforts to take such action as is reasonably requested by Tenant to dispute the denial of any such consent (but without liability of any kind to Landlord based upon the outcome of such dispute). Tenant shall promptly reimburse Landlord for any and all reasonable out-of-pocket costs which Landlord shall incur in expending such efforts on behalf of Tenant pursuant to this Subsection. If any fee or other charge is required by the board of managers or any other party pursuant to the Cooperative Documents in connection with any request for consent made by Landlord in connection with a request of Tenant, then Tenant shall pay all such amounts to Landlord upon demand therefor as a condition to Landlord's obligation to seek such consent.

(E)    With regard to any items of repair, maintenance, restoration, services or other obligations of Landlord under this Lease that, under the Cooperative Documents or by law, are the duty or responsibility of the Corporation, the board of directors, or the owner of any other unit in the Building (each of the foregoing being a "Responsible Party"), Landlord shall have no liability to Tenant for the performance (or the failure to perform) such work or obligations and Tenant shall look directly to the Responsible Party whose obligation is involved for such work or obligations therefor and for any damages therefrom. Without limiting the foregoing, the failure of any Responsible Party to perform any of its obligations shall not be the grounds for any termination of this Lease by Tenant on the basis of a claim for constructive eviction against Landlord. Notwithstanding the foregoing, if a Responsible Party defaults in any of its obligations under the Cooperative Documents or otherwise, including, without limitation, any failure to perform or provide any item of repair, maintenance, restoration, services or other obligations of such Responsible Party that, under the Cooperative Documents or by law, is the duty or responsibility of such Responsible Party, Landlord shall use commercially reasonable efforts to take timely and appropriate action for the enforcement of Landlord's rights against such Responsible Party, but at no out of pocket cost or expense to Landlord. If Landlord has used such commercially reasonable efforts as set forth in the preceding sentence, but such Responsible Party has not performed its obligations under the Cooperative Documents or otherwise, Tenant shall have the right, at Tenant's expense, to take any lawful action in its own name or in Landlord's name and, for that purpose and only to such extent, all of the rights of Landlord to enforce such obligations are hereby conferred upon and are assigned to Tenant and Tenant hereby is subrogated to such rights (including, without limitation, the benefit of any recovery or relief). Landlord shall have no liability of any kind to Tenant in the event any efforts by Landlord or Tenant are unsuccessful or unsatisfactory to Tenant. Tenant shall indemnify and hold Landlord harmless from and against any and all losses, costs, liability, claims, damages, expenses (including, without limitation, reasonable attorneys' fees and disbursements), penalties and fines to which Landlord may be exposed and which Landlord may incur in connection with or arising out of the taking of any such action by Tenant.

## ARTICLE XXX

### Intentionally Deleted

### ARTICLE XXXI

000426-008/00058606-10          {000426-008/00058606-10}

67

**Intentionally Deleted**

**ARTICLE XXXII**

**Anti-Terrorism Requirements**

SECTION 32.1    Anti-Terrorism Requirements

Tenant represents and warrants that (i) neither Tenant nor any person who owns any direct or indirect beneficial interest in Tenant or any of them, is listed on the list maintained by the United States Department of the Treasury, Office of Foreign Assets Control (commonly known as the OFAC List) or otherwise qualifies as a person with whom business by a United States citizen or resident is prohibited and (ii) neither Tenant nor any person who owns any direct or indirect beneficial interest in Tenant or any of them is in violation of any to anti-money laundering or anti-terrorism statute, including, without limitation, the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, U.S. Public Law 107-56 (commonly known as the USA PATRIOT Act), and the related regulations issued thereunder, including temporary regulations, all as amended from time to time.

**ARTICLE XXXIII**

**Guaranty**

SECTION 33.1    Guaranty

Upon execution and delivery of this Lease by Tenant to Landlord, Tenant shall deliver to Landlord the Good Guy Guaranty executed by Maison Kitsune, Inc., a New York corporation and Kitsune France, an SARL incorporated under the laws of France (collectively, the "Guarantor") in the form annexed hereto and made a part hereof as Exhibit E (the "Good Guy Guaranty"). Landlord agrees that the obligations of Kitsune France pursuant to the Good Guy Guaranty shall be released by Landlord upon Tenant delivering to Landlord a financial statement of Maison Kitsune, Inc. reflecting annual gross income of at least $2,000,000.00, which statement shall be prepared by an independent accountant and certified by an officer of Maison Kitsune, Inc. The foregoing release shall not release Maison Kitsune, Inc. from any of its obligations pursuant to the Good Guy Guaranty.

**ARTICLE XXXIV**

**No Recordation**

SECTION 34.1    No Recordation

This Lease shall not be recorded. The recordation of this Lease by Tenant shall constitute a default by Tenant under this Lease.

IN WITNESS WHEREOF, Landlord and Tenant have set their hands, the day, month and year first above written.

LANDLORD:

JARV LLC

By: _____

Name: Victor Settov

Title: President

TENANT:

MK LAFAYETTE LLC

By: _____

Name: VINOD KASTURI

Title: MANAGER

TENANT NOTARIZATION

STATE OF  New York        )
                         ) ss.:
COUNTY OF  New York       )


On the _10_ day of February in the year 2017, before me, the undersigned a Notary Public in and for said state, personally appeared Vinod R. Kasturi_____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.


_____
                                          Notary Public

Christian Lee
Notary Public, State Of New York
No. 01LE6187488
Qualified in Kings County
Commission Expires May 19, 2020

000426-008/00058606-9                    {000426-008/00058606-9}        000426-008/00058606-7
                                         000426-008/00066925-1          000426-008/00058606-1
                                         1183097 v2

# EXHIBIT A

## Premises

(See attached)

000426-008/00058606-10                {000426-008/00058606-10}                000426-008/00058606-7
                                        000426-008/00066925-1                000426-008/00058606-1

A-1



EXHIBIT B

Landlord's Work

- Provide and install a new storefront
- Install new bathroom on ground floor, to code in pre-determined location shown on floor plans of the Premises attached to the Lease as Exhibit A.
- Deliver approx. 200amps of electric with a separate meter
- Relocate electrical panel and meter to a mutually agreed upon location in the lower level of the Premises.
- Close up existing doorway to building lobby
- Deliver basement demised and water tight
- Deliver direct access and water tight sidewalk hatch
- Relocate upper portion of steam pipe by storefront
- Obtain the temporary Retail CO covering the entire Premises and deliver a copy thereof to Tenant

EXHIBIT C

Recognition Agreement and Estoppel Certificate

(See attached)

000426-008/00058606-10        {000426-008/00058606-10}        000426-008/00058606-7
                               000426-008/00066925-1          000426-008/00058606-1

1

RECOGNITION AND ATTORNMENT AGREEMENT

THIS RECOGNITION AND ATTORNMENT AGREEMENT (this "Agreement") is made as of _____, 2017 by and between CITY STUDIOS, INC., a New York corporation, having an office at 248 Lafayette Street, New York, New York 10012 (the "Corporation"), and MK LAFAYETTE LLC, a New York limited liability company, having an office c/o Emmet, Marvin & Martin, LLP. 120 Broadway, Floor 32, New York, New York 10271 Attention: J. Dudley B. Kimball, Esq. ("Tenant").

WITNESSETH

WHEREAS, pursuant to two (2) Proprietary Leases each dated as of October 4, 2013 (as the same may be amended from time to time, collectively, the "Proprietary Lease"), the Corporation leased to JARV LLC, a New York limited liability company ("Landlord"), the first floor and basement in the building located at 248 Lafayette Street, New York, New York (the "Building");

WHEREAS, pursuant to a certain Lease dated as of the date hereof (as the same may be amended from time to time, the "Lease"), Landlord leased to Tenant a portion of the premises leased to Landlord pursuant to the Proprietary Lease; and

WHEREAS, the Corporation and Tenant desire to enter into this Agreement upon the terms, covenants and conditions contained herein.

NOW, THEREFORE, in consideration of the premises and the agreements of the parties contained herein, the parties hereby agree as follows:

1. The Corporation hereby consents to the Lease.

2. Tenant hereby confirms that the Lease and all of Tenant's rights thereunder are and shall be at all times and in all respects subject and subordinate to the Proprietary Lease and to the terms and provisions thereof.

