# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————x

MAISON KITSUNE, INC.,

                Plaintiff,                          Docket No. 24-cv-04431 (ALC)

                ~~Plaintiff,~~

                v.

VINOD KASTURI,

                Defendant.

———————————————————————x

VINOD KASTURI,

                Counterclaimant and
                Third-Party Plaintiff,

                v.

MAISON KITSUNE, INC. and KITSUNE
CREATIVE SAS,

                Counterclaim and
                Third-Party Defendants.

———————————————————————x

**MEMORANDUM OF LAW IN SUPPORT OF ~~PLAINTIFF/COUNTER-DEFENDANT MAISON~~THIRD-PARTY DEFENDANT KITSUNE~~, INC~~ CREATIVE S.A.S.'S MOTION TO DISMISS ~~COUNTERCLAIMS~~THIRD-PARTY COMPLAINT**

Of Counsel:

Paul S. Haberman
Mueller Haberman Law Group
19 Engle Street, Tenafly, New Jersey 07670
88 Pine Street, 22nd Floor, New York, New York 10005
phaberman@muellerfirm.com: Email
(201) 567-4969: Phone

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES................................................................iv

PRELIMINARY STATEMENT.............................................................1

RELEVANT PROCEDURAL HISTORY/MATERIAL FACTS.......................3

    Summary of the Pertinent Factual Allegations in the French Complaint...............3

    Summary of the Pertinent Factual Allegations in the Counterclaims............~~6~~7

    The Affidavit of Raphael Grand (Summary).................................10

ARGUMENT.............................................................................~~9~~12

    I.    THE COUNTERCLAIMS SHOULD BE DISMISSED PURSUANT
        TO PRINCIPLES OF INTERNATIONAL COMITY AND THE
        "PRIOR ACTION PENDING" DOCTRINE...............................~~9~~12

        i.    The Parties in the French Complaint and the Equity
           ~~Counterclaims are Substantially~~Third-Party Claims are Exactly the Same~~10~~13

        ii.    The Issues in the French Complaint and the Equity
           ~~Counterclaims are Substantially Similar if Not~~Third-Party Claims
           Identical.................................................~~11~~14

        iii.    The Interest of Judicial Economy Favors Dismissing the
           Equity ~~Counterclaims~~Third-Party Claims in Favor of the
           Commercial Court
           of Paris..................................................~~13~~16

        iv.    Third-Party Defendant's French Action was Filed Three (3)
           Months Before Defendant's ~~Equity Counterclaims14~~Third-Party Complaint    17

        v.    The Commercial Court of Paris is the Most Adequate
           Forum in Which to Litigate the ~~Equity~~Third-Party Counterclaims..........~~15~~18

        vi.    The Commercial Court of Paris and the Southern
           District of New York are Similarly Convenient to the
           Parties..................................................~~16~~20

        vii.    There Would be Prejudice to ~~Plaintiff~~Third-Party Defendant if the Equity
           ~~Counterclaims are Heard in the Instant Matter Rather Than in the~~
           ~~Commercial Court of Paris, as the Equity~~
           Counterclaims are Heard in the Instant Matter Rather Than
           in the Commercial Court of Paris, as the Equity
           ~~Counterclaims~~Third-Party Claims Deal with Decidedly Different Issues
           That Require More Discovery Than Plaintiff's Claims and

the Employment of Experts to Determine Compensation ........................... ~~17~~21

     viii.    The Totality of the Circumstances are Sufficiently ~~Exceptional in Order to Favor Abstention as to the Equity Counterclaims 19~~
Exceptional in Order to Favor Abstention as to the Third-Party Claims ............................................................................... 23

CONCLUSION .................................................................................................................... ~~19~~25

## TABLE OF AUTHORITIES

**Cases**

Conti Zweite Cristallo Schiffarhrts GMBH & Co. v. PPG Industries, Inc.,
2001 WL 1154690 (S.D.N.Y. Sept. 28, 2001) ~~15~~19

Cunard S.S. Co. Ltd. v. Salen Reefer Services AB, 773 F.2d 452 (2d Cir. 1985) ~~15~~18

Doody v. Nationstar Mortgage, LLC, 2023 WL 8476322 (D. Conn. Dec. 7, 2023) ~~10~~13, ~~12~~15

Gambra v. Int'l Lease Fin. Corp., 377 F. Supp.2d 810 (C. D. Cal. 2005) ~~16~~19

In re: Atari, Inc., 2016 WL 1618346 (S.D.N.Y. April 16, 2016) ~~15~~18

In re: Solutia, Inc., 653 B.R. 99 (S.D.N.Y. 2023) ~~15~~18

Int'l Nutrition Co. v. Horphag Research Ltd., 257 F.3d 1324 (Fed. Cir. 2001) ~~16~~19

Landis v. N. Am. Co., 299 U.S. 248 (1936) ~~9~~12

Lickteig v. Cerberus Capital Management, L.P., 589 F. Supp.3d 302
(S.D.N.Y. 2022) ~~18-19~~22

Motion Picture Lab'y Technicians Local 780 v. McGregor & Werner Inc.,
804 F.2d 16 (2d Cir. 1986) ~~10~~13

Ole Media Management, L.P. v. EMI April Music, Inc.,
2013 WL 2531277 (S.D.N.Y. June 10, 2013) ~~9~~12, ~~10~~13, ~~11~~14

Oui Financing LLC v. Dellar, 2013 WL 5568732 (S.D.N.Y. Oct. 9, 2013) ~~15~~19

Royal & Sun Alliance Ins. Co. of Canada v. Century Int'l Arms, Inc.,
466 F.3d 88 (2d Cir. 2006) ~~9-10~~13

Scholastic Inc. v. Harris, 259 F.3d 73 (2d Cir. 2001) ~~19~~22

Sunset Equities Ltd. v. Donald J. Urgo & Assocs., LLC, 2024 WL 1195414
(S.D.N.Y. March 20, 2024) ~~10~~13, ~~19~~23

**Statutes and Other Authorities**

5C Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 1360 ~~10~~13, ~~12~~15-16

**PRELIMINARY STATEMENT**

In a readily transparent effort by defendant VINOD KASTURI (the "Defendant") to avoid litigation in the Commercial Court of Paris as to certain actions affecting third-party defendant KITSUNE CREATIVE SAS (the "Third-Party Defendant"), Defendant filed his September 3, 2024 "Answer with Affirmative Defenses, Counterclaims, and Third-Party Complaint" (the "~~Counterclaims~~Third-Party Claims" for the purposes of this motion)[1] in which he meticulously details his position as to a dispute for which a lawsuit was already filed in France by Third-Party Defendant three (3) months earlier (the "French  Complaint").