3. In the event of (i) the termination or cancellation of the Proprietary Lease for any reason, (ii) the surrender of the Proprietary Lease, whether voluntary, involuntary or by operation of law, or (iii) the rejection of the Lease in any bankruptcy action by Landlord, then, provided that Tenant is not then in default of the Lease beyond applicable notice and cure periods, (x) Tenant shall attorn to the Corporation and shall recognize the Corporation as its landlord under the Lease, (y) the Corporation shall recognize and keep in effect the Lease and shall assume all obligations of Landlord thereunder, and (z) the Lease shall continue as a direct lease between the Corporation and Tenant upon all the terms and conditions thereof, except that the Corporation shall not be (a) liable for any previous act or omission of Landlord under the Lease, but the Corporation shall be liable for any act or omission of the Corporation under the Lease occurring after such attornment, including the failure of the Corporation to remedy, within a reasonable time after such attornment, any default by Landlord in performing any of its obligations under the Lease which continues after such attornment, (b) subject to any offsets, defenses, claims or counterclaims that Tenant may have against Landlord, but the Corporation shall be subject to any

7373091_1

offset, defense, claim or counterclaim available to the Tenant under the Lease accruing after such attornment, (c) bound by any payment of rent or other charges under the Lease made more than thirty (30) days prior to its due date, (d) liable for the return of any security deposit which was delivered to Landlord, but which was not subsequently delivered to the Corporation, (e) bound by any amendment or modification of the Lease unless the Corporation has consented thereto in writing or unless the same is effected pursuant to the express terms of the Lease, or (f) notwithstanding the terms of clause (a) above, obligated to perform any of "Landlord's Work" (as defined in the Lease) which Landlord shall have failed to perform.

4.    The attornment and recognition provided for in Paragraph 3 above shall be self-operative, and no further instrument shall be required to give effect to such attornment and recognition.  However, either party, upon written demand of the other party, agrees to execute instruments in confirmation thereof, reasonably satisfactory to the parties hereto, acknowledging such attornment and recognition.

5.    The Corporation hereby confirms to Tenant as follows:

a.    The Proprietary Lease is in full force and effect and has not been amended or modified;

b.    The Proprietary Lease constitutes the entire agreement, and contain all understandings between the Corporation and Landlord, with respect to the subject matter thereof and Landlord's leasing and occupancy of space in the Building, and there are no other agreements relating thereto;

c.    All rental payments, maintenance charges or other amounts due and payable under the Proprietary Lease have been paid through _____, 2017;

d.    To the best knowledge of the Corporation, Landlord is not in default in the performance of any of Landlord's obligations under the Proprietary Lease and no event has occurred which, with the passage of time or the giving of notice, or both, would constitute a default by Landlord under the Proprietary Lease;

e.    No notice of default, termination and/or cancellation under the Proprietary Lease has been given by the Corporation to Landlord; and

f.    The Corporation has not received notice of any default by the Corporation under any mortgage encumbering the Building granted by the Corporation.

6.    This Agreement may not be modified, amended or terminated unless in writing and duly executed by the party against whom the same is sought to be asserted and constitutes the entire agreement between the parties with respect to the subject matter hereof.  The agreements herein contained shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors, and assigns.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.  This Agreement shall bind and inure to the benefit of the parties hereto and their respective successors and assigns.  This Agreement may be signed in counterparts, all of which taken together shall constitute one and the same instrument, and each of the parties hereto may execute this Agreement by signing any such counterpart.

2

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

CITY STUDIOS, INC.

Witness:

_____

By:_____
     Name:
     Title:   President

MK LAFAYETTE LLC

Witness:

_____

By:_____
     Name:
     Title:

3

EXHIBIT D

Rules and Regulations

A.    GENERAL

1.    Compliance With Laws.    Tenant agrees to observe and perform all insurance requirements and comply with all Laws pertaining to Tenant's business or Tenant's use of the Premises, including, among others, (i)  all requirements concerning health and safety standards and environmental protection, (ii)  all requirements under the Americans With Disabilities Act, and (iii)  the obtaining of all permits required by applicable law other than the Retail CO.

2.    No Discrimination. Tenant agrees, in the conduct of Tenant's business, not to discriminate against or segregate (or to permit anyone acting under the color of Tenant's authority to discriminate against or segregate) any person on account of sex, sexual orientation, age, race, color, creed, religion, marital status, ancestry or physical handicap.  This covenant also governs Tenant's employment practices and selection of suppliers and contractors.

3.    Rights of Access.  Landlord and Landlord's experts/consultants may enter the Premises at any time in case of an emergency and otherwise at reasonable times, in order to inspect the condition of the Premises, to verify Tenant's compliance with this Lease and applicable law and to effect required or necessary repairs. Any such entry will be at Landlord's expense unless it reveals a violation of applicable law or a condition that if not promptly remedied would result in a default under this Lease.  As long as Landlord acts in good faith and with reasonable care, no such entry shall constitute an eviction or disturbance of Tenant's possession nor render Landlord liable to Tenant.

4.    Building Additional Reserved Rights.  Landlord reserves the following additional rights: (i) to change the character, use and quality standards of the Building; (ii)  to change the name or street address of the Building; (iii)  to control access to and from Building common areas; (iv)  to rearrange, relocate, close or change corridors, elevators, stairs, lavatories, doors, lobbies, entrances or exits to the Building; and (v)  at reasonable times, to exhibit the Premises to prospective lessees, purchasers or others.

5.    No Solicitation. Tenant acknowledges Landlord's legitimate interest in preventing solicitation from and around the Premises and in, from and around the Building. Tenant agrees not to solicit or permit customer solicitation, canvassing or peddling by any persons stationed in or near the entrance to the Premises, in any Building lobby or common area, or otherwise in the immediate vicinity of the Building.

6.    Intentionally omitted.

7.    Distress Sales.  Tenant must not conduct or permit on the Premises any auction, fire,

000426-008/00058606-10                    {000426-008/00058606-10}                    000426-008/00058606-7
                                          000426-008/00066925-1                       000426-008/00058606-1

1

bankruptcy, going out of business or relocation sale, or any similar distress sale, whether or not otherwise permitted by applicable law.

8.      Alcoholic Beverages. Tenant must not use or permit the Premises to be used for the making, storing, using, selling or giving away of any alcoholic beverage, as that term is defined under any applicable law.

9.      Cooking.   Unless specifically permitted by the Schedule or a Rider to this Lease, Tenant must not cook or permit cooking on the Premises.

10.     Access.    Tenant must not obstruct or encumber any areas of the Building outside Tenants' Premises, nor use them for any purpose other than entering and leaving the Premises. If the Premises are accessible from a public sidewalk, Tenant is responsible for keeping the areas directly in front of the Premises clean and free from ice, snow, dirt, rubbish and other accumulation.

11.     Miscellaneous.   Tenant must not cover or obstruct the sashes, sash doors, skylights, windows and doors that reflect or admit light into areas of the Building outside Tenant's Premises, nor shall Tenant place or permit parcels, bottles or other articles on the window sills. Tenant must not throw anything out of the doors, windows or skylights of the Premises.

12.     Plumbing Fixtures.   Plumbing fixtures must be used only for their generally accepted purposes. Tenants are responsible for damages resulting from abuse or misuse of these fixtures by Tenant or Tenant's employees or invitees.

13.     Defacing Prohibited. Tenant must not in any way deface any part of the Premises or the Building.   Floor coverings of any kind may only be used in a manner, and with such adhesives, as Landlord first approves.

14.     Vehicles; Animals.  No bicycles, vehicles, animals, birds or fish shall be permitted in the Premises, except aids for the disabled.

15.     Objectionable Odors.   Tenant must not cause or permit any unusual or objectionable odors to be produced or to emanate from the Premises.

16.     Disturbing Noises.  Tenant must not make or permit any unseemly or disturbing noises or otherwise disturb or interfere with other tenants, guests and patrons of the Building. Tenant must not place or permit antennae of any kind, loud speakers, sound amplifiers, flashing lights or spotlights on the roof or inside or outside of the Premises or the Building.