As detailed at length herein, Defendant's ~~Counterclaims~~Third-Party Claims are not only related to issues appreciably different than those giving rise to plaintiff MAISON KITSUNE, INC.'s (the "Plaintiff") instant lawsuit, but are also for ~~Counterclaims~~Third-Party Claims (1) to (4) wholly identical to those raised in the French Complaint.

 In short~~Put shortly~~, the ~~Counterclaims~~Third-Party Claims can be divided in two very distinct categories:

- First, Third-Party  Claims/Counterclaims (1) to (5) all relate to whether there existed an equity incentive plan which could have resulted in the monetized sum of $9.1 million to Defendant's benefit (the "Equity ~~CC~~TPC");

---

[1]   ~~As of the date of this filing, Plaintiff has not received any notice of the service of the Answer with Affirmative Defenses, Counterclaims, and Third-Party Complaint upon Third-Party Defendant, which is a separate legal entity that does not conduct business in the United States. Likewise, Plaintiff's counsel has not been asked to represent Third-Party Defendant. Accordingly, to the extent that the same facts purportedly constitute a third-party complaint, their sufficiency or appropriateness for the purposes of a third-party complaint are not addressed in this motion. Further, it is not intended that this motion be the only motion that may potentially be filed in connection with Defendant's counterclaims.~~

- Second, Third-Party Claims/Counterclaims (6) to (8) relate to whether Defendant should be able to claim, under various labor law provisions, damages against his former employer, Plaintiff (the "Labor CC").

As was the case in pending motion by Plaintiff accepts that(D.E. No. 20), the Labor CC are not an issue in this motion, as the Labor CC are related to the employment relationship between itPlaintiff and Defendant and should be adjudicated in the present lawsuit as this would be satisfy the pursuit of a good administration of justice in terms of rationalization of costs.

The same cannot however be said of the Equity CCTPC. The Equity CCTPC create a full panoply of unrelated issues and litigation demands upon the instant lawsuit which serve little purpose in this Court other than to obfuscate the claims by Plaintiff that Defendant repeatedly misused, or otherwise misappropriated, Plaintiff's funds prior to his termination. It is Defendant's wholesale misuse and misappropriation of Plaintiff's funds alone that gave rise to this lawsuit. At the same time, it is the dispute that arose between Third-Party Defendant and Defendant as to the existence of Defendant's purported incentive plan which gave rise to the French Complaint.

Defendant's Equity CCTPC are therefore both (i) entirely unrelated to the issues which are being put for adjudication by Plaintiff in the present proceedings, and (ii) entirely duplicative of the issues that have already been put for adjudication by Third-Party Defendant in the proceedings already commenced and pending before the Commercial Court of Paris. In fact, Defendant has not filed a motion to dispute the jurisdiction of the Commercial Court of Paris in relation to the French Complaint, even though it had ample time and leave to do so. As

a result, the Equity ~~CC~~TPC have no place in the Southern District of New York where, in any event, there is no personal jurisdiction over Third-Party Defendant. Rather, they should be litigated where they belong and where they are already being adjudicated: the Commercial Court of Paris (now called the "*Tribunal des activités économiques*"). Accordingly, for the reasons discussed at length herein, as well as those similarly discussed at length in Plaintiff's pending motion (D.E. No. 20). Defendant's Equity ~~CC~~TPC should be dismissed in their entirety.

## RELEVANT PROCEDURAL HISTORY/ MATERIAL FACTS[1]

On or about June 3, ~~2023~~2024, Third-Party Defendant filed the French Complaint in the Commercial Court of Paris. Exh. A. Defendant is the only named defendant in the French Complaint. Id. Plaintiff is not a party to the French Complaint. Id. As will be documented below, the entirety of the French Complaint deals with claims arising as a result of the history of the inconclusive negotiation of an incentive plan by Defendant and Third-Party Defendant between September 2016 and May 2023. Id. Defendant was served with the French Complaint on June 14, 2024. Exh. B. Despite the earlier filing and service of the French Complaint, Defendant filed his Counterclaims on September 3, 2024 even though they pertain, in relation to the equity plan, to substantially identical issues to those in the French Complaint. See, ~~Counterclaims~~Third-Party Claims.

---

[1] As the Court will likely note that the factual allegations contained herein are substantially similar to those contained within Plaintiff's pending motion (D.E. No. 20). Having said that, the focus of this motion is different because it is Third-Party Defendant, a French entity, that is making this motion, not Plaintiff, the U.S. based legal entity that actually employed Defendant . It is therefore respectfully requested that, to the extent that the motions are not reviewed separately, that the Court be cognizant that Third-Party Defendant, unlike Plaintiff, is not a U.S.-based entity, and thus that it does not summarily lump the two entities together for its consideration of the merits of each motion. Such a scenario would only feed into Defendant's efforts to confuse many of the issues by his misleading assertions as their overlap.

**Summary of the Pertinent Factual Allegations in the French Complaint**

According to the French Complaint, from 2016 to 2024, Defendant was the head of American operations for the Kitsune group, and led its American and Canadian subsidiaries. Exh. A at ¶ 5.[2] Defendant was ultimately employed by ~~Third-Party Defendant~~Plaintiff from September 5, 2016 until March 28, 2024, at which time he was terminated following the discovery of the misuse of corporate funds taken by Defendant. Id. at ¶¶ 12-15.