17.     Locking Mechanisms. Tenant must not place additional gates, locks or bolts of any kind upon any doors or windows outside Tenant's Premises, nor shall Tenant change existing locks or their mechanisms. Upon expiration of the Term, Tenant must return all keys to such areas either furnished to or otherwise procured by Tenant. If Tenant loses any key furnished to Tenant by Landlord, Tenant must replace it or promptly pay Landlord its cost. Upon termination of this Lease or Tenant's right to possession, Tenant must surrender to Landlord all keys and

combinations used by Tenant in connection with the Premises and otherwise advise Landlord as to the operation of all locks, combination or otherwise, on safes, cabinets, doors and vaults in the Premises.

18.     Freight.  Unless equipped with rubber tires and side guards, hand trucks are not to be used in the Building. Tenant must not permit such use. Tenant must also comply with Landlord's reasonable instructions concerning parking, loading and unloading in or around the Building.

19.     Prohibited Uses. Tenant must not use or permit the Premises to be used for possessing, storing, making, using, selling or giving away narcotics or controlled substances of any kind, as an employment bureau or for any illegal or immoral purpose. Tenant must not engage or pay any employees on the Premises except those actually working for Tenant on the Premises.

20.     Use of Landlord's Employees.  Tenant must not request Landlord's employees to perform any work for Tenant or to do anything outside of their regular duties without first obtaining Landlord's written consent.  If Landlord makes its employees available to assist Tenant, Tenant must promptly pay Landlord for their employee's services at reasonable hourly rates.

21.     Window and Door Coverings. Tenant may install awnings, shades, Venetian blinds or window or door coverings of any kind only with Landlord's prior written approval. If so installed, Tenant must maintain them in good and attractive condition, at Tenant's cost and risk.

22.     Floor Overloading. Tenant must not overload any floor.

23.     Any additional rules and regulations promulgated by the Corporation provided Landlord delivers a written copy of same to Tenant prior to the effective date thereof.

000426-008/00058606-10

EXHIBIT E

Good Guy Guaranty

In consideration of, and as an inducement for the granting, execution and delivery of that certain Lease, dated as of February __, 2017 (as same may hereafter be amended, modified and/or supplemented, the "Lease"), by JARV LLC, a New York limited liability company, as Landlord ("Landlord"), to MK LAFAYETTE LLC, a New York limited liability company, as Tenant ("Tenant"), for portion of the first floor and a portion of the lower level of the building known as 248 Lafayette Street, New York, New York (the "Building") and more particularly described in the Lease, and in further consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration paid by Landlord to the undersigned, the receipt and legal sufficiency of which are hereby acknowledged, the undersigned does hereby agree as follows:

1.      (a) All capitalized terms used but not otherwise defined herein shall have the meanings ascribed thereto in the Lease.  Maison Kitsune, Inc., a New York corporation and Kitsune France, an SARL incorporated under the laws of France, both having an address at c/o Emmet, Marvin & Martin, LLP, 120 Broadway, Floor 32, New York, New York 10271, (collectively, "Guarantor"), do each hereby unconditionally guarantee to Landlord, its successors and assigns the full prompt payment of Rent (as defined in the Lease) and all other charges payable by Tenant, its successors and/or assigns, and the full and complete performance of all obligations of Tenant under the Lease and any other agreements with Landlord.   Guarantor hereby covenants and agrees with Landlord that if default shall at any time be made by Tenant or its successors or assigns in the payment of any Rent or other charges, or if Tenant or its successors or assigns should in any wise or manner default in the performance and observance of any of the covenants, terms, conditions and agreements contained in the Lease to be performed or observed, in each case after notice to Tenant and the expiration of any applicable cure period, Guarantor, in each and every instance, shall and will forthwith pay such Rent and other charges to Landlord and any arrears thereof (which shall include, without limitation, the Rent described in Section 1.5 of the Lease for the abatement period provided for therein, subject to the limitations set forth in Section 1.5 of the Lease), and shall and forthwith faithfully perform and fulfill all of such covenants, terms, conditions and agreements under the Lease, including without limitation, payment of reasonable attorneys' fees and disbursements incurred by Landlord (to the extent that the same shall be payable to Landlord pursuant to Section 21.7 of the Lease or the other express provisions of the Lease), or caused by or in any way related to any such default and/or the enforcement of this Guaranty. Guarantor hereby represents that Guarantor is the sole owner of the beneficial interests of Tenant.   Kitsune France ("KF") hereby designates and appoints J. Dudley B. Kimball, Esq. as its agent to receive all notices delivered pursuant to this Guaranty, and service of process pursuant to N.Y. Civil Practice Law and Rules Section 308, and J. Dudley B. Kimball, Esq. is authorized to accept all notices and service of process and other court filings on KF's behalf.   KF agrees that no notices, correspondence, service of process and other court filings need to be sent to KF at any other address except as set forth above in this Section 1(a).

000426-008/00058606-10               {000426-008/00058606-10}                    000426-008/00058606-7
                                     000426-008/00066925-1                      000426-008/00058606-1

1

(b)    Notwithstanding anything to the contrary contained in Paragraph 1(a) above, if after the Commencement Date Tenant (i) provides Landlord with written notice that Tenant intends to vacate the Premises, (ii) within 120 days thereafter  delivers possession of the Premises to Landlord in the condition required by the Lease, and free and clear of all leases, tenancies and rights of occupancy of any person or entity claiming by or through Tenant, and (iii) executes and delivers to Landlord the surrender declaration in the form annexed hereto as Schedule 1 ((i), (ii) and (iii) are hereinafter, collectively, the "Surrender Conditions"; the date on which Tenant satisfies the Surrender Conditions, is hereafter referred to as the "Vacate Date"), then Guarantor's liability under this Paragraph 1 shall be limited to the amount of Rent that is due and payable by the Tenant pursuant to the Lease for the period commencing on the Rent Commencement Date through the Vacate Date (but which date for these purposes shall not be deemed to have occurred earlier than 120 days after the date that Landlord receives the notice described in subsection (i) above) (such amount shall be hereinafter referred to as the "Vacate Date Rent"). "Vacate Date Rent" shall not include amounts arising by reason of any acceleration of Rent.

2.    In addition to Guarantor's obligations pursuant to Section 1 herein, Guarantor hereby guarantees (i) the payment by Tenant of any and all costs and expenses payable by Tenant with respect to any improvements, alterations, additions or changes to the Premises undertaken by Tenant and (ii) the discharge (by bonding or otherwise) of any mechanics' or materialmen's liens which are placed on the premises demised by the Lease or any improvements therein, or the Building arising from the performance of work by Tenant, and Guarantor agrees to indemnify and save harmless Landlord and its agents in respect of the foregoing and to pay all costs and expenses (including, without limitation, reasonable legal fees) of Landlord relating thereto.  The provisions of this paragraph shall survive the expiration or termination of the Lease.  Notwithstanding the foregoing, the amount of the Security Deposit then on deposit with Landlord shall first be applied to Guarantor's obligations pursuant to this Section 2, and Guarantor shall remain liable only for any deficiency.

3.    This Guaranty is an irrevocable, absolute and unconditional guaranty of payment and of performance.  It shall be enforceable against Guarantor without the necessity of any suit or proceeding on Landlord's part of any kind or nature whatsoever against Tenant or its successors or assigns, and without the necessity of resorting to any security under the Lease or any need to give notice of nonpayment, nonperformance or nonobservance or of any notice of acceptance of this Guaranty or of any other notice or demand to which Guarantor might otherwise be entitled, all of which Guarantor hereby expressly waives; and Guarantor hereby expressly agrees that the validity of this Guaranty and the obligations of Guarantor hereunder shall in no way be terminated, affected, diminished or impaired by reason of the assertion or the failure to assert by Landlord against Tenant or against Tenant's successors or assigns, any of the rights or remedies reserved to Landlord pursuant to the provisions of the Lease.