Prior to Defendant's termination, there was nearly eight (8) years of intermittent discussion between Defendant and Third-Party Defendant as to the implementation of a possible equity incentive plan for Defendant. Despite the protracted talks as to an incentive plan, the parties were never able to agree to either: (i) the actual nature of the incentive instrument; (ii) the identity of the company within the Kitsune group that would issue the incentive plan (suggestions varied between Plaintiff and Third-Party Defendant, but was never conclusively settled between the parties); or (iii) the key terms and conditions that would have governed the contract for the issue of the incentive instruments in question including, but not limited to, issue date, issue term, issue price, exercise price, holding period, liquidation conditions, etc. Id. at ¶ 17. The discussions as to incentives took place throughout five (5) distinct time periods:

- Between July and September 2016, the parties discussed the possibility of granting shares to Defendant by allowing him to subscribe to a plan to issue BSPCEs [a singular French instrument for ~~young~~nascent companies that is governed by the French General Tax Code]. Defendant refused this proposal and instead requested the

---

[2]     The numbered paragraphs begin on Page 13 of this Exhibit under the heading "PURPOSE OF THE REQUEST."

allocation of warrants or any other equivalent instrument entitling him to ordinary shares totaling 1.5% of Third-Party Defendant's ordinary shares. Id. at ¶¶ 18, 42;.

- x Between June 2020 and January 2021, Defendant counter-proposed that he be granted free ordinary shares corresponding to Three Percent (3%) of Third-Party Defendant's capital stock, while indicating that share warrants could also be granted to him. Third-Party Defendant did not accept this proposal. Id.;

- Between July and October 2021, the negotiations resumed with a different incentive offer that Defendant be granted an incentive instrument with Plaintiff (and no longer Third-Party Defendant) as this made more sense since he was head of Plaintiff and any incentive should have been adjusted to his operation perimeter. The offer remained, however, unclear as to the exact nature of the instrument to be issued, provided however that they be similar to stock options. Following Defendant's objections to the offer, discussions continued until October 2021 pursuant to which Defendant never replied to Third-Party Defendant's last email;

- January 2022, Third-Party Defendant and Defendant emailed again to see if they could finalize the incentive plan. Following a couple of exchanges, the topic was dropped until October 27, 2022; and

- Between October 27, 2022 and April, 2023, Defendant proposed an entirely new incentive formula involving the contractualization of phantom stocks in Third-Party Defendant's American subsidiary, Plaintiff. It was also the first time that Defendant documented the demand that he ~~receive~~receives equivalent economic rights to the value of the purported equity he was requesting should Third-Party Defendant not issue the ordinary shares. This is of importance because that is the underlying basis of

Defendant's ~~counterclaims~~Third-Party Claims (1) to (4) against Plaintiff, i.e., that he be granted equivalent economic rights commensurate to the value of the equity he deems he should have been granted under the phantom plan documentation which would be shared by his counsel, Foley Hoag LLP, shortly thereafter. Third-Party Defendant, having not seen such a mechanism for incentives under French law, did not accept the documentation presented to it as to this proposed incentive formula. Id. at ¶ 18.

It follows from the foregoing that neither ~~Plaintiff nor~~ Third-Party Defendant nor Plaintiff ever issued any of the various and changing incentive instruments discussed by email with Defendant. And Defendant never subscribed to any instrument issued by Third-Party Defendant. Id. at ¶ 19. Each of the aforementioned rounds of negotiations are described in detail within the French Complaint. Id. at ¶¶ 19-91.

As a result of Defendant's saber-rattling and related correspondence, the French Complaint concludes by asking that the Commercial Court of Paris find that: (1) "there is no contract between [Defendant] and [Third-Party Defendant] relating to an incentive plan in [Third-Party Defendant's] capital for the benefit of [Defendant];" (2) "there is no promise between [Defendant] and [Third-Party Defendant] relating to an incentive plan in [Third-Party Defendant's] capital for the benefit of [Defendant];" or, in the alternative, (3) "[Defendant's] claim for compensation under the contract concluded in July 2016 is time-barred," along with costs. Id. at p. 31. In sum, all of the claims for relief pertain solely to the dispute over any alleged incentive plan issues.

Noticeably absent from any of the claims for relief in the French Complaint are any claims arising from the mismanagement of Plaintiff's money, which is the sole focus of the

Complaint in the instant matter, a matter which Third-Party Defendant did not file, or otherwise join as a plaintiff. Equally absent from any of the claims for relief in the French Complaint are any claims regarding Defendant's entitlement to bonuses under his employment agreement with Plaintiff.

**Summary of the Pertinent Factual Allegations in the Third-Party Claims**

Defendant's Equity TPC is based on the following three erroneous factual allegations:

- ~~**Summary of the Pertinent Factual Allegations in the Counterclaims** Defendant alleges in his Counterclaims~~First, that from the outset of his negotiations with Third-Party Defendant, he "made clear that an equity interest...was of a paramount importance to his decision of whether to leave his current employer, and an express condition for him to commence-full time employment with [Plaintiff] []" and that he "was not willing leave a position of employment that included equity as part of his compensation package unless he could similar secure an ownership stake in the Maison Kitsune brand, which he was deeply passionate about developing." ~~Counterclaims~~Third-Party Claims at ¶ 29.

- He further purports that both Plaintiff and Third-Party Defendant agreed to an "Initial Equity Grant" of 1.5% in July 2016, captured within a draft employment agreement, which enticed him to leave his prior employment. Id. at ¶¶ 39-47. Defendant goes on to allege that "[f]or seven years, [Plaintiff and Third-Party Defendant] repeatedly acknowledged and validated the Initial Equity Grant contained in [the] July 2016 Agreement" but also were delayed "in preparing the administrative document representing the issuance of" same. Id. at ¶¶ 54-57. ~~In~~

- • Third, in the interim, between November 2016 and January 2021, Defendant alleges that he "had discussions about the additional grant of 1.5% equity [later referred to throughout as the "Second Equity Grant"]" and that "it ~~was initially~~wasinitially agreed that [Defendant] would receive the total equity grant of 3%[.]" Id. at ¶ 60. The negotiation of a contract reflecting same was discussed between June 5, 2020 and April 12, 2022, but Defendant's allegations do not reflect that any such agreement was ever finalized, or otherwise formalized. Id at. ¶¶ 62-69.