4.    This Guaranty shall be a continuing guaranty and the liability of Guarantor hereunder shall in no way be affected, modified, impaired or diminished by reason of any event or circumstance which might otherwise constitute a legal or equitable discharge of Guarantor, including without limitation: (i) any expiration, assignment, renewal, amendment or modification

of the Lease; (ii) any modification or waiver of or change in any of the terms, covenants, conditions or provisions of the Lease by Landlord to Tenant or its successors or assigns notwithstanding that such modifications or changes increase the liability of Guarantor under this Guaranty; (iii) any dealings or transactions or matter or thing of any kind or nature occurring between Landlord and Tenant or Tenant's successors or assigns; provided, however, that Guarantor's obligations and liabilities under this Guaranty shall not be increased by any such amendment, modification, change, dealings or transactions described in clauses (i), (ii) and (iii) above which shall be entered into after the Lease is assigned to an entity that is not affiliated with Tenant; (iv) any consent, indulgence or other action, inaction or omission with respect to Tenant under or in respect to the Lease; (v) any failure to act, delay or lack of diligence on the part of Landlord to enforce, assert or exercise any right, power or remedy conferred on Landlord under the Lease or this Guaranty; (vi) any compromise, settlement, release or termination of any or all of the obligations of Tenant under the Lease; (vii) any bankruptcy, insolvency, reorganization, arrangement, assignment for the benefit of creditors, receivership or trusteeship affecting Tenant or Tenant's successors or assigns, whether or not notice thereof is given to Guarantor, and/or (viii) any security held or applied by Landlord under the Lease.

5.     If more than one party is executing this Guaranty, this Guaranty is a joint and several guaranty by each of the parties executing as Guarantor. All of Landlord's rights and remedies under the Lease and/or under this Guaranty are intended to be distinct, separate and cumulative and no such right or remedy therein or herein mentioned is intended to be in exclusion of or a waiver of any of the others. This Guaranty and/or any of the provisions hereof cannot be modified, waived or terminated unless such modification, waiver or termination is in writing, signed by Landlord and (in the case of a modification) Guarantor.

6.     Guarantor hereby agrees that whenever at any time or from time to time Guarantor shall make any payment to Landlord or perform or fulfill any covenant, term, condition or agreement hereunder on account of the liability of Guarantor hereunder, Guarantor will notify Landlord in writing that such payment or performance, as the case may be, is for such purpose. No such payment or performance by Guarantor pursuant to any provision hereof shall entitle Guarantor by subrogation or otherwise to the rights of Landlord to any payment by Tenant or out of the property of Tenant, except after payment of all sums and fulfillments of all covenants, terms, conditions or agreements to be paid or performed by Tenant or its permitted successors or assigns under the Lease. Any payments Guarantor may receive from Tenant on account of any subrogation rights at a time where Tenant's obligations under the Lease shall not be paid in full shall be held in trust for Landlord and shall be paid over to Landlord to be credited and applied against the obligations of Tenant in accordance with the terms of the Lease.

7.     Guarantor agrees that it will, at any time and from time to time, within fifteen (15) days following written request by Landlord and without charge therefor, execute, acknowledge and deliver to Landlord a statement certifying that this Guaranty is unmodified and in full force and effect (or if there have been modifications that the same is in full force and effect as modified and stating such modification). Guarantor agrees that such certificates may be relied upon by anyone holding or proposing to acquire any interest in the Premises from or through Landlord or by any mortgagee, ground lessor or prospective mortgagee of the Premises or of any interest therein.

000426-008/00058606-10

8.      Guarantor acknowledges and agrees that all disputes arising, directly or indirectly, out of or relating to this Guaranty and Consent may be adjudicated in the state courts of the State of New York sitting in the county in which the Premises are located (the "County") or the federal courts sitting in the County and hereby expressly and irrevocably submits the person of Guarantor to the in personam jurisdiction of those courts in any suit, action or proceeding arising, directly or indirectly, out of or relating to this Guaranty.  To the extent permitted under applicable law, this consent to personal jurisdiction shall be self-operative and no further instrument or action, other than service of process in one of the manners specified in this Guaranty or as otherwise permitted by law, shall be necessary in order to confer jurisdiction upon the person of Guarantor in any such court.

9.      As a further inducement to Landlord to execute and deliver the Lease and in consideration thereof, Landlord and Guarantor covenant and agree that in any action or proceeding brought on, under or by virtue of this Guaranty, Landlord and Guarantor shall and do waive trial by jury.

10.     Guarantor acknowledges and agrees that it shall be deemed in default under this Guaranty if at any time during the duration of this Guaranty any of the following shall occur:

a.  If, after notice to Guarantor of a default under the Lease, Guarantor shall fail to perform or cause the performance of Tenant's obligations under the Lease, or if Guarantor shall otherwise default in the performance of its obligations under this Guaranty and such default shall continue for ten (10) days after Landlord notifies Guarantor thereof.

b.  If any of the representations made by Guarantor in this Guaranty shall be untrue in any material respect.

11.     The validity and enforcement of this Guaranty shall be governed by and construed in accordance with the internal laws of the State of New York without regard to principles of conflicts of law.

12.     This Guaranty shall be binding upon and inure to the benefit of Guarantor and Landlord, and their respective successors, assigns and/or legal representatives.  This Guaranty may be executed in one or more counterparts, each of which may be a so-called "pen" original, telecopy or electronic file portable data format (.PDF), each of which shall be deemed an original, and all of such counterparts shall together constitute one and the same instrument.

13.     If any provision of this Guaranty or the application thereof to any person or circumstance shall to any extent be held void, unenforceable or invalid, then the remainder of this Guaranty or the application of such provision to persons or circumstances other than those as to which it is held void, unenforceable or invalid, shall not be affected thereby and each provision of this Guaranty shall be valid and enforceable to the fullest extent permitted by law.

*Remainder Intentionally Left Blank*
*&*
*Signature Page to Immediately Follow*

000426-008/00058606-10

IN WITNESS WHEREOF, Guarantor has caused this Guaranty to be duly executed.

Dated:  as of February ___, 2017

MAISON KITSUNE, INC.

By:     _____
        Name: J. Dudley B. Kimball
        Title:   Treasurer

STATE OF NEW YORK       )
                        ) ss:
COUNTY OF NEW YORK  )

On the _____ day of February in the year 2017 before me, the undersigned, personally appeared J. Dudley B. Kimball, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.

_____
Notary Public

000426-008/00058606-10

KITSUNE FRANCE

By: _____
        Name: Gildas Loaëc
        Title:  President

[Signature Page to Good Guy Guaranty re: 248 Lafayette Street]

000426-008/00058606-10

Schedule 1

## SURRENDER DECLARATION

**SURRENDER DECLARATION** dated this _____ day of _____, 20__, by _____, a _____, having an office at _____ ("Tenant").

## W I T N E S E T H:

**WHEREAS,** _____ ("Landlord") and Tenant heretofore entered into a certain written lease (the "Lease") dated _____, 20__, whereby Landlord leased to Tenant certain premises (the "Premises") located at _____, [New York, New York] as more fully described in the Lease, for a term, at the rental and additional rental and upon the covenants, conditions, provisions and agreements contained in such Lease; and

**WHEREAS,** Tenant desires to deliver the keys to the Premises to Landlord and surrender the Premises to Landlord effective as of the date hereof ("Surrender Date").

**NOW, THEREFORE,** in consideration of Ten ($10,00) Dollars and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Tenant hereby declares, covenants, and agrees as follows:

Effective as of the Surrender Date, Tenant hereby surrenders to Landlord all of Tenant's right, title and interest in and to the Premises and the Lease, together with all alterations, installations, additions and improvements in and to said Premises installed by Tenant and not removed by Tenant in accordance with the Lease, and further relinquishes all of its right, title and interest in and to all prepaid rent deposited thereunder and the security deposited thereunder subject to the provisions of Section 19.2 of the Lease, to the intent and purpose that the estate of Tenant in and to the Premises shall be wholly extinguished as of the Surrender Date.

Tenant hereby warrants and represents to Landlord that nothing has been done or suffered by Tenant whereby the Lease, the Premises or the estate of Tenant in and to said Premises or any part thereof, have been encumbered in any way whatsoever; the Tenant has good right to surrender the same; and that no one other than Tenant has acquired through or under Tenant any right, title or interest in and to the Lease or the term and estate thereby granted or in and to all or any part of the Premises covered by the Lease including, without limitation, all alterations, installations, additions and improvements in and to said premises.

Tenant further warrants and represents to Landlord that it has not dealt with any broker in connection with this Declaration, and Tenant agrees to indemnify and hold Landlord harmless from and against any and all claims for commissions, costs, expenses and other compensation on account of the claims of any broker claiming to have dealt with Tenant in connection with this Declaration (including, without limitation, attorneys' fees and disbursements),

The delivery of this Declaration to Landlord shall not affect any liability or obligation of Tenant under the Lease and shall not be construed to diminish, limit or otherwise

000426-008/00058606-10

reduce any liability or obligation that Tenant would otherwise have under the Lease if this Declaration were never delivered to Landlord.