Defendant next details an alleged failure to pay an annual bonus for three (3) years, which he blames exclusively on Plaintiff. Id. at ¶¶ 70-74. As relevant to this motion, Defendant then goes on to detail how, "[i]n the summer of 2023, [Defendant] informed [Plaintiff and Third-Party Defendant] of his desire to move to a reduced work schedule, and to relocate from New York to Los Angeles, as he transitioned to a new employer which was headquartered there." Id. at ¶ 80. Correspondingly, the Parties purportedly "agreed that subject to the execution of the formal documentation regarding [Defendant's] equity grants in the business" Defendant would move to a reduced schedule during which he would receive a reduced salary and certain additional compensation. Id. at ¶ 82. Parties then allegedly continued to discuss the Initial Equity Grant and Secondary Equity Grant through December 2023. Id. at ¶ 85. The discussion is said to have culminated in Defendant providing Plaintiff and Third-Party Defendant "with a draft separation agreement, which incorporated a proposed phantom-stock structure as a simplified and alternative mechanism to satisfy the Initial Equity Grant and Second Equity Grant." Id. at ¶ 89. Defendant alleges that Plaintiff and Third-Party Defendant "refused to engage with [Defendant] or otherwise respond to the draft separation agreement and phantom-stock structure, and also did

not provide any documentation of the Initial Equity Grant and Secondary Equity Grant." Id. at ¶ 90.

Before an equity grant of any sort was allegedly finalized, Defendant was terminated on March 28, 2024. Id. at ¶ 100. Despite the allegations made by Plaintiff in the Complaint, Defendant alleges that the termination was done, inter alia, in "retaliation for insisting on [Third-Party Defendant's] fulfillment of its obligation to provide the Initial Equity Grant that was provided [for] in the July 2016 Agreement and the Second Equity Agreement agreed to in February 2022." Id. at ¶ 104.

Defendant's First, Second, Third, Fourth, and Fifth Counterclaims all make allegations, in pertinent part, as to the alleged equity grants and phantom-stock proposal which, based upon their particulars, are plainly the very same items referred to as "incentive plan[s]" focused upon in the French Complaint. In doing so, Defendant unnecessarily and misleadingly conflates the issues between himself and Plaintiff, on the one hand,[3] and himself and Third-Party Defendant on the other. Or, to borrow the synopsis made by Third-Party Defendant's counsel in the French Complaint, it seems apparent that "[t]he massive confusion created by [Defendant] in [the Counterclaims] is intended to give the impression that all his claims are intertwined and can only be dealt with together. This intentionally confusing factual characterization pursues a single objective: to justify the alleged jurisdiction of the American Courts over [Third-Party Defendant], in order to force the latter to settle in order to avoid very costly litigation before the American courts." Exh. A at ¶ 103.[4]

---

[3]    Pertaining to the failure to pay bonuses.

[4]    For the purpose of this motion, it should be noted that ~~Plaintiff~~Third-Party Defendant is not asking the Court to consider the veracity or facial sufficiency of the Counterclaims/Third-Party Claims, but rather to note the parallel stories told by Third-Party Defendant in the French Complaint and Defendant in his Counterclaims/Third-Party Claims.

**The Affidavit of Raphael Grand**

As detailed within the Affidavit of Raphael Grand, Deputy Managing Director of Third-Party Defendant, annexed hereto as Exhibit C, Third-Party Defendant is a company organized under the laws of France under no. SIRET 538 017 187 with the registry of commerce and companies of Paris (France). Exh. C at ¶ 6. Third-Party Defendant, as an issuer of securities, is governed by French securities law and falls under the supervision of the French's *Autorite des Marches Financiers*. Id. at ¶ 7. All of the holders of equity interests in Third-Party Defendant, with respect to any disputes arising out of the interpretation, or enforcement of, the underlying securities are bond by corporate legal documentation subjecting any such disputes to French law and the exclusive jurisdiction of French courts. Id. at ¶ 8. More specific to this matter, any claims of shareholders in Third-Party Defendant against Third-Party Defendant with regards to the underlying securities must be submitted to the Commercial Court of France. Id. at ¶ 9 (annexing pertinent excerpt of Third-Party Defendants' October 19, 2016 shareholders' agreement). Any issuance, divestiture, or reallocation of securities of Third-Party Defendant also require the consent of its shareholders to approve any such issuance under the laws of France. Id. at ¶ 10.

Mr. Grand goes on to confirm both that Third-Party Defendant is not a party to the employment agreement between Defendant and Plaintiff and that Plaintiff is a separate and distinct legal entity. Id. at ¶¶ 11, 12. Moreover, Defendant did not sign any written agreement with Third-Party Defendant for the issuance of its securities. Id. at ¶ 13. As with other agreements for the issuance of Third-Party Defendant's securities that Mr. Grand is aware of, if it had been issued, such an agreement would have been governed by French law and would have included an exclusive choice of forum provision designating the Commercial Court of

Paris as the sole court in which to litigate any disputes of the nature raised by Defendant. Id. at ¶ 13.

With regard to the equity claims of Defendant in the instant matter, Mr. Grand advises that the prior approval of Third-Party Defendant's shareholders would have been required to issue an equity interest in Third-Party Defendant to Defendant. Id. at ¶ 14. The shareholders of Third-Party Defendant were never called to vote to issue any securities to Defendant. Id. at ¶ 15. Necessarily then, Third-Party Defendant and its shareholders never approved, consented, or ratified any issuance of securities to Defendant. Id. at ¶ 16. The rules related to a vote of the shareholders on the issuance of securities is a matter governed exclusively by French corporate law. Id. at ¶ 17.

When Third-Party Defendants' shareholders learned that a former employee of a U.S. subsidiary accused of conversion and other acts of malfeasance, with no contractual relationship with Third-Party Defendant, threatened legal action in the United States seeking the issuance of an equity interest of Third-Party Defendant, rather than in France were such disputes are litigated by the biding legal documentation, the main shareholders of Third-Party Defendant came to the conclusion that an action needed to be presented before the most adequate forum to rule on the issuance of French securities of a French entity; the Commercial Court of Paris. Id. at ¶ 21. To that point, the primary relief sought in the Commercial Court of Paris is a declaratory judgment seeking a judicial finding that: (1) there is no contract between Defendant and Third-Party Defendant relating to an incentive plan in Third-Party Defendant's capital for the benefit of Defendant; and (2) there was no promise made between Defendant and Third-Party Defendant relating to an incentive plan in Third-Party Defendant's capital for the benefit of Defendant. Id. at ¶ 22 (citing Exh. A at p. 44).