The covenants, conditions, provisions and agreements contained in this Declaration shall bind Tenant, its successors and assigns and inure to the benefit of Landlord and its successors and assigns.

**IN WITNESS WHEREOF,** Tenant has executed this Declaration as of the day and year first above written.

_____,

a _____


By:_____
Name:
Title:

EXHIBIT F

Special Permit


(See attached)

000426-008/00058606-10          {000426-008/00058606-10}          000426-008/00058606-7
                                  000426-008/00066925-1              000426-008/00058606-1
                                        B-1-1

**CITY PLANNING COMMISSION**

September 7, 2016 / Calendar No. 15                                    C 160199 ZSM

**IN THE MATTER OF** an application submitted by Jarv LLC pursuant to Sections 197-c and 201 of the New York City Charter for the grant of a special permit pursuant to Section 74-711 of the Zoning Resolution to modify use regulations of Section 42-14D(2)(b) to allow retail uses (Use Group 6) on portions of the ground floor and cellar of an existing 6-story building, located at 248 Lafayette Street (Block 496, Lot 5), in an M1-5B District, within the SoHo Cast Iron Historic District, Borough of Manhattan, Community District 2.

This application for a special permit was filed by Jarv LLC on February 19, 2016. The requested special permit seeks to modify the regulations of Zoning Resolution Section 42-14(D)(2)(b) to legalize and allow existing Use Group 6 retail uses below the level of the second story at 248 Lafayette Street (Block 496, Lot 5). The project site is located in an M1-5B District within the SoHo-Cast Iron Historic District Extension, within Manhattan Community District 2.

**BACKGROUND**

The project site is a through block building at 248 Lafayette Street a/k/a 87 Crosby Street (Block 496, Lot 5) located between Prince Street to the north and Spring Street to the south within the SoHo-Cast Iron Historic District Extension. The surrounding area, can generally be characterized as two distinct areas separated by Lafayette Street. East of Lafayette Street, the area is of a predominately mixed residential-commercial nature with ground floor retail and residences occupying the upper floors. The buildings are characterized as having strong street walls and range in height from two to seven stories, with the exception of a nine story and two, twelve story buildings. West of Lafayette Street, which includes the project site, land use is predominately commercial and mixed residential-commercial with manufacturing uses interspersed. Buildings in the area are characterized as having strong street walls and range in height from two to 15 stories.

On Lafayette Street, a wide street, the project site has a frontage of 26.27 feet, and on Crosby Street, a narrow street, frontage is 25 feet. The total lot area of this property is 3,450 square feet and the lot is improved with a six-story and cellar building. The building's street wall rises to a height of 77 feet along Lafayette Street and 83 feet along Crosby Street. The building is wholly within the M1-5B zoning district, which permits a maximum manufacturing and commercial FAR

of 5.0 and a maximum community facility FAR of 6.5. Permitted Use Groups as-of-right include 7, 9, 11, 16, 17A, 17B, 17C, and 17E. Use Group 17D Joint Living-Work Quarters for Artists (JLWQA) units are permitted as-of-right in conversions of buildings constructed prior to December 15, 1961, that have a lot coverage that does not exceed 5,000 square feet. Residential use is not permitted as-of-right. Use Group 6 commercial and retail uses are not permitted as-of-right below the level of the second story. The building contains approximately 18,855 square feet of zoning floor area for a FAR of 5.47. The degree of the pre-existing FAR non-compliance will not be increased as part of this application.

The building was constructed in 1900 and built in the Renaissance Revival style. Today, the building is a co-op building, with each of the existing six JLWQA units under individual ownership. The JLWQA use occupies part of the ground floor and the entirety of the remaining five upper floors. In 2013, the applicant became the co-op owner for the remaining portion of the ground floor consisting of 1,390 square feet on the Lafayette Street side of the building and 2,270 square feet of space in the cellar on the Crosby Street side of the building. At the time of purchase, the space was unlawfully occupied as a residence and art gallery. Currently, the portions of the ground floor the cellar owned by the applicant are vacant.

The applicant is seeking a special permit to facilitate a Use Group 6 retail uses in the space he owns. Each space will be for separate retailers. Modifications to the interior spaces will include a new stairwell for JLWQA units between the ground floor and the cellar at the Lafayette Street entrance; installation of an entrance and ADA compliant lift to the cellar level on the Crosby Street side; installation of fire proof self-closing doors for emergency egress; and removal of walls on the ground floor and cellar spaces to create open retail spaces.

On December 7, 2015, the City's Landmark Preservation Commission (LPC) issued a Certificate of Appropriateness (17-9732) approving the façade work and restoration. The application includes a report from the Landmarks Preservation Commission stating that a continuing maintenance program has been established that will result in the preservation of the building.

2                                                                                    C 160199 ZSM

**ENVIRONMENTAL REVIEW**

This application (C 160199 ZSM) was reviewed pursuant to the New York State Environmental Quality Review Act (SEQRA), and the SEQRA regulations set forth in Volume 6 of the New York Code of Rules and Regulations, Section 617.00 et seq. and the City Environmental Quality Review (CEQR) Rules of Procedure of 1991 and Executive Order No. 91 of 1977. The designated CEQR number is 16DCP109M. The lead is the City Planning Commission.

On March 7, 2016, the application (C 160199 ZSM) was determined to be a Type II action pursuant to 6 NYCRR Part 617, Section 617.5(c)(7), which requires no further environmental review.

**UNIFORM LAND USE REVIEW PROCEDURE (ULURP)**

This application (C 160199 ZSM) was certified as complete by the Department of City Planning on April 25, 2016, and was duly referred to Community Board 2 and the Borough President in accordance Title 62 of the Rules of the City of New York, Section 2-02(b).

**Community Board Public Hearing**

Community Board 2 held a public hearing on this application (C 160199 ZSM) on May 19, 2016, and on that date; by a vote of 34 in favor, 0 opposed, and no abstentions or recusals; adopted a resolution recommending approval of the application. The resolution noted the Community Board's desire that the proposed retail spaces not permit eating and drinking establishments.

**Borough President Recommendation**

This application (C 160199 ZSM) was considered by the Borough President, who issued a recommendation on August 3, 2016 supporting approval of the application.

**City Planning Commission Public Hearing**

On July 27, 2016 (Calendar No. 11), the City Planning Commission scheduled August 10, 2016 for a public hearing on this application (C 160199 ZSM). The hearing was duly held on August 10, 2016 (Calendar No. 49). There were two speakers in favor of the application and none in opposition.

3                                                                         C 160199 ZSM

The applicant's land use counsel spoke in favor of the application describing the project site, the proposed project, the landmark preservation approval, and the land use action sought for approval.

A representative for the Manhattan Borough President reiterated the Borough President's recommendation, stating that one of the deciding factors for the approval was due to research that showed a vast percentage of the ground floor uses in the vicinity of the project site were consistent with Use Group 6 retail uses.

There were no other speakers and the hearing was closed.

## WATERFRONT REVITALIZATION PROGRAM CONSISTENCY

The application (C 160199 ZSM) was reviewed by the City Coastal Commission for consistency with the policies of the New York City Waterfront Revitalization Program (WRP), as amended, approved by the New York City Council on October 30, 2013 and by the New York State Department of State on February 3, 2016, pursuant to the New York State Waterfront Revitalization and Coastal Resources Act of 1981, (New York State Executive Law, Section 910 *et seq.*)  The designated WRP number is 15-044.

This action was determined to be consistent with the policies of the New York City Waterfront Revitalization Program.

## CONSIDERATION

The Commission believes that this application for a special permit to facilitate Use Group 6 retail uses below the level of the second story is appropriate.

The existing building at 248 Lafayette Street is located in the M1-5B zoning district, within the SoHo-Cast Iron Historic District where, pursuant to Section 42-14(D)(2)(b) of the Zoning Resolution, retail uses are not permitted below the floor level of the second story. The requested

---

action would allow 1,390 square feet of existing Use Group 6 retail use located on a portion of the ground floor on the Lafayette Street side of the building and 2,270 square feet of Use Group 6 retail space in a portion of the cellar on the Crosby Street side of the building.

The Commission believes that the proposed retail uses will not adversely affect the internal circulation of the building. Access to the retail uses will be separate from the JLWQA units. Therefore, the Commission believes that the proposed modification of use regulations to allow Use Group 6 uses on portions of the ground floor and cellar levels of the building will have minimal adverse effects on the conforming uses within the building.