Mr. Grand concludes his Affidavit by emphasizing that the instant matter was initially commenced by Plaintiff, a U.S. entity, against its former employee, Defendant, for misappropriation of assets and conversion after he was terminated, for cause, by Plaintiff in the United States. Id. at ¶ 24. In doing so, he further notes that Defendant's mismanagement of the corporate finances of Plaintiff has little to do with his claim to entitlement to equity of Third-Party Defendant, as the entities themselves may be related in corporate way, but the claims are not. Id. at ¶ 25. Mr. Grand further advised that he would be prepared to state the exact same facts summarized here under oath at any deposition in the event that the instant motion is not granted. Id. at ¶ 26. His Affidavit thus supplements the comparison of the Equity TPC and the French Complaint and provides a firsthand, behind-the-scenes account of the thinking behind, and timing of, the French Complaint.

**ARGUMENT**

## I. THE ~~COUNTERCLAIMS~~THIRD-PARTY CLAIMS SHOULD BE DISMISSED PURSUANT TO PRINCIPLES OF INTERNATIONAL COMITY AND THE "PRIOR ACTION PENDING" DOCTRINE

It is established that "[a] court has the inherent power to dismiss or stay an action based on the pendency of a related proceeding in a foreign jurisdiction." Ole Media Management, L.P. v. EMI April Music, Inc., 2013 WL 2531277, *2 (S.D.N.Y. June 10, 2013) (citing Landis v. N. Am. Co., 299 U.S. 248, 254 (1936)) (additional citations omitted). The "'prior act pending' doctrine recognizes the "principles upon which international comity is based: the proper respect for litigation in and the courts of a sovereign nation, fairness to litigants, and judicial efficiency.'" Id. (quoting Royal & Sun Alliance Ins. Co. of Canada v. Century Int'l Arms, Inc., 466 F.3d 88, 94 (2d Cir.2006) (Lynch, J.)). Accordingly, "[i]t is proper to either stay or dismiss the

subsequently-filed case in deference to the earlier filed case." <u>Doody v. Nationstar Mortgage,</u> <u>LLC</u>, 2023 WL 8476322, \*3 (D. Conn. Dec. 7, 2023) (<u>citing Motion Picture Lab'y Technicians</u> <u>Local 780 v. McGregor & Werner, Inc.</u>, 804 F.2d 16, 19 (2d Cir. 1986)). "Dismissal is appropriate where 'an identity of issues exists and the controlling issues in the dismissed action will be determined in the other lawsuit.'" <u>Id</u>. (<u>quoting</u> 5C Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 1360, at 89 (3d. ed. 2004)). In considering whether to stay or dismiss a claim based on a prior action pending in a foreign jurisdiction, five non-exclusive factors are to be considered: "the similarity of the parties and issues; the interests of judicial economy; the order in which the actions were filed; the adequacy of the alternative forum; and the convenience of, and potential prejudice to, either party." <u>Ole Media Management, L.P.</u>, 2013 WL 2531277, at \*3 (<u>citing Royal & Sun Alliance Ins. Co. of Canada</u>, 466 F.3d at 94). "This list is 'not exhaustive,'...and courts should 'examine the totality of the circumstances to determine whether the specific facts before it are sufficiently exceptional to justify abstention.'" <u>Sunset</u> <u>Equities Ltd. v. Donald J. Urgo & Assocs., LLC</u>, 2024 WL 1195414, \*5 (S.D.N.Y. March 20, 2024) (<u>quoting Royal & Sun Alliance Ins. Co. of Canada</u>, 466 F.3d at 93)).

     **i.**     **The Parties in the French Complaint and the Equity ~~Counterclaims are Substantially~~<u>Third-Party Claims are Exactly</u> the Same**

The parties in the first-filed French Complaint are Third-Party Defendant, which is the French-based holding company of Plaintiff, and Defendant. <u>Exh</u>. A at ¶¶ 1-5~~.~~<u>; Exh. C at ¶¶ 21-22.</u>

Likewise, by way of the ~~Counterclaims~~<u>Equity TPC</u>, the parties/intended parties to the instant matter are ~~Plaintiff,~~ Defendant~~,~~ and Third-Party Defendant~~, provided that it is ultimately served in this matter.~~ <u>.</u>

These are the exact same parties. Based on the foregoing, it is indisputable that there ~~is currently a substantial similarity between the~~are identical Parties for the purposes of determining whether the Equity ~~CC~~TPC should be dismissed as a result of the French Complaint. <u>Ole Media Management, L.P.</u>, 2013 WL 2531277, at *3.

   ii.    **The Issues in the French Complaint and the ~~Equity Counterclaims are Substantially Similar if Not~~Third-Party Claims are Identical**

As can readily be gleaned from the above summaries of the pertinent facts and allegations in both the French Complaint and the Equity ~~CC~~TPC, Third-Party Defendant and Defendant are actively litigating the same question in both venues ~~at present~~; whether or not Defendant was entitled to any incentives in the form of equity in Third-Party Defendant.

The French Complaint recaps five (5) distinct phases of the negotiation wherein Defendant and Third-Party Defendant negotiated, without ever conclusively agreeing, to an equity incentive instrument (the nature and conditions varying from one draft to another and never reaching an agreement). <u>Exh</u>. A at ¶¶ 18, 42. Defendant, in the Equity ~~CC~~TPC, discusses the negotiation between 2016 and 2023 for an "Initial Equity Grant" of 1.5%, a "Second Equity Grant" which would have given him a total equity interest of 3%, and the inclusion in a proposed separation agreement of a "phantom-stock structure as a simplified and alternative mechanism to satisfy the Initial Equity Grant and Second Equity Grant." ~~Counterclaims~~Third-Party Claims at ¶¶ 39-47, 60, 85, 89, 90. Both Defendant and ~~Plaintiff~~Third-Party Defendant allege in their respective papers that none of the aforementioned equity incentives ever made it to a final, executed agreement, while giving different explanations as to why. <u>Exh</u>. A at ¶¶ 42-45; ~~Counterclaims~~Third-Party Claims at ¶¶ 90, 100.