The Commission recognizes that the surrounding area has evolved from a primarily manufacturing district to an area with a dynamic mix of uses, including residential use, artist live-work spaces, offices, retail and service establishments, and a few remaining manufacturing uses. Therefore, the Commission believes that the proposed retail uses are consistent with the prevailing land use pattern found in the surrounding area and that the proposed modification of use regulations to allow Use Group 6 uses on portions of the ground floor and cellar levels of the building will have minimal adverse effects on the conforming uses in the surrounding area.

The Commission acknowledges the desire of the Community Board that the proposed retail spaces not permit eating and drinking establishments and notes that the applicant's representative stated at the public hearing that he was amenable to precluding eating and drinking establishments on the proposed project site.

The Commission is also in receipt of a report from the Landmarks Preservation Commission stating that it has reviewed the proposal and that a program has been established for continuing maintenance that will result in the preservation of the subject building, and that the required restoration work under the continuing maintenance program contributes to a preservation purpose. The continuing maintenance program is contained within a restrictive declaration entered into in connection with this application. The Commission concurs with the Borough President that the redevelopment and improvement of this building, to be facilitated by this special permit, will enhance the architectural and historic built fabric the SoHo Cast-Iron Historic District.

5                                                                                                    C 160199 ZSM

**FINDINGS**

The City Planning Commission hereby makes the following findings pursuant to Section 74-711 (Landmark preservation in all districts) of the Zoning Resolution:

(1) [This finding is not applicable; no bulk modification is being requested]

(2) Such use modifications shall have minimal adverse effects on the conforming uses within the building and in the surrounding area.

**RESOLUTION**

**RESOLVED,** that the City Planning Commission determines that the action described herein is classified as Type II (6 NYCRR Part 617, Section 617.5(c)(7)) and not subject to review pursuant to State Environmental Quality Review and City Environmental Quality Review; and be it further

**RESOLVED,** the City Coastal Commission finds that the action will not substantially hinder the achievement of any WRP policy and hereby determines that this action is consistent with WRP policies; and be it further

**RESOLVED,** by the City Planning Commission, pursuant to Sections 197-c and 200 of the New York City Charter, that based on the environmental determination, and the consideration and findings described in this report, the application submitted by Jarv LLC pursuant to Sections 197-c and 201 of the New York City Charter for the grant of a special permit pursuant to Section 74-711 (Landmark preservation in all districts) to modify the use regulations of Section 42-14D(2)(b) (Use Group 17) of the Zoning Resolution to allow Use Group 6 retail uses on portions of the ground floor and cellar of an existing six story building, on property located at 248 Lafayette Street (Block 496, Lot 5), in a M1-5B District, within the SoHo-Cast Iron Historic District, Borough of Manhattan, Community District 2, is approved, subject to the following terms and conditions:

6                                                                                    C 160199 ZSM

1. The property that is the subject of this application (C 160199 ZSM) shall be developed in size and arrangement substantially in accordance with the dimensions, specifications and zoning computations indicated on the following approved plans, prepared by Amoia Cody Architecture, filed with this application and incorporated in this resolution:

| Drawing No. | Title | Last Date Revised |
|---|---|---|
| Z101.00 | Zoning Diagrams | January 25, 2016 |
| G001.00 | Site Plan | January 15, 2016 |
| A001.00 | Existing Cellar Plan | January 25, 2016 |
| A002.00 | Existing Mezzanine Plan | January 25, 2016 |
| A003.00 | Existing First Floor Plan | January 25, 2016 |
| A101.00 | Proposed Cellar Plan | January 25, 2016 |
| A102.00 | Proposed First Floor Plan | January 25, 2016 |
| A201.00 | Lafayette Street Elevation Drawing | January 15, 2016 |
| A202.00 | Crosby St Elevation Drawing | January 15, 2016 |
| A301.00 | Building Section | January 15, 2016 |

2. Such development shall conform to all applicable provisions of the Zoning Resolution, except for the modifications specifically granted in this resolution and shown on the plans listed above which have been filed with this application. All zoning computations are subject to verification and approval by the New York City Department of Buildings.

3. Such development shall conform to all applicable laws and regulations relating to its construction, operation and maintenance.

4. All leases, subleases, or other agreements for use or occupancy of space at the subject property shall give actual notice of this special permit to the lessee, sublessee or occupant.

5. Upon failure of any party having any right, title or interest in the property that is the subject of this application, or the failure of any heir, successor, assign, or legal representative of such party, to observe any of the covenants, restrictions, agreements, terms or conditions of this resolution whose provisions shall constitute conditions of the special permit hereby granted, the City Planning Commission

may, without the consent of any other party, revoke any portion of or all of said special permit. Such power of revocation shall be in addition to and not limited to any other powers of the City Planning Commission, or of any other agency of government, or any private person or entity. Any such failure as stated above, or any alteration in the development that is the subject of this application that departs from any of the conditions listed above, is grounds for the City Planning Commission or the City Council, as applicable, to disapprove any application for modification, cancellation or amendment of the special permit hereby granted.

6. Neither the City of New York nor its employees or agents shall have any liability for money damages by reason of the city's or such employee's or agent's failure to act in accordance with the provisions of this special permit.

The above resolution (C 160199 ZSM), duly adopted by the City Planning Commission on September 7, 2016 (Calendar No. 15), is filed with the Office of the Speaker, City Council, and the Borough President together with a copy of the plans of the development, in accordance with the requirements of Section 197-d of the New York City Charter.

**CARL WEISBROD,** Chairman
**KENNETH J. KNUCKLES, ESQ.,** Vice Chairman
**RAYANN BESSER, IRWIN G. CANTOR, P.E., ALFRED C. CERULLO, III, MICHELLE R. DE LA UZ, JOSEPH I. DOUEK, CHERYL COHEN EFFRON, ANNA HAYES LEVIN, ORLANDO MARIN, LARISA ORTIZ,** Commissioners

C 160199 ZSM

Tobi Bergman, *Chair*
Terri Cude, *First Vice Chair*
Susan Kent, *Second Vice Chair*
Bob Gormley, *District Manager*



Antony Wong, *Treasurer*
Keen Berger, *Secretary*
Susan Wittenberg, *Assistant Secretary*

# COMMUNITY BOARD NO. 2, MANHATTAN

## 3 WASHINGTON SQUARE VILLAGE
### NEW YORK, NY 10012-1899
www.cb2manhattan.org
P: 212-979-2272 F: 212-254-5102 E: info@cb2manhattan.org
Greenwich Village ❖ Little Italy ❖ SoHo ❖ NoHo ❖ Hudson Square ❖ Chinatown ❖ Gansevoort Market

May 23, 2016

Carl Weisbrod, Director
City Planning Commission
22 Reade Street
New York, NY 10007

Dear Mr. Weisbrod:

At its Full Board meeting on May 19, 2016, CB#2, Manhattan (CB#2-Man.), adopted the following resolution:

**248 Lafayette Street** (west side between Prince and Spring Streets) Application to CPC for a special permit pursuant to Section 74-711 of the Zoning Resolution to allow retail uses (Use Group 6) on portions of the ground floor and basement of an existing six-story building in a M1-5B district

**Whereas:**

1. Application is to convert 2270sf of space in basement with entrance on Crosby St. and 1390sf (approximately half) of first floor to Use Group 6 retail.

2. JLWQA residents on first to sixth floors will not be affected and the applicant stated that the application has the approval of the building's coop board.

3. Applicant agrees to no eating and drinking establishments in the proposed retail spaces.

**Therefore,** CB2, Man. recommends approval of this application.

Vote: Unanimous, with 34 Board members in favor.

Please advise us of any decision or action taken in response to this resolution.