In the French Complaint, Third-Party Defendant seeks findings that Defendant had no entitlement to any of the aforementioned incentives. <u>Exh</u>. A at p. 31; Exh. C. at ¶¶ 21-22.

Three months later, Defendant filed the Equity ~~CC~~TPC, including the First, Second, Third, Fourth, and Fifth Counterclaims, which all make allegations as to Defendant's alleged entitlement to the equity grants and the phantom-stock proposal. ~~Counterclaims~~Third-Party Claims at ¶¶ 105-134.

Other factual allegations within the ~~Counterclaims~~Third-Party Claims pertain to the payment of bonuses by Plaintiff, a distinct entity from Third-Party Defendant that was not involved in the negotiation of any incentives, as evidenced by its absence as a party in the French Complaint. Defendant, as summarized above, simply conflates the two entities and how each one allegedly wronged him, a conflation which should be seen as erroneous when compared against the appreciably different causes of action alleged by Plaintiff in the instant matter, on the one hand, and Third-Party Defendant in the French Complaint, on the other. Defendant should not be rewarded for his attempt to tie the two entities together to distract the Court for the primary issue in this lawsuit; whether or not he misappropriated Plaintiff's money while he was employed in a position that gave him the opportunity to do so.

Based on the foregoing, it should be readily apparent to the Court that, aside from Defendant's minimal conflation of his bonus and equity entitlements, that "an identity of issues exists and the controlled issues in the [~~Counterclaims~~Third-Party Claims] will be determined" in the lawsuit previously filed in the Commercial Court of Paris by Third-Party Defendant. Doody, 2023 WL 8476322, at *3 (quoting 5C Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 1360, at 89 (3d. ed. 2004)); see also Exh. C at ¶¶ 6-10, 13, 17, 18, 20-22. Defendant's Equity ~~CC~~TPC should accordingly be dismissed in their entirety.

### iii. The Interest of Judicial Economy Favors Dismissing the ~~Equity Counterclaims~~Third-Party Claims in Favor of the Commercial Court of Paris

First, the instant matter, based upon the initial Complaint, was, is, and can be, a relatively straightforward matter wherein Plaintiff seeks compensatory damages in the amount of no less than $175,831.58 plus interest and reasonable attorney's fees to make itself whole for Defendant's misappropriation of its funds. D.E. No. 1. At the same time, those of Defendant's Counterclaims/Third-Party Claims that most appropriately pertain to Plaintiff seek three (3) years of unpaid bonuses. CounterclaimsThird-Party Claims at ¶¶ 70-79. Both the sum certain plus interest and reasonable attorney's fees sought by Plaintiff, as well as the unpaid bonuses sought by Defendant as against Plaintiff, are readily ascertainable figures from the pleadings and other documentary evidence which would not require expert analysis and can thus be subject to a streamlined discovery period that requires little more than document exchange and the testimony of material witnesses.

However, assuming, *arguendo*, that Defendant is both allowed to maintain its Equity CCTPC as against Third-Party Defendant and ultimately succeeds in establishing his entitlement to same, such analysis would not just require standard calculations, but also a complete economic evaluation of Third-Party Defendant's value during the years in question and the analysis of same by experts on both sides in order to arrive at an appropriate value for compensation purposes. Aside from the concerns raised below as to the prejudice that such claims would bring upon Plaintiff,Third-Party Defendant, such additional discovery, which is entirely peripheral to the discovery needed to establish Plaintiff's causes of action, would make this matter drag out longer in the Court, which would then have to provide expert disclosure deadlines and expert deposition deadlines that would be appreciably farther out than a discovery schedule that does not require such extra steps. In addition to being highly prejudicial to Plaintiff

who, again, was not party to the equity discussions, the complication of this case by way of Defendant's Equity CC is an affront toTPC runs against the idea of judicial economy.

Second, the adjudication of the Equity CCTPC will require submissions under French law as the issue as to whether Third-Party Defendant ever consented to granting an equity incentive mechanism to Defendant is an issue that should be governed by French law. Exh. C at ¶¶ 13, 17, 18. It makes little sense to have expert reports on French law submitted before the Southern District of New York so that the Court can decide on French law when the same issues of French law are already being litigated under French law before a French sitting judge.

Third, entertaining the Equity CCTPC will only cause a duplication of costs (submissions, translation costs for the submissions and expert reports) as it will require all relevant parties to plead twice the same issues before two distinct forums. This is especially so if the matter in the Commercial Court of Paris, if allowed to go forward without concern of any conflicting outcome here in the United States, could render such a potential drag on the litigation of this case moot by the time that it is completed. Defendant's Equity CCTPC should accordingly be dismissed their entirety.

### iv.    Third-Party Defendant's French Action was Filed Three (3) Months Before Defendant's Equity CounterclaimsThird-Party Complaint

As detailed above, on or about June 3, 2023, Third-Party Defendant filed the French Complaint. Exh. A. The entirety of the French Complaint deals with claims arising as a result of the history of the negotiation of the incentive plan between the Parties between September 2016 and April 2023. Id.; Exh. C at ¶¶ 21-22.

Defendant was served with the French Complaint on June 14, 2024. Exh. B. Irrespective of the earlier filing of the French Complaint, and without any acknowledgement of its existence in his papers, Defendant filed his Equity CCTPC on September 3, 2024 despite the

substantially similar issues which exist between the two. See, ~~Counterclaims~~Third-Party Claims.

Regardless of whether Defendant wished to acknowledge the French Complaint in its

~~Counterclaims~~Third-Party Claims, or not, it is nonetheless wholly indisputable that the French

Complaint was filed well in advance of Defendant filing the Equity ~~CC.~~TPC. Moreover, it was

filed as the end result of a demonstrably separate and discrete concern. Exh. C at ¶¶ 21-22,

24-25.