Sincerely,

Tobi Bergman, Chair
Community Board #2, Manhattan

Anita Brandt, Chair
Land Use & Business Development Committee
Community Board #2, Manhattan

TB/fa

c:     Hon. Jerrold L. Nadler, Congressman
       Hon. Deborah Glick, Assembly Member
       Hon. Daniel Squadron, NY State Senator
       Hon. Gale A. Brewer, Manhattan Borough President
       Hon. Margaret Chin, Council Member
       Sylvia Li, Dept. of City Planning

OFFICE OF THE PRESIDENT
BOROUGH OF MANHATTAN
THE CITY OF NEW YORK

1 Centre Street, 19th floor, New York, NY 10007
(212) 669-8300 p    (212) 669-4306 f

431 West 125th Street, New York, NY 10027
(212) 531-1609 p    (212) 531-4615 f

*www.manhattanbp.nyc.gov*

**Gale A. Brewer, Borough President**

**August 3, 2016**

**Recommendation on ULURP Application No. C 160199 ZSM - 248 Lafayette Street
By Jarv LLC**

**PROPOSED ACTION**

Jarv LLC[1] ('the applicant") seeks a special permit pursuant to Section 74-711 of the Zoning
Resolution ("ZR") to modify the use regulations of Section 42-14D (2)(b) to allow Use Group 6
(commercial use) on portions of the ground floor and cellar of an existing six-story building at
248 Lafayette Street, Block 496, Lot 5 ("Project Site"), located in a M1-5B District within the
SoHo Cast Iron Historic District, Borough of Manhattan, Community District 2.

Pursuant to ZR §74-711, applicants may request a special permit to modify the use regulations of
zoning lots that contain landmarks or are within Historic Districts as designated by the
Landmarks Preservation Commission ("LPC"). In order for the City Planning Commission
("CPC") to grant use modifications, the applicant must first meet the following conditions:

1.  The LPC has issued a report stating that the applicant will establish a continuing
    maintenance program for the preservation of the subject building or buildings, and that
    such use or bulk modifications, or restorative work required under this continuing
    maintenance program will contribute to a preservation purpose;[2]
2.  The application shall include a Certificate of Appropriateness, other permit, or report
    from LPC stating that such bulk modifications relate harmoniously to the subject
    landmark building in the Historic District;[3] and
3.  The maximum number of permitted dwelling units is as set forth in ZR § 15-111.[4]

Further, in order to grant a special permit, the CPC must find that:

1.  The modifications shall have minimal adverse effects on the structures or open space in
    the vicinity in terms of scale, location and access to light and air; and
2.  Such modifications shall have minimal adverse effects on the conforming uses within the
    building and in the surrounding area.

**PROJECT DESCRIPTION**

---

[1] Jarv LLC is the co-op owner of portions of the ground floor and cellar.
[2] The LPC issued a report on March 5, 2014.
[3] The LPC issued the Certificate of Appropriateness 17-9732 (LPC 17-9258) on March 5, 2014.
[4] Pursuant to ZR § 15-111, up to 18 dwelling units would be permitted at this site. As proposed, this building will
have three dwelling units.

The applicant proposes to convert 2,270 square feet of floor area in the cellar for a new, separate retail space with an entrance located on the Crosby Street side and 1,390 sf. (approximately half) of the portion of the first floor to Use Group 6 retail use with an entrance on the Lafayette Street side.

The applicant's proposal does not include any change to the height or bulk of the building. The building sits within the SoHo-Cast Iron Historic District Extension. The LPC designated the SoHo-Cast Iron Historic District in 1973, citing it as the largest collection of intact and partial cast iron facades. This district was later extended in 2010. The special permit pursuant to § 74-711 requires the applicant enter into a Restrictive Declaration with the LPC and establish a continuing maintenance program for the preservation of the building.

**Area Context**
The project site is located in a M1-5B zoning district in the SoHo-Cast Iron Historic District Extension in Community District 2, Manhattan. The SoHo-Cast Iron Historic District Extension was designated by the Landmark's Preservation Commission in 2010 as an effort to preserve the continuity of the streetscape of cast iron architecture along Crosby and Howard Streets developed in the post-Civil War era. The SoHo-Cast Iron Historic District consists of two subsections, including 13 blocks containing 135 buildings. The project area is north of the Tribeca East Historic District, historically the commercial and industrial center of the city. Designated in 1992, the Tribeca East Historic District includes ornate store and loft buildings developed in the mid-19th to early 20th century. To the north of the site are the NoHo Historic District, the NoHo Historic District Extension and the NoHo East Historic District. The NoHo Historic District was designated in 1999, which includes buildings constructed between 1850 and 1910, and was historically the retail and wholesale dry goods commercial center. The NoHo Historic District Extension was designated in 2008 as an effort to extend the protection of the distinctive historic commercial and manufacturing district developed in the 19th and early 20th centuries. The NoHo East Historic District, designated in 2003, includes residential, commercial and institutional buildings built in the mid-19th Century.

M1-5B zoning districts permits light manufacturing, commercial and community facility uses. The manufacturing and commercial maximum floor area ratio ("FAR") is 5.0 and community facility FAR is 6.5. The building character surrounding the site reflects the permitted use, though there are many ground floor retail establishments. The neighborhood generally consists of two to fifteen-story buildings that are major commercial uses, mixed commercial & residential uses and residential uses with ground floor retail. The dominant zoning district in the area is M1-5B. Other zoning districts within a 600-foot radius include M1-5A, C6-1, C6-2, C6-3 and the Special Little Italy District. While residential use is not permitted as-of-right, Joint Live-Work Quarter for Artists ("JLWQA") is a permitted conforming use within the greater NoHo and SoHo neighborhoods. In addition, the majority of the ground floor retail that does exist was generally granted by special permit - ground floor retail is not allowed in the M1-5B and M1-5A districts below the level of the second story.

The area is well served by mass transit with the N/Q train entrance one block northwest at Prince Street and Broadway, the 6 train entrance one block south at Spring Street and Lafayette Street

and the B/D/F/M trains entrance two block north at East Houston Street and Lafayette Street. The M5 bus runs south on Broadway and there are multiple Citi bike bicycle stations two to three blocks west, north and south of the site.

**Site Description**

The Project Site is fully comprised of Tax Lot 5 on Block 496; a through block lot located midblock, which is generally bounded by Lafayette Street to the east, Crosby to the west, Prince Street to the north and Spring Street to the south. The Project Site sits on an irregular lot with a frontage of 26.7 feet along the west side of Lafayette Street and 25 feet of frontage on the east side of Crosby Street. The lot is 134 feet in depth on the north side and 142 feet in depth on the south side of the lot with an approximately total lot area that equals 3,450 square feet. Although the project site FAR is 5.47 and exceeds the permitted maximum, that floor area is considered a lawful non-conforming use.

The project site is a six-story mixed-use building with cellar that reaches 77 feet tall on Lafayette Street and 83.5 feet tall on Crosby street. Designed by Architect C. Abbott French and erected in 1900, the building exterior reflects the Renaissance Revival style adopted by similar-sized commercial buildings in this area at the beginning of the 19th Century and contributed to the defining characteristics that joined these buildings together as one of the City's major manufacturing areas[5]. The types of businesses at the project site have varied over the years[6], but the most recent commercial use on the project site is a mobile phone shop specializing in no contract phones and mobile accessories.

Floors one through six of the building were converted into JLWQA pursuit to a certification granted by the City Planning Commission in 1981. In a M1-5B district, joint-live working quarters are permitted as a light manufacturing use. The ownership of the building is divided by a cooperative cooperation, City Studios Inc., which owns the top 5 floors, the ground floor and cellar.

**Proposed Actions**

The applicant seeks a special permit pursuant to Section 74-711 of the Zoning Resolution ("ZR") to modify use regulations of Section 42-14D (2)(b) that would allow Use Group 6 (commercial use) on portions of the ground floor and cellar of an existing building.

The planned renovations, if permitted, would remove the existing ground floor enclosure, areaway stair, and below-grade entrance infill. The applicant intends to convert 2,270 square feet of floor area in the cellar for a new, separate retail space with an entrance located on the Crosby

---

[5] 1 "Soho-Cast Iron Historic District Extension Designation Report" NYC Landmarks Preservation Commission, pg. 68 (May 10, 2010)

[6] Some of the businesses that have been registered at this address include: Greenberg & Co., hat makers (1907); the Magneto Fly Trap Co. (1914); a rowboat manufacturer (1925); Israel Kartiganer, milliner (1933); Lafayette Venetian Blind Co. (1939); Arjay Metal Products Co. (1949); manufacturers of containers, knit fabrics, and hair products 69 (1952); a bar and grill (1954); a metal stamping shop (1966); unknown wholesale establishment (1982), and the Art Student Showcase Gallery (1999).