> **v.** **The Commercial Court of Paris is the Most Adequate Forum in Which to Litigate the ~~Equity Counterclaims~~Third-Party Claims**

It is recognized that "[c]omity will be granted...if it is shown that the foreign court is a

court of competent jurisdiction, and that the laws and public policy of the forum state and the

rights of its residents will not be violated." Cunard S.S. Co. Ltd. v. Salen  Reefer Services AB, 773

F.2d 452, 457 (2d Cir. 1985) (internal citations omitted). Courts in the Second Circuit have

repeatedly found French courts and/or the Commercial Court of Paris specifically, to be courts of

competent jurisdiction that provide adequate procedural protections and safeguards for their

litigants. See, e.g., In re: Solutia, Inc., 653 B.R. 99, 117 (S.D.N.Y. 2023) (noting, in passing, that

another court found the Commercial Court of Paris "was competent to handle the dispute"); In re:

Atari, Inc., 2016 WL 1618346, *7 (S.D.N.Y. April 20, 2016) (noting that the Court "does not

deny the competence of the Paris Commercial Court to apply and interpret" the releases at issue

in the matter); Oui Financing LLC v. Dellar, 2013 WL 5568732, *5-9 (S.D.N.Y. Oct. 9, 2013)

(specifically opining that Commercial Court of Paris satisfied the court that its mechanisms

"support the French safeguard procedure as a procedurally fair process for creditors," as part of a

larger analysis); Conti Zweite Cristallo Schiffarhrts GMBH &  Co. v. PPG Industries, Inc., 2001 WL

1154690, *5, fn 3 (finding that a Tahitian forum applying French substantive law would be

"adequate" for the dispute in question). Other courts, moreover, have made more blanket

endorsements of the French courts and their ability to handle commercial matters. See, e.g., Int'l Nutrition Co. v. Horphag Research Ltd., 257 F.3d 1324, 1330–31 (Fed.Cir.2001) (stating that "the French courts abide[] by 'fundamental standards of procedural fairness,' ... and [thus the Federal Circuit found] no abuse of discretion in the district court's judgment that international comity should be extended") (internal quotation omitted); Gambra v. Int'l Lease Fin. Corp., 377 F.Supp.2d 810, 817 (C.D.Cal.2005) (granting motion to dismiss on *forum non conveniens* grounds, in part, because "French courts have a rigorous judicial system that seeks to promote fair proceedings and debate").

In the present case, it is respectfully requested that the Court follows its sister courts in the Southern District of New York and elsewhere, find that the Commercial Court of Paris is not only an adequate forum to litigate the Equity ~~CC~~TPC, but the most appropriate forum to adjudicate the Equity ~~CC~~TPC based upon the circumstances giving rise to the French Complaint and the unique issues of French law that are raised by the equity dispute. Exh. C at ¶¶ 6-10, 13-14, 17, 18, 20-22. Third-Party Defendant is a French company that is governed by commercial rules and regulations of France with regard to its equity interests and any alterations to the same. Id. at ¶¶ 6-9. As a result, it is respectfully requested that the Equity ~~CC~~TPC be dismissed in their entirety. See also, Exh. ~~C~~D (discussing French law).

### vi. The Commercial Court of Paris and the Southern District of New York District Court are Similarly Convenient to the Parties

According to the travel website Trip.com, the flight time from New York to Paris is generally about 8 hours and 31 minutes. See, https://www.trip.com/hot/paris-to-new-york-flight-time/ (last visited on ~~October 15~~March 28, ~~2024~~2025). The same website notes that the flight time from Los Angeles, where Defendant currently resides, to Paris is about 10 hours and 41 minutes. See,

https://www.trip.com/hot/flight-time-from-los-angeles-to-paris/ (last visited on ~~October 15~~March 28, ~~2024~~2025). In sum, for Defendant, aside from the need for a passport, there is barely a two (2) hour difference in having to travel to New York or France from Los Angeles to litigate the Equity ~~CC~~TPC. Moreover, it is understood that Defendant has already travelled to Paris and is, more generally, a frequent user of aviation as a means of commuting. After having worked for almost eight (8) years within a French group of companies such as the Kitsune group, Defendant cannot today plead that this would result in an undue inconvenience.

As the French Complaint was filed and served first and addresses substantially similar issues to those at issue as to the Third-Party Defendant in the Counterclaims, the *de minimus* time differential should make little difference in the Court's determination as to which forum is more convenient. And it is respectfully requested that the

determination should be that Defendant's Equity ~~CC~~TPC should be dismissed in their entirety in favor of the litigating with the Third-Party Defendant in the Commercial Court of Paris. This is especially so if one considers that the only reason Defendant even had the opportunity to file the Third-Party Claims in the Southern District of New York is because it was first accused by Third-Party Defendant's subsidiary, Plaintiff, of financial misappropriation from during the time he employed by Plaintiff. To put it another way, Defendant's misdeeds are the sole reason that the Parties are even litigating in the Southern District of New York today and not just in France, where the French Complaint was filed three (3) months earlier. No consideration should be given to Defendant on this prong of the inquiry accordingly, as he comes in with wholly unclean hands and should not be rewarded for his actions towards Plaintiff by having the equity claims litigated wherever he alone feels it is more convenient. See also Exh. C. at ¶ 19.

      vii.      **There Would be Prejudice to ~~Plaintiff~~Third-Party Defendant if the Equity ~~Counterclaims~~Third-Party Claims are Heard in the Instant Matter Rather**

**Than in the Commercial Court of Paris, as the Equity ~~Counterclaims~~Third-Party Claims Deal with Decidedly Different Issues That Require More Discovery Than Plaintiff's Claims and the Employment of Experts to Determine Compensation**

Plaintiff seeks compensatory damages in the amount of no less than $175, 831.58 plus interest and reasonable attorney's fees to make itself whole for Defendant's misappropriation of Plaintiff's funds. D.E. No. 1. At the same time, Defendant's Labor CC that most appropriately pertain to Plaintiff seek three (3) years of unpaid bonuses. Counterclaims at ¶¶ 70-79. Both the sum certain plus interest and reasonable attorney's fees sought by Plaintiff, as well as the unpaid bonuses sought by Defendant as against Plaintiff, are readily ascertainable figures from the pleadings and other documentary evidence which would not require expert analysis. ~~As already submitted in the introduction to this Memorandum, Plaintiff accepts the Labor CC.~~