Street side and 1,390 square feet (approximately half) of the portion of the first floor to Use Group 6 retail use with its own separate entrance on the Lafayette Street side. None of the proposed actions will disrupt or change the status of the existing JLWQA units located partially on the ground floor and through the 5 floors above.

Prior to seeking this special permit, the applicant obtained a Certificate of Appropriateness[7] and report from the NYC Landmarks Preservation Commission (LPC) establishing a continuing maintenance program recorded as a restrictive declaration that will be filed against the property. A restoration plan has been approved for both facades, including a fiberglass replica of the missing cornice on the Lafayette and Crosby façades, new wood storefront infill, and a window master plan. The LPC concluded that the plan would restore the building façade more closely to its original look and contribute to the historic fabric of the district.

As described in the application materials, Certificate of Appropriateness and LPC report, the reconstruction and restoration of the building will put the building in a sound, first-class condition. The LPC noted in its report to the City Planning Commission that the restoration work "returned the building closer to its original appearance, and will reinforce the architectural and historic character of the building, the streetscape, and SoHo-Cast Iron Historic District Extension."

## COMMUNITY BOARD RECOMMENDATION

At its Full Board meeting on May 19, 2016 Manhattan Community Board 2 ("CB2") voted unanimously (34 Board members) for approval of this application. CB2's approval was contingent on the applicant agreeing to exclude eating and drinking establishments from potential vendors in the proposed retail spaces. Additionally, CB2 made clear their position that JLWQA residents not be affected.

## BOROUGH PRESIDENT'S COMMENTS

After reviewing the applicant's submission, the Borough President believes a sound and thorough argument has been presented for granting a special permit pursuant to ZR § 74-711. The applicants have acted in good faith with a proposal that does nothing to modify the use of the JLWQA units above the ground floor and with a commitment to a robust restoration and maintenance plan for both the Lafayette and Crosby sides of the lot. Additionally, the applicants showed their willingness to work with the community by addressing CB2's concerns by prohibiting any eating and drinking establishments from occupying the ground floor or cellar.

The special permit pursuant to ZR § 74-711 is a powerful tool that can be employed to modify use or bulk restrictions set out in the Zoning Resolution in order to make the ownership and maintenance of historic buildings less financially burdensome. To that end, LPC concluded in a letter sent to the Department of City Planning (DCP) on November 5, 2015 that the applicant's restoration plans should return the building closer to its original appearance. The report also

---

[7] NYC Landmark Preservation Commission Certificate of Appropriateness 17-9732 (LPC 17-9258)

noted that these changes should strengthen the historic character of Lafayette and Crosby Streets, and provide a value-added restored building to the broader SoHo-Cast Iron Historic District Extension. The applicant's agreement to improve the building's facade to first class condition and establish a cyclical maintenance plan codified in a restrictive declaration against the property binding all heirs into perpetuity is a commendable response to the findings for a use waiver from CPC.

Data provided by the applicant also reinforced the anecdotal evidence that SoHo and NoHo has undergone a strong shift towards ground floor retail use from its roots as a manufacturing district. The results of survey work completed by the applicant showed the overwhelming presence of ground floor retail on Crosby and Lafayette Street and determined that ground floor retail existed in 82% of the buildings on Crosby and Lafayette Street between Broome and Houston Streets. However, while the applicants' provided survey does show that this area is mixed-use in character, it does not address whether that shift occurred pursuant to zoning. The Borough President continues to believe in a study for this neighborhood and that the prevalence of non-conformance should not be used as justification for further incursions.

However, for this particular building located at 248 Lafayette Street and the special permit currently under consideration, the building form and historic storefront clearly lends itself to commercial retail use. The small building floor plate has historically given flexibility to a plethora of commercial and manufacturing uses. Existing storefront infill indicates a store presence for portions of this building's history. Furthermore, the footprints planned as part of the renovation, 2,270 square feet and 1,390 square feet, are examples of the kind of local retail that serve local residents, local business entrepreneurship, and are contributors to the character of the neighborhood today.

The conditions and findings have been satisfied for the requested special permit. The applicant has presented a thorough restoration and maintenance plan and provided a compelling case for legalization of a non-conforming use, a corrective action sought immediately upon discovery. Additionally, the applicant has received the support of Manhattan CB2 by listening to their concerns and emphasizing that no changes to the status of the JLWQA units is part of this application and that eating and drinking establishments will not be allowed in either of the commercial spaces on the project site.

**BOROUGH PRESIDENT'S RECOMMENDATION**
Therefore, the Manhattan Borough President recommends approval of ULURP Application No. C 160199 ZSM.

Gale A. Brewer
Manhattan Borough President



JARV LLC
248 Lafayette Street
New York, NY 10012

Council Member Margaret Chin
250 Broadway
Suite 1882
New York, NY 10007

> Re:    248 Lafayette Street, Manhattan
>        74-711 Special Permit Application

September 22, 2016

Dear Council Member Chin,

I am the co-op owner of a portion of the ground floor and cellar space of the building located at 248 Lafayette Street (aka 87 Crosby Street). The Site is located in an M1-5B zoning district where Use Group 6 commercial uses are not permitted as of right. Through a ZR 74-711 special permit application I have proposed to convert the ground floor space on the Lafayette Street side and the cellar space on the Crosby Street side to Use Group 6. On September 7, 2016 the NYC City Planning Commission approved the application. As it has been a concern with the local Community Board 2, we have committed to not occupy the space with an eating and drinking establishment. This letter confirms that commitment.

Sincerely,

X _____

Victor Setton
JARV LLC President

Additional Rent...........................................7
Alterations..................................................65
Bankruptcy Code ......................................52
Base Tax Year.............................................1
Builders' Risk ...........................................66
Building .......................................................1
Cancellation Acceptance ..........................28
Cancellation Payment ...............................28
CGL ..........................................................66
Commencement Date.................................10
Control Area ..............................................25
Cure Period ...............................................53
Current Tax Period ....................................22
Destruction Date .......................................49
Environmental Laws..................................70
Existing L/C...............................................77
Expiration Date............................................6
Failure to do Business...............................28
Fair Market Rental Rate............................11
Fixed Rent.................................................13
Guarantor ..................................................83
Guaranty ...................................................83
Hazardous Substances or Waste...............70
HVAC........................................................37
ICAP .........................................................82
Program.....................................................82
Issuing Bank .............................................76
Landlord.......................................................1
Landlord Parties........................................33
Landlord's Determination..........................11
Landlord's Notice .....................................11
Landlord's Work..........................................7
Laws..........................................................47
Lease ......................................................1, 40
Lease Term .................................................6
Lease Year ...................................................3
Letter of Credit .........................................76
Maintenance Fees .....................................79
Minimum Rating Requirement..................77
Mortgage...................................................51
Non-Renewal Notice .................................76
Notice........................................................58
Operating Expenses ..................................20
Partial Lease Year.......................................3

Permitted Use............................................25
Premises......................................................6
Qualified Appraiser ..................................11
Real Estate Taxes........................................3
Renewal Notice .........................................11
Renewal Term............................................10
Rent...........................................................14
Rent Commencement Date ........................10
Replacement L/C .......................................77
Replacement Notice...................................77
Responsible Party .....................................80
Security Deposit........................................75
Sign Items .................................................72
Signage Replacement.................................73
Special Cause of Loss Form .....................33
Subsequent Year .........................................4
Substantial Completion..............................10
Substantially Completed............................10
Substitution Space ....................................81
Superior Lease ..........................................51
Superior Lessor.........................................51
Superior Mortgage ....................................51
Superior Mortgagee ..................................51
Tax Expenses..............................................5
Tax Statement.............................................5
Tax Year .....................................................5
Temporary Cessation.................................28
Tenant .........................................................1
Tenant Change ..........................................32
Tenant's Determination .............................11
Tenant's Notice..........................................11
Tenant's Property.......................................29
Tenant's Property Policy ...........................33
Tenant's Proportionate Share .....................5
Tenant's Tax Payment ...............................22
Tenant's Work .............................................7
Term............................................................6
Termination Date.......................................62
Termination Notice....................................62
Third Qualified Appraiser.........................12
Transferee .................................................71
Work .........................................................36
Work Completion Date................................7

000426-008/00058606-10                  {000426-008/00058606-10}                  000426-008/00058606-7
                                        000426-008/00066925-1                     000426-008/00058606-1