However, assuming, *arguendo*, that Defendant is both allowed to maintain its Equity ~~CC~~TPC, Defendant would:

- First, have to establish under French law (i.e., the law that governs the issuance of equity in Third Party Defendant) that he is entitled to any entitlements from Third-Party Defendant. Exh. A; Exh. C at ¶¶ 6-10, 20;

- Second, should he ultimately succeed in establishing his entitlement to same, Defendant would also be required to demonstrate whether his entitlement should be in the form of equity (specific performance) or damages;

- Third, should Defendant succeed in demonstrating that damages would be the appropriate remedy for the Equity ~~CC (*quod non*)~~TPC, then the resulting analysis would not just require standard calculations, but a complete economic evaluation of Third-Party Defendant's value during the years in question and the analysis of same by experts on both sides in order to agree an appropriate value for

compensation purposes. Not only would such a need palpably drive up the cost of this litigation by requiring substantial expert analysis in case that otherwise does not require it, but it would also make this matter necessarily drag out longer, and be more susceptible to the need for a jury trial than one where sums certain can readily be established beforehand for the purposes of an earlier resolution. See, e.g., Lickteig v. Cerberus Capital Management, L.P., 589 F. Supp.3d 302 (S.D.N.Y. 2022) (finding that proposed expert testimony regarding the fair market value of an equity interest would assist the trier of fact and thus denying summary judgment); Scholastic Inc. v. Harris, 259 F.3d 73, 84 (2d Cir. 2001) (finding that issues surrounding stock appreciation rights and the contractual ambiguities surrounding same required a jury to "have the task of discerning the parties' intended meaning").

Based on the foregoing, it is inescapable that Plaintiff, a non-participant in the French Complaint, would be substantially prejudiced by the inclusion of the equity/ incentives dispute in this matter rather than dismissing or staying such claims in favor of them being litigated in the Commercial Court of Paris, and so too would Third-Party Defendant, which would have to undertake substantial additional financial burden to assert the same claims here that it already has in the Commercial Court in Paris in a matter that was filed three (3) months before any of the Third-Party Claims were interposed and for entirely separate and discrete reasons. Exh. C at ¶¶ 19, 23-25. Defendant's Equity CC TPC should accordingly be dismissed in their entirety.

      **viii.**    **The Totality of the Circumstances are Sufficiently Exceptional in Order to Favor Abstentation as to the ~~Equity Counterclaims~~ Third-Party Claims**

For all of the foregoing reasons stated throughout this Memorandum of Law, and detailed at length in both the French Complaint and Mr. Grand's Affidavit, it is respectfully submitted that the totality of the circumstances in this case ~~are~~is "sufficiently exceptional" in favor of ~~Plaintiff~~Third-Party Defendant "to justify abstentation" as to the Equity ~~CC~~TPC. Sunset Equities Ltd., 2024 WL 1195414, at *5. Indeed, while ~~Plaintiff is a subsidiary of~~ Third-Party Defendant is the parent company of Plaintiff, it is plain from the pleadings, as well as the factors discussed throughout, that requiring ~~Plaintiff to litigate~~Third-Party Defendant to start over in the Southern District of New York and have to both prosecute and defend against legal claims that have already been litigated for several months in the Commercial Court of Paris, deal with issues of equity interests/incentives ~~in Third-Party Defendant~~that are appropriately decided under French law, exh. C at ¶¶ 6-10, 17, 18, 20-23, and ~~that~~ are wholly peripheral to ~~its~~Plaintiff's claims as to financial misappropriation against Defendant is wholly unfair and unjustified in the circumstances. Defendant may gripe about being the little person against the heavy-handed internationally based entity and its subsidiary, but the scorecard reads that the only reason that Defendant is even party to an action in the United States, and not just in the matter in the Commercial Court of Paris, is because he was engaged in a palpable amount of financial misappropriation as to Plaintiff. Defendant accordingly has forfeited the right to cry to the Court about the difficulties that he purportedly now faces in having to defend the two actions in two different venues. At the same time, Third-Party Defendant, an entity that never actually employed Defendant, should not be expected to defend or prosecute anything in the Southern District of New York that is wholly separate and discrete from the issues in the instant matter because its

subsidiary dared call out Defendant on his misdeeds from during the time of his employment.[5]

Exh. C at ¶¶ 24-25.

**CONCLUSION**

For all of the foregoing reasons, it is respectfully requested that the Court issue an Order: (1) pursuant to the inherent power of the Court, ~~to dismiss or stay~~dismissing or staying defendant/third-party plaintiff VINOD KASTURI's ~~counterclaims~~third-party claims against third-party defendant KITSUNE CREATIVE SAS based on the pendency of a related prior pending proceeding in the Commercial Court of Paris; and (2) for such other and further relief as this Court deems just and proper.

---

[5] Parenthetically, the law firm filing this motion boasts a mere 7 attorneys on its website, most of whom are "of counsel." https://www.muellerfirm.com/our-attorneys/ (last visited on March 28, 2025). Defendant's counsel's firm boasts over 180 attorneys. https://www.coleschotz.com/about-us/ (last visited on March 28, 2025). The disingenuous theme of the little guy against the big companies which is raised repeatedly throughout the history of Defendant's submissions accordingly needs to be summarily disregarded by the Court in its consideration of this motion.

Dated: New York, New York

~~October 24~~April 4, ~~2024~~2025

Respectfully submitted,

**MUELLER HABERMAN LAW GROUP**

/s/ Paul S. Haberman

By: _____

~~By:~~ _____
Paul S. Haberman (PH 2771)

| Summary report: Litera Compare for Word 11.8.0.56 Document comparison done on 4/22/2025 3:36:59 PM | |
|---|---|
| **Style name:** Default Style | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** Vinod - Old MOL.docx | |
| **Modified filename:** Vinod - New MOL.docx | |
| **Changes:** | |
| Add | 188 |
| Delete | 150 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 338 